# AMENDED AND RESTATED AGREEMENT

PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED
PARTNERSHIP
AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

As of September 1, 2002

THE LIMITED PARTNERSHIP INTERESTS EVIDENCED BY THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (THE "AGREEMENT") HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR PURSUANT TO APPLICABLE STATE SECURITIES LAWS ("BLUE SKY LAWS"). ACCORDINGLY, THE LIMITED PARTNERSHIP INTERESTS CANNOT BE RESOLD OR TRANSFERRED BY ANY PURCHASER THEREOF WITHOUT REGISTRATION OF THE SAME UNDER THE ACT AND THE BLUE SKY LAWS OF SUCH STATE(S) AS MAY BE APPLICABLE, OR IN A TRANSACTION WHICH IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE BLUE SKY LAWS OR WHICH IS OTHERWISE IN COMPLIANCE THEREWITH. IN ADDITION, THE SALE OR TRANSFER OF SUCH LIMITED PARTNERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, THE RESTRICTIONS SET FORTH IN ARTICLE IX HEREOF.

W225990 8

TABLE OF CONTENTS

ARTICLE I.         2

FORMATION OF PARTNERSHIP ..................................................................... 2

    1.01.     Continuation ........................................................................................... 2

    1.02.     Name  2

    1.03.  Principal Executive Offices; Agent for Service of Process ...................... 2

    1.04.     [Intentionally omitted.] ......................................................................... 2

    1.05.     Term  2

    1.06.     Recording of Certificate ......................................................................... 2

ARTICLE II        3

DEFINED TERMS ............................................................................................... 3

ARTICLE III.      15

PURPOSE AND BUSINESS OF THE PARTNERSHIP .................................. 15

    3.01.     Purpose of the Partnership .................................................................. 15

    3.02.     Authority of the Partnership ............................................................... 15

ARTICLE IV       17

REPRESENTATIONS, WARRANTIES AND COVENANTS; ......................... 17

DUTIES AND OBLIGATIONS .......................................................................... 17

    4.01.     Representations, Warranties and Covenants Relating to the Apartment
            Complex and the Partnership ............................................................... 17

    4.02.     Duties and Obligations Relating to the Apartment Complex and the
            Partnership ............................................................................................ 21

    4.03.     [Intentionally omitted] ......................................................................... 24

    4.04.     Managing General Partner's Representations, Warranties and Duties With
            Respect to Calculation of Eligible Basis ............................................. 24

ARTICLE V.        26

PARTNERS, PARTNERSHIP INTERESTS ..................................................... 26

AND OBLIGATIONS OF THE PARTNERSHIP ............................................. 26

    5.01.     Partners, Capital Contributions, Bridge Loan and Partnership Interests ......... 26

5.02.    Return of Capital Contribution ............................................................ 37

5.03.    Withholding of Capital Contribution Upon Event of Default ................. 37

5.04.    Legal Opinions .................................................................................... 37

5.05.    Repurchase Obligation ......................................................................... 39

5.06.    Guaranteed Payments ......................................................................... 40

5.07.    IP Loans and GP Loans ........................................................................ 40

ARTICLE VI.      43

CHANGES IN PARTNERS ......................................................................... 43

6.01.    Withdrawal of the General Partner ...................................................... 43

6.02.    Admission of a Successor or Additional General Partner ..................... 43

6.03.    Effect of Bankruptcy, Death, Withdrawal, Dissolution or Incompetence of a General Partner ......................................................................... 44

ARTICLE VII.     46

ASSIGNMENT TO THE PARTNERSHIP ..................................................... 46

ARTICLE VIII.    47

RIGHTS, OBLIGATIONS AND POWERS ..................................................... 47

OF THE GENERAL PARTNER ................................................................... 47

8.01.    Management of the Partnership ............................................................ 47

8.02.    Limitations Upon the Authority of the General Partner ....................... 48

8.03.    Management Purposes .......................................................................... 49

8.04.    Delegation of Authority ........................................................................ 49

8.05.    General Partner or Affiliates Dealing with Partnership ....................... 50

8.06.    Other Activities ................................................................................... 50

8.07.    Liability for Acts and Omissions .......................................................... 50

8.08.    [Intentionally omitted.] ........................................................................ 51

8.09.    Construction of the Apartment Complex, Construction Cost Overruns, Operating Deficits; Other General Partner Guarantees ....................... 51

8.10.    Reserve For Replacements ................................................................... 54

8.11.    Development Fee .................................................................................. 55

8.13.    Withholding of Fee Payments .............................................................. 55

8.14.         56

W225990 8

8.15.   GP Pledged Payments ...................................................................... 56

8.16.   Removal of a General Partner ......................................................... 56

8.17.   Selection of Property Manager; Management Agreement ................ 59

8.18.   Removal of the Property Manager .................................................. 60

8.19.    Loans to the Partnership .............................................................. 60

8.20.   Unconditional Guaranty ................................................................ 60

8.21.   Operating and Capital Budgets ...................................................... 61

ARTICLE IX.      62

TRANSFERS OF, AND RESTRICTIONS ON TRANSFERS ................................. 62

OF INTERESTS OF LIMITED PARTNERS ....................................................... 62

9.01.   62

9.02.   Restrictions on Transfer of Limited Partners' Interests .................. 62

9.03.   Admission of Substitute Limited Partners ....................................... 62

9.04.   Rights of Assignee of Partnership Interest ..................................... 63

ARTICLE X.      64

RIGHTS AND OBLIGATIONS ....................................................................... 64

OF LIMITED PARTNERS ............................................................................. 64

10.01.   Management of the Partnership .................................................... 64

10.02.   Limitation on Liability of Limited Partners ................................... 64

10.03.   Other Activities ........................................................................... 64

ARTICLE XI.      65

PROFITS, LOSSES AND DISTRIBUTIONS ..................................................... 65

11.01.   Allocation of Profits, Losses, Credits and Cash Distributions .......... 65

11.02.   Determination of Profits, Losses and Credits ................................ 67

11.03.   Allocation of Gains and Losses ..................................................... 68

11.04.   Distribution of Proceeds from Sale, Refinancing, and Liquidation of Partnership Property ................................................................... 68

11.05.   Capital Accounts .......................................................................... 69

11.06.   Authority of the General Partner to Vary Allocations to Preserve and Protect Partners' Intent ......................................................... 70

11.08.   Designation of Tax Matters Partner .............................................. 71

W225990 8

11.08.   Rights and Obligations of Tax Matters Partner ................................... 72

11.09.   Expenses of Tax Matters Partner ................................................................ 73

11.10.   Minimum Gain Provisions ........................................................................... 73

ARTICLE XII.    76

SALE, DISSOLUTION AND LIQUIDATION ........................................................ 76

12.01.   Dissolution of the Partnership .................................................................... 76

12.02.   Winding Up and Distribution ...................................................................... 76

ARTICLE XIII.    78

BOOKS AND RECORDS, ACCOUNTING ............................................................. 78

TAX ELECTIONS, ETC. ......................................................................................... 78

13.01.   Books and Records ....................................................................................... 78

13.02.   Bank Accounts .............................................................................................. 78

13.03.   Accountants ................................................................................................... 78

13.04.   Reports to Partners ...................................................................................... 78

13.05.   Section 754 Elections ................................................................................... 81

13.06.   Fiscal Year and Accounting Method ........................................................... 81

ARTICLE XIV.    82

AMENDMENTS 82

14.01.   Proposal and Adoption of Amendments ...................................................... 82

ARTICLE XV.    83

CONSENTS, VOTING AND MEETINGS ............................................................... 83

15.01.   Method of Giving Consent ........................................................................... 83

15.02.   Submissions to Limited Partners ................................................................ 83

15.03.   Meetings; Submission of Matter for Voting ............................................... 83

ARTICLE XVI.    84

GENERAL PROVISIONS ........................................................................................ 84

16.01.   Burden and Benefit ...................................................................................... 84

16.02.   Applicable Law ............................................................................................. 84

16.03.   Counterparts ................................................................................................. 84

W225990 8

16.04.   Separability of Provisions .................................................................. 84

16.05.   Entire Agreement ............................................................................. 84

16.06.   Liability of the Investment Partnership ........................................... 84

16.07.   Environmental Protection ................................................................ 84

16.08.   Notices ............................................................................................ 86

16.09.   No Continuing Waiver .................................................................... 87

ARTICLE XVII.   88

RIGHT OF FIRST REFUSAL AND OPTION ........................................... 88

17.01.   Grant of Right of First Refusal ...................................................... 88

17.02.   Term   88

17.03.   Manner of Exercising Right of First Refusal .................................. 88

17.04.   Purchase Price ................................................................................ 88

17.05.   Completion of Sale .......................................................................... 89

ARTICLE XVIII. 91

MICHIGAN STATE HOUSING DEVELOPMENT ................................... 91

AUTHORITY REQUIREMENTS ............................................................. 91

ARTICLE XIX.   92

\F C \L          92

PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED
PARTNERSHIP
AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

This Amended and Restated Agreement of Limited Partnership is made and entered into as of September 1, 2002, by and among the undersigned parties.

WHEREAS, on or about June 30, 2001, Pathway Senior Living of Michigan, LLC, a Michigan limited liability company ("PSLM") and Presbyterian Village North, a Michigan non-profit corporation, ("Presbyterian") executed a Certificate of Limited Partnership (the "Certificate") for the formation of Pontiac ILF Limited Dividend Housing Association Limited Partnership (the "Partnership") pursuant to the terms of the Michigan Revised Uniform Limited Partnership Act (the "Act"), which Certificate was subsequently filed with the Secretary of State of Michigan (the "State") on July 3, 2001; and

WHEREAS, the PSLM, Presbyterian, as general partners, and Jerome E. Finis, as limited partner (the "Initial Limited Partner") executed an Agreement of Limited Partnership (the "Original Agreement") of the Partnership; and

WHEREAS, PSLM, Presbyterian, Pathway of Pontiac, Inc., a Michigan corporation, PV North LLC, a Michigan limited liability company, and SunAmerica Housing Fund 1050, a Nevada limited partnership ("SHF" or the "Investment Partnership"), as the Limited Partner, wish to continue the Partnership pursuant to the Act; and

WHEREAS, the Partnership has been formed to acquire, rehabilitate, own, maintain and operate a 150-unit apartment complex intended for rental to elderly persons of low and moderate income, known as Presbyterian Village North, and located in Pontiac, Michigan (the "Apartment Complex"); and

WHEREAS, the parties hereto now desire to enter into this Amended and Restated Agreement of Limited Partnership to (i) continue the Partnership under the Act; (ii) withdraw the Initial Limited Partner from the Partnership; (iii) admit the Investment Partnership to the Partnership as a Limited Partner; (iv) withdraw Pathway Senior Living of Michigan, LLC as a general partner; (v) admit Pathway of Pontiac, Inc., a Michigan corporation ("Pathway") as a general partner; (vi) withdraw Presbyterian as a general partner; (viii) admit PV North LLC as a general partner (together with Pathway, to be referred to hereinafter as the "General Partner" or the "General Partners") and (ix) set forth all of the provisions governing the Partnership.

NOW, THEREFORE, in consideration of the foregoing, of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree to form the Partnership pursuant to the Act, as set forth in this Amended and Restated Agreement of Limited Partnership, which reads in its entirety as follows:

ARTICLE I.
CONTINUATION OF PARTNERSHIP

1.01.   Continuation.  The undersigned hereby continue the Partnership as a limited partnership under the Act.

1.02.   Name.   The name of the Partnership is Pontiac ILF Limited Dividend Housing Association Limited Partnership

1.03.   Principal Executive Offices; Agent for Service of Process.   The principal executive office of the Partnership shall be c/o Presbyterian Village North, 25300 West Six Mile Road, Redford, Michigan 48240.   The Partnership may change the location of its principal executive office to such other place or places as may hereafter be determined by the Managing General Partner.   The Managing General Partner shall promptly notify all other Partners of any change in the principal executive office.   The Partnership may maintain such other offices at such other place or places as the Managing General Partner may from time to time deem advisable.

The name and address of the Agent for service of process is Michael G. Damone c/o Damone Holdings, Inc., 850 Stephenson Highway, Suite 200, Troy, Michigan 48083.

1.04.   [Intentionally omitted.]

1.05.   Term.  The term of the Partnership shall commence as of the date of the filing of the Certificate with the Secretary of State of the State, and shall continue until December 31, 2060, unless the Partnership is sooner dissolved in accordance with the provisions of this Agreement.

1.06.   Recording of Certificate.   Upon the execution of this Amended and Restated Agreement of Limited Partnership by the parties hereto, the General Partner shall take all actions necessary to assure the prompt filing of an amendment to the Certificate as required by the Act, including filing with the Department of Consumer and Industrial Services of the State.   All fees for filing shall be paid out of the Partnership's assets.   The General Partner shall take all other necessary action required by law to perfect and maintain the Partnership as a limited partnership under the laws of the State, and shall register the Partnership under any assumed or fictitious name statute or similar law in force and effect in the State.

ARTICLE II.
DEFINED TERMS

In addition to the abbreviations of the parties set forth in the preamble to this Agreement, the following defined terms used in this Agreement shall have the meanings specified below:

"Accountants" means Friduss, Lukee, Schiff & Co., P.C., of Chicago, Illinois-, or such other firm of independent certified public accountants as may be engaged by the General Partner, with the Consent of the Investment Partnership, to prepare the Partnership income tax returns.

"Act" means the Revised Uniform Limited Partnership Act of the State, as may be amended from time to time during the term of the Partnership.

"Actual Credits" means as of any point in time, the total amount of the Tax Credits allocated by the Partnership to the Investment Partnership, representing ninety-nine and nine tenths per cent (99.9%) of the Tax Credits reported by the Partnership on its Federal information tax return, and not disallowed by any taxing authority.

"Additional Capital Contributions" means the First Additional Capital Contribution, the Second Additional Capital Contribution and the Third Additional Capital Contribution of the Investment Partnership paid or payable to the Partnership pursuant to Sections 5.01(c)(iii), (iv) and (v).

"Adjusted Capital Account" means, with respect to any Partner, such Partner's Capital Account as of the end of the relevant taxable year, after crediting to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations.

"Affiliate" means any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the General Partner, or with another designated Person, as the context may require.

"AFR" means the long-term applicable Federal rate (as defined in Section 1274(d) of the Code).

"Agency" means the Michigan State Housing Development Authority, in its capacity as the designated agency of the State to allocate Low-Income Housing Tax Credits, acting through any authorized representative.

"Agreement" or "Partnership Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"Apartment Complex" means the land currently owned (or to be purchased) by the Partnership in Pontiac, Michigan, and the 150-unit rental housing development and other

improvements located thereon and to be rehabilitated, owned and operated by the Partnership, and known as Presbyterian Village North. A description of the Land on which the Apartment Complex is located is provided in Exhibit "D", attached hereto.

"Authority" or "Authorities" means any nation or government, any state or other political subdivision thereof, and any entity exercising its executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including but not limited to, any federal, state or municipal department, commission, board, bureau, agency, court, tribunal or instrumentality.

"Bankruptcy" or "Bankrupt" as to any Person means the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Act of 1898 or the Bankruptcy Code of 1978 or like provision of law (except if such petition is contested by such Person and has been dismissed within 60 days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of his assets; commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates his approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally dismissed within 60 days.

"Breakeven Operations" means the date upon which the income from the normal operation of the Apartment Complex received on a cash basis (including all public subsidy payments due and payable at such time but not yet received by the Partnership and proceeds from rental interruption insurance) for a period of three (3) consecutive calendar months after Final Closing, equals or exceeds all accrued operational costs of the Apartment Complex, including, but not limited to, taxes, assessments, Reserve Fund for Replacement deposits and debt service payments, and a ratable portion of the annual amount (as reasonably estimated by the General Partner) of those seasonal and/or periodic expenses (such as utilities, maintenance expenses and real estate taxes or service charges in lieu of real estate taxes) which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation, for such period of three (3) consecutive calendar months on an annualized basis (but excluding depreciation and amortization) (based on projections of the Partnership), as evidenced by a certification of the General Partner with an accompanying unaudited balance sheet of the Partnership indicating that all trade payables have been satisfied, all as shall be subject to the approval of the Investment Partnership.

"Bridge Loan Maturity Date" means the date on which the Bridge Loan matures, which is the earlier of the date which is two years after Initial Closing, or the due date of the First Additional Capital Contribution.

"Bridge Loan" means the recourse loan to be made by the Investment Partnership to the Partnership, as provided in Section 5.01(c)(ii) of this Agreement.

"Capital Account" means the capital account of a Partner as described in Section 11.05.

"Capital Contribution" means the total amount of money or other property contributed or agreed to be contributed, as the context requires, to the Partnership by each Partner pursuant to the terms of this Agreement.   Any reference to the Capital Contribution of a Partner shall include the Capital Contribution made by a predecessor holder of the Interest of such Partner.

"Capital Transaction" means any transaction the proceeds of which are not includable in determining Net Cash Flow, including without limitation the disposition, whether by partial sale (except when such sale proceeds are to be used pursuant to a plan or budget approved by all of the Partners), casualty (where the proceeds are not to be used for reconstruction), condemnation, refinancing or similar event of any part of the Apartment Complex, prior to the sale of the Apartment Complex. where the gross proceeds from such transaction exceed $50,000.

"Carryover Documents" means the preliminary cost certification and supporting documentation for the costs incurred for the Apartment Complex evidencing that at least 10% of the total expected eligible basis in the Apartment Complex has been met, the Accountant's letter regarding the 10% cost certification and a reliance letter from the Accountant to the Investment Partnership authorizing the Investment Partnership to rely thereon.

"Certificate" means the Partnership's Certificate of Limited Partnership or any certificate of limited partnership or any other instrument or document which is required under the laws of the State to be signed and sworn to by the Partners of the Partnership and filed in the appropriate public offices within the State to perfect or maintain the Partnership as a limited partnership under the laws of the State, to effect the admission, withdrawal or substitution of any Partner of the Partnership, or to protect the limited liability of the Limited Partners as limited partners under the laws of the State.

"Certified Credits" means ninety-nine and nine tenths percent (99.9%) of the annual Tax Credits that the Accountants certify in writing to the Partnership that the Partnership will be able to claim during each full fiscal year during the Credit Period for all buildings in the Apartment Complex, assuming full compliance with the rent restrictions and income limitations of Section 42 of the Code.  The calculation of the Certified Credits shall be based, among other things, on the Forms 8609s issued by the Agency for all the buildings comprising the Apartment Complex and on the cost certification prepared in connection with the application by the Partnership for Forms 8609s and a determination of the applicable fraction and qualified basis of the Apartment Complex as defined in Section 42 of the Code.  Once the Certified Credits are determined, they shall not be adjusted during the term of this Agreement; provided, however, if with respect to a Tax Credit Recapture Event either of the General Partners makes a payment under clause (E) of Section 8.09(d)(ii). then the Certified Credits shall be reduced prospectively by the annual reduction in Tax Credits attributable to such Tax Credit Recapture Event.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding law.

"Compliance Period" means the compliance period (as defined in Section 42(i)(1) of the Code) applicable to the Apartment Complex.

"Consent" means the prior written consent or approval of the Investment Partnership and/or any other Partner, as the context may require, to do the act or thing for which the consent is solicited.

"Construction Contract" means the construction contract(s) in the amount(s) to be determined by the General Partner, which contract(s) shall be subject to  the approval of the Limited Partner, which approval shall not be unreasonably withheld.  The aggregate amount of the Construction Contract(s) is anticipated to be approximately $6,998,968 (including all exhibits and attachments thereto) entered into between the Partnership and the Contractor, pursuant to which the Apartment Complex is to be rehabilitated.

"Construction Documents" means all building permits issues by applicable governmental authorities, resume of Contractor, a fully executed Construction Contract in form approved by the Investment Partnership, Contractor's general liability insurance certificate, 25% letter of credit or payment and performance bonds, construction budget , construction progress schedule, fully executed Architect's contract, evidence of architect's errors and omissions insurance, final set of plans and specifications for the Apartment Complex stamped by the Architect or engineer for the Apartment Complex.

"Contractor" means Damone Construction, L.L.C. the general construction contractor(s) for the Apartment Complex, which Contractor(s) shall be selected by the Managing General Partner, subject to the approval of the Limited Partner, which approval shall not be unreasonably withheld.

"Counsel" or "Counsel for the Partnership" shall mean Dykema Gossett PLLC of Detroit, Michigan, and/or Block Caron & Lyon, of Deerfield, Illinois, or such other attorney or law firm upon which the Investment Partnership and the Managing General Partner shall agree; provided, however, that if any section of this Agreement either (i) designates particular counsel for the purpose described therein, or (ii) provides that counsel for the purpose described therein shall be chosen by another method or by another Person, then such designation or provision shall prevail over this general definition.

"Credit Period" means the "credit period" with respect to all buildings in the Apartment Complex, as defined in Section 42(f) of the Code.

"Default IP Loans" means IP Loans (or portions thereof) that arise from an Event of Default by the General Partner in its obligations to the Partnership under this Agreement. For example, an IP Loan made to fund Excess Development Cost Loans that the General Partner failed to fund in breach of its Construction Completion  Guaranty shall constitute a Default IP Loan.

"Developer" means collectively, Presbyterian Village North and Pathway Senior Living of Michigan, LLC.  All allocations to the Developer shall go 51% to Presbyterian Village North and 49% to Pathway Senior Living of Michigan, LLC.

"Development Agreement" means the Agreement between the Partnership and the Developer as of even date herewith relating to the development of the Apartment Complex and providing for the payment of the Development Fee, in the form set forth in Exhibit "B".

"Development Budget" means the development budget prepared by the General Partner and Developer and approved by the Investment Partnership with respect to the costs and sources of financing for the development and construction of the Apartment Complex, attached hereto as Exhibit "H".

"Development Costs" means all of the following:  (i) all direct or indirect costs paid or accrued by the Partnership related to the acquisition of the Land and Apartment Complex and the rehabilitation of the Apartment Complex, including the Development Fee, amounts due under the Construction Contract, any construction cost overruns, the cost of any change orders and all costs necessary to achieve Substantial Completion; (ii) all costs to achieve Initial Closing and Final Closing, effect funding in full of the Mortgage Loan, effect repayment in full of the Bridge Loan, and satisfy any escrow deposit requirements which are conditions to the Final Closing, including any amounts necessary for local taxes, utilities, mortgage insurance premiums, casualty and liability insurance premiums, and other amounts which are required pursuant to the Mortgage Loan, and any applicable loan fees, discounts or other expenses; (iii) all costs and expenses relating to remedying any environmental problem or condition or Hazardous Materials that existed on or prior to Final Closing; and (iv) all Operating Deficits incurred by the Partnership prior to Breakeven Operations .

"Development Fee" means the fee payable by the Partnership to the Developer pursuant to Section 8.11 of this Agreement and the Development Agreement.

"Eligible Basis" has the meaning set forth in Section 42(d) of the Code and Treasury regulations and rulings thereunder.

"Excess Development Costs" means all Development Costs that at any time are in excess of $14,847,378.

"Excess GP Loan Amount" means the amount, if any, by which the outstanding balance of all GP Loans, including principal and accrued interest, exceeds the outstanding balance of all IP Loans, including principal and accrued interest.

"Excess IP Loan Amount" means the amount, if any, by which the outstanding balance of all IP Loans, including principal and accrued interest exceeds the outstanding balance of all GP Loans, including principal and accrued interest.

"Extended Use Agreement" means the extended low-income housing commitment executed or to be executed by the Partnership and the Agency and properly recorded in the

appropriate land records for the jurisdiction in which the Apartment Complex is located, setting forth certain terms and conditions under which the Apartment Complex is to be operated and which shall meet the requirements of Code Section 42(h)(6)(B).

"Final Closing" means the occurrence of all of the following:  (i) Substantial Completion, (ii) approval by the Lender, if required, and the Investment Partnership of the Partnership's certification of actual costs as to the acquisition and rehabilitation of the Apartment Complex, (iii) disbursement by the Lender of the Mortgage Loan proceeds, (iv) repayment of the Bridge Loan, (v) commencement of amortization as to the Mortgage Loan (to the extent the Mortgage Loan requires principal amortization), and (vi) to the extent applicable, final endorsement of the Mortgage Loan for mortgage insurance.

"Final Mortgage Amount" means the principal amount of the Mortgage Loan, advanced at or prior to the Final Closing, before any reduction resulting from repayment(s) of principal thereof.

"First Mortgage Loan" means the mortgage loan in the principal amount of not less than $5,300,000 to be made to the Partnership by the Lender at the Final Closing, which will be evidenced by the deed of trust note to be given by the Partnership to the Lender at the Final Closing, which will be secured by the Mortgage and other related security documents and financing statements, the terms of which will be subject to the approval of the Investment Partnership, and which will be nonrecourse to the Partnership and the Partners from and after Final Closing.  The terms of the First Mortgage Loan are set forth on Exhibit O, a copy of which is attached hereto and incorporated by reference herein.

"40-60 Set-Aside Test" means the Minimum Set-Aside Test whereby at least 40% of the units in the Apartment Complex must be occupied by individuals with incomes of 60% or less of area median income, as adjusted for family size.

"GP Loans" means the loans which may be made by the General Partners to the Partnership pursuant to Section 5.07(a) hereof.  Excess Development Costs Loans shall not constitute GP Loans.

"General Partner" means Pathway of Pontiac, Inc. and PV North LLC and any other Person admitted as a general partner pursuant to this Agreement, and their respective successors pursuant to this Agreement.

"General Partner-AHP Loan" or "GP-AHP Loan" means the $500,000 loan to be made to the Partnership by PV North, which loan funds represent proceeds from the Federal Home Loan Bank Affordable Housing Program..  This loan shall be for a term of 15 years and shall bear no interest.  The GP-AHP Loan shall be paid to the Partnership at or before the time of the third Draw Request on the Bridge Loan and no later than the closing of the First Mortgage Loan.

"General Partner's Special Capital Contribution" has the meaning set forth in Section 5.01(a).

"GP Pledged Payments" shall have the definition given it in Section 8.15.

"Guarantor" means Pathway Senior Living of Michigan, LLC, E. James Keledjian, Michael G. Damone, Jerome E. Finis, Robert H. Helle and Brian J. Cloch.

"Guaranty Agreement" means the Guaranty Agreement executed by the Guarantor in the form set forth in Exhibit "G".

"Initial Closing" means the date upon which the Investment Partnership makes an initial disbursement of its Initial Capital Contribution; Initial Closing is anticipated to occur no later than September 20, 2002.

"Interest" or "Partnership Interest" means the ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in this Agreement and in the Act, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and of said Act. Such Interest of each Partner shall, except as otherwise specifically provided herein, be that percentage of the aggregate of such benefit or obligation specified by Section 5.01 as such Partner's Percentage Interest.

"Investment Partnership" means SunAmerica Housing Fund 1050, A Nevada Limited Partnership.

"IP Loans" means the loans which may be made by the Investment Partnership to the Partnership pursuant to Section 5.07(b) hereof.

"Land" means the tract of land currently owned or to be purchased by the Partnership and the improvements thereon, more particularly described in Exhibit B.

"Lender" or "Lenders" means GMAC Commercial Mortgage Corporation, as Maker of the First Mortgage Loan in its capacity as the holder of the Mortgage Loan, or its successor and assigns in such capacity, acting through any authorized representative.

"Limited Partner(s)" means the Investment Partnership,  or any other Limited Partner in such Person's capacity as a limited partner of the Partnership.

"Liquidator" means the General Partner or, if there is none at the time in question, such other Person who may be appointed in accordance with applicable law and who shall be responsible for taking all action necessary or appropriate to wind up the affairs of, and distribute the assets of, the Partnership upon its dissolution.

"Low-Income Housing Tax Credit" means the low-income housing tax credit allowed for low-income housing projects pursuant to Section 42 of the Code.

"Management Agreement" means the agreement between the Partnership and the Property Manager providing for the marketing and management of the Apartment Complex by the Property Manager.

"Managing General Partner" means PV North.

"Minimum Set-Aside Test" means the set-aside test selected by the Partnership pursuant to Section 42(g) of the Code with respect to the percentage of units in its Apartment Complex to be occupied by tenants with incomes equal to no more than a certain percentage of area median income.  The Partnership has selected or will select the 40-60 Set-Aside Test as the Minimum Set-Aside Test.

"Mortgage" means the deed of trust to be given by the Partnership at the Final Closing in favor of the Lender as holder of the Mortgage Loan, constituting a first lien on the Apartment Complex and securing the Mortgage Loan.

"Mortgage Loan" or "Mortgage Loans" means the First Mortgage Loan.

"Net Cash Flow" means, for the period beginning at Final Closing, the sum of the following:  (i) all cash received from rents, lease payments and all other sources, but excluding (A) tenant security or other deposits, (B) Capital Contributions and interest thereon (other than if used to pay for an item deducted below in determining Net Cash Flow), (C) proceeds from Capital Transactions, (D) interest on reserves not available for distribution and (E) proceeds from Excess Development Costs Loans, IP Loans and GP Loans; plus, (ii) the net proceeds of any insurance, other than fire and extended coverage and title insurance, to the extent not reinvested, plus (iii) any other funds deemed available for distribution by the General Partner with the approval of the Investment Partnership and the Lender, if required, minus the sum of (1) all cash expenditures, and all expenses unpaid but properly accrued, which have been incurred in the operation of the Partnership's business (whether or not such expenditure is deducted, amortized or capitalized for tax purposes) including the management fee to the Property Manager and the Asset Management Fee pursuant to Section 13.04(h)(iii) all payments on account of any loans or payments made to the Partnership, but not including any amounts to be paid pursuant to the Development Agreement, IP Loans, GP Loans and Excess Development Costs payments; and (3) any payments to increase cash reserves for working capital, capital expenditures (excluding any capital expenditures funded from the Partnership reserves), repairs, replacements and anticipated expenditures, in such amounts as may be required by the Lender or the Investment Partnership or may be determined from time to time by the General Partner with the approval of the Investment Partnership, and the Lender, if required, to be advisable for the operation of the Partnership.

Net Cash Flow shall be determined separately for each fiscal year or portion thereof commencing on the day after Final Closing and shall not be cumulative.  Wherever there is a reference to the distribution of Net Cash Flow pursuant to the provisions of this Agreement, Net Cash Flow shall be deemed to be limited to Surplus Cash available for distribution.

"Net Interim Income" means, for the period beginning at Initial Closing and ending at Final Closing, all of the Partnership's net income as determined pursuant to the

definition of Net Cash Flow, except that interest payments made from funds in the interest reserve shall not be treated as a cash expenditure.

"Note" means the mortgage promissory note(s) given by the Partnership at Final Closing in favor of the Lender, evidencing the Mortgage Loan.

"Notice" means a writing containing the information required by this Agreement to be communicated to a Partner and sent by express courier or telephone facsimile transmission, or by registered or certified mail, with postage prepaid and return receipt requested, to such Partner at such Partner's address as specified pursuant to Section 16.08, the date of receipt thereof (or the next business day if the date of receipt is not a business day) (or, in the case of registered or certified mail, the date of registry thereof or the date of the certification receipt, as applicable) being deemed the date of such Notice; provided, however, that any written communication containing such information sent to such Partner actually received by such Partner shall constitute Notice for all purposes of this Agreement.

"Operating Deficit" means the amount by which the income of the Partnership from rental payments made by tenants of the Apartment Complex, and all other income of the Partnership (other than proceeds of any loans to the Partnership and investment earnings on funds on deposit in the Reserve Fund for Replacements, and other such reserve or escrow funds or accounts) for a particular period of time, is exceeded by the sum of all the operating expenses, including all debt service, operating and maintenance expenses, required deposits into the Reserve Fund for Replacements, any fees to the Lenders and/or any applicable mortgage insurance premium payments and all other Partnership obligations or expenditures, excluding payments for construction of the Apartment Complex and fees and other expenses and obligations of the Partnership to be paid from the Capital Contributions of the Investment Partnership to the Partnership pursuant to this Agreement, during the same period of time. An Operating Deficit shall occur only after the Partnership has expended the Operating Reserves in its entirety.

"Partner" means any General Partner and any Limited Partner.

"Partner Loans" means collectively the IP Loans and the GP Loans.

"Partnership" means Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership.

"Pathway" means Pathway of Pontiac, Inc.

"Payment Date" means the date which is ninety (90) days after the end of the Partnership's fiscal year with respect to the preceding fiscal year.

"Percentage Interest" means the percentage Interest of each Partner as set forth in Section 5.01.

"Person" means any individual, partnership, corporation, trust, limited liability company or other entity.

"Plans and Specifications" means the plans and specifications for the rehabilitation of the Apartment Complex stamped with the seal of an architect and/or engineer, which are subject to the reasonable approval of the Investment Partnership, and any changes thereto made in accordance with the terms of this Agreement.

"Presbyterian" means Presbyterian Village North.

"Prime Rate" means the prime commercial lending rate as published from time to time by Chase Manhattan Bank of New York.

"Project Documents" means and includes the Mortgage, the Note, the Regulatory Agreement, the Extended Use Agreement, the Management Agreement and all other instruments delivered to (or required by) the Lender, or the Agency and all other documents relating to the Apartment Complex and by which the Partnership is bound, as amended or supplemented from time to time.

"Projected Credit" means Low-Income Housing Tax Credits in the amount of $276,721 for the year 2003, $1,013,462 for the year 2004, $1,108,638 per year for each of the years 2005 through 2012, $831,917 for the year 2013, and $95,177 for year 2014, which the General Partner has projected to be the total amount of the Tax Credits which will be allocated to the Investment Partnership Limited Partners by the Partnership, constituting ninety-nine and nine tenths per cent (99.9%) of the Tax Credits which are projected to be available to the Partnership.

"Property Manager" means the property manager for the Apartment Complex designated pursuant to Section 8.17.

"PV North" means PV North LLC.

"Regulatory Agreement" means, to the extent applicable, and collectively, any regulatory agreements and/or any declaration of covenants and restrictions to be entered into between the Partnership and the Lender or any applicable government agency at or after the Initial Closing, setting forth certain terms and conditions under which the Apartment Complex is to be operated.

"Rent Restriction Test" means the test pursuant to Section 42(g) of the Code whereby the gross rent charged to tenant(s) of the low-income units in the Apartment Complex cannot exceed thirty percent (30%) of the imputed income limitation of the applicable units.

"Reserve Fund for Replacements" means the Reserve for Replacements to be established by the Partnership and administered in accordance with Section 8.10 of this Agreement, including any funds of the Partnership held by the Lender as a reserve for repairs or replacements.

"SAHP" means SunAmerica Affordable Housing Partners, Inc.

"Stabilization" means the last day of a period of three consecutive calendar months in which, for each month in such period, (i) occupancy was at 95%, and (ii) the income from the normal operation of the Apartment Complex received on a cash basis (including all public subsidy payments due and payable at such time but not yet received by the Partnership) equals or exceeds all accrued operational costs of the Apartment Complex, including, but not limited to, taxes, assessments, required payments to the Reserve Fund for Replacement, 115% of debt service payments, and a ratable portion of the annual amount (as reasonably estimated by the General Partner) of those seasonal and/or periodic expenses (such as utilities, maintenance expenses and real estate taxes or service charges in lieu of real estate taxes) which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation, for such period of twelve (12) consecutive calendar months on an annualized basis (based on projections of the Partnership), as evidenced by a certification of the General Partner with an accompanying unaudited balance sheet of the Partnership indicating that all trade payables have been satisfied, all as shall be subject to the approval of the Limited Partner.

"State" means the State of Michigan.

"State Designation" means, with respect to the Apartment Complex, (i) the allocation by the Agency of Low-Income Housing Tax Credits, as evidenced by the receipt by the Partnership of either a carryover allocation of Tax Credits meeting the requirements of Section 42(h)(1)(E) of the Code and Treasury Regulations or IRS Forms 8609 executed by the Agency as to all buildings in the Apartment Complex or (ii) if the Mortgage Loan is financed by the proceeds of tax-exempt bonds and the Apartment Complex qualifies for the exception described in Section 42(h)(4)(B) of the Code, then "State Designation" means the written determinations by the Agency and/or Lender that the Apartment Complex meets the requirements set forth in Sections 42(m)(1)(D) and 42(m)(2)(D) of the Code and the assignment by the Agency of Tax Credit building identification number(s) with respect to the Apartment Complex.

"Subordinated Loan" means any loan made by a Partner to the Partnership pursuant to Section 8.19.

"Substantial Completion" means the later of (i) completion of the rehabilitation described in the Plans and Specifications, and (ii) the date that the Partnership receives all necessary permanent certificates of occupancy or governmental approvals for occupancy (or certificates of occupancy which contain conditions or qualifications which are Consented to by the Investment Partnership) from the applicable governmental jurisdiction(s) or authority(ies) for one hundred per cent (100%) of the apartment units in the Apartment Complex; provided, however, that Substantial Completion shall not be deemed to have occurred if on such date any liens or other encumbrances as to title to the Land and the Apartment Complex exist, other than those securing the Mortgage Loan and/or those Consented to by the Investment Partnership and/or those liens bonded over by the Contractor and/or insured over by title insurance to the satisfaction of the Investment Partnership.

"Substitute Limited Partner" means any Person admitted to the Partnership as a Limited Partner pursuant to Section 9.03.

"Surplus Cash" means, for the period from and after the Final Closing, any Net Cash Flow which, pursuant to the Project Documents or rules or regulations of the Agency, is permitted to be distributed to the Partners.

"Tax Credit" means the Low-Income Housing Tax Credit.

"Tax Credit Recapture Event" means (a) the filing of a tax return by the Partnership or an amendment to a tax return evidencing a reduction in the qualified basis of the Apartment Complex causing a recapture or disallowance of Tax Credits previously allocated to the Investment Partnership, (b) a reduction in the qualified basis of the Apartment Complex following an assessment or an audit by the Internal Revenue Service which results in the assessment of a deficiency by the Internal Revenue Service against the Partnership with respect to any Tax Credits previously claimed in connection with the Apartment Complex, unless the Partnership shall timely file a petition with respect to such deficiency with the United States Tax Court and any other federal tax court of competent jurisdiction and the collection of such assessment shall be stayed pending the disposition of such petition, (c) a decision by the United States Tax Court or any other federal court of competent jurisdiction upholding the assessment of such deficiency against the Partnership with respect to any Tax Credits previously claimed in connection with the Apartment Complex, unless the Partnership shall timely appeal such decision and the collection of such assessment shall be stayed pending the disposition of such appeal, or (d) the decision of a federal court of competent jurisdiction affirming such decision.

"Tax Credit Shortfall" means, as to any period of time the difference between the Certified Credit for such period of time and the Actual Credit (after any and all tax credit adjustments to capital described in Section 5.01(d)).

"Tax Law Change" means any change in the Code or the regulations which occurs after the date of this Agreement.

"Tax Matters Partner" or "TMP" means the Pathway, or any other General Partner designated by the Investment Partnership acting as the Tax Matter Partner pursuant to Section 11.08.

"Title Company" means Chicago Title Insurance Company.

ARTICLE III.
PURPOSE AND BUSINESS OF THE PARTNERSHIP

3.01. <u>Purpose of the Partnership</u>. The Partnership has been organized exclusively to acquire the Apartment Complex and to acquire, finance, rehabilitate, own, maintain, operate and sell or otherwise dispose of the Apartment Complex, in order to obtain long-term appreciation, cash income, Tax Credits and tax losses.

3.02. <u>Authority of the Partnership</u>. In order to carry out its purpose, the Partnership is empowered and authorized to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of its purpose, and for the protection and benefit of the Partnership, including but not limited to the following:

(a)      acquire the Land and the Apartment Complex;

(b)      rehabilitate, operate, maintain, improve, buy, own, sell, convey, assign, mortgage, rent or lease any real estate and any personal property necessary to the operation of the Apartment Complex;

(c)      provide housing, subject to the Minimum Set-Aside Test and the Rent Restriction Test and consistent with the requirements of the Extended Use Agreement, the Regulatory Agreement and the Mortgage so long as the Extended Use Agreement, the Regulatory Agreement and the Mortgage, as applicable, remain(s) in force;

(d)      enter into any kind of activity, and perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership;

(e)      borrow money and issue evidences of indebtedness in furtherance of the Partnership business and secure any such indebtedness by mortgage, pledge, or other lien, including without limitation, the Mortgage Loan, provided, however, that the Mortgage Loan, and any evidence(s) of indebtedness thereof and any documents amending, modifying or replacing it shall be subject to the approval of the Investment Partnership and shall have the legal effect that at and after Final Closing the Partnership and the Partners shall have no personal liability for the repayment of the principal of or payment of interest on the Mortgage Loan, that the sole recourse of the Lender, with respect to the principal thereof and interest thereon shall be to the property securing the Mortgage Loan, except that any Partner shall be personally responsible (i) for funds or property of the Apartment Complex coming into such party's hands, which, by the terms of the Mortgage and Regulatory Agreement it is not entitled to retain, (ii) for such party's own acts and deeds, or the acts and deeds of others which it has authorized, in violation of the provisions of the Mortgage and Regulatory Agreement; and (iii) any other customary non-recourse carve-outs approved by the Investment Partnership, provided they do not effect the non-recourse character of the loan for tax-purposes.

(f)     maintain and operate the Apartment Complex, including hiring a Property Manager, (subject to the approval of the Investment Partnership), and entering into a Management Agreement;

(g)     subject to the approval of the Agency and/or the Lender, if required, and to other limitations expressly set forth elsewhere in this Agreement, negotiate for and conclude agreements for the sale, exchange, lease or other disposition of all or substantially all of the property of the Partnership, or for the refinancing of any mortgage loan on the property of the Partnership;

(h)     enter into the Mortgage, the Regulatory Agreement and the Extended Use Agreement, providing for regulations with respect to rents, profits, dividends and the disposition of property;

(i)     rent dwelling units in the Apartment Complex from time to time, in the ordinary course of business in accordance with the provisions of the Code applicable to Low-Income Housing Tax Credits and in accordance with applicable federal, state and local regulations, collecting the rents therefrom, paying the expenses incurred in connection with the Apartment Complex, and distributing the net proceeds to the Partners, subject to any requirements which may be imposed by the Extended Use Agreement, the Regulatory Agreement and/or the other Project Documents; and

(j)     do any and all other acts and things necessary or proper in furtherance of the Partnership business.

ARTICLE IV.
REPRESENTATIONS, WARRANTIES AND COVENANTS;
DUTIES AND OBLIGATIONS

4.01.    Representations, Warranties and Covenants Relating to the Apartment Complex and the Partnership.    As of the date hereof, the General Partners hereby represent, warrant and covenant to the Partnership and to the Partners that:

(a)    the execution and delivery of this Agreement by the General Partners and the performance by the General Partners of the transactions contemplated hereby have been duly authorized by all requisite corporate, partnership or trust actions or proceedings; each General Partner is duly organized, validly existing and in good standing under the laws of the state of its formation with power to enter into this Agreement and to consummate the transactions contemplated hereby;

(b)    the rehabilitation of the Apartment Complex shall be undertaken and shall be completed using commercially reasonable best efforts in a timely and workmanlike manner in accordance with (i) all applicable requirements of the Mortgage Loan, if applicable, and the Project Documents, (ii) all applicable requirements of all appropriate governmental entities, the violation of which would have, or would be likely to have, a material adverse effect on the Apartment Complex or the Partnership, and (iii) the Plans and Specifications of the Apartment Complex that have been or shall be hereafter approved by the Lender, if required, and any applicable governmental entities, as such Plans and Specifications may be changed from time to time with the approval of the Investment Partnership, and the Lender, if required, and any applicable governmental entities, if such approval shall be required; it shall provide copies of all change orders to the Investment Partnership promptly after the preparation and prior to the execution thereof;

(c)    to the best of knowledge after due inquiry, as of the date hereof, at the Initial Closing and at the time of commencement of construction, the Land is and will be properly zoned for the Apartment Complex, all consents, permissions and licenses required by all applicable governmental entities have been or will be obtained prior to commencement of rehabilitation, and the Apartment Complex conforms and will conform to all applicable federal, state and local land use, zoning, environmental and other governmental laws and regulations, the violation of which would have, or would be likely to have, an adverse effect on the Apartment Complex or the Partnership;

(d)    all appropriate public utilities, including sanitary and storm sewers, water, gas and electricity, are currently available and will be operating properly for all units in the Apartment Complex at the time of first occupancy of such units;

(e)    mortgagees' title insurance policies of a financially responsible institution and in amounts acceptable to the Lender, and an owner's title insurance policy of a financially responsible institution acceptable to the Investment Partnership, in the amount of the replacement cost of the Apartment Complex (which amount shall not be less than the aggregate of the principal amount of the Mortgage Loan and the Capital Contributions of the General Partners and the Investment Partnership), in favor of the

W225990 8                                     - 17 -

Lender and the Partnership, respectively, will be issued at or prior to the Initial Closing (as to the Partnership) and Final Closing (as to the Lender), and shall remain in full force and effect, subject only to such easements, covenants, restrictions and such other standard exceptions as are normally included in owner's or mortgagee's title insurance policies and which are acceptable to the Lender and the Investment Partnership, respectively;

   (f) at and after the Final Closing, there shall be no direct or indirect personal liability of the Partnership or of any of the Partners for the repayment of the principal of or payment of interest on the Mortgage Loan, except for customary non-recourse carve-outs, and the sole recourse of the Lender under the Mortgage Loan with respect to the principal thereof and interest thereon shall be to the property securing the indebtedness;

   (g) Neither General Partner has received any written notice of, nor is aware of any default under any agreement, contract, lease, or other commitment, or of any claim, demand, litigation, proceedings or governmental investigation pending or threatened against either General Partner, the Apartment Complex, the Guarantor or the Partnership, or related to the business or assets of the Partnership or of the Apartment Complex, which claim, demand, litigation, proceeding or governmental investigation could result in any judgment, order, decree, or settlement which would materially and adversely affect the business or assets of the Partnership or of the Apartment Complex;

   (h) neither of the General Partner nor any of its Affiliates nor the Partnership, has entered, or shall enter, into any agreement or contract for the payment of any Mortgage Loan discounts, additional interest, yield maintenance or other interest charges or financing fees or any agreement providing for the guarantee of payment of any such interest charges or financing fees relating to the Mortgage Loan; in no event will the General Partner or the Partnership enter into any such agreement or guaranty of any kind whatsoever (such as an escrow arrangement or letter of credit arrangement) which would subject the Partnership or any of the Partners to personal liability as to the principal of or interest on the Mortgage Loan, except for customary non-recourse carve-outs;

   (i) to the actual of knowledge after due inquiry, the execution of this Agreement, the incurrence of the obligations set forth in this Agreement, and the consummation of the transactions contemplated by this Agreement do not violate any material provision of law, any order, judgment or decree of any court binding on the Partnership or either General Partner or any Affiliate(s) thereof, any material provision of any indenture, agreement, or other instrument to which the Partnership or either General Partner is a party or by which the Partnership or the Apartment Complex is affected, and is not in conflict with, and will not result in a breach of or constitute a default under any such indenture, agreement, or other instrument or result in creating or imposing any lien, charge, or encumbrance of any nature whatsoever upon the Apartment Complex;

   (j) the Construction Contract shall be entered into between the Partnership and the Contractor; no consideration or fee shall be paid to the Contractor in its capacity as the Contractor for the Apartment Complex other than the amounts set forth in the Construction Contract or as evidenced by change orders approved by the Investment

Partnership or its designee and, as applicable, and as otherwise disclosed in writing to and approved by the Investment Partnership.  In addition, no consideration or fee shall be paid to the Developer or General Partners by the Contractor;

(k)     to the extent required by the Investment Partnership, 100% payment and performance bonds issued by a nationally, financially recognized bonding company, in forms acceptable to the Investment Partnership, and satisfactory to the Investment Partnership will be obtained by the Contractor at or before Initial Closing and shall remain in full force and effect under terms and conditions as shall be acceptable to the Investment Partnership; in the alternative, the obligations of the Contractor will be secured by cash, letter of credit or other security acceptable to the Investment Partnership;

(l)     the Managing General Partner will obtain and maintain the insurance policies set forth in Exhibit "K" in accordance with the provisions thereof, provided such policies are commercially available;

(m)     neither General Partner has, either individually, or on behalf of the Partnership, and the Partnership has not incurred any financial responsibility with respect to the Apartment Complex prior to the date of execution of this Agreement, other than (i) that disclosed to the Investment Partnership, or (ii) obligations which will be fully satisfied at or prior to the Initial Closing;

(n)     at Initial Closing and at Final Closing, the Partnership will be and will continue to be a valid limited partnership, duly organized under the laws of the State, and shall have and shall continue to have full power and authority to acquire the Land and to develop, construct, operate and maintain the Apartment Complex in accordance with the terms of this Agreement, and shall have taken and shall continue to take all action under the laws of the State and any other applicable jurisdiction that is necessary to protect the limited liability of the Limited Partners and to enable the Partnership to engage in its business;

(o)     no restrictions on the sale or refinancing of the Apartment Complex, other than the restrictions to be set forth in the Extended Use Agreement, the Regulatory Agreement and Section 42 of the Code and the Regulations thereunder and except for those restrictions set forth in Exhibit "F" and except for the right of first refusal granted in Article XVII hereof, exist as of the date hereof, and no such restrictions shall, at any time while the Investment Partnership is a Limited Partner, be placed upon the sale or refinancing of the Apartment Complex;

(p)     the Apartment Complex is being developed in a manner which satisfies, and shall continue to satisfy, all restrictions, including tenant income and rent restrictions, applicable to projects generating Low-Income Housing Tax Credits under Section 42 of the Code;

(q)     the Projected Credits are $276,721 of Low-Income Housing Tax Credits for the year 2003, $1,013,462 for the year 2004, $1,108,638 per year of Low-Income

Housing Tax Credits for each of the years 2005 through 2012 $831,917 for the year 2013, and $95,177 of Low-Income Housing Tax Credits for the year 2014;

(r)   to the best of knowledge after due inquiry, at the time of the execution of this Agreement, the Managing General Partner has fully complied with all applicable provisions and requirements of any and all purchase and/or lease agreements, loan agreements, stormwater management agreement and other agreements with respect to the purchase of the Land and the rehabilitation, financing and operation of the Apartment Complex; it shall take, and/or cause the Partnership to take, all actions as shall be necessary to achieve and maintain continued compliance with the provisions, and fulfill all applicable requirements, of such agreements;

(s)   as of the date hereof, the Partnership has received valid reservation of low income housing tax credits with respect to the Apartment Complex in the amount of $11,606,890, subject to the conditions provided in the reservation issued by the Agency;

(t)   the only tenant eligibility requirements or rent restrictions with which the Apartment Complex and the Partnership must comply, including restrictions necessary to receive the full amount of the Projected Credits, are the following:

> 64 units 1-bedroom must be rented to tenants earning less than or equal to 35% of area median income, 34 1-bedroom units must be rented to tenants earning less than or equal to 40% of area median income, 44 units 1-bedroom must be rented to tenants earning less than or equal to 60% of area median income, 4 2-bedroom units must be rented to tenants earning less than or equal to 40% of area median income and 4 2-bedroom units must be rented to tenants earning less than or equal to 35% of area median income.

(u)   the term of the Extended Use Agreement will be perpetual, however, neither the Extended Use Agreement nor any other document, instrument or agreement to which the Partnership is a party shall restrict, limit or waive the right of the Partnership to cause a termination of the Extended Use Agreement prior to the end of such perpetual term in accordance with Code Section 42(h)(6)(E)(i)(I);

(v)   [Intentionally omitted]

(w)   to the best of its knowledge, based solely on the title insurance policy obtained by the Partnership, on each date of funding by the Investment Partnership of a Capital Contribution, the Partnership shall have fee simple title to the Apartment Complex, subject only to permitted exceptions thereto to which the Investment Partnership has given its Consent. All real estate taxes, assessments, water and sewer charges and other municipal charges, to the extent due and owing, have been paid in full on the Apartment Complex;

(x)   to the best of its knowledge, no representation, warranty or statement of either General Partner in this Agreement or in any document, certificate or schedule

furnished or to be furnished to any Limited Partner pursuant hereto contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements or facts contained therein not misleading;

(y)   the Developer is a cash basis taxpayer; the Developer shall take such actions as are necessary to assure that at no time during the term of this Agreement shall any depreciation deductions arising with respect to the Development Fee be delayed, suspended or disallowed or deferred because of the application of Code Section 267(a)(2) (or any other provision of the Code dealing with affiliated parties as recipients of fees) to the Partnership;

(z)   Each General Partner shall do nothing to intentionally cause a default and shall use its best efforts to prevent a default from occurring under the Project Documents resulting from a breach by such General Partner, the Guarantors or their Affiliates of any term, condition or restriction applicable to such parties under the Project Documents, including without limitation, a breach of a restriction on the ownership of such General Partner or the financial condition of such General Partner, the Guarantors or their Affiliates;

(aa)   the Managing General Partner shall keep all sources of funding "in balance" and has adequate sources of funds to timely cause Substantial Completion of the Apartment Complex and satisfaction of all other obligations of the Partnership and Managing General Partner under this Agreement; and

(bb)   except as noted herein, all of the representations, warranties and covenants contained herein shall survive the date of Final Closing and the funding date of each Capital Contribution made by the Investment Partnership.  The Managing General Partner shall indemnify and hold harmless the Investment Partnership against a breach of any of the foregoing representations, warranties and covenants and any damage, loss or claim caused thereby, including reasonable attorneys' fees and costs and expenses of litigation and collection, except to the extent caused by the willful misconduct of the Investment Partner.

(cc)   to the extent the Apartment Complex received points under the Agency's Low-Income Housing Tax Credit ranking system pursuant to the Partnership's Low Income Housing Tax Credit Application for Reservation (the "Application") submitted to and approved by the Agency for any undertaking with respect to the development and operation of the Apartment Complex the Managing General Partner shall at no time develop the Apartment Complex or manage the Partnership in a manner which is inconsistent with the award of the number of points assigned to the Application by the Agency, except with the prior approval of the Agency and the Investment Partnership.

(dd)   the Managing General Partner shall fully cooperate with the Investment Partnership in its efforts to obtain the First Mortgage Loan.

4.02.   <u>Duties and Obligations Relating to the Apartment Complex and the Partnership</u>.  The General Partners shall use commercially reasonable best efforts in fulfilling the following duties and obligations with respect to the Apartment Complex and the Partnership:

(a)     the Managing General Partner shall use its best efforts to ensure that all requirements shall be met which are necessary to obtain or achieve (i) compliance with the Minimum Set-Aside Test, the Rent Restriction Test, and any other requirements necessary for the Apartment Complex to initially qualify, and to continue to qualify, for Tax Credits, including all applicable requirements set forth in the Regulatory Agreement and the Extended Use Agreement, (ii) issuance of IRS Forms 8609, (iii) issuance of all necessary permanent, unconditional certificates of occupancy, including all governmental approvals required to permit occupancy of all of the apartment units in the Apartment Complex, (iv) Initial Closing and Final Closing, (v) compliance with all material provisions of the Project Documents , and (vi) compliance with all provisions contained in the application for Tax Credits submitted by the Agency as to which the Agency awarded points pursuant to its scoring or award procedures including, but not limited to the following: non-profit involvement, readiness to proceed, and rent restrictions.

(b)     while conducting the business of the Partnership, neither General Partner shall act in any manner which it knows or should have known after due inquiry will (i) cause the termination of the Partnership for federal income tax purposes without the Consent of the Investment Partnership, or (ii) cause the Partnership to be treated for federal income tax purposes as an association taxable as a corporation;

(c)     the Apartment Complex shall be managed upon Substantial Completion so that (i) no less than 80 percent of the gross income from the Apartment Complex in every year is rental income from or with respect to dwelling units in the Apartment Complex used to provide living accommodations not on a transient basis, and (ii) the rental of all units in the Apartment Complex comply with the tenant income limitations and other restrictions under the Rent Restriction Test and as set forth in the Regulatory Agreement and the Extended Use Agreement;

(d)     each General Partner shall exercise good faith in all activities relating to the conduct of the business of the Partnership, including the rehabilitation, development, operation and maintenance of the Apartment Complex, and each General Partner shall take no action with respect to the business and property of the Partnership which is not reasonably related to the achievement of the purpose of the Partnership;

(e)     all of (i) the fixtures, maintenance supplies, tools, equipment and the like now and to be owned by the Partnership or to be appurtenant to, or to be used in the operation of the Apartment Complex, as well as (ii) the rents, revenues and profits earned from the operation of the Apartment Complex, will be free and clear of all security interests and encumbrances except for the Mortgage Loan, the Mortgage, and any additional security agreements executed in connection therewith;

(f)     the General Partners will execute on behalf of the Partnership all documents necessary to elect, pursuant to Sections 732, 743 and 754 of the Code, to adjust the basis of the Partnership's property upon the request of the Investment Partnership, if, in the sole opinion of the Investment Partnership, such election would be advantageous to any Limited Partner; and

(g)     the Managing General Partner guarantees that it will make a Capital Contribution to the Partnership, the proceeds of which shall be used by the Partnership to make payment to the Developer of the Development Fee, as provided in Section 5.01(a);

(h)     the Managing General Partner shall, during and after the period in which it is a Partner, provide the Partnership with such information and sign such documents as are necessary for the Partnership to make timely, accurate and complete submissions of federal and state income tax returns;

(i)     the Managing General Partner shall comply and cause the Partnership to comply with the provisions of all applicable governmental and contractual obligations;

(j)     the Managing General Partner has made (if applicable) and shall make such elections, or refrain from making such elections, with respect to the Low-Income Housing Tax Credits, as are necessary to achieve and maintain the maximum allowable Low-Income Housing Tax Credits to the Limited Partners, unless otherwise directed by the Investment Partnership; any such elections (including elections made at the direction or with the consent of the Investment Partnership) shall not reduce the obligations of the Managing General Partner pursuant to Section 5.01(d);

(k)     the General Partners shall be responsible for the payment of any fines or penalties imposed by the Agency or Lender pursuant to the Project Documents and any documents executed in connection with obtaining Tax Credits (other than with respect to payments of principal or interest under the Mortgage Loan) attributable to any action or inaction of it or its Affiliates.

(l)     the General Partners shall immediately notify the Investment Partnership of any written or oral notice of (i) any default or failure of compliance with respect to the Mortgage Loan or any other financial, contractual or governmental obligation of the Partnership or the General Partner, or (ii) any IRS proceeding regarding the Apartment Complex or the Partnership.

(m)     in the event that at any time during the rehabilitation of the Apartment Complex, (i) rehabilitation is, or may be, stopped or suspended for a period of 30 consecutive days, or (ii) construction or rehabilitation has or may be delayed so that in the reasonable determination of the Managing General Partner, (A) Substantial Completion may not be achieved by the date set forth in the Construction Contract or (B) the Projected Credits for any year during the Credit Period may not be achieved, the Managing General Partner shall immediately send Notice of such occurrence, together with an explanation of the circumstances surrounding such occurrence, to the Investment Partnership;

(n)     [Intentionally Omitted]

(o)     the Managing General Partner shall maintain books, files and records including tenant leasing files in compliance with the Code, the Regulations and which will adequately document the timing, amount and availability of the Tax Credits. The Managing

General Partner shall cause construction related files and files which document the initial qualification of apartment units for Tax Credits to be copied and stored off-site at the General Partner's principal place of business or at another location over which the General Partner has control for a period of not less than 21 years. Within one business days' notice from any Limited Partner, the Managing General Partner shall afford that Limited Partner and its agents access to all such files, including files stored off-site during ordinary business hours. All such files are property of the Partnership and not of the Managing General Partner; and

        (p)    in the event that the Managing General Partner determines to offer to residents of the Apartment Complex cable television or other telecommunications services (including, but not limited to broad band and internet transmission services), such services shall be provided in a manner consistent with the policies set forth in Exhibit "N", attached hereto.

    4.03.   [Intentionally omitted].

    4.04.   <u>General Partner's Representations, Warranties and Duties With Respect to Calculation of Eligible Basis</u> .

        (a)    The General Partners represent, warrant and covenant that:

            (i)    Counsel for the Partnership has certified that all amounts included in the determination of Eligible Basis as set forth in the Development Budget and in the application submitted to the Agency for Tax Credits, are, as classified, properly includable pursuant to the Code and Internal Revenue Service rulings.

            (ii)    the Managing General Partner shall cause the Accountant to re-certify the Eligible Basis of the Apartment Complex in conjunction with the Partnership's application to the Agency for IRS Forms 8609 and in conjunction with the audited cost certification of Eligible Basis prepared in connection with the making of the Second Additional Capital Contribution.

            (iii)    no portion of the Apartment Complex's Eligible Basis, including the portion of the Development Fee included in Eligible Basis, is allocable, under the Code and rulings issued by the Internal Revenue Service, to land costs, organizational or syndication costs imposed by any Authority; any land preparation costs included in Eligible Basis are inextricably associated with depreciable assets of the Partnership.

            (iv)    any portion of the Development Fee that is included in Eligible Basis, including any portion the payment of which is deferred, is properly includable in Eligible Basis under the Code and Internal Revenue Service rulings.

            (v)    the General Partners shall provide to the Accountants and the Investment Partnership, promptly upon their request, such written documentation as is reasonably requested by the Accountants and Investment Partnership in order to verify the determination of Eligible Basis, including documentation supporting the allocation of any costs incurred by the Partnership into the determination of Eligible Basis.

(b)      the General Partners, and not the Developer, shall be solely responsible for the following:

(i)      analyzing the qualified allocation plan for targeted areas within the State (shall be the sole responsibility of the Managing General Partner);

(ii)      [Intentionally Omitted];

(iii)      analyzing the economy and forecasting future growth potential of the geographic area in which the Apartment Complex is located;

(iv)      determining the Land's zoning status;

(v)      Contacting local government officials concerning access to utilities, public transportation, impact fees and local ordinances;

(vi)      performing environmental tests on the Land (except to the extent that the Developer is responsible for such tests on any buildings or Land immediately below the buildings);

(vii)      negotiating the purchase of the Land and Apartment Complex and its related financing;

(viii)      causing the Partnership to acquire the Land and Apartment Complex;

(ix)      processing necessary documentation with the Agency in connection with Tax Credits;

(x)      arranging the permanent Mortgage Loan for the Partnership (shall be the sole responsibility of the Managing General Partner); and

(xi)      arranging for the admission to the Partnership of the Investment Partnership.

In consideration for their services set forth in this Section 4.04(b), the General Partners have received their interests in distributions of the Partnership's Net Cash Flow and of the proceeds from sale and liquidation of Partnership property as set forth in Sections 11.01 and 11.04. The General Partners shall not assign any of these duties to the Developer. Except where noted above with respect to certain duties which are the sole responsibility of the Managing General Partner, each of the General Partners shall participate in all of the duties set forth above and otherwise which are required to be performed by the General Partners. Duties retained by the Managing General Partner shall not be assigned either to Pathway or the Developer.

ARTICLE V.
PARTNERS, PARTNERSHIP INTERESTS
AND OBLIGATIONS OF THE PARTNERSHIP

5.01.  Partners, Capital Contributions, Bridge Loan and Partnership Interests.

(a)     Each General Partner, its principal address or place of business, its Capital Contribution and its Percentage Interest is as follows:

| | | |
|---|---|---|
| Pathway of Pontiac, Inc.<br>850 Stephenson Highway,<br>Suite 200<br>Troy, Michigan 48083 | $49 | 0.0049% |
| PV North LLC<br>25300 West Six Mile Road<br>Redford, MI  48240 | $51 | 0.0051% |

Each General Partner represents that as of the date of this Agreement the balance of its Capital Account does not exceed the respective amounts set forth above.

In the event that the Partnership has not paid all or part of the Development Fee when the final payment is due pursuant to the Development Agreement or in the event that the General Partners are removed pursuant to Section 8.15, the General Partners shall contribute to the Partnership an amount equal to  any remaining balance (including accrued but unpaid interest) due under the Development Agreement (the "General Partner's Special Capital Contribution") and the Partnership shall thereupon make a payment in an equal amount to pay off the balance of the Development Fee.

(b)     The Limited Partners, their  principal offices and places of business, their Capital Contribution and their Percentage Interests are as follows:

| | | |
|---|---|---|
| Investment Partnership:<br><br>SunAmerica Housing Fund 1050,<br>A Nevada Limited Partnership<br>c/o SunAmerica Inc.<br>SunAmerica Center<br>Century City<br>Los Angeles, CA  90067 | $8,647,378<br>plus amounts specifically set forth in subparagraph (c) immediately below | 99.9% |

In the event that the Investment Partnership becomes a Special General Partner for purposes of acting as the Tax Matters Partner pursuant to Section 11.07, the Percentage

Interest of the Investment Partnership shall not change, nor shall the Investment Partnership's share of any allocations and distributions be changed.

(c)     The aggregate Capital Contributions the Investment Partnership shall make to the Partnership, subject to adjustment as provided in Section 5.01(c)(i)(B) and Section 5.01(d) is $8,647,378 plus the amount set forth in 5.01(c)(i)(A) in excess of $15,000, plus the amount of any Bridge Loan interest owed on the principal balance of the Bridge Loan up to $6,411,000. Subject to the provisions of this Agreement, including without limitation the provisions of Sections 5.01(d) and 5.03, the Investment Partnership shall be obligated to make Capital Contributions to the Partnership in installments, and to make the Bridge Loan to the Partnership, as follows:

(i)     Initial Capital Contribution. The Investment Partnership shall make an Initial Capital Contribution (the "Initial Capital Contribution") equal to the sum of (A) the amount necessary to pay fees and costs charged by counsel for the Investment Partnership in connection with this Agreement and related documents (the "Legal Fee Amount"); and (B) the Initial Bridge Loan Fee payable pursuant to Section 5.01(c)(ii). The Partnership shall pay the Legal Fee Amount to counsel for the Investment Partnership promptly after receiving such sum. The Initial Capital Contribution shall be disbursed pursuant to Section 5.01(c)(viii) commencing after satisfactory completion of the Investment Partnership's due diligence (and/or temporary waiver of certain due diligence items in the sole discretion of the Investment Partnership) as to the Partnership, each General Partner, the acquisition of the Land and Apartment Complex and the rehabilitation, financing and future operation of the Apartment Complex. If the Managing General Partner provides written notice to the Investment Partnership that it believes all of its due diligence requirements have been satisfied, then the Investment Partnership shall respond within five (5) business days after receipt of such Notice. Such response shall either evidence its approval of all due diligence or list specific items which have not yet been satisfied.   If the Investment Partnership fails to respond within such period, then the General Partners will be deemed to have satisfied all of its due diligence requirements. If the Investment Partnership responds to the Managing General Partner's Notice with a list of outstanding due diligence items, then the Investment Partnership shall have three (3) business days to respond to any subsequent Notices provided by the Managing General Partner to the Investment Partnership stating all of its due diligence requirements have been satisfied.

(ii)     Bridge Loan. Not earlier than the date the Initial Capital Contribution is made and after receipt of the legal opinion required pursuant to Section 5.04 and satisfactory completion of the Investment Partnership's due diligence as to the Partnership, the General Partner, the acquisition of the Land and Apartment Complex and the rehabilitation, financing and future operation of the Apartment Complex, the Investment Partnership shall make a Bridge Loan to the Partnership in an amount equal to $7,789,608 (the "Bridge Loan"). The Bridge Loan shall be used to pay for costs of rehabilitating the Apartment Complex (but not payment of the Development Fee) and the costs of acquiring the Land.   The Partnership shall pay a fee to SunAmerica Affordable Housing Partners, Inc. in an

amount equal to $112,770 for its services in making the Bridge Loan (the "Bridge Loan Fee") and construction advisory services. The Bridge Loan shall, subject to Section 5.01(c)(viii), be drawn down after disbursement of the proceeds of the Investment Partnership's Initial Capital Contribution. The Bridge Loan shall be on the following terms and conditions:

(A)    the Bridge Loan shall be a recourse obligation of the Partnership; the Bridge Loan shall be advanced in accordance with the procedures set forth in Section 5.01(c)(viii).;

(B)    The Investment Partnership shall pay the interest on the principal balance of the Bridge Loan up to $6,411,000, and interest shall accrue monthly on the portion above $6,411,000 at the Prime Rate. All accrued and unpaid interest will be payable upon maturity of the Bridge Loan;

(C)    [Intentionally Omitted];

(D)    on the date of the First Additional Capital Contribution, the Partnership shall make a principal payment on the Bridge Loan;

(E)    The promissory note evidencing the Bridge Loan (the "Bridge Loan Note) shall be substantially in the form attached hereto as Exhibit C;

(F)    the proceeds of the Bridge Loan shall be used solely for Partnership purposes in accordance with the Development Budget and the terms of this Agreement;

(G)    Subject to any required Lender consent, the Bridge Loan shall be secured by a pledge of the General Partner's Partnership Interest and the General Partner hereby grants a security interest in its Partnership Interest to the Investment Partnership, and shall execute and deliver such further documents, including a Uniform Commercial Code - 1 Financing Statement, in favor of the Investment Partnership, if requested to do so by the Investment Partnership. Any such pledge and security interest shall be released upon repayment in full of the Bridge Loan and all accrued and unpaid interest thereon;

(H)    Subject to any required Lender consent, if requested by the Investment Partnership the General Partner shall execute and deliver on behalf of the Partnership a mortgage to secure debt in favor of the Investment Partnership as additional security for the Bridge Loan and shall obtain a mortgagee's policy of title insurance in favor of the Investment Partnership in an amount equal to the Bridge Loan in form and substance acceptable to the Investment Partnership; and

(I)    Completion of Due Diligence.  No later than the third Bridge Loan Draw request, the Partnership shall have delivered to the Investment Partnership, in form reasonably satisfactory to the Investment Partnership, all outstanding due diligence including the Carryover Documents, the Construction Documents, a commitment letter for the First Mortgage Loan from the First Mortgage Lender, evidence of the availability of all financing under the First Mortgage Loan and evidence of the availability of all funds under the GP-AHP Loan.

(iii)   First Additional Capital Contribution.  After satisfaction of all of the conditions set forth below, and review and approval by the Investment Partnership of the items described below, the Investment Partnership shall make the First Additional Capital Contribution:

(A)    General Partner's Certificate.    The Investment Partnership shall have received a certificate from the General Partners that the representations, warranties and covenants in Sections 4.01, 4.02, 4.04 and 16.07 are true and accurate in all material respects as of the date of the proposed First Additional Capital Contribution, that the Partnership has obtained all consents required to admit the Limited Partners to this Partnership, including but not limited to any required consents of the Lender and applicable governmental authorities, and that no Event of Default has occurred hereunder, and the General Partners and the Partnership are not in default of any of their obligations under the Project Documents as of the date of the proposed First Additional Capital Contribution;

(B)    Bridge Loan.  The Bridge Loan shall have previously been funded, and the General Partners shall have provided evidence satisfactory to the Investment Partnership that all payments due through the date of funding the First Additional Capital Contribution, including without limitation payment of a portion of the principal amount of the Bridge Loan;

(C)    Physical Inspection.  A construction consultant selected by the Investment Partnership shall have prepared a physical inspection report.

(D)    Substantial Completion.  Substantial Completion of the Apartment Complex shall have occurred.

(E)    Title Policy.  The title insurance company shall have issued the following endorsements to the Partnership's title policy:  (1) an endorsement indicating that the Partnership owns fee simple title to the Land; (2) a "date-down" endorsement to the title policy extending the effective date of the title policy to the date of funding and showing no

exceptions to the title other than the exceptions reflected on the title policy as of Initial Closing, except as shall be acceptable to the Investment Partnership; (3) an endorsement (if available in the State) affording mechanics lien coverage (or if such liens are reported, they are bonded over); and (4) such other endorsements as the Investment Partnership may reasonably require.

(F)     As-Built Plans and Specifications.   The General Partners shall have submitted to the Investment Partnership a written document executed by the General Partners, the architect and the Contractor certifying no material change to the approved "for-construction" Plans and Specifications.

(G)     Permits, Licenses and Certificates of Occupancy.   The Investment Partnership shall have received a copy of any permits, final and unconditional certificate or certificates of occupancy, or the equivalent, and licenses which are required for the operation and use of the Apartment Complex issued by the appropriate governmental authorities for the Apartment Complex in its entirety.

(H)     Environmental Matters.   The Investment Partnership shall have received a report in form satisfactory to the Investment Partnership showing that radon gas is not present in any of the apartment units at a level above the recommended permitted safe level as determined by the Environmental Protection Agency or any other applicable governmental authority.   In addition, the General Partner shall have provided the Investment Partnership evidence that the rehabilitation of the Apartment Complex did not result in the filling or disturbance of any wetlands and that any actions recommended to be taken which were contained in any environment assessment reports prepared in conjunction with the development of the Apartment Complex have been appropriately completed in a manner that fully complies with such recommendations and all laws, regulations, ordinances, orders or decrees pertaining to environmental matters.

(I)     Rent Roll.   The Managing General Partner shall have delivered to the Investment Partnership a current rent roll for the Apartment Complex certified to the Limited Partners by the General Partner and in form and substance reasonably satisfactory to the Investment Partnership, together with copies of all tenant leases, if requested by the Investment Partnership.

(J)     Estoppel Certificates.   The Managing General Partner shall have provided the Investment Partnership with an estoppel certificate from the Lender or other evidence reasonably satisfactory to the Investment Partnership that there are no defaults or events which with notice or the

passage of time or both, would constitute a default under the documents evidencing and securing the Mortgage Loan.

(K) [Intentionally Omitted].

(L) Architect's Certificate. The General Partners shall have delivered to the Investment Partnership an architect's certificate in the form requested by the Investment Partnership.

(M) Payment of Taxes. The Investment Partnership shall have received satisfactory evidence (which may be included in the title policy described in subparagraph (E) immediately above) that all real property taxes and assessments for the Apartment Complex due and payable through the date of funding have been timely and fully paid.

(N) GP Loan. The GP Loan shall have been paid in, in its entirety, to the Partnership.

(O) Other Documentation. The Investment Partnership shall have received such other documentation as it may reasonably request to verify the accuracy of the representations and warranties, and compliance with the covenants, duties and obligations, set forth in Article IV.

(P) Completion of Due Diligence. The Investment Partnership shall have completed, to its reasonable satisfaction, due diligence as to the Partnership, Guarantor, the General Partners and acquisition of the Land and development financing and future operation of the Apartment Complex. In addition, the Investment Partnership shall have determined that there has been no material adverse change to the facts disclosed by the prior due diligence it conducted with respect to the Partnership, the General Partners, the Guarantor, the Land and/or the development, financing and operations of the Apartment Complex prior to its admission to the Partnership. The Partners shall follow the procedures set forth at the end of Section 5.01(c)(i) in obtaining the Investment Partnership's approval of due diligence.

The amount of the First Additional Capital Contribution shall be the sum of (i) $7,789,608; and (ii) the interest payable on the principal balance of the Bridge Loan up to $6,411,000. The funds contributed as the First Additional Capital Contribution shall be used to pay the Bridge Loan in full.

(iv) Second Additional Capital Contribution. Following (and conditioned upon) (A) the occurrence of the conditions for making the Investment Partnership's First Additional Capital Contribution; (B) Final Closing; (C) the Investment Partnership shall have received evidence that the Partnership has achieved Stabilization; (D) receipt of a certificate from each General Partner that (1) the representations, warranties and covenants in Sections 4.01, 4.02, 4.04 and

16.07 continue to be true and accurate in all material respects through the date of the proposed Second Additional Capital Contribution, and (2) the Partnership and each General Partner are not in default of any of their obligations with respect to the Partnership or the Apartment Complex at such time; (E) the Limited Partners shall have received a legal opinion as set forth in Section 5.04 or an update of such legal opinion previously delivered to the Investment Partnership in connection with its making the Bridge Loan, (F) the Investment Partnership shall have received such other documentation as it may reasonably request to verify the accuracy of the representations and warranties and compliance with the covenants, duties and obligations set forth in Article IV, and (G) the Managing General Partner shall have delivered to the Limited Partners a current rent roll for the Apartment Complex certified to the Investment Partnership and in form and substance reasonably satisfactory to the Investment Partnership, together with copies of all tenant leases, if requested by the Investment Partnership, the Investment Partnership shall make the Second Additional Capital Contribution to the Partnership.

The amount of the Second Additional Capital Contribution shall be $600,000 subject to reduction as provided in Section 5.01(d)(i). The Partnership shall use the Second Additional Capital Contribution to pay $600,000 of the Development Fee to the Developer under the Development Agreement.

(v)     Third Additional Capital Contribution.    Following (and conditioned upon) (A) the occurrence of the conditions for making the Second Additional Capital Contribution; (B) receipt of an audited cost certification of Eligible Basis (as defined in Code Section 42(d)) for the Apartment Complex prepared by the Accountants; receipt by the Investment Partnership of a copy of an as-recorded Extended Use Agreement; and receipt of the Form(s) 8609 for the entire Apartment Complex executed by the Agency; (C) receipt of a certificate from each General Partner that (1) the representations, warranties and covenants in Sections 4.01, 4.02, 4.04 and 16.07 are true and accurate in all material respects as of the date of the proposed Third Additional Capital Contribution, and (2) the Partnership and the General Partner are not in default of any of their obligations with respect to the Partnership or Apartment Complex at such time; and (D) the Investment Partnership shall have received such other documentation as it may reasonably request to verify the accuracy of the representations and warranties and compliance with the covenants, duties and obligations set forth in Article IV, (E) the Managing General Partner shall have delivered to the Investment Partnership a current rent roll for the Apartment Complex certified to the Limited Partners by the Managing General Partner and in form and substance reasonably satisfactory to the Investment Partnership, together with copies of all tenant leases, if requested by the Investment Partnership and (F) receipt by the Limited Partners of a determination in writing by the Accountants of the Certified Credits, the Investment Partnership shall make the Third Additional Capital Contribution to the Partnership.

The amount of the Third Additional Capital Contribution shall be equal to $130,000 subject to reduction as provided in Section 5.01(d)(i) and 5.01(d)(iii). The

Partnership shall use the Third Additional Capital Contribution to pay the balance of the Development Fee to the Developer under the Development Agreement.

(vi) <u>Cost Savings</u>. If aggregate funds exist based upon savings in costs from those costs contained in the Development Budget, net of any decrease in Capital Contributions due to the provisions of Section 5.01(d)(i), on the date of funding the Third Additional Capital Contribution, the Partnership shall distribute such funds 70% to the Developer as an Incentive Development Fee, not to be included in Qualified Basis with respect to the calculation of the credit eligibility, and 30% to the Investment Partnership. The Accountants shall determine the amount of Cost Savings on or before the date of funding of the Third Additional Capital Contribution.

(vii) <u>Special Additional Capital Contributions</u>. If in any fiscal year of the Partnership the Investment Partnership's Capital Account balance may be reduced to or below zero, the Investment Partnership may, in its sole and absolute discretion, make a Special Additional Capital Contribution to the Partnership, in an amount reasonably required to avoid the reduction of the Investment Partnership's Capital Account balance to or below zero. If the Investment Partnership makes a Special Additional Capital Contribution to the Partnership pursuant to this paragraph, the Investment Partnership shall receive a guaranteed payment pursuant to Section 5.06 for the use of its Special Additional Capital Contribution. Whenever the Investment Partnership makes a Special Additional Capital Contribution to the Partnership pursuant to this paragraph, the General Partner shall have the option, in its sole and absolute discretion, to make Special Additional Capital Contributions to the Partnership, up to the same amount and on the same terms in the aggregate as the Special Additional Capital Contribution made by the Investment Partnership at that time.

(viii) <u>Initial Capital Contribution/Bridge Loan Draw Procedures</u>. The Limited Partners have designated SAHP ("SAHP") as their agent for the purpose of reviewing, on behalf of the Investment Partnership, copies of requests for draws of the Initial Capital Contribution and under the Bridge Loan to pay costs of constructing the Apartment Complex. A draw is sometimes hereinafter referred to as "Draw". The Limited Partners shall have the right, exercisable from time to time as hereinafter provided, to appoint another Person as its agent for such purpose by delivering to the Partnership written notice of the appointment of a successor agent in which the Investment Partnership terminates the appointment of the prior agent. The agent at any time serving as the agent of the Limited Partners hereunder shall hereinafter be called the "Agent;"

(A) Not less than five (5) business days before the date on which the Partnership desires a Draw to be made, the Partnership shall have delivered to the Agent the following documents (together, the "Draw Documents"):

(1) An original Contractor's requisition for payment (the "Contractor's Requisition") in a form reasonably satisfactory to the Agent (American Institute of Architects standard

form G-722 or G-702/G-703 shall be deemed satisfactory) certified by the architect for actual improvements in place and for materials securely stored on site through the date of that requisition.

    (2) An original of Schedule of Values showing costs incurred in the various construction and soft cost categories, summarized in a format provided by the Investment Partnership.

    (3) Copy of the Owner's and Contractor's Affidavit (construction in progress) in the Form of Exhibit "L", duly executed and acknowledged on behalf of the Contractor and the Partnership.

    (4) Copies of the Partial Waiver of Liens, (subject to retainages) of each subcontractor and material supplier, as to all work performed and materials purchased for which the immediately preceding Draw, if any, had been made, and an accounting prepared by the Contractor of all payments made under the immediately preceding Draw.

    (5) [Intentionally Omitted].

    (6) Copy of project schedule, updated monthly, showing the progress of the work.

    (7) An original SunAmerica Construction Update in the form attached hereto as Exhibit "M".

    (B) The Agent shall have five (5) business days after receiving the Draw Documents in which he has the right, exercisable by notice by facsimile transmittal to the Partnership, to object to the Draw on the basis that the Draw Documents are incomplete or inaccurate. As soon as practical after receipt of such notice, the Partnership shall complete the Draw Documents, correct all inaccuracies and resubmit the Draw Documents for approval. If the Agent does not object to the Draw Documents within such five (5) day period, the Draw Documents shall be deemed approved.

    (C) Upon approval of the Draw Documents, the Partnership shall have the examination of title to the Apartment Complex updated through the date of the Draw and have the Title Company deliver, in escrow to the Agent, endorsements issued by the Title Company to the owner's title insurance policy for the Partnership's protection as to the Apartment Complex (the "Owner's Title Policy") which (a) increases the coverage thereunder by the amount of the Draw, (b) updates the date thereof through the date of the Draw and (c) reports no exceptions for filed mechanics or materialmen's liens (or if such liens are reported, affirmatively insures the insured thereunder against loss or damage caused by such liens). When the

Title Company delivers such endorsements, the Agent shall confirm receipt thereof by facsimile transmittal to the Investment Partnership. Within two business days of receipt of such facsimile transmittal, the Investment Partnership shall wire transfer the amount of the Draw to the Partnership and notify the Agent by telephone that such wire transfer has been commenced. Upon receiving such telephonic notification, the Agent shall release from escrow the title endorsements then held by the Agent and deliver such endorsements to the Partnership.

(d)     Adjustment to Capital Contributions of Investment Partnership.

(i)     After the occurrence of State Designation and the issuance of IRS Forms 8609, and prior to the making of the Third Capital Contribution, the Accountants shall determine the Certified Credits for all of the Credit Period for the Project (the "Aggregate Certified Credits"). If the Aggregate Certified Credits are less than the aggregate amount of the Projected Credits for all of the Credit Period (such difference being referred to as the "Allocation Differential"), then (unless such reduction is a result of the transfer by the Investment Partnership of its Interest) the Capital Contributions of the Investment Partnership shall be reduced by the "Adjustment Amount." The Adjustment Amount shall equal the Allocation Differential multiplied by 77%. Any such reduction in Capital Contributions shall be applied to reduce the First Additional Capital Contribution (if it has not previously been funded), and, then to the extent necessary, the Second Additional Capital Contribution and, then to the extent necessary, the Third Additional Capital Contribution. If no further Additional Capital Contributions are to be paid, or if the First, Second and/or Third Additional Capital Contribution have not been funded, but the Adjustment Amount is greater than the amount of the unfunded First, Second and/or Third Additional Capital Contribution, then the General Partner shall make a payment to the Partnership equal to the amount by which the Adjustment Amount exceeds the unfunded Capital Contributions of the Investment Partnership, and the Partnership shall immediately distribute such amount to the Investment Partnership as a return of capital. The General Partner's payment required by the preceding sentence shall constitute a non-reimbursable funding by it and shall not give rise to any right of repayment as a loan or credit as a Capital Contribution or any increase in the Capital Account of the General Partner. No such payment by the General Partner shall be required if the Certified Credits are reduced as a result of a change in the Tax Law, actions by the Limited Partner or a transfer by the Limited Partner of its interest in the Partnership.

(ii)     If a reduction in the Capital Contributions of the Investment Partnership occurs as a result of the application of Section 5.01(d)(i) above, then (A) the portion of the Development Fee payable from Capital Contributions of the Investment Partnership shall be reduced by the Adjustment Amount, and (B) the deferred Development Fee shall be increased by the Adjustment Amount.

(iii)     Upon State Designation and the issuance of IRS Forms 8609, if Aggregate Certified Credits exceed the Projected Credits for all of the Credit Period (the "Upward Allocation Differential") then the Capital Contributions of the

Investment Partnership shall be increased by the "Upward Adjustment Amount.", provided however that in conjunction with State Designation and the issuance of such IRS Forms 8609, the General Partner shall have caused the Accountants to re-certify the Eligible Basis of the Apartment Complex and the General Partner shall have provided to the Investment Partnership a certification that the representations and warranties set forth in Section 4.04 remain true and correct as of the date of the issuance of such IRS Forms 8609. The Upward Adjustment Amount shall be equal to the Upward Allocation Differential multiplied by 77%. The Upward Adjustment Amount shall increase the Third Additional Capital Contribution. The Partnership shall use the Upward Adjustment Amount (i) to prepay the Development Fee, and (ii) the balance, if any, to fund operating reserves.

(iv)     In addition to any other adjustment in Capital Contribution or payment required by this Section 5.01(d), in the event that (i) the Actual Credit for 2003 is less than $276,721, then the Capital Contribution of the Investment Partnership to the Partnership shall be reduced by an amount equal to the $276,721 minus the Actual Credit for 2003 multiplied by 77% (the "Timing Reduction Amount"), or (ii) the Actual Credit for 2004 is less than $1,013,462, then the Capital Contribution of the Investment Partnership to the Partnership shall be reduced by an amount equal to the $1,013,462 minus the Actual Credit for 2004 multiplied by 77%. Any reduction in Capital Contribution caused by the Timing Reduction Amount shall first be applied to reduce the Second Additional Capital Contribution and, if necessary, the Third Additional Capital Contribution. If no Capital Contributions remain to be paid, or if the amount of the Timing Reduction Amount is greater than the Capital Contributions to be made, then the General Partner shall pay the Timing Reduction Amount to the Investment Partnership promptly after demand is made therefor. Any amounts not promptly paid upon demand shall bear interest at the Prime Rate prevailing at the end of the preceding calendar month, plus two percent (2.0%), until paid in full. It is understood and agreed that the provisions of this Section 5.01(d)(iv) are intended to address any reductions in or delays in the delivery of the first year of Credit Period from the Projected Credit amounts during such year where the total Projected Credits for the entire Credit Period is not affected. It is intended that the adjustments and/or payments required by this Section 5.01(d)(iv) are to compensate the Investment Partnership for the delay in the receipt of Tax Credits.

(e)     Without the Consent of all of the Partners, no additional Persons may be admitted as additional Limited Partners and Capital Contributions may be accepted only as and to the extent expressly provided for in this Article V.

(f)     The cash portion of the Capital Contributions of each Partner shall be deposited at the General Partner's discretion in a checking, savings and/or money market or similar account, to be established and maintained in the name of the Partnership, or invested in government securities or certificates of deposit issued by any bank. Thereafter, such amounts shall be utilized for the conduct of the Partnership business pursuant to the terms of this Agreement.

(g)     Except as may otherwise be provided under applicable law, no Limited Partner shall be bound by, or personally liable for, the expenses, liabilities or obligations of the Partnership.

5.02.   <u>Return of Capital Contribution</u>.   Except as provided in this Agreement, no Partner shall be entitled to demand or receive the return of his Capital Contribution.

5.03.   <u>Withholding of Capital Contribution Upon Event of Default</u>.   In the event that:   (a) the General Partner, or any successor General Partner shall not have substantially complied with any material provisions under this Agreement, after Notice from the Investment Partnership of such noncompliance and failure to cure such noncompliance within a period of thirty (30) days from and after the date of such Notice (provided, however, that as long as the General Partner has paid any resulting credit adjuster pursuant to Section 5.01(d) or the Capital Contribution of the Investment Partnership has been adjusted pursuant thereto, the violation of Section 4.01(q) shall not be considered a non-compliance) and provided, however, that in the event such noncompliance is of a nature which cannot reasonably be cured within 30 days, no Event of Default shall have occurred if the General Partner has commenced the cure within such 30 day period and diligently proceeds to cure, or (b) the Lender shall have declared the Partnership to be in default under the Mortgage Loan, or (c) foreclosure proceedings shall have been commenced against the Apartment Complex, an Event of Default of this Agreement shall be deemed to have occurred by the Partnership and the General Partner, and the Limited Partners, at their sole election, may cause the withholding of payment of any Additional Capital Contribution otherwise payable to the Partnership.

All amounts so withheld by the Limited Partners under this Section 5.03 shall be promptly released to the Partnership only after the General Partner or the Partnership have cured the Event of Default justifying the withholding, as demonstrated by evidence reasonably acceptable to the Investment Partnership.

Notwithstanding the foregoing, if a payment of all or any portion of the then due installment will cure the event justifying the withholding, then the Limited Partner shall pay such installment otherwise payable if it is applied to cure such event. At the sole election of the Limited Partner it may directly apply all or any part of any unpaid installment of Capital Contribution to cure the event justifying the withholding.

5.04.   <u>Legal Opinions</u>.   As a condition precedent to the Investment Partnership making the Bridge Loan and the First Additional Capital Contribution and Second Additional Capital Contribution, the Investment Partnership shall have received the opinions of Dykema Gossett, special counsel to the Partnership and/or of Block Caron & Lyon, of Deerfield, Illinois, special tax counsel to the Partnership, and the General Partner, which opinions shall explicitly state that Nixon Peabody LLP, of Washington, D.C., counsel to the Limited Partners, may explicitly rely upon them (subject to customary assumptions, qualifications and limitations reasonably agreed to by Nixon Peabody, LLP), that:

(a)     the Partnership is a duly formed and validly existing limited partnership under the Act, and the Partnership has full power and authority to own and

operate the Apartment Complex and to conduct its business hereunder; the Partnership is duly qualified to transact its business in the State of Michigan; the Investment Partnership have been validly admitted as Limited Partners of the Partnership entitled to all the benefits of a Limited Partner under this Agreement, and the Interest of the Investment Partnership in the Partnership is the Interest of a limited partner with no personal liability for the obligations of the Partnership;

(b)     the General Partners are duly and validly organized and validly existing in good standing as corporations under the laws of the State, with full power and authority to enter into and perform its obligations hereunder; the General Partners are duly qualified to transact its business in the State of Michigan;

(c)     except to the extent and under the circumstances specified in the standard non-recourse carve out provisions of the First Mortgage Loan, there is and shall be no direct or indirect personal liability of the Partnership or of any of the Partners or their Affiliates for the repayment of the principal of and payment of interest on the Mortgage Loan, and the sole recourse of the Lender, with respect to the principal thereof and interest thereon, shall be to the assets of the Partnership securing such indebtedness (this aspect of the opinion may be deferred until the opinion given in conjunction with the making of the Second Additional Capital Contribution);

(d)     execution of this Agreement by the General Partners has been duly and validly authorized by or on behalf of such General Partners and, having been executed and delivered in accordance with its terms, this Agreement constitutes the valid and binding agreement of the General Partners, enforceable in accordance with its terms and based on an affidavit of the General Partners, execution by the General Partners is not in violation of any contract, agreement, charter, by-law, resolution, judgment, order, decree, law or regulation to which the General Partner are bound or as to which they are subject;

(e)     based solely on the title insurance policy issued to the Partnership and identified in Section 4.01(e), the Partnership owns good and marketable fee simple title to the Apartment Complex, subject only to the Mortgage Loan, the Mortgage, and such other liens, charges, easements, restrictions and encumbrances as are set forth in the title insurance policy issued to the Partnership, none of which materially interfere with or adversely affect the development or operation of the Apartment Complex;

(f)     the Partnership has a reservation of low income housing tax credits in the amount of $1,160,689 from the appropriate state or local credit authority for the jurisdiction in which the Apartment Complex is located and the Partnership will own the Land and Apartment Complex as of December 31, 2002, the year of the credit reservation;

(g)     the Bridge Loan, as made pursuant to the terms of the Bridge Loan Note and the Partnership Agreement, has been duly authorized executed and delivered, is enforceable against the Partnership in accordance with its terms;

(h)     to the best of knowledge based on an affidavit from the General Partners, and without any further inquiry, there are no defaults existing with respect to any of the Project Documents; and

(i)     to the best of knowledge, based on litigation searches and an affidavit from the General Partners, and without any further inquiry, no event of Bankruptcy has occurred with respect to the Partnership or the General Partner; and

(j)     execution of the Guaranty Agreement by the Guarantor has been duly and validly authorized by or on behalf of each such Guarantor and having been executed and delivered in accordance with its terms, the Guaranty Agreement constitutes the valid and binding agreement of each Guarantor, enforceable in accordance with its terms.

5.05.   <u>Repurchase Obligation.</u>

(a)     If (i) the Apartment Complex is not placed in service by December 31, 2004, (or such later date as may be Consented to by the Investment Partnership); (ii) the Partnership has not received State Designation in 2002 or the IRS Forms 8609 are not issued by the State Agency so as to allow the Partnership to claim Tax Credits for the first year of the Credit Period; (iii) Final Closing has not occurred by December 31, 2005 (or such later date as may be Consented to by the Investment Partnership); (iv) the Partnership fails to meet the Minimum Set-Aside Test and the Rent Restriction Test by the close of the first year of the Credit Period (as defined in Section 42(f) of the Code); (v) the Partnership's basis in the Apartment Complex for federal income tax purposes, as finally determined by the Accountants or pursuant to an audit by the Internal Revenue Service, as of December, 2002,, shall have been less than 10% of the Partnership's reasonably expected basis in the Apartment Complex, as required pursuant to Section 42(h)(1)(E) of the Code; (vi) an Event of Default described in Section 5.03(b) or (c) shall exist and as to Section 5.03(b) such Default has not been cured within any applicable cure period and as to Section 5.03(c) only if such foreclosure proceeding has not been dismissed within thirty (30) days of commencement, or (vii) an Extended Use Agreement is not in effect before the end of the first year of the Credit Period, then the General Partner shall, within 15 days of the occurrence thereof, send to the Limited Partners Notice of such event and of its obligation to purchase the Interest of the Investment Partnership hereunder and return to the Investment Partnership its Capital Contributions in the event the Investment Partnership in its sole discretion requires such purchase of the Interest of the Investment Partnership. Thereafter, the General Partner, within 60 days of the mailing date of Notice by the Investment Partnership of such election, shall acquire the entire Interest of the Investment Partnership in the Partnership by making payment to the Investment Partnership, in cash, of an amount equal to the sum of (x) its Capital Contributions actually paid to the Partnership, (y) the amount of the Bridge Loan advanced to the Partnership by the Bridge Loan Lender pursuant to Section 5.01(c)(ii) in discharge of the lien of the Bridge Loan, if any, and (z) interest on the sum of the amounts set forth in clauses (x) and (y) at the rate of the Prime Rate plus two percent per annum or ten percent per annum, whichever is greater. In addition, within 15 days of the notice of exercise, the General Partner shall cause the Partnership to effect the release of any letter of credit, guaranty or collateral which the Investment Partnership and its Affiliates may have provided to secure obligations of the

Partnership and to reimburse the Investment Partnership and its Affiliates against any loss, damage or liability they may have incurred as a result of providing any such letter of credit, guaranty or collateral. The General Partner's repurchase obligation shall terminate on the date upon which the Investment Partnership funds all of its Capital Contributions.

(b)     Upon receipt by the Investment Partnership of any such repayment of its Capital Contributions previously paid to the Partnership, the Interest of the Investment Partnership shall terminate, and, to the extent that the Investment Partnership has acted in accordance with the terms of this Agreement, the General Partner shall indemnify and hold harmless the Investment Partnership from any losses, damages, and/or liabilities, to or as a result of claims of Persons other than Partners or Affiliates thereof, to which the Investment Partnership (as a result of its respective participation hereunder) may be subject.

5.06.   Guaranteed Payments.   No later than 90 days after the end of the Partnership's fiscal year, any Partner who has made a Special Additional Capital Contribution pursuant to Section 5.01(c)(vii) shall receive, as a guaranteed payment for the use of its capital, an amount equal to the annual interest earned by the Partnership, if any, on such Special Additional Capital Contributions. The Partnership shall invest any amounts contributed pursuant to Section 5.01(c)(vii) as reasonably directed by the contributing Partner. Any guaranteed payment due to a Partner shall be deemed an expense of the Partnership for purposes of determining Net Cash Flow. Any guaranteed payment which is not paid when due shall remain a liability of the Partnership and shall bear interest as set forth above.

5.07.   IP Loans and GP Loans.

(a)     GP Loans.   The General Partner, subject to the consent of the Investment Partnership, shall have the right, but not the obligation, after funding all other obligations under this Agreement, including, without limitation, its obligation to fund Excess Development Costs under its Construction Completion Guaranty under Section 8.09(a) hereof, to make "GP Loans" pursuant to this Section 5.07(a) to fund Operating Deficits of the Partnership or to fund other reasonable and necessary obligations of the Partnership; provided, however, that the General Partner shall not have such right to make such GP Loan at any time when it has an unsatisfied obligation to fund Excess Development Costs as required under this Agreement. GP Loans shall be on the following terms: (i) interest shall accrue on the Excess GP Loan Amount at an annual interest rate of fifteen percent (15%), compounded annually, and on any other GP Loans at an annual interest rate of ten percent (10%), compounded annually; and (ii) GP Loans shall be repayable solely as set forth in Sections 11.01 and 11.04 of this Agreement. By making a GP Loan, the General Partner does not waive any claim of, or remedies with respect to a default, if any, by the Investment Partnership in its obligations under this Agreement.

(b)     IP Loans.   The Investment Partnership shall have the right subject to subsection (c) below, but not the obligation, to make "IP Loans" pursuant to this Section 5.07(b) to fund Operating Deficits of the Partnership or to fund other reasonable and necessary obligations of the Partnership. In the event the Investment Partnership makes an

IP Loan, it will provide advance notice to the General Partner. IP Loans shall be on the following terms: (i) interest shall accrue on Default IP Loans at an annual interest rate of twenty percent (20%) compounded annually; (ii) interest shall accrue on the Excess IP Loan Amount (other than Default IP Loans) at an annual interest rate of fifteen percent (15%) compounded annually, and on any other IP Loans at an annual interest rate of ten percent (10%) compounded annually; and (iii) IP Loans shall be repayable solely as set forth in Sections 11.01 and 11.04 of this Agreement. By making an IP Loan, the Investment Partnership does not waive any claim of, or remedies with respect to, a default, if any, by the General Partner in its obligations under this Agreement.

(c)     Notice of Loans. If the Partnership shall require a Partner Loan to fund Operating Deficits or to satisfy other reasonable and necessary obligations of the Partnership, a Partner (the "Initiating Partner") shall give the other Partners (the "Non-Initiating Partners") notice of the Initiating Partner's intent to fund a Partner Loan, which notice shall state (i) the total amount of Partner Loan proposed to be funded, (ii) the purpose for such Partner Loan, and (iii) the proposed funding date of such Partner Loan, which date ("Contribution Date") shall be not more than thirty (30) days following the date of such notice; provided that the notice requirement shall be shortened to the extent necessary to permit a Partner to fund a Partner Loan for the purpose of curing a default under the Mortgage Loan. The Non-Initiating Partners shall notify the Initiating Partner at least five (5) days prior to the Contribution Date whether and in what amount the Non-Initiating Partners intend to make a Partner Loan to the Partnership, which amount may be up to, but not in excess of, fifty percent (50%) of the total proposed Partner Loan. The Initiating Partner and the Non-Initiating Partners shall each fund the portion of the Partner Loan it agreed to make by the Contribution Date. If a Partner fails to make such Partner Loan to the Partnership on or before the Contribution Date, any Partner who makes such Partner's share of the Partner Loan may, at such Partner's option, advance to the Partnership the amount of the non-lending Partner's share of the Partner Loan. No Partner shall have the right to propose and fund a Partner Loan to fund distributions and/or payments to be made pursuant to Sections 11.01, or 11.04.

(d)     Documentation of Partner Loans. At the request of a Partner, which request may be made quarterly, any Partner Loan shall be evidenced by a non-negotiable promissory note or notes reflecting any such Partner Loans made during the preceding calendar quarter. Each Partner Loan shall be an unsecured loan by such Partner. Partner Loans shall not be considered Capital Contributions, and shall not increase such Partner's Capital Account.

(e)     Usury Savings Clause. Notwithstanding anything to the contrary herein or in any note evidencing a Partner Loan, in no event shall interest accrue on any Partner Loan at a rate in excess of the highest rate permitted by applicable law.

(f)     Excess IP Funds. The sum of the Excess IP Loan Amount plus (or minus) the amount by which the Investment Partnership's Section 5.07 Capital Contributions (hereinafter defined) exceeds (or is less than) the General Partner's Sections 5.07 Capital Contributions shall be known as the "Excess IP Funds." If the Excess IP Funds at any time exceed $50,000, then (i) all references in Section 11.01 and 11.04 to distributions or payments

to the General Partner of a specified percentage shall be reduced by five percentage points for each $25,000 (or portion thereof) that the Excess IP Funds exceed $50,000, and (ii) all references in Section 11.01 and Section 11.04 to distributions or payments to the Investment Partnership of a specified percentage shall be increased accordingly. The resulting percentage to the General Partner shall be referred to as the "Incentive Percentage". For example, in the event the Excess IP Funds exceed $100,000 but do not exceed $125,000, all references in Section 11.01 and 11.04 to distributions or payments to the General Partner which equal 50% shall be reduced to 40% (2 portions of $25,000 x 5 percentage points for each portion = a 10 percentage point reduction).

(g)  Capital Contribution Alternative.  If a Partner which has made or intends to make a Partner Loan (a "Lending Partner") reasonably concludes that the operation of the usury savings clause in Section 5.07(e) will result in a reduction in the interest rate otherwise specified in this Section 5.07, then the Lending Partner may request that its existing or proposed Partner Loans be restructured as Capital Contributions. In such event, all the Partners shall cooperate to negotiate and execute an amendment to this Agreement (the "Amendment"), which shall include the following terms:  (i) each of the Investment Partnership and the General Partner shall have the right to make Capital Contributions pursuant to the Amendment ("Section 5.07 Capital Contributions") either instead of making IP Loans and GP Loans, respectively, or to fund the concurrent repayment by the Partnership of IP Loans or GP Loans, respectively; (ii) with respect to such Section 5.07 Capital Contributions, the Partner(s) making them shall be entitled to receive (A) guaranteed payments or a preferred return in amounts and at times corresponding to interest payments that would have been due had the Section 5.07 Capital Contributions been made as Partner Loans, and (B) distributions as a return of capital in amounts and at times corresponding to principal payments that would have been due had the Section 5.07 Capital Contributions been made as Partner Loans; and (iii) Article 11 shall be revised to the maximum extent feasible to provide that such guaranteed payments or a preferred return and return of capital distributions shall have the same amounts, timing, priority of payment and tax consequences as the corresponding payments of Partner Loans would have had.  Notwithstanding the foregoing, the Investment Partnership shall have no obligation to consent to any amendment pursuant this Section 5.07(g), which it concludes could adversely affect the timing or amount of the allocation to the Investment Partnership of tax credits, losses, income or gains.

ARTICLE VI.
CHANGES IN PARTNERS

6.01.   Withdrawal of the General Partner.

(a)   The General Partner may not withdraw from the Partnership or sell, transfer, pledge, hypothecate or assign his or its Interest as General Partner or any interest in the General Partner without the prior Consent of the Investment Partnership, which may be withheld in its sole and absolute discretion, and of the Agency and the Lender, if required, and only after being given written approval by the necessary parties as provided in Section 6.02, and by the Agency and the Lender, if required, of the General Partner(s) to be substituted for him or it or to receive all or part of his or its Interest as General Partner.

(b)   In the event that a General Partner withdraws from the Partnership or sells, transfers or assigns his or its entire Interest pursuant to Section 6.01(a), he or it shall be and shall remain liable for all obligations and liabilities incurred by him or it as General Partner before such withdrawal, sale, transfer or assignment shall have become effective, but shall be free of any obligation or liability incurred on account of the activities of the Partnership from and after the time such withdrawal, sale, transfer or assignment shall have become effective.

(c) Pathway may withdraw as a General Partner from the Partnership at any time following the 10 year anniversary of stabilization, subject to approval of both the Investment Partnership and the remaining General Partner, which approval shall not be unreasonably withheld. The consideration by the Investment Partnership of any proposed withdrawal, and any release of a guarantee, will include the compliance history and financial condition of the Apartment Complex and the financial condition of the remaining General Partner.

6.02.   Admission of a Successor or Additional General Partner.   A Person shall be admitted as a General Partner of the Partnership only if the following terms and conditions are satisfied or waived by the Investment Partnership:

(a)   the admission of such Person shall have been Consented to by the General Partner or its successor and the Investment Partnership, and consented to by the Agency, and the Lender, if required;

(b)   the successor or additional Person shall have accepted and agreed to be bound by (i) all the terms and provisions of this Agreement, by executing a counterpart thereof, and (ii) all the terms and provisions of the Mortgage, Extended Use Agreement and the Regulatory Agreement, by executing counterparts thereof, if required by the Lender, and (iii) all the terms and provisions of such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a General Partner, and this Agreement evidencing the admission of such Person as a General Partner shall have been filed and all other actions required by Section 1.05 in connection with such admission shall have been performed;

(c)     if the successor or additional Person is a corporation, it shall have provided the Partnership with evidence satisfactory to counsel for the Partnership of its authority to become a General Partner, to do business in the State and to be bound by the terms and provisions of this Agreement; and

(d)     Counsel for the Partnership shall have rendered an opinion that the admission of the successor or additional Person is in conformity with the Act and that none of the actions taken in connection with the admission of the successor Person will cause the termination or dissolution of the Partnership or will cause it to be classified other than as a partnership for federal income tax purposes.

6.03.   Effect of Bankruptcy, Death, Withdrawal, Dissolution or Incompetence of a General Partner.

(a)     In the event of the Bankruptcy of a General Partner or the withdrawal, death or dissolution of a General Partner or an adjudication that a General Partner is incompetent (which term shall include, but not be limited to, insanity) the business of the Partnership shall be continued by the other General Partner(s); provided, however, that if the withdrawn, Bankrupt, deceased, dissolved or incompetent General Partner is then the sole General Partner, or if such General Partner withdraws from the Partnership in contravention of the provisions of Section 6.01(a) of this Agreement, then the Partnership shall be dissolved, unless within ninety (90) days after receiving Notice of such Bankruptcy, withdrawal, death, dissolution or adjudication of incompetence, a majority in interest of the other Partners elect to designate a successor General Partner and continue the Partnership upon the admission of such successor General Partner to the Partnership.

(b)     Upon the Bankruptcy, death, dissolution or adjudication of incompetence of a General Partner, such General Partner shall immediately cease to be a General Partner and its Interest shall without further action be converted to a Limited Partner Interest; provided, however, that if such Bankrupt, dissolved, incompetent or deceased General Partner is the sole remaining General Partner, such General Partner shall cease to be a General Partner only upon the expiration of ninety (90) days after Notice to the Investment Partnership of the Bankruptcy, death, dissolution or declaration of incompetence of such General Partner.

Except as set forth above, such conversion of a General Partner Interest to a Limited Partner Interest shall not affect any rights, obligations or liabilities (including without limitation, any of the General Partner's obligations under Section 8.09 herein) of the Bankrupt, deceased, dissolved or incompetent General Partner existing prior to the Bankruptcy, death, dissolution or incompetence of such person as a General Partner (whether or not such rights, obligations or liabilities were known or had matured).

(c)     If, at the time of the withdrawal, Bankruptcy, death, dissolution or adjudication of incompetence of a General Partner, the withdrawn, Bankrupt, deceased, dissolved or incompetent General Partner was not the sole General Partner of the

Partnership, the remaining General Partner or General Partners shall immediately (i) give Notice to the Limited Partners of such withdrawal, Bankruptcy, death, dissolution or adjudication of incompetence, and (ii) make such amendments to this Agreement and execute and file such amendments or documents or other instruments as are necessary to reflect the conversion of the Interest of the withdrawn, Bankrupt, deceased, dissolved or incompetent General Partner and his having ceased to be a General Partner. Such action or actions by the remaining General Partner or General Partners shall, in the event that permission of a bankruptcy court is necessary, be deemed to have been taken subject to the provisions of paragraph 6.03(d) below. The remaining General Partner or General Partners are hereby granted an irrevocable power of attorney, coupled with an interest, to execute any or all documents on behalf of the Partners and the Partnership and to file such documents as may be required to effectuate the provisions of this Section 6.03.

(d)    The General Partner, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agrees that in the event a General Partner should make application for or seek protection or relief under any of the Sections or Chapters of the United States Bankruptcy Code (the "Bankruptcy Code"), or in the event that any involuntary petition is filed against a General Partner, then, in such event, any other Partner shall thereupon be entitled to immediate relief from any automatic stay imposed by Section 362 of the Code, or otherwise, on or against the exercise of the rights and remedies available to such Partner pursuant to this Agreement, or otherwise. The foregoing shall in no way preclude, restrict or prevent the General Partner from filing for protection under the Code.

(e)    The Partners acknowledge and agree that this Agreement is a contract under which a Limited Partner is excused from accepting performance from the General Partner, its assignee or trustee, in the event that a General Partner makes application for or seeks protection under any of the Sections or Chapters of the Bankruptcy Code, or in the event that an involuntary petition is filed against such General Partner. The effect of this paragraph shall be that this Agreement is hereby deemed to be subject to the exceptions to assumption and assignment of contracts set forth in Sections 365(c)(1) and 365(e)(2)(A) of the Bankruptcy Code and that a Limited Partner, by its refusal to consent to an assumption or assignment of this Agreement by the General Partner, shall be able to prevent such assumption or assignment.

(f)    In the event that a General Partner makes application for or seeks relief or protection under any of the Sections or Chapters of the Bankruptcy Code, or in the event that any involuntary petition is filed against said General Partner, then, in such event, any Partner may apply or move to the bankruptcy court in which such petition is filed for a change of venue to the bankruptcy court where the Partnership has its principal place of business, and the General Partner hereby agree not to oppose or object to such application or motion in any way.

ARTICLE VII.
<u>ASSIGNMENT TO THE PARTNERSHIP</u>

The General Partner (solely in its capacity as a general partner, and not in its capacity as seller of the Apartment Complex) hereby transfers and assigns to the Partnership all of its right, title and interest in and to the Apartment Complex, including the following:

(i)   all contracts with architects, contractors and supervising architects with respect to the development of the Apartment Complex;

(ii)   all plans, specifications and working drawings, heretofore prepared or obtained in connection with the Apartment Complex and all governmental approvals obtained, including planning, zoning and building permits;

(iii)   any and all commitments with respect to the Mortgage Loan and the Tax Credits;

(iv)   any and all rights under and pursuant to the Project Documents; and

(v)   any other work product related to the Apartment Complex.

ARTICLE VIII.
RIGHTS, OBLIGATIONS AND POWERS
OF THE GENERAL PARTNER

8.01. <u>Management of the Partnership</u>.

(a)     Except as otherwise set forth in this Agreement, the General Partner, within the authority granted to it under this Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Partnership for the purposes stated in Article III, shall make all decisions affecting the business of the Partnership and shall manage and control the affairs of the Partnership to the best of ability and use best efforts to carry out the purpose of the Partnership.  In so doing, the General Partner shall take all actions necessary or appropriate to protect the interests of the Limited Partners and of the Partnership.  The General Partner shall devote such time as is necessary to the affairs of the Partnership.  The General Partner shall be responsible for managing the day to day operations of the Partnership.

(b)     Except as otherwise set forth in this Agreement and subject to the applicable Lender, and/or Agency rules and regulations and the provisions of the Mortgage and Regulatory Agreement, the General Partner (acting for and on behalf of the Partnership), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall, in its sole discretion, have the full and entire right, power and authority in the management of the Partnership business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purpose of the Partnership.  In furtherance and not in limitation of the foregoing provisions, the General Partner is specifically authorized and empowered to execute and deliver, on behalf of the Partnership, the Regulatory Agreement, the Extended Use Agreement, the Mortgage, and the other Project Documents and amendments thereto, and to execute any and all other instruments and documents, and amendments thereto, as shall be required in connection with the Mortgage Loan, including, but not limited to, executing any mortgage, note, contract, building loan agreement, bank resolution and signature card, release, discharge, or any other document or instrument in any way related thereto or necessary or appropriate in connection therewith; provided, however, that copies of all applications for advances of the Mortgage Loan proceeds shall be provided to the Investment Partnership prior to the disbursement of any funds pursuant thereto; and provided, further, that any such applications which provide for the disbursement of funds of the Partnership in lieu of or in addition to the Mortgage Loan proceeds shall be subject to the reasonable approval of the Investment Partnership.  All decisions made for and on behalf of the Partnership by the General Partner shall be binding upon the Partnership.  No person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the Partnership, nor to determine any facts or circumstances bearing upon the existence of such authority.  In consideration of its obtaining an Interest in the Partnership's profits, the General Partner shall take all actions on behalf of the Partnership set forth in Section 4.04(b).

8.02.   Limitations Upon the Authority of the General Partner.

(a)   The General Partner shall not have any authority to:

(i)   perform any act in violation of any applicable law or regulation thereunder;

(ii)   perform any act in violation of the provisions of the Regulatory Agreement, the Extended Use Agreement, the Mortgage, or any other Project Documents;

(iii)   do any act required to be approved or ratified in writing by the Limited Partners under the Act unless the right to do so is expressly otherwise given in this Agreement;

(iv)   knowingly rent apartments in the Apartment Complex such that the Apartment Complex would not meet the requirements of the Rent Restriction Test or Minimum Set-Aside Test; or

(v)   borrow from the Partnership or commingle Partnership funds with funds of any other Person.

(b)   The General Partner shall not, without the Consent of the Investment Partnership which Consent may be withheld in its sole and absolute discretion, have any authority to:

(i)   except as provided in Article 17 hereof, sell or otherwise dispose of, at any time, all or any material portion of the assets of the Partnership;

(ii)   increase or make application(s) for an increase or increases in the First Mortgage Loan which would result in the aggregate principal balance exceeding $5,300,000 (the Investment Partnership does not have any present intent to Consent to an increase in the maximum principal amount of the Mortgage Loan);

(iii)   borrow in excess of $10,000 in the aggregate at any one time outstanding on the general credit of the Partnership, except borrowings constituting Subordinated Loans, and except as and to the extent provided for in an approved budget pursuant to Section 8.21;

(iv)   following Final Closing, construct any new or replacement capital improvements on the Apartment Complex which substantially alter the Apartment Complex or its use or which are at a cost in excess of $10,000 in a single Partnership fiscal year, except (a) replacements and remodeling in the ordinary course of business or under emergency conditions, or (b) reconstruction paid for from insurance proceeds, or (c) as and to the extent provided for in an approved budget pursuant to Section 8.21;

          (v)     acquire any real property in addition to the Apartment Complex other than easements reasonable and necessary for the operation of the Apartment Complex;

          (vi)     following Final Closing, refinance the Mortgage Loan (the Investment Partnership has no present intent to Consent to a replacement loan which would provide any funds for distribution pursuant to Section 11.04);

          (vii)     enter into the Mortgage Loan or a commitment therefor, or agree to any amendment or alteration of the Mortgage Loan including without limitation, any extension of the term of the Mortgage Loan;

          (viii)     execute or deliver any general assignment for the benefit of the creditors of the Partnership or file a petition or acquiesce in the filing of a petition for Bankruptcy or consent to the lifting of the automatic stay;

          (ix)     make any modification to the Development Budget or make any expenditure which is not consistent with the Development Budget (the Investment Partnership's Consent to such modifications or inconsistent expenditures not to be unreasonably withheld or delayed, provided that adequate funds are available for such purpose); or

          (x)     consent to the resolution (including any settlement) of any lawsuit or any other legal or administrative proceeding involving the Partnership as a party.

    Notwithstanding the foregoing, at any time after the fourteenth (14th) anniversary of the first day of the first taxable year of the applicable Compliance Period and subject to Presbyterian's purchase options set forth in Article XVII, the Investment Partnership may request that (A) the Partnership sell the Apartment Complex subject to the Extended Use Agreement (a "Continued Compliance Sale"); or (B) request that MSHDA arrange for the sale of the Apartment Complex after submission of a "Qualified Contract" (as defined in Section 42(h)(6)(F) of the Code) (a "Compliance Termination Sale").

    8.03.  <u>Management Purposes</u>.  In conducting the business of the Partnership, the General Partner shall be bound by the Partnership's purposes set forth in Article III.

    8.04.  <u>Delegation of Authority</u>.  The General Partner may delegate all or any of its powers, rights and obligations hereunder, and may appoint, employ, contract or otherwise deal with any Person for the transaction of the business of the Partnership, which Person may, under supervision of the General Partner, perform any acts or services for the Partnership as the General Partner may approve, provided however, that in the event any such delegation is made, the General Partner shall remain responsible for and will oversee and supervise the person or parties to whom the duty or right was delegated and such delegation does not excuse the General Partner from overseeing and supervising, on an ongoing basis, duties or rights that are delegated.

8.05.   General Partner or Affiliates Dealing with Partnership.

(a)   The General Partner or any Affiliate may act as Property Manager on such terms and conditions permitted by any applicable Lender regulations, and may receive compensation at the highest rates approved and permitted by the Lender and the Investment Partnership at any time, subject to the provisions of Section 8.17.

(b)   The General Partner or any Affiliates thereof shall have the right to contract or otherwise deal with the Partnership for the sale of goods or services to the Partnership in addition to those set forth herein, if (A) compensation paid or promised for such goods or services is reasonable (i.e., at fair market value) and is paid only for goods or services actually furnished to the Partnership, (B) the goods or services to be furnished shall be reasonable for and necessary to the Partnership, (C) the fees, terms and conditions of such transaction are at least as favorable to the Partnership as would be obtainable in an arm's-length transaction, (D) no agent, attorney, accountant or other independent consultant or contractor who also is employed on a full-time basis by the General Partner or any Affiliate shall be compensated by the Partnership for its services and (E) the Investment Partnership shall have given its Consent to a particular contract or other dealings between the Partnership and the General Partner or its Affiliates.

Any contract covering such transactions shall be in writing and shall be terminable without penalty on sixty (60) days Notice. Any payment made to the General Partner or any Affiliate for such goods or services shall be fully disclosed to all Limited Partners in the reports required under Section 13.04. Neither the General Partner nor any Affiliate shall, by the making of lump-sum payments to any other Person for disbursement by such other Person, circumvent the provisions of this Section 8.05(b).

8.06.   Other Activities.  Subject to the provisions of Section 8.09(b), this Agreement shall not prohibit the General Partner or any Affiliate of the General Partner from engaging in or possessing interests in other business ventures of every kind and description for their own account, including, without limitation, serving as general partner of other partnerships which own, either directly or through interests in other partnerships, government-assisted housing projects similar to the Apartment Complex. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom. The General Partner, however, shall be bound by the restrictions set forth in this Agreement, including Section 4.03 hereof.

8.07.   Liability for Acts and Omissions.  No General Partner or Affiliate thereof shall be liable, responsible or accountable in damages or otherwise to any of the Partners for any act or omission performed or omitted by him or it, or any of them, in good faith on behalf of the Partnership and in a manner reasonably believed by him or it or any of them to be within the scope of the authority granted to him or it or any of them by this Agreement and in the best interest of the Partnership, provided that the protection afforded the General Partner pursuant to this Section 8.07 shall not apply in the case of negligence (where the General Partner is the party who is primarily negligent with respect to such event), misconduct, fraud or any breach of fiduciary duty as General Partner with respect to such acts or omissions which has a materially adverse effect on the Investment

Partnership.  Any loss or damage incurred by any General Partner or Affiliate thereof by reason of any act or omission performed or omitted by him or it or any of them in good faith on behalf of the Partnership and in a manner reasonably believed by him or it or any of them to be within the scope of the authority granted by this Agreement and in the best interests of the Partnership (but not, in any event, any loss or damage incurred by the General Partner or Affiliate thereof by reason of negligence (where the General Partner is the party who is primarily negligent with respect to such event), misconduct, fraud or any breach of fiduciary duty as General Partner with respect to such acts or omissions) shall be paid from Partnership assets to the extent available (but the Limited Partners shall not have any personal liability to the General Partner or Affiliate(s) thereof under any circumstances on account of any such loss or damage incurred by the General Partner or Affiliate(s) thereof or on account of the payment thereof).

8.08.   [Intentionally omitted.]

8.09.   <u>Rehabilitation of the Apartment Complex, Construction Cost Overruns,; Operating Deficit and Other General Partner Guarantees</u>.

(a)   <u>Construction Completion Guaranty</u>.

(i)   The Partnership shall enter into the Construction Contract and a true and correct copy thereof shall be provided to the Investment Partnership. Pathway shall be responsible for:

(A)   achieving completion of rehabilitation of the Apartment Complex on a timely basis in accordance with the Plans and Specifications for the Apartment Complex, the terms of this Agreement and the Project Documents;

(B)   meeting all requirements for obtaining all necessary permanent, unconditional certificates of occupancy for all the apartment units in the Apartment Complex;

(C)   fulfilling all actions required of the Partnership to assure that the Apartment Complex satisfies the Minimum Set-Aside Test and the Rent Restriction Test;

(D)   causing the making of the Mortgage Loan by the Lender, respectively; and

(E)   achieving Final Closing.

(ii)   Pathway hereby is obligated to fund all Excess Development Costs. Any amounts paid by Pathway pursuant to this clause which are eligible for Tax Credits may be treated as Capital Contributions of Pathway to the Partnership provided however that the amount contributed by Pathway shall be subject to the approval of the Investment Partnership which approval shall be in the Investment

Partnership's sole and absolute discretion.  Any amounts funded which are not treated as Capital Contributions shall not be reimbursed to Pathway.

(iii)    In the event that Pathway shall fail to fund any such Excess Development Costs as required in this Section 8.09(a), the Guarantor shall be obligated to pay such Excess Development Costs.

(iv)    Pathway or the Developer, if applicable, shall pay any Excess Development Cost pursuant to this Section 8.09(a) by the earlier of (A) the date required to avoid a default or penalties under Partnership obligations, including without limitation the Mortgage Loan, (B) the date required to keep all sources of funding for the Apartment Complex "in-balance" and as adequate sources of funds to timely cause Substantial Completion of the Apartment Complex and satisfaction of other obligations of the Partnership in accordance with this Agreement, or (C) such earlier date as may be set forth in this Agreement.

(b)    Operating Deficit Guaranty.  In the event that, at any time during the period ending on the third anniversary of the achievement of Breakeven Operations (the "Initial Period"), an Operating Deficit shall exist, the General Partner shall provide such funds to the Partnership as shall be necessary to pay such Operating Deficit(s) not later than sixty (60) days after the occurrence of such Operating Deficit.  Any such funds provided after the achievement of Breakeven Operations shall be in the form of a loan to the Partnership (the "Operating Deficit Loan(s)").  An Operating Deficit Loan shall be a Subordinated Loan in accordance with the provisions of Section 8.19; provided, however, that an Operating Deficit Loan shall bear no interest.

If on or before expiration of the Initial Period, the General Partner or any affiliate of the General Partner constructs or participates in a project (the "New Project") which qualifies for Tax Credits within a one (1) mile radius of the location of the Apartment Complex (the "Radius"), then the obligation of the General Partner to make Operating Deficit Loans shall continue until four (4) years from the date the last certificate of occupancy for the New Project is issued (the "Extended Period") by the applicable Authority (the "Issuance Date").  If the General Partner or any Affiliate of the General Partner, constructs or otherwise participates in a New Project within the Radius after the Initial Period, then the General Partner shall provide Operating Deficit Loans for a period of four (4) years commencing on the Issuance Date (also to be referred to as the "Extended Period").  Notwithstanding the foregoing, the General Partner hereby agrees to provide a right of first refusal to the Investment Partnership and any and all Affiliates of the Investment Partnership to participate in the development of a New Project under commercially reasonable terms, conditions and pricing.  If the Investment Partnership participates in the New Project, the obligation of the General Partner to fund Operating Deficit Loans for the Extended Period shall not apply.  However, in the event the Investment Partnership, or an Affiliate of the Investment Partnership does not participate, but the New Project is developed, General Partner shall be obligated to fund the Operating Deficit Loans for the Extended Period.

For the purpose of this Section 8.09(b), all expenses shall be paid on a sixty (60) day current basis.  The obligations of the General Partner and Guarantors under this Section 8.09(b) shall not exceed $675,000.  Notwithstanding the foregoing, if the General Partner does not obtain a Section 8 Housing Assistance Payments Contract ("HAP Contract") for the Apartment Complex for a term greater than or equal to the term remaining in the Compliance Period, which HAP Contract may be subject to annual Congressional Appropriations, and must be in a form acceptable to the Investment Partnership, then the obligation hereunder shall be unlimited in amount and shall remain in place for the full Compliance Period or until such a contract is obtained, whichever is earlier.

(c)     Guaranty of Bridge Loan.   Pathway hereby irrevocably and unconditionally guaranties to the Investment Partnership the full and timely repayment of and the performance of all obligations of the Partnership under the Bridge Loan and the Bridge Loan Note issued by the Partnership in connection therewith.  The foregoing is referred to hereinafter as the "Bridge Loan Guaranty".

(d)     Tax Credit Compliance Guaranty.

(i)     If with respect to any fiscal year of the Partnership there is a Tax Credit Shortfall other than a shortfall resulting from changes in Tax Law, actions by the Limited Partner or a transfer by the Limited Partner of its interest in the Partnership, Pathway shall on the following Payment Date pay the Investment Partnership an amount equal to (i) the amount of the Tax Credit Shortfall for the fiscal year immediately preceding the Payment Date, (ii) all penalties and interest imposed by the Code and assessed against the Investment Partnership by the Internal Revenue Service with respect to any Tax Credit Shortfall, and (iii) an amount sufficient to pay any tax liability owed by the Investment Partnership resulting from the receipt of the amounts specified in the foregoing clauses (i), (ii) and this clause (iii) (such calculation to be made assuming the Investment Partnership is subject to the highest federal and Michigan state rate imposed on corporate taxpayers under the Code at that time and applicable state law for the taxable year of the Investment Partnership in which such payment is taken into income by the Investment Partnership) together with interest on such amounts at the AFR accruing from such Payment Date.

(ii)     Pathway irrevocably and unconditionally guarantees payments specified in this paragraph to the Investment Partnership if there is a Tax Credit Recapture Event other than a recapture resulting from changes in Tax Law, action by the Limited Partner or a transfer by the Limited Partner.  The payments required by this Section shall be the sum of the following amounts:  (A) the amount of Tax Credits previously allocated to the Investment Partnership and subsequently disallowed because of such Tax Credit Recapture Event; (B) all penalties and interest imposed by the Code and assessed against the Investment Partnership by the Internal Revenue Service with respect to such Tax Credit Recapture Event; (C) an amount sufficient to pay any tax liability owed by the Investment Partnership resulting from the receipt of the amounts specified in the foregoing clauses (A) and (B), and this clause (C) (such calculation to be made assuming the Investment Partnership is subject to the highest federal rate imposed on corporate taxpayers under the Code at that time and is subject to all applicable state tax laws for the taxable year of the Investment Partnership in

which such payment is taken into income by the Investment Partnership) together with interest on such amounts at the AFR accruing from the date the Investment Partnership remits funds to a taxing authority with respect to a Tax Credit Recapture Event; and (E) if the cause of the Tax Credit Recapture Event will in the determination of the Investment Partnership decrease the maximum amount of Tax Credits that will be available to the Partnership and allocated to the Investment Partnership during the remainder of the Compliance Period assuming full compliance with Code Section 42, then an amount equal to the total amount of such decrease.  Pathway shall make such payment to the Investment Partnership within seventy-five (75) days of the Tax Credit Recapture Event.  The foregoing payment to be made by Pathway hereunder shall be treated as a Capital Contribution by the General Partner followed by a distribution by the Partnership to the Investment Partnership unless, such treatment has a negative impact on the Investment Partnership as determined by the Investment Partnership in its reasonable discretion, in which case the payment shall be made directly to the Investment Partnership and treated as a breach of warranty payment.

(iii)     Moreover, if the Investment Partnership receives a payment under the Tax Credit Compliance Guaranty and the Partnership has appealed the issue giving rise to such payment (but has not caused a stay of enforcement with respect to such payment), and if the Partnership prevails on such appeal based on a final ruling by a federal court of competent jurisdiction, then the Investment Partnership shall refund the excess payment under the Tax Credit Compliance Guaranty which it had received.

8.10.    Reserve For Replacements/ Operating Reserve.

(a)    On the first day of each calendar month commencing after Substantial Completion, the Partnership shall fund a Reserve For Replacements (the annual amount of contributions to the Reserve For Replacements shall be funded in 12 equal monthly payments).  The Reserve For Replacements shall be funded as follows:  (i) from the date of Substantial Completion until the date ten (10) years after the date of Substantial Completion, the Reserve For Replacements shall be funded based on $250 per apartment unit per year; (iii) from the date ten (10) years from the date of Substantial Completion until the date fifteen (15) years after the date of Substantial Completion, the Reserve for Replacements shall be funded based on $300 per apartment unit per year; (iv) beginning fifteen (15) years from the date of Substantial Completion, the Reserve for Replacements shall be based on $350 per unit per year, provided that the General Partner shall increase the minimum funds of the Reserve For Replacements if necessary to ensure that such increase is necessary to comply with sound asset management principles. With the Consent of the Investment Partnership, the General Partners may make withdrawals from the Reserve For Replacements, solely for the purpose of paying the cost of capital items, which shall consist of the acquisition or replacement of property expected to have a useful life of three years or more and the cost of repairs to property that will extend the useful life of such property by three years or more. Examples of such capital items and repairs are outlined in Exhibit "I", attached hereto.  If the terms of the Mortgage Loan imposes more strict requirements regarding the funding and/or use of Reserve for Replacements, such more strict requirements shall apply.    Upon the Admission Date, the Reserve for Replacements shall be capitalized in the amount of $535,000, and be held in a segregated account by the Partnership, to be used for the purposes specified in this section 8.10(a).

(b)      Operating Reserves will, pursuant to MSHDA and HUD requirements, be capitalized at Initial Closing with $225,621 to be held in a Partnership account and $100,000 to be held by HUD as working capital.  All funds remaining in the HUD working capital account as of the date permitted under the Project Documents, will be transferred to the Partnership to be held as Operating Reserves for the duration of the Compliance Period.  . Subject to approval by the Lender, at the end of the Compliance Period these funds in the Operating Reserves shall be released to the partnership and paid or distributed in accordance with the priorities set forth in Section 11.01, provided, however, that (i) the managing General Partner shall not receive as a distribution an amount greater than 10% of the proceeds available after payments of fees and other amounts set forth in Section 11.01(a)(i) - (vi) first and (vi) second,  and (ii) general partners collectively shall not receive more than 70% of the available proceeds.

8.11.   Development Fee.   The Partnership has entered into a Development Agreement of even date herewith with the Developer for its services in connection with the development and construction of the Apartment Complex.   In consideration for such services, a Development Fee in a total amount equal to $1,000,000 shall be payable by the Partnership, in accordance with the terms of the Development Agreement and this Agreement.   It is anticipated that the entire Development Fee will be paid out of the proceeds of the Investment Partnership's Capital Contributions as follows:  (i) $150,000 at Initial Closing and $120,000 paid pro rata during construction at the rate of $10,000 per month; (ii) $600,000 from the proceeds of the Second Additional Capital Contribution; and (iii) $130,000 from the proceeds of the Third Additional Capital Contribution.   The Developer shall not be responsible for and shall take no actions with respect to the duties set forth in Section 4.04(b).

8.12.   [Intentionally Omitted]

8.13.   Withholding of Fee Payments.   In the event that either General Partner or any successor General Partner shall not have substantially complied with any material provisions under this Agreement, after Notice from the Investment Partnership of such noncompliance and failure to cure such noncompliance within a period of thirty (30) days from and after the date of such Notice, then such General Partner shall be in default of this Agreement.  In the event that (a) the Lender shall have declared the Partnership to be in default under the Mortgage Loan, or (b) foreclosure proceedings shall have been commenced against the Apartment Complex, then the General Partners shall be in default of this Agreement.  In the case of any default under this section, the Partnership shall withhold payment of any installment of fees and/or allowance payable pursuant to Sections 8.11 and/or 8.12.

All amounts withheld by the Partnership under this Section 8.13 shall be promptly released to the payees thereof only after the General Partner has cured the default justifying the withholding, as demonstrated by evidence reasonably acceptable to the Investment Partnership.   Neither General Partner shall pledge, assign or otherwise

encumber any fee or any distribution of cash or other property made or to be made pursuant to this Agreement or any rights with respect thereto without the prior Consent of the Investment Partnership.

8.14.   Environmental Assessment Consultant's Fee.   Each General Partner acknowledges that, on behalf of the Investment Partnership, SAHP will retain an environmental consultant (the "Environmental Consultant") to review and give recommendations related to environmental reports that are provided to the Investment Partnership by the General Partners (including, but not limited to, Phase I and Phase II environmental assessments, wetlands reports, lead and asbestos reports, abatement reports and other environmental reports required by the Environmental Consultant, to the reasonable satisfaction of the Environmental Consultant) for the Land or the rehabilitation of existing buildings.  SAHP shall be solely liable for the payment of fees charged by the Environmental Consultant up to a maximum of $1,000.00.  The Partnership shall be solely responsible for the payment of the fees of the Environmental Consultant in excess of $1,000.00, any such excess to be paid by the Partnership within ten (10) days after receipt of invoices.

8.15.   GP Pledged Payments.   To secure the payment and performance by each General Partner to the Investment Partnership of the performance of the General Partner's obligations under this Agreement, each General Partner and Developer, as applicable, hereby collaterally assign, pledge and grant a security interest to the Investment Partnership in all right, title and interest the General Partner has in its Interest hereunder and in the right to receive any distributions and payments under this Agreement and the Development Agreement, including without limitation, any payments of the Development Fee, payments with respect to Excess Development Costs and GP Loans and distributions of Net Cash Flow and Cash from Capital Event ("GP Pledged Payments").  Each General Partner and Developer irrevocably direct the Partnership to pay to the Investment Partnership any GP Pledged Payments at any time that there is an unsatisfied obligation secured by the GP Pledged Payments.  The Partnership and the Partners shall treat any GP Pledged Payments made by the Partnership to the Investment Partnership as a payment by the Partnership to the General Partner of the particular GP Pledged Payment. If there is more than one type of outstanding obligation secured at the time a GP Pledged Payment is made to the Investment Partnership, the Investment Partnership in its sole discretion shall decide to which secured obligation the GP Pledged Payments shall be applied.  This Section 8.15 shall constitute a security agreement under the laws of the State of Michigan.  In addition, each General Partner grants the Investment Partnership a right of offset against GP Pledged Payments with respect to all amounts due to the Investment Partnership from the General Partner under the Agreement.

8.16.   Removal of a General Partner

(a)      The Investment Partnership, so long as it is a Partner, shall have the right to remove either or both General Partners for any or all of the following (collectively, the "General Partner Defaults"):

(i)　　for any intentional misconduct or failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Apartment Complex or assets of the Partnership), or

(ii)　　upon the occurrence of any of the following:

(A)　　the General Partner or the Partnership shall have violated any material provisions of the Regulatory Agreement, the Extended Use Agreement and/or the Mortgage, or any material provisions of any other Project Document or other document required in connection with the Mortgage Loan or any material provisions of the Lender, and/or Agency requirements applicable to the Apartment Complex, which violation has not been cured within any applicable cure period or explicitly waived in writing by the Lender, or the Agency, as applicable;

(B)　　the General Partner shall have violated any material provision of this Agreement including, without limitation, any of its guaranties pursuant to Sections 5.01(d), 5.05 and/or 8.09, or violated any material provision of applicable law;

(C)　　the Bridge Loan or the Mortgage Loan shall have gone into default, which default remains uncured after the expiration of any applicable cure period; or

(D)　　the General Partner shall have conducted their own affairs or the affairs of the Partnership in such manner as would:

(1)　　cause the termination of the Partnership for federal income tax purposes; or

(2)　　cause the Partnership to be treated for federal income tax purposes as an association, taxable as a corporation; or

(E)　　the amount of Actual Credits for any year (except for the years 2003 and 2004) are, or are projected by the Accountants after State Designation to be, less than 85% of the Certified Credits for that year; or

(F)　　the making of a general assignment by General Partner or a Guarantor for benefit of its creditors, the filing by Guarantor with any bankruptcy court of competent jurisdiction of a voluntary petition under Title 11 of U.S. Code, as amended from time to time, the filing by a Guarantor of any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, Guarantor being the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended from time to time, or the dissolution or liquidation of Guarantor.

Notwithstanding the foregoing, (i) if at all times throughout the Guaranty Period, a minimum of three out of five of the individual Guarantors are solvent and have not made any filings or assignments as described in this Paragraph (F), then the making of an assignment or the filing with any bankruptcy court by either or both of the other Guarantors shall not trigger the removal of any General Partner hereunder; and (ii) the making of an assignment or the filing with any bankruptcy court by a Guarantor shall not trigger the removal of PV North.

(b)     The Investment Partnership shall give Notice to all Partners, and to the Lender, of its determination that a General Partner shall be removed.  The General Partner shall have thirty (30) days after receipt of such Notice to cure any default or other reason for such removal, or if such General Partner Default is not reasonably capable of being cured within such thirty (30) day period, then so long as the General Partner has commenced curative action within such period and continues to diligently pursue a cure of such General Partner Default, such thirty (30) day cure period shall be extended for an additional thirty (30) days.   In the event the General Partner cures such General Partner Default, then it shall remain as General Partner.  If, at the end of such cure period, the General Partner has not cured any General Partner Default or other reason for such removal, it shall cease to be General Partner and the powers and authorities conferred on it as General Partner under this Agreement shall cease and the Interests of such General Partner shall be transferred to a designee of the Investment Partnership which, without further action, shall become the General Partner; in such event, upon becoming the General Partner, such designee shall be bound by all applicable terms and conditions of this Agreement and of the Project Documents.

(c)     (i)     In the event that a General Partner is removed as aforesaid, the General Partner shall be and shall remain liable for all obligations and liabilities incurred by it as General Partner of the Partnership, including but not limited to the obligations and liabilities of the General Partner with respect to its obligations set forth in Sections 5.01(d) and 8.09 of this Agreement prior to the date of its removal (which includes obligations and liabilities determined after the date of removal but were due to circumstance arising prior to the removal date).

(ii)     If a General Partner is removed as Partner of the Partnership then, immediately prior to removal, the General Partner shall make a Capital Contribution to the Partnership in an amount equal to any remaining balance (including accrued but unpaid interest) on the Development Fee, and the Partnership shall thereupon make a payment in an equal amount to pay off such amount of the Development Fee.  Upon any such removal of the General Partner, the Partnership shall not be obligated to repay any Excess Development Costs Loans or GP Loans made by the removed General Partner, provided, however, if the sole cause for removal is either the Bridge Loan or the Mortgage Loan shall have gone into default (as  more fully set forth in Section 8.16(a)(ii)(C) above) then, 50% of the outstanding principal balance of such loans shall be repaid to the General Partner solely out of Net Cash Flow.  In the event that the General Partner fails to make the Capital Contribution as set forth in this clause (ii), any remaining balance due under the Development Agreement shall be satisfied by the removed General Partner and not from Partnership assets and the Developer agrees that it shall report the remaining

balance of the Development Fee as income for federal income tax purposes in the year in which the General Partner is removed.

(d)    The Investment Partnership hereby is granted an irrevocable power of attorney, coupled with an interest, to execute any and all documents on behalf of the Partners and the Partnership as shall be legally necessary and sufficient to effect all of the foregoing provisions of this Section 8.16. The election by the Investment Partnership to remove a General Partner under this Section shall not limit or restrict the availability and use of any other remedy which the Investment Partnership or any other Partner might have with respect to the General Partner in connection with its undertakings and responsibilities under this Agreement.

(e)    If Pathway is removed as a General Partner of the Partnership for any reason, the Investment Partnership shall have the sole right to appoint another General Partner, which General Partner has sufficient financial viability to replace that of Pathway, and which replacement General Partner will not require any prior approval or consent of PV North.

8.17.    Selection of Property Manager; Management Agreement.

(a)    The Managing General Partner shall cause the Partnership at all times during which the Partnership owns the Apartment Complex to engage a Property Manager to provide property management services for the Partnership with respect to the Apartment Complex pursuant to a Management Agreement meeting the requirements of this Agreement. Presbyterian Village of Michigan is approved by the Partners as the initial Property Manager.

(b)    The Managing General Partner shall at least once each fiscal year review the performance of the Property Manager and recommend to the Investment Partnership in writing whether to continue the Management Agreement with the then current Property Manager or whether to replace such Property Manager. The recommendation of the Managing General Partner shall be implemented by the General Partner, provided that the Managing General Partner has obtained the Consent of the Investment Partnership, which Consent shall not be unreasonably withheld, except as provided in Section 8.17(d).

(c)    Unless the Investment Partnership otherwise Consents, any Management Agreement must satisfy the following terms and conditions: (i) the Partnership shall pay the Property Manager a monthly management fee not to exceed five percent (5%) of the gross operating revenues of the Apartment Complex for the month preceding payment; (ii) the Management Agreement shall be cancelable upon thirty (30) days' prior notice from the Partnership without cause  and without the payment of any fee, penalty, premium or additional charge; (iii) if the Property Manager is an Affiliate of the Managing General Partner, the Property Manager will accrue the management fee to the extent necessary at any time to prevent a default under the Mortgage Loan; (iv) all security deposits shall be maintained in a segregated account for the benefit of the Partnership; and (v) the Management Agreement shall be in the form of Exhibit "J" hereto with only such changes to

which the General Partner and the Investment Partnership have given their respective Consent.

(d)    Notwithstanding anything to the contrary herein, no Affiliate shall act as the Property Manager without the prior written Consent of the Investment Partnership which may be withheld in its sole discretion.  The Consent to the use of an Affiliate Property Manager pursuant to the initial Property Management Agreement or any renewal thereof shall not prevent the Investment Partnership from withholding its Consent in connection with a periodic performance review pursuant to Section 8.17(b).

8.18.   Removal of the Property Manager.   At the request of the Investment Partnership, the Managing General Partner shall cause the Partnership to terminate the Management Agreement then in place and appoint a replacement Property Manager and execute a new Property Management Agreement in accordance with Section 8.16 if any of the following events occur: (i) if the Property Manager becomes Bankrupt; (ii) if the Property Manager defaults in its obligations under the Management Agreement and fails to cure such default within any applicable cure period provided therein; or (iii) if the Investment Partnership is the holder of any outstanding IP Loans which IP Loans were made during the period that such Property Manager was engaged by the Partnership.  The Managing General Partner shall cause such replacement to occur on the date designated by the Investment Partnership in such written request, which date must be not less than 45 days from the date of such written request.

8.19.   Loans to the Partnership.   The Partnership is authorized to receive IP Loans and GP Loans on the terms set forth in this Agreement.  In addition, if (A) additional funds are required by the Partnership for any purpose relating to the business of the Partnership or for any of its obligations, expenses, costs or expenditures, and (B) the Partnership has not received an IP Loan or GP Loan to pay such amounts, then the Partnership may borrow such funds as are needed from a Person or organization other than a Partner in accordance with the terms of this Section 8.19, for such period of time and on such terms as the General Partner and the Investment Partnership may agree; provided, however, that no such additional loans shall be secured by any mortgage or other encumbrance on the property of the Partnership without the prior approval of the Investment Partnership except that such approvals shall not be required in the case of the hypothecation of personal property purchased by the Partnership and not included in the security agreements executed by the Partnership at the time of Initial Closing.  Nothing in this Section 8.19 shall modify or effect the obligation of the General Partner to make Excess Development Costs Loans and to perform its obligations when and as required by this Agreement.

8.20.   Guaranty Agreement.   Concurrently with the execution of this Agreement, Pathway shall deliver to the Investment Partnership (A) the Guaranty Agreement fully executed by each Guarantor, (B) a UCC-1 Financing Statement perfecting the security interest granted under Section 8.15, and (C) an opinion of counsel to the Guarantors in form satisfactory to the Investment Partnership regarding the Guaranty Agreement and the perfection of such security interest and the pledge and security agreement.

8.21.   <u>Operating and Capital Budgets</u>.  Not less than seventy-five (75) days prior to the commencement of each fiscal year, the Managing General Partner shall submit to the Investment Partnership for its review and approval (which approval shall not be unreasonably withheld), proposed operating and capital budgets for the Apartment Complex and the Partnership for the next fiscal year.  Such budgets shall specifically list all budgeted expenses in all major categories including, but not limited to, administration, operation, repairs and maintenance, utilities, taxes, insurance, interest, debt service with respect to the Mortgage Loan, capital improvements, and all budgeted expenses which are to be paid to the Managing General Partner or its Affiliates.  The Investment Partnership shall submit its response to such proposed budgets to the Managing General Partner within forty-five (45) days (or such shorter period of time as may be requested by the Lender, but in no event less than thirty (30) days) after its receipt of such proposed budgets; such response shall either evidence its approval of the proposed budgets or shall contain specific comments and recommendations with respect thereto.  If no such response is submitted to the Managing General Partner within such period, the Investment Partnership will be deemed to have approved such budgets.

ARTICLE IX.
TRANSFERS OF, AND RESTRICTIONS ON TRANSFERS
OF INTERESTS OF LIMITED PARTNERS

9.01.   [Reserved].

9.02.   Restrictions on Transfer of Limited Partners' Interests.

(a)   Under no circumstances will any offer, sale, transfer, assignment, hypothecation or pledge of any Limited Partner Interest be permitted unless the General Partner, in its sole discretion, shall have Consented thereto, and the Lender, if required, also shall have Consented thereto.

(b)   The Limited Partner whose interest is being transferred shall pay such reasonable expenses as may be incurred by the Partnership in connection with such transfer.

(c)   Nothing in this Section 9.02 shall limit the authority of the Investment Partnership to sell, transfer and/or assign interests within the Investment Partnership, in the sole discretion of the Investment Partnership.

9.03.   Admission of Substitute Limited Partners.

(a)   Subject to the other provisions of this Article IX, an assignee of the Interest of a Limited Partner (which shall be understood to include any purchaser, transferee, donee, or other recipient of any disposition of such Interest) shall be deemed admitted as a Substitute Limited Partner of the Partnership only upon the satisfactory completion of the following:

(i)   Consent of the General Partner (which may be withheld in its reasonable discretion), and the consent of the Lender, if required, shall have been given; such Consent of the General Partner may be evidenced by the execution by the General Partner of an amended Agreement and/or Certificate evidencing the admission of such Person as a Limited Partner pursuant to the requirements to the Act;

(ii)   the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement by executing a counterpart thereof or an appropriate amendment hereto, and such other documents or instruments as the General Partner may require in order to effect the admission of such Person as a Limited Partner;

(iii)   an amended Agreement and/or Certificate evidencing the admission of such Person as a Limited Partner shall have been filed for recording pursuant to the requirements to the Act;

(iv)    if the assignee is a corporation, the assignee shall have provided the General Partner with evidence satisfactory to Counsel for the Partnership of its authority to become a Limited Partner under the terms and provisions of this Agreement; and

(v)    the assignee or the assignor shall have reimbursed the Partnership for all reasonable expenses, including all reasonable legal fees and recording charges, incurred by the Partnership in connection with such assignment.

(b)    For the purpose of allocation of profits, losses and credits, and for the purpose of distributing cash of the Partnership, a Substitute Limited Partner shall be treated as having become, and as appearing in, the records of the Partnership as a Partner upon his signing of an amendment to this Agreement, agreeing to be bound hereby.

(c)    The General Partner shall cooperate with the Person seeking to become a Substitute Limited Partner by preparing the documentation required by this Section and making all official filings and publications.  The Partnership shall take all such action, including the filing, if required, of any amended Agreement and/or Certificate evidencing the admission of any Person as a Limited Partner, and the making of any other official filings and publications, as promptly as practicable after the satisfaction by the assignee of the Interest of a Limited Partner of the conditions contained in this Article IX to the admission of such Person as a Limited Partner of the Partnership.  Any cost or expense incurred in connection with such admission shall be borne by the Substitute Limited Partner.

9.04.   Rights of Assignee of Partnership Interest.

(a)    Except as provided in this Article and as required by operation of law, the Partnership shall not be obligated for any purpose whatsoever to recognize the assignment by any Limited Partner of his (its) Interest until the Partnership has received actual Notice thereof.

(b)    Any Person who is the assignee of all or any portion of a Limited Partner's Interest, but does not become a Substitute Limited Partner and desires to make a further assignment of such Interest, shall be subject to all the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make an assignment of his (its) Interest.

ARTICLE X.
RIGHTS AND OBLIGATIONS
OF LIMITED PARTNERS

10.01.  Management of the Partnership.  No Limited Partner shall take part in the management or control of the business of the Partnership nor transact any business in the name of the Partnership.  Except as otherwise expressly provided in this Agreement, no Limited Partner shall have the power or authority to bind the Partnership or to sign any agreement or document in the name of the Partnership.  No Limited Partner shall have any power or authority with respect to the Partnership except insofar as the consent of any Limited Partner shall be expressly required and except as otherwise expressly provided in this Agreement.

10.02.  Limitation on Liability of Limited Partners.  The liability of each Limited Partner shall be limited to its Capital Contribution as and when payable under the provisions of this Agreement, and as provided under the Act.  No Limited Partner shall have any other liability to contribute money to, or in respect of the liabilities or obligations of, the Partnership, nor shall any Limited Partner be personally liable for any obligations of the Partnership, except as and to the extent provided in the Act.  Except as provided in Section 5.01(c), no Limited Partner shall be obligated to make loans to the Partnership.

10.03.  Other Activities.  Any Limited Partner may engage in or possess interests in other business ventures of every kind and description for its own account, including without limitation, serving as general or limited partner of other partnerships which own, either directly or through interests in other partnerships, government-assisted housing projects similar to the Apartment Complex.  Neither the Partnership nor any of the Partners shall have any right by virtue of this Agreement in or to such other business ventures to the income or profits derived therefrom.

ARTICLE XI.
PROFITS, LOSSES AND DISTRIBUTIONS

11.01. <u>Allocation of Profits, Losses, Credits and Cash Distributions</u>.

(a)    All profits, losses and credits, except as provided in Sections 11.01., 11.03, 11.06 and 11.10 below shall be allocated to the Partners in accordance with their Percentage Interests. Subject to the approval of the Lender, if required, all Net Cash Flow and such portion of Net Interim Income in excess of $400,000, available after payment of the fee payable pursuant to Paragraph 13.04(h)(iii) shall be applied and/or distributed on the Payment Date in the following priority:

(i)    first, to the payment of any Tax Credit Shortfall to the Investment Partnership;

(ii)    second, to the payment of the IP Asset Management Fee;

(iii)    third, to the payment of any outstanding Excess IP Loan Amount and then to the payment of any remaining IP Loans and GP Loans pro rata;

(iv)    fourth, if any of the Development Fee has been deferred, until the Development Fee has been paid in full, to payments due under the Development Agreement;

(v)    fifth, if any Operating Deficit Loans from a General Partner exist, 70% to such General Partner with no interest accrual as repayment of such Operating Deficit Loans, and 30% to the Investment Partnership as a cash distribution;

(vi)    sixth, out of  a maximum of 63% of Net Cash Flow, in the following priorities:

first, to PV North LLC as repayment of the GP-AHP Loan, an annual amount equal to 7% of the original principal balance of such GP-AHP Loan, until such GP-AHP Loan is repaid,

second, to the General Partners as a distribution in an amount which will, with the distribution under section 11.01(a)(vii) below, fully repay the General Partners' capital accounts in the Partnership over a 15-year period, and

third, to Pathway Senior Living of Michigan, LLC as an Incentive Management Fee, an amount equal to 7% of Gross Income, with any such amounts payable to PV North LLC or Pathway Senior Living of Michigan, LLC not paid in any year to cumulate and be payable solely from Net Cash Flow in future years; and

(vii)    seventh, any remaining thereafter shall go (a) 9.69% to PV North LLC: (b) 9.31% to Pontiac, and (c) 81% to the Investment Partnership.  PV North LLC and Pontiac shall each be allocated an amount of gross income equal to the amount distributed to it under this Section 11.01(a)(vii).

In the event that either (A) the General Partner violates any provision of Section 5.01(d) (requiring it to make a payment to the Investment Partnership) and/or any provision of Section 8.09, and/or (B) the Developer violates any provision of Section 8.09(a)(iii) (requiring it to pay certain Excess Development Costs), then notwithstanding the foregoing provisions of Section 11.01(a), an amount equal to any such required payment which was not made shall be distributed to the Investment Partnership prior to any payments or distributions to the General Partners or the Developers pursuant to Section 11.01(a)(iv),(v) and (vi);

Notwithstanding the foregoing, during such time as regulations of the Lender are applicable to the Apartment Complex, the total amount of Net Cash Flow which may be so distributed to the Partners with respect to any fiscal year shall not exceed such amounts as such regulations permit to be distributed.

Notwithstanding the foregoing, for the period after Stabilization until the Partnership has a Section 8 contract with a term extending through the end of the Compliance Period and with rents not less than the underwritten rents of $637 for a one bedroom unit and $662 for a two bedroom unit (a "Long Term Section 8 Contract"), the payments and distributions to the General Partners and the Developers, to be made pursuant to Sections 11.01(a) (iv), (v) and (vi) from Net Cash Flow (the "GP/Developer Cash Share") shall not be paid or distributed, but shall be retained by the Partnership in a reserve account. Until such a Long Term Section 8 Contract has been entered into, the funds in such reserve account will be used to support the property, if necessary, with their use being approved by both the GP and LP. In the event that the Partnership does not enter into such a Long Term Section 8 Contract, but the current Section 8 contract is extended for at least a five year term at the foregoing underwritten rents, the funds held in the reserve will be released for payments and distributions in accordance with the priorities set forth in Section 11.01(a), and, thereafter, 35% of the GP/Developer Cash Share shall be retained by the Partnership in such reserve account, and 65% of the GP/Developer Cash Share shall be paid or distributed in accordance with the provisions of Sections 11.01(a)(iv),(v),and (vi).   Upon the Partnership's entering into an Long Term Section 8 Contract, (1), the funds held in the reserve account, including any interest earned thereon, will be released, and (2), the reserve will be eliminated.

(b)     In any year in which a Partner sells, assigns or transfers all or any portion of an Interest to any Person who during such year is admitted as a substitute Partner, the share of all profits and losses allocated to, and of all Net Cash Flow and of all cash proceeds distributable under Section 11.04  attributable to the Interest sold, assigned or transferred shall be divided between the assignor and the assignee ratably on the basis of the number of monthly periods in such year before, and the number of monthly periods on and after, the first day of the month during which such Person is admitted as a substitute Partner.

(c)     Net Interim Income up to $400,000 may be used by the Partnership as a source for the rehabilitation of the Apartment Complex.  An amount of Gross Income equal to all Net Interim Income up to $400,000 shall be allocated to the Managing General Partner.

(d)     In the event that there is a determination that there is any original issue discount or imputed interest attributable to the Capital Contribution of any Partner, or any loan between a Partner and the Partnership, any income or deduction of the Partnership attributable to such imputed interest or original issue discount on such Capital Contribution or loan (whether stated or unstated) shall be allocated solely to such Partner.

(e)     In the event that the deduction of all or a portion of any fee paid or incurred by the Partnership to a Partner or an Affiliate of a Partner is disallowed for federal income tax purposes by the Internal Revenue Service with respect to a taxable year of the Partnership, the Partnership shall then allocate to such Partner an amount of gross income of the Partnership for such year equal to the amount of such fee as to which the deduction is disallowed. Any Partnership depreciation or other cost recovery deductions not otherwise allocated pursuant to Section 11.10(e) hereof shall be allocated among the Partners in accordance with their Percentage Interests.

(f)     If any Partner's Interest in the Partnership is reduced but not eliminated because of the admission of new Partners or otherwise, or if any Partner is treated as receiving any items of property described in Section 751(a) of the Code, the Partner's Interest in such items of Section 751(a) property that was property of the Partnership while such Person was a Partner shall not be reduced, but shall be retained by the Partner so long as the Partner has an Interest in the Partnership and so long as the Partnership has an Interest in such property.

(g)     In accordance with Section 704(c) of the Code (relating to allocations with respect to appreciated contributed property) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall be allocated, solely for tax purposes, among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its fair market value. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

(h)     If the General Partner funds any Operating Deficit Loans pursuant to Section 8.09(b), any deductions or losses of the Partnership attributable to the use of those funds shall be specially allocated to the General Partner and in any year in which the Partnership repays all or a portion of such Loans, the General Partner shall be specially allocated an item of gross income equal to the amount of such repayment.

11.02. <u>Determination of Profits, Losses and Credits</u>.  Profits, losses and credits for all purposes of this Agreement shall be determined in accordance with the accrual accounting method, except that any adjustments made pursuant to Section 754 of the Code, other than the adjustments made with respect to the admission of the Investment Partnership to the Partnership, shall not be taken into account. Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profits or losses, or applicable to the period during which such profits and losses were realized, shall

be considered allocated to each Partner in the same proportion as profits and losses are allocated to such Partner.

11.03. <u>Allocation of Gains and Losses</u>.   Except to the extent provided in Sections 11.06 and 11.10 below, gains and losses recognized by the Partnership upon the sale, exchange or other disposition of all or substantially all of the property owned by the Partnership shall be allocated in the following manner:

(a)   gains shall be allocated (i) first, to the Partners with negative Adjusted Capital Account balances, that portion of gains (including any gains treated as ordinary income for federal income tax purposes) which is equal in amount to, and in proportion to, such Partners' respective negative Adjusted Capital Accounts in the Partnership; provided, that no gain shall be allocated under this Section 11.03(a)(i) to a Partner once such Partner's Adjusted Capital Account is brought to zero; and (ii) second, gain in excess of the amount allocated under (i) shall be allocated to the Partners in the amount and to the extent necessary to increase the Partners' respective Adjusted Capital Accounts so that the proceeds distributed under Sections 11.04(d), will be distributed in accordance with the Partners' respective Adjusted Capital Account balances.

(b)   Losses shall be allocated (i) first, to the Partners in the amounts and to the extent necessary so that the proceeds distributed under Sections 11.04(d) will be distributed in accordance with the Partners' respective Adjusted Capital Account balances, and (ii) second, any remaining loss to the Partners in accordance with the manner in which they bear the economic risk of loss associated with such loss or, if none, to the Partners in accordance with their Percentage Interests.

(c)   Any portion of the gains treated as ordinary income for federal income tax purposes under Sections 1245 and 1250 of the Code ("Recapture Amount") shall be allocated on a dollar for dollar basis to those Partners to whom the items of Partnership deduction or loss giving rise to the Recapture Amount had been previously allocated.

11.04. <u>Distribution of Proceeds from Sale, Refinancing, and Liquidation of Partnership Property</u>.   Except as may be required under Section 12.02(b), the proceeds resulting from the liquidation of the Partnership assets pursuant to Section 12.02, the net proceeds resulting from any sale of the property of the Partnership or refinancing of the Mortgage Loan or a Capital Transaction, as the case may be, shall be distributed and applied in the following order of priority:

(a)   to the payment of all matured debts and liabilities of the Partnership (including amounts due pursuant to the Mortgage Loan and all expenses of the Partnership incident to any such sale or refinancing), excluding (1) debts and liabilities of the Partnership to Partners or any Affiliates, and (2) all unpaid fees owing to the General Partner under this Agreement;

·(b)   to the payment of any debts and liabilities (including unpaid fees) owed to the Partners or any Affiliates by the Partnership for the Partnership obligations; provided, however, that the foregoing debts and liabilities owed to the Partners and their

Affiliates shall be paid or repaid, as applicable, in the following order of priority, if and to the extent applicable: (i) first, to the Investment Partnership as payment of any unpaid Tax Credit Shortfall; (ii) to the payment of any outstanding Excess IP Loan Amount and then to the payment of any remaining IP Loans; (iii) to the payment of any accrued but unpaid asset management fee payable to SAHP pursuant to Section 13.04(h)(iii); (iv) to the payment of any unpaid Operating Deficit Loans; (v) amounts, if any, due under the Development Agreement, but other than in connection with the liquidation of the Partnership not more than fifty percent (50%) of proceeds then remaining; (vi) to the payment of any outstanding GP Loans; (vii) 6% of the gross proceeds from the purchase shall be paid to Pathway Senior Living of Michigan, LLC as a property disposition fee; and (viii) in connection with the liquidation of the Partnership only, any other such debts and liabilities;

      (c)    to the setting up of any reserves which the Liquidator (or the General Partner if the distribution is not pursuant to the liquidation of the Partnership) deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Partnership;

      (d)    to the Partners in the following percentages: (i) 9.69% to PV North; (ii) 9.31% to Pathway; and (iii) 81% to the Investment Partnership.

    11.05. <u>Capital Accounts</u>. A separate Capital Account shall be maintained and adjusted for each Partner. There shall be credited to each Partner's Capital Account the amount of its Capital Contribution, the fair market value of any property contributed to the Partnership (net of any liabilities secured by such property) and such Partner's distributive share of the profits for tax purposes of the Partnership; and there shall be charged against each Partner's Capital Account the amount of all Cash Flow distributed to such Partner, the fair market value of any property distributed to such Partner (net of any liabilities secured by such property), the net proceeds resulting from the liquidation of the Partnership's assets or from any sale or refinancing of the Apartment Complex distributed to such Partner, and such Partner's distributive share of the losses for tax purposes of the Partnership. Each Partner's Capital Account shall be maintained and adjusted in accordance with the Code and the Treasury Regulations thereunder. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treas. Reg. §1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. It is the intention of the Partners that the Capital Accounts maintained under this Agreement be determined and maintained throughout the full term of this Agreement in accordance with the accounting rules of Treas. Reg. §1.704-1(b)(2)(iv).

    If a Partner has more than one interest in the Partnership, such Partner shall have a single capital account that reflects all such interest, regardless of the class of interests owned by such Partner and regardless of the time or manner in which such interests were acquired.

    If the Partnership is liquidated within the meaning of Treasury Reg. Section 1.704-1(b)(2)(ii)(g), if the General Partner's Capital Account has a deficit balance (after giving

effect to all contributions, distributions and allocations), the General Partner shall make Capital Contributions in the amount of such deficit in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(3). Notwithstanding the foregoing, if the Partnership is liquidated within the meaning of Treasury Reg. Section 1.704-1(b)(2)(ii)(g) but no event has occurred under Section 12.01 to dissolve the Partnership, the Partnership assets shall not be liquidated, the Partnership's liabilities shall not be paid or discharged, and the Partnership's affairs shall not be wound up. Instead, the Partnership shall be deemed to have distributed its assets in-kind to the Partners who shall be deemed to have assumed and taken subject to all Partnership liabilities, all in accordance with their respective Capital Accounts. Immediately thereafter, the Partners shall be deemed to have recontributed the assets in-kind to the Partnership, which shall be deemed to have assumed and taken subject to all such liabilities.

11.06. <u>Authority of the General Partner to Vary Allocations to Preserve and Protect Partners' Intent</u>.

(a)     It is the intent of the Partners that each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with this Article XI and Section 5.01 to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Article XI and Section 5.01, the General Partner hereby is authorized and directed to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Article XI and Section 5.01 to the extent that allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in Article XI and Section 5.01 would cause the determinations and allocations of each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder. Any allocation made pursuant to this Section 11.06 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Article XI and Section 5.01 and no amendment of this Agreement or approval of any Partner shall be required.

(b)     In making any allocation (the "new allocation") under Section 11.06(a), the General Partner is authorized to act only after having been advised by the Accountants that, under Section 704(b) of the Code and the Treasury Regulations thereunder, (i) the new allocation is necessary, and (ii) the new allocation is the minimum modification of the allocations otherwise provided for in this Article XI and Section 5.01 necessary in order to assure that, either in the then current year or in any preceding year, each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) is determined and allocated in accordance with this Article XI and Section 5.01 to the fullest extent permitted by Section 704(b) of the Code and the Treasury Regulations thereunder.

(c)     If the General Partner is required by Section 11.06(a) to make any new allocation in a manner less favorable to the Limited Partners than is otherwise provided for in this Article XI and Section 5.01, then the General Partner is authorized and directed, only after having been advised by the Accountants that it is permitted by Section

704(b) of the Code, to allocate income, gain, loss, deduction, or credit (or item thereof) arising in later years in such manner so as to bring the allocations of income, gain, loss, deduction, or credit (or item thereof) to the Limited Partners as nearly as possible to the allocations thereof otherwise contemplated by this Article XI and Section 5.01.

(d)     New allocations made by the General Partner under Section 11.06(a) and Section 11.06(c) in reliance upon the advice of the Accountants shall be deemed to be made pursuant to the fiduciary obligation of the General Partner to the Partnership and the Limited Partners, and no such allocation shall give rise to any claim or cause of action by the Limited Partner.

11.07. <u>Designation of Tax Matters Partner</u>. Pathway hereby is designated as Tax Matters Partner of the Partnership, and shall engage in such undertakings as are required of the Tax Matters Partner of the Partnership, as provided in regulations pursuant to Section 6231 of the Code. Each Partner, by its execution of this Agreement, Consents to such designation of the Tax Matters Partner and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices (including the Internal Revenue Service) such documents as may be necessary or appropriate to evidence such Consent.

Notwithstanding any other provision of this Agreement, the Investment Partnership(s) hereby is granted the authority at any time to be admitted as a general partner by converting all or portion of its limited partnership interest to a general partnership interest for the purpose of acting as the TMP General Partner (the "Special TMP General Partner") with all the authority and powers given to Pathway as Tax Matters Partner of the Partnership under the Code and under this Agreement. Unless otherwise specifically provided or agreed, the new TMP General Partner in these circumstances will not be responsible for or have the right to conduct any operational or managerial functions of the Partnership besides those required to discharge its responsibilities as TMP. The Investment Partnership may exercise its right to assume the TMP responsibilities for the Partnership, as provided herewith, upon ten (10) days notice to the then existing TMP General Partner, and may continue as TMP indefinitely. In the event that the Investment Partnership exercises its right to become a general partner and to assume duties of the TMP, the pre-existing TMP will resign in accordance with Treas. Reg. § 301.6231(a)(7)-1(i) and will redesignate the new general partner as TMP in accordance with Treas. Reg. § 301.6231(a)(7)-1(e). Each Partner, by its execution of this Agreement Consents to such admission and designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such Consent. The Special TMP General Partner shall, upon such admission, replace the General Partner as Tax Matters Partner and shall have thereafter all the authority and powers given to the General Partner as Tax Matters Partner of the Partnership under the Code and under this Agreement.

Notwithstanding the foregoing, if the Investment Partnership becomes the Special TMP General Partner then, the Special TMP General Partner shall consult with, and permit input by, the General Partner, and shall not take any action, give any consent or fail to take any requested action in connection with any claims made by the Internal

Revenue Service with respect to the Partnership without the consent of the General Partner which consent shall not be unreasonably withheld, provided, that: (I) the General Partner confirms in writing that it and/or the Guarantor would be obligated to fund such claim under Sections 5.01(d) and 8.09(d) of this Agreement, and (II) the General Partner and/or the Guarantor, if applicable, has demonstrated the financial wherewithal to pay on such guaranty (collectively, the "Guaranteed Claims"). With respect to any such claim or claims the total aggregate amount of which (taking into account such correlative adjustments) would exceed the Guaranteed Claims, the Special TMP General Partner shall consult with, and permit input by, the General Partner, and shall not settle any such claim or claims without the consent of the General Partner, which consent shall not be unreasonably withheld.   In the event the General Partner desires to settle any claim described in this paragraph and the Special TMP General Partner does not desire to settle any such claim, the General Partner's liability in respect to the applicable claim shall not exceed the amount the General Partner would have paid if such settlement had been completed.

11.08.  <u>Rights and Obligations of Tax Matters Partner</u>.

(a)   The Tax Matters Partner shall have and perform all of the duties required under the Code, including the following duties:

(i)   Furnish the name, address, profits interest, and taxpayer identification number of each Partner to the Internal Revenue Service (the "Service") ; and

(ii)   Within five calendar days after the receipt by the General Partner or an Affiliate thereof or the Partnership of any correspondence or communication relating to the Partnership or a Partner or an Affiliate of a Partner from the Service, the Tax Matters Partner shall forward to each Partner a photocopy of all such correspondence or communication(s).  The Tax Matters Partner shall, within five calendar days thereafter, advise each Partner in writing of the substance and form of any conversation or communication held with any representative of the Service.

(b)   The Tax Matters Partner shall, upon request by the Limited Partner(s), permit the Limited Partner(s) to include its attorney in the power of attorney (Form 2848) for the Partnership for any taxable years under a tax audit or in a tax administrative Appeals process.

(c)   The Tax Matters Partner shall not without the Consent of the Limited Partner(s):

(i)   Extend the statute of limitations for assessing or computing any tax liability against the Partnership (or the amount of character of any Partnership tax items);

(ii)    Engage an accounting firm or counsel to represent the Partnership before the Internal Revenue Service

(iii)   Settle any audit with the Service concerning the adjustment or readjustment of any partnership item(s) (within the meaning of Section 6231(a)(3) of the Code);

(iv)   File a request for an administrative adjustment with the Service at any time or file a petition for judicial review with respect to any such request;

(v)    Initiate or settle any judicial review or action concerning the amount or character of any partnership tax item(s) (within the meaning of Section 6231(a)(3) of the Code);

(vi)   Intervene in any action brought by any other Partner for judicial review of a final partnership administrative adjustment; or

(vii)  Take any other action not expressly permitted by this Section 11.09 on behalf of the Partners of the Partnership in connection with any administrative or judicial tax proceeding.

(d)    In the event of any Partnership-level proceeding instituted by the Service pursuant to Sections 6221 through 6233 of the Code, the Tax Matters Partner shall consult with the Limited Partners and the General Partner that is not acting as Tax Matters Partner, regarding the nature and content of all action and defense to be taken by the partnership in response to such proceeding.  The Tax Matters Partner also shall consult with the Limited Partners regarding the nature and content of any proceeding pursuant to Sections 6221 through 6233 of the Code instituted by or on behalf of the Partnership (including the decision to institute proceedings, whether administrative or judicial, and whether in response to a previous Service proceeding against the Partnership or otherwise).

11.09.   Expenses of Tax Matters Partner.   The Partnership shall indemnify and reimburse the Tax Matters Partner for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Partners.  The payment of all such expenses shall be made before any distributions are made from Cash Flow or any discretionary reserves are set aside by the General Partner.  The General Partner shall have the obligation to provide funds from Cash Flow for such purpose.  Notwithstanding the foregoing, the provisions on liability and indemnification of General Partners set forth in Section 8.07 of this Agreement shall be fully applicable to the Tax Matters Partner in its capacity as such.

11.10.   Minimum Gain Provisions.

(a)    Notwithstanding any other provision of this Agreement, no allocation of loss or deduction (or item thereof) shall be made by the Partnership to a Partner if such allocation would cause the sum of the deficit capital account balances of the Partner or Partners

otherwise receiving such allocation (excluding the portion of such deficit balances that must be restored (or which the Partner is deemed to have to restore) to the Partnership under this Agreement, if any) to exceed the Partners' share of "Partnership Minimum Gain" (as defined in Treas. Reg. § 1.704-2(b)(2) and §1.704-2(d)), and "Partner Nonrecourse Debt Minimum Gain" (as defined in Treas. Reg. §1.704-2(i)(2)), both determined at the end of the Partnership taxable year to which the allocation relates. Any allocations in excess of the limitation contained in this Section 11.10(a) shall be allocated to the General Partner.

(b) Notwithstanding any other provision of this Agreement, if there is a net decrease in Partnership Minimum Gain or in Partner Nonrecourse Debt Minimum Gain during a Partnership taxable year, items of income and gain for such year (and if necessary, for future years) shall be allocated to each Partner in an amount equal to the Partner's share of the net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain, as applicable.

(c) If any Partner unexpectedly receives any adjustments, allocations or distributions described in Treas. Reg. §§1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate (to the extent required by the Regulations under Code Section 704(b)) the deficit balance in each such Partner's Capital Account as quickly as possible, provided that an allocation pursuant to this Section 11.10(c) shall be made if and only to the extent that such Partner would have a deficit Capital Account (after giving effect to Treas. Reg. §1.704-2(g)(1) and 1.704-2(i)(5)) after all other allocations provided for in this Article XI have been tentatively made as if this Section 11.10(c) were not in the Agreement.

(d) In the event any Partner has a deficit Capital Account at the end of any fiscal year in excess of the sum of (i) the amount that such Partner must restore to the Partnership upon liquidation, if any, and (ii) the amount such Partner is deemed obligated to restore pursuant to the penultimate sentence of Treas. Reg. §1.704-2(g) and §1.704-2(i)(5), such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 11.10(d) shall be made if and only to the extent that such Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article XI have been tentatively made as if this Section 11.10(d) and Section 11.10(c) hereof were not in the Agreement.

(e) "Nonrecourse deductions" (within the meaning of Treas. Reg. §1.704-2(b)(1)) shall be allocated to Partners in accordance with their Percentage Interests. "Partner nonrecourse deductions" (within the meaning of Treas. Reg. §1.704(2)(c)) shall be allocated to the Partner who bears the economic risk of loss associated with such deductions in accordance with Treas. Reg. §1.704(2)(i).

(f) If income, loss or items thereof are allocated to one or more Partners pursuant to the last sentence of Section 11.10(a) or Sections 11.10(b), (c), (d) or (e), subsequent income, loss or items thereof shall be allocated (subject to the provisions of Sections 11.10(a), (b), (c), (d) or (e)) to the Partners so that, to the extent possible in the

judgment of the General Partner, the net amount of allocations shall be equal to the amount that would have been allocated had Sections 11.10(a), (b), (c), (d) and (e) not been applied.  In making such judgment, the General Partner shall be permitted to take into account that allocations made pursuant to Section 11.10(e) are likely to be offset by allocations to be made pursuant to Section 11.10(b).

ARTICLE XII.
SALE, DISSOLUTION AND LIQUIDATION

12.01. <u>Dissolution of the Partnership</u>.  The Partnership shall be dissolved upon the earlier of the expiration of the term of the Partnership, or upon:

(a)   the withdrawal, Bankruptcy, death, dissolution or adjudication of incompetency of any General Partner who is at that time the sole General Partner, subject to the provisions of Section 6.03, unless a majority in Interest of the other Partners, within ninety (90) days after receiving Notice of such withdrawal, Bankruptcy, death, dissolution or adjudication of incompetence elects to designate a successor General Partner(s) and continue the Partnership upon the admission of such successor General Partner(s) to the Partnership;

(b)   the sale or other disposition of all or substantially all of the assets of the Partnership;

(c)   the election by the General Partners, with the Consent of a majority in interest of the other Partners; or

(d)   any other event causing the dissolution of the Partnership under the laws of the State.

12.02. <u>Winding Up and Distribution</u>.

(a)   Upon the dissolution of the Partnership pursuant to Section 12.01, (i) a Certificate of Cancellation shall be filed in such offices within the State as may be required or appropriate, and (ii) the Partnership business shall be wound up and its assets liquidated as provided in this Section 12.02 and the net proceeds of such liquidation, except as provided in Section 12.02(b) below, shall be distributed in accordance with Section 11.04.

(b)   It is the intent of the Partners that, upon liquidation of the Partnership, any liquidation proceeds available for distribution to the Partners be distributed in accordance with the Partners' respective Capital Account balances and the Partners believe that distributions under Section 11.04 will effectuate such intent.  In the event that, upon liquidation, there is any conflict between a distribution pursuant to the Partners' respective Capital Account balances and the intent of the Partners with respect to distribution of proceeds as provided in Section 11.04, the Liquidator shall, notwithstanding the provisions of Sections 11.01, 11.02 and 11.03, allocate the Partnership's gains, profits and losses in a manner that will cause the distribution of liquidation proceeds to the Partners to be in accordance with the Partners' respective  Capital Account balances.

(c)   The Liquidator shall file all certificates and notices of the dissolution of the Partnership required by law.  The Liquidator shall proceed without any unnecessary delay to sell and otherwise liquidate the Partnership's property and assets; provided, however, that if the Liquidator shall determine that an immediate sale of part or all of the Partnership property would cause undue loss to the Partners, then in order to avoid such

loss, the Liquidator may, except to the extent provided by the Act, defer the liquidation as may be necessary to satisfy the debts and liabilities of the Partnership to Persons other than the Partners.   Upon the complete liquidation and distribution of the Partnership assets, the Partners shall cease to be Partners of the Partnership, and the Liquidator shall execute, acknowledge and cause to be filed all certificates and notices required by the law to terminate the Partnership.

(d)     Upon the dissolution of the Partnership pursuant to Section 12.01, the Accountants shall promptly prepare, and the Liquidator shall furnish to each Partner, a statement setting forth the assets and liabilities of the Partnership upon its dissolution. Promptly following the complete liquidation and distribution of the Partnership property and assets, the Accountants shall prepare, and the Liquidator shall furnish to each Partner, a statement showing the manner in which the Partnership assets were liquidated and distributed.

ARTICLE XIII.
BOOKS AND RECORDS, ACCOUNTING
TAX ELECTIONS, ETC.

13.01. <u>Books and Records</u>.  The books and records of the Partnership shall be maintained on an accrual basis in accordance with sound federal income tax accounting principles. These and all other records of the Partnership, including information relating to the status of the Apartment Complex and information with respect to the sale by the General Partners or any Affiliate of goods or services to the Partnership, shall be kept at the principal office of the Partnership and shall be available for examination there by any Partner, or his duly authorized representative, at any and all reasonable times. Any Partner, or his duly authorized representative, upon paying the costs of collection, duplication and mailing, shall be entitled to a copy of the list of names and addresses of the Limited Partners.

13.02. <u>Bank Accounts</u>.  All funds of the Partnership not otherwise invested shall be deposited in one or more accounts maintained in such banking institutions as the General Partner shall determine, and withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partner may, from time to time, determine.  No funds of the Partnership shall be deposited in any financial institution in which any Partner is an officer, director or holder of any proprietary interest.

13.03. <u>Accountants</u>.  The Accountants shall annually prepare for execution by the General Partner all tax returns of the Partnership, shall annually audit the books of the Partnership, and shall certify, in accordance with generally accepted accounting principles, a balance sheet, a profit and loss statement, and a cash flow statement.  With respect to each fiscal year during the Partnership's operations, at such time as the Accountants shall have prepared the proposed tax return for such year, the Accountants shall provide copies of such proposed tax return to the Investment Partnership for its review and comment. Any changes in such proposed tax return recommended by the Investment Partnership's accountants and approved by the Accountant and the General Partner shall be made by the Accountants prior to the completion of such tax return for execution by the General Partner.  A full detailed statement shall be furnished to all Partners, showing such assets, properties, and net worth and the profits and losses of the Partnership for the preceding fiscal year.  All Partners shall have the right and power to examine and copy, at any and all reasonable times, the books, records and accounts of the Partnership.

13.04. <u>Reports to Partners</u>.

(a)    The Managing General Partner shall cause to be prepared and distributed to all persons who were Partners at any time during a fiscal year of the Partnership:

(i)    Within 75 days after the close of each fiscal year of the Partnership, audited financial statements prepared by the Accountants (or other independent accountants approved by the Limited Partner) in accordance with generally accepted accounting principles, and such financial information with

respect to each fiscal year of the Partnership as shall be reportable for Federal and state income tax purposes.

        (ii)     Within thirty-five (35) days after the end of each month, a report of operations for such month containing:

        (A)     A balance sheet, which may be unaudited; and

        (B)     a statement of income and expense and a cash flow statement for the month and the period then ended, which may be unaudited; and

        (C)     other pertinent information regarding the Partnership and its activities during the period covered by the report.

        (b)     Within seventy-five (75) days after the end of each fiscal year of the Partnership the Managing General Partner shall provide to the Limited Partners:

        (i)     A certification by the Managing General Partner that (A) all Mortgage Loan payments and taxes and insurance payments with respect to the Apartment Complex are current as of the date of the year-end report, (B) there is no material default under the Project Documents or this Agreement, or if there is any material default, a description thereof, and (C) it has not received notice of any building, health or fire code violation or similar violation of a governmental law, ordinance or regulation against the Apartment Complex or, if any such notice of any violation has been received, a description thereof;

        (ii)     the information specified in Section 13.04(c);

        (iii)     a descriptive statement of all transactions during the fiscal year between the Partnership and the Managing General Partner and/or any Affiliate, including the nature of the transaction and the payments involved (including accrued cash or other payments);

        (iv)     a Cash Flow and Net Cash Flow statement; and

        (v)     a copy of the annual report to be filed with the Agency concerning the status of the Apartment Complex as low-income housing.

        (c)     Upon the written request of the Investment Partnership for further information with respect to any matter covered in items (a) or (b) above, the General Partner shall furnish such information within 30 days of receipt of such request.

        (d)     The Managing General Partner, on behalf of the Partnership, shall send to the Limited Partners, on or before July 31 in each year, a report which shall state:

        (i)     the then occupancy level of the Apartment Complex;

(ii)     if there are any Operating Deficits or anticipated Operating Deficits, the manner in which such deficits will be funded; and

(iii)     such other matters as shall be material to the operation of the Partnership, including, without limitation, any building, health or fire code violation or similar violation of a governmental law, ordinance or regulation by the Apartment Complex of which the Managing General Partner is aware.

(e)     Prior to October 15 of each year, the Managing General Partner, on behalf of the Partnership, shall send to the Limited Partners an estimate of the Limited Partners' share of the Tax Credits, profits and losses of the Partnership for federal income tax purposes for the current fiscal year.

(f)     Within 15 days after the end of any calendar quarter during which

(i)     there is a material default by the Partnership under the Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt,

(ii)     any reserve has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserve was established,

(iii)     the Managing General Partner has received any notice of a material fact which may substantially affect further distributions, or

(iv)     any Partner has pledged or collateralized its Interest in the Partnership.

The Managing General Partner shall send the Investment Partnership a detailed report of such event.

(g)     After the date of Substantial Completion, the Managing General Partner, on behalf of the Partnership, shall send to the Limited Partners, a copy of all applicable periodic reports covering the status of project as may be required by the Agency or the Lender, within 10 days of submission of such reports to the Agency and/or applicable Lender.

(h)     (i)     In the event that the reports or information provided for in Sections 13.04(a) and/or (b) above are, at any time, not provided within the time frames set forth therein, the Managing General Partner shall be obligated to pay to the Investment Partnership the sum of $250 per day, as liquidated damages, for each day from the date upon which such reports or information is (are) due pursuant to the provisions of the aforesaid Sections until the date upon which such reports or information is(are) provided; however, that any delays beyond the aforesaid dates in the provision of the applicable reports or information due to factors beyond the

control of the General Partner and the Accountants may be a cause for waiver of the aforesaid liquidated damages, but only if the delayed reports or information were supplied by the applicable aforesaid date in a draft or estimated form.

(ii)     In the event that the reporting requirements set forth in any of the above provisions of this Section 13.04 are not met, the Investment Partnership, in its reasonable discretion, may direct the Managing General Partner to dismiss the Accountants, and to designate successor Accountants, subject to the approval of the Investment Partnership; provided, however, that if the Managing General Partner and the Investment Partnership cannot agree on the designation of successor Accountants, the successor Accountants shall be designated by the Investment Partnership in its sole reasonable discretion.

(iii)     The Partnership shall pay, as an operational expense of the Partnership, an annual Asset Management Fee of Seven Thousand Five Hundred Dollars ($7,500) (increased annually by 2% per year) to SunAmerica Affordable Housing Partners, Inc. (or to such other entity as the Investment Partnership shall designate), for an annual review of the operations of the Partnership and the Apartment Complex. Such fee shall accrue beginning with the commencement of leasing or marketing activity for the Apartment Complex. Such fee shall be due 90 days after the end of each fiscal year of the Partnership with respect to the fee earned for such fiscal year. Such fee shall be prorated with respect to any period that is less than one year. Such fee shall be paid from Net Cash Flow in accordance with Section 11.01(a) hereof or from proceeds of sale, refinancing or liquidation in accordance with this Section 11.04 hereof.

13.05. <u>Section 754 Elections</u>.  In the event of a transfer of all or any part of the Interest of a General Partner or of a Limited Partner, the Partnership may elect, pursuant to Sections 743 and 754 of the Code (or any corresponding provision of succeeding law), to adjust the basis of the Partnership property if, in the opinion of the Investment Partnership, based upon the advice of the Accountants, such election would be most advantageous to the Investment Partnership.  Each Partner agrees to furnish the Partnership with all information necessary to give effect to such election.

13.06. <u>Fiscal Year and Accounting Method</u>.  The fiscal year of the Partnership shall be the fiscal year of the Investment Partnership, which ends at December 31. All Partnership accounts shall be determined on the accrual basis.

ARTICLE XIV.
AMENDMENTS

14.01. <u>Proposal and Adoption of Amendments</u>. This Agreement may be amended only by a written amendment executed by both General Partners and the Limited Partners. The General Partners agree to execute amendments proposed by the Investment Partnership which (a) increases or imposes upon the Investment Partnership the obligation to restore a deficit balance in its Capital Account, or (b) prospectively decreases the obligation of the Investment Partnership to restore a deficit balance in its Capital Account in a subsequent fiscal year of the Partnership. The General Partners agree to cooperate and to act promptly with respect to amendments proposed by the Investment Partnership.

ARTICLE XV.
CONSENTS, VOTING AND MEETINGS

15.01. <u>Method of Giving Consent</u>.  Any Consent required by this Agreement may be given by a written Consent given by the consenting Partner and received by the General Partners at or prior to the doing of the act or thing for which the Consent is solicited.

15.02. <u>Submissions to Limited Partners</u>.   The General Partners shall give the Limited Partners Notice of any proposal or other matter required by any provision of this Agreement or by law to be submitted for consideration and approval of the Limited Partners.  Such Notice shall include any information required by the relevant provision or by law.  If the Limited Partners fail to respond within forty-five (45) days after receipt of such notice (or such later time as specifically provided for in this Agreement), the Limited Partner shall be deemed to have not approved the proposals or matters included in such notice.

15.03. <u>Meetings; Submission of Matter for Voting</u>.   Subject to the provisions of Section 10.01, a majority in Interest of the Limited Partners shall have the authority to convene meetings of the Partnership and to submit matters to a vote of the Partners.

## ARTICLE XVI.
## GENERAL PROVISIONS

16.01. <u>Burden and Benefit</u>.  The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

16.02. <u>Applicable Law</u>.   This Agreement shall be construed and enforced in accordance with the laws of the State.

16.03. <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

16.04. <u>Separability of Provisions</u>.   Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

16.05. <u>Entire Agreement</u>.  This Agreement and the agreements referred to herein set forth all (and is intended by all parties to be an integration of all) of the representations, promises, agreements and understandings among the parties hereto with respect to the Partnership, the Partnership business and the property of the Partnership, and there are no representations, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth, incorporated or referred to herein.

16.06. <u>Liability of the Investment Partnership</u>.  Notwithstanding anything to the contrary contained herein, neither the Investment Partnership nor any of its partners, general or limited, shall have any personal liability to any of the parties to this Agreement with regard to the representations and covenants extended, or the obligations undertaken, by the Investment Partnership under this Agreement.  In the event that the Investment Partnership shall be in default under any of the terms of this Agreement, the sole recourse of any party hereto for any indebtedness due hereunder, or for any damages resulting from any such default by the Investment Partnership, shall be against the Interest of the Investment Partnership and the capital contributions of the investor limited partners of the Investment Partnership (either directly or through another investment partnership) allocated to, and remaining for investment in, the Partnership; provided however, that under no circumstances shall the liability of the Investment Partnership for any such default be in excess of the amount of Capital Contribution payable by the Investment Partnership to the Partnership, under the terms of this Agreement, at the time of such default, less the value of the Interest of the Investment Partnership, if such Interest is claimed as compensation for damages.

16.07. <u>Environmental Protection</u> .

(a)     The General Partner represents and warrants that (i) it has no knowledge of any deposit, storage, disposal, burial, discharge, spillage, uncontrolled loss, seepage or filtration of any Hazardous Substances at, upon, under or within the Land or any contiguous real estate, and (ii) it has not caused or permitted to occur, and it shall not permit to exist, any condition which may cause a discharge of any Hazardous Substances at, upon, under or within the Land or on any contiguous real estate.

(b)     The General Partner further represents and warrants that (i) neither it nor, to the best of its knowledge, any other party has been, is or will be involved in operations at or, pursuant to the General Partner's best knowledge, near the Land, which operations could lead to (A) a determination of liability under the Hazardous Waste Laws as to the Partnership, or (B) the creation of a lien on the Land under the Hazardous Waste Laws or under any similar laws or regulations; and (ii) the General Partner has not permitted, and will use best efforts not to permit, any tenant or occupant of the Apartment Complex to engage in any activity that could impose liability under the Hazardous Waste Laws on such tenant or occupant, on the Land or on any other owner of the Apartment Complex.

(c)     The General Partner shall comply strictly and in all respects with all material requirements of the Hazardous Waste Laws and related regulations and with all similar laws and regulations.

(d)     It shall at all times indemnify and hold harmless the Limited Partners against and from any and all claims, suits, actions, debts, damages, costs, charges, losses, obligations, judgments, and expenses, of any nature whatsoever, suffered or incurred by the Limited Partners and arising from their investment in the Partnership, under or on account of the Hazardous Waste Laws or any similar laws or regulations, including the assertion of any lien thereunder, except to the extent caused by the gross negligence or willful misconduct of the Limited Partner or its Affiliate.

(e)     For purposes of this Section 16.07, "Hazardous Substances" means oil, petroleum or chemical liquids or solids, liquid or gaseous products or any hazardous wastes or hazardous substances, as those terms are used in the Hazardous Waste Laws; and "Hazardous Waste Laws" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, and any other federal, state or local law governing Hazardous Substances, as such laws may be amended from time to time.

(f)     The Investment Partnership and its Affiliates shall have the right, but not the obligation, to obtain one or more policies of insurance related to the Apartment Complex, including without limitation, policies related to earthquakes, environmental liabilities and acts of war or terrorism ("IP Policies").  The Investment Partnership shall pay all insurance premiums and other costs of obtaining IP Policies without any right of reimbursement from the Partnership or the General Partner.  The Investment Partnership shall have sole control over the terms of the IP Policies, including choice of insurer, policy limits, risks covered, exclusions from coverage and the designation of insureds (which designation may or may not include the Partnership or the General Partner).  Neither the Partnership nor the General Partner shall have any right to approve or to Consent to the

terms of any IP Policy. Unless the Investment Partnership otherwise agrees in its sole and absolute discretion, neither the Partnership nor the General Partner shall have any right to provide notice of a claim under an IP Policy, to submit a claim under an IP Policy, to receive any proceeds of an IP Policy or to make any decisions or elections under an IP Policy. Neither the Partnership nor the General Partner shall have any rights with respect to any payments due to or made under IP Policies to the Investment Partnership or Affiliates. Nothing in this section shall modify the obligation of the General Partner to cause the Partnership to obtain insurance coverage as provided elsewhere in this Agreement.

16.08. <u>Notices</u>. Any Notice required by the provisions of this Agreement to be given to one or more Partners shall be addressed as follows:

(a)     To the Investment Partnership:

AIG SunAmerica Inc.,
General Partner of SunAmerica Housing
Fund 1050, A Nevada Limited Partnership
1 SunAmerica Center
Century City
Los Angeles, CA 90067-6022
Attention: Michael Fowler, Vice President
Fax No.: 310/772-6778

With a copy to:

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC 20004-2128
Attention: Herbert F. Stevens
Fax No.: 202/585-8000

(b)     To the General Partners:

Pathway of Pontiac, Inc.
701 Lee Street, Suite 450
Des Plaines, Illinois 60016
Attention: Jerome Finis
Fax No.:847-635-2148

With a copy to:

Block Caron & Lyon
790 Estate Drive, Suite 180
Deerfield, Illinois 60015
Attention: Jeffrey Lyon
Fax No: 847-945-8810

PV North LLC
25300 West Six Mile Road
Redford, MI  48240
Attention:  Roger Myers
Fax No:  313-794-6849

With a copy to:

Dykema Gossett PLC
400 Renaissance Center
Detroit, MI 48243
Attention:  Anthony Ilardi, Esq.
Fax No.: 313-568-6701

16.09. <u>No Continuing Waiver</u>.   The waiver of any party or any breach of this Agreement or of any full or partial condition for performance hereunder shall not operate or be construed to be a waiver of any subsequent breach or condition.

ARTICLE XVII.
RIGHT OF FIRST REFUSAL AND OPTION

17.01. <u>Grant of Right of First Refusal</u>.  Partnership hereby grants to Presbyterian a right of first refusal to purchase the Apartment Complex on the terms and conditions set forth in Sections 17.02, 17.03, 17.04 and 17.05 hereof.  Presbyterian's right to exercise the right of first refusal is subject to Presbyterian providing the Partnership with an opinion of counsel reasonably acceptable to Partnership and the Investment Partnership that the exercise of the right of first refusal will not cause any recapture of tax credits to any Partner of Partnership allowable under Section 42 of the Code, that there is no existing Event of Default of General Partner under this Agreement, and that Presbyterian is a qualified nonprofit organization or government agency as required by Section 42(i)(7)(A) of the Code.  Notwithstanding the foregoing, if the PV North is removed as a General Partner pursuant to the terms of this Agreement, the grant of right of first refusal shall be null and void and shall be of no further force and effect.

17.02. <u>Term</u>.  The term of this right of first refusal shall commence one day after the Compliance Period and shall terminate one year thereafter.

17.03. <u>Manner of Exercising Right of First Refusal</u>.  Upon receipt of a bona fide offer, Partnership shall notify Presbyterian in writing of the offer, and Presbyterian shall thereupon exercise its right of first refusal within thirty (30) days, or Partnership may sell the Apartment Complex on the terms as it may determine.

17.04. <u>Purchase Price</u>.

(a)    The purchase price shall be the sum of (i) the principal amount of outstanding indebtedness secured by the Apartment Complex (other than indebtedness incurred within the five-year period ending on the date of the sale), (ii) the IP Loan, the unpaid amount of any Tax Credit Shortfall, and all federal, state, and local taxes projected to be attributable to the sale and the receipt of the above amounts by the Limited Partner, and (iii) all GP Loans, Operating Deficit Loans, and Excess Development Cost payments made by Pathway or Pathway Senior Living of Michigan, LLC or their Affiliates. Notwithstanding any other provision of this Agreement, the proceeds from the purchase described hereunder, shall be distributed to Pathway with respect to proceeds received under clause (iii) hereunder, and to the Investment Partnership with respect to proceeds received under clause (ii) hereunder.

(b)    Presbyterian shall pay the purchase price in cash at closing.  In lieu of paying the purchase price at closing, however, Presbyterian may assume any outstanding debts secured by deeds of trust or mortgages on the Apartment Complex and any other obligations of Partnership, provided that any holder of such underlying obligation consents to the assumption.  The balance of the purchase price, if any, shall be payable in readily available funds.

17.05. Completion of Sale.

(a)     Escrow for the sale of the Apartment Complex shall close no later than 120 days after Partnership's receipt of Presbyterian's written notice of exercise of the option, at which time the purchase price shall be payable by taking subject to the existing debt, with the balance of the purchase price payable in readily available funds. Presbyterian shall obtain the consent to the sale from the Tax Credit Agency and the holders of any mortgages or deeds of trust on the Apartment Complex, if required.

(b)     Partnership shall convey the Apartment Complex to Presbyterian in an "as is" condition without representation or warranty.

17.06. Grant of Option.   The Partnership grants to Presbyterian an option to purchase the Apartment Complex or, in the alternative, at the election of Presbyterian, the Investment Partnership grants to Presbyterian an option to purchase the Interest of the Investment Partnership, in either event, on the terms and conditions set forth in this Article. Presbyterian's right to exercise the option is subject to Presbyterian providing the Partnership with an opinion of counsel reasonably acceptable to the Partnership, Pathway and the Investment Partnership that the exercise of the option will not cause any recapture of tax credits to any Limited Partner of Partnership allowable under Section 42 of the Code, and that there is no Event of Default of any of the obligations of the General Partner under this Agreement. Notwithstanding the foregoing, if PV North is removed as a General Partner pursuant to the terms of this Agreement, the grant of option to Presbyterian shall be null and void and shall be of no further force and effect.

17.07   Term of Option.   The term of the option shall commence one day after the Compliance Period and shall terminate one year thereafter.

17.08   Manner of Exercising Option.   Presbyterian may exercise its option by delivering to Partnership, with a copy to the Investment Partnership, during the option term, written notice of the exercise.  The notice of exercise shall state that the option is exercised without condition or qualification.

17.09   Purchase Price.

(a)     The purchase price of the Apartment Complex under the option shall be the greater of (1) the fair market value (as continued low-income housing) or (2) the purchase price set forth in Section 17.04(a).

(b)     The fair market value of the Apartment Complex shall refer to the fair market value on exercise of the option and shall be determined as follows.  The Limited Partner, on behalf of Partnership, and Presbyterian shall select a mutually acceptable appraiser who shall determine the fair market value of the Apartment Complex.  In the event the parties are unable to agree on an appraiser, the Limited Partner, on behalf of Partnership, and Presbyterian shall each select an appraiser.  If the difference between the two appraisals is within 10 percent of the lower of the two appraisals, the fair market value shall be the average of the two appraisals.  If the difference between the two appraisals is

greater than 10 percent of the lower of the two appraisals and at least one of the appraisals exceeds the amount described in Section 17.09(a), then the two appraisers shall jointly select a third appraiser.  If the two appraisers are unable jointly to select a third appraiser, either the Limited Partner, on behalf of Partnership, or Presbyterian may, upon written notice to the other, request that the appointment be made by the then president of the Detroit, Michigan Chapter of the American Arbitration Association, or his or her designee. The appraisals shall take into account any requirements that the Apartment Complex remain dedicated for the use of low-income households pursuant to any restrictions under any loan agreements, regulatory agreements, or otherwise.  If the third appraisal is less than either of the first two, the fair market value shall be the average of the two lowest appraisals.  If the third appraisal is greater than the first two, the fair market value shall be the average of the two highest appraisals.  If the third appraisal falls between the previous two appraisals, the fair market value shall be the value established by the third appraisal.  Partnership and Presbyterian shall share the cost equally of any appraiser jointly selected or shall pay the costs of the appraiser they each select and shall share the cost equally of any third appraiser.  Any appraiser selected pursuant to this section shall be an MAI appraiser with at least five years of experience in the Metropolitan Detroit Area.

      (c)    The Partnership shall pay the purchase price in cash at closing.  In lieu of paying the purchase price at closing, however, the Partnership may assume any outstanding debts secured by deeds of trust or mortgages on the Apartment Complex and any other obligations of Partnership, provided that any holder of such underlying obligation consents to the assumption.

ARTICLE XVIII.
MICHIGAN STATE HOUSING DEVELOPMENT  AUTHORITY REQUIREMENTS

18.01  .  Name.  The Partnership shall be conducted under the name of Pontiac ILF Limited Dividend Housing Association Limited Partnership.

18.02  .  Purpose  .  The Partnership has been organized exclusively to provide housing facilities for persons of low and moderate income, or for persons whose income does not exceed limits established in Act No. 346 of Public Acts of 1966 of the State of Michigan, as amended (the "Act"), and for social, recreational, commercial, and communal facilities as may be necessary to serve and improve a residential area in which Authority-aided or federally-aided housing is located or is planned to be located, thereby enhancing the viability of the housing.

18.03  .  Return.  Notwithstanding any other provisions of this Agreement, by acceptance of a beneficial interest in the Partnership or by executing the document of basic organization, every partner of the Partnership shall be deemed to have agreed that he or she at no time shall receive from the Partnership, any return in excess of the face value of the investment attributable to his or her respective interest plus cumulative dividend payments at a rate as the Michigan State Housing Development Authority (the "Authority") determines to be reasonable and proper, computed from the initial date on which money was paid or property delivered in consideration for the interest, and that upon the dissolution of the Partnership, any surplus in excess of such amounts shall be paid to the Authority or to any other regulating governmental body as the Authority directs.

To assist in interpretation of the above, the Authority has adopted definitions of two of the terms employed therein, as follows:

(1)    The term "surplus" as used herein shall not be deemed to include any increase in assets of the Partnership by reason of reduction of a mortgage, by amortization or similar payments, or realized from the sale or disposition of any assets of the Partnership to the extent such surplus can be attributed to any increase in market value of any real property or tangible personal property accruing during the period the assets were owned and held by the Partnership.

(2)    Any payment to a person having a beneficial interest in the Partnership shall not be deemed a "return" to such person if the funds with which such payment is made are funds contributed to the Partnership by persons purchasing a beneficial interest in the Partnership.

18.04  Supervision by Authority.  Notwithstanding any other provisions of this Agreement, the operations of the Partnership may be supervised by the Authority or by any other governmental body as the Authority directs and the Partnership shall enter into agreements with the Authority or with the governmental body as the Authority from time to time requires.  The Agreements shall provide for regulation by the Authority or the governmental body of the planning, development and management of the housing

development undertaken by the Partnership and the disposition of the property and franchises of the Partnership.

18.05 <u>Authority's Right to Appoint Managing Agent</u>. Notwithstanding any other provisions of this Agreement, the Authority shall have the power to appoint a managing agent of the Partnership and its partners, who may be an officer, employee, or agent of the Authority, and such managing agent shall have complete power to act as agent and attorney in fact for the Partnership and its partners, in connection with any assets or liability of the Partnership, to fulfill any obligations the Partnership may have to the Authority if:

(1) The Partnership has received a loan or advance as provided in the Act and the Authority determines that the loan or advance is in jeopardy of not being repaid;

(2) The Partnership has received a loan or advance as provided for in the Act and the Authority determines that the proposed housing development for which the loan or advance was made is in jeopardy of not being constructed;

(3) The Authority determines that some part of the net income or net earnings of the Partnership, in excess of that permitted by other provisions of the Act, shall inure to the benefit of any private individual, firm, corporation, partnership, trust or association;

(4) The Authority determines that the Partnership is in violation of the rules promulgated under Section 22 of the Act; or

(5) The Authority determines that the Partnership is in violation of any agreements entered into with the Authority providing for regulation by the Authority of the planning, development and management of any housing development undertaken by the Partnership or the disposition of the property and franchises of such Partnership.

18.06 <u>Authority's Reliance on Continuing Effect of Provisions</u>. Notwithstanding any other provisions of this Agreement, the partners of the Partnership agree that the Authority may rely upon the continuing effect of this Partnership Agreement in this form as approved by the Authority and, by the execution of this Agreement, such partners agree not to amend, alter or change the provisions of this Agreement without the prior written consent of an Authorized Officer of the Authority.

ARTICLE XIX.
HUD REQUIRED PROVISIONS

1. So long as the Secretary of the Department of Housing and Urban Development ("Secretary" or "HUD") or the Secretary's successors or assigns is the insurer or holder of the mortgage note secured by the mortgage on [insert project's name and FHA project number] in [insert the city, county and state] (the "Project"), no amendment to the Certificate of Limited Partnership or the Partnership Agreement dated [insert date] (the "Partnership Agreement") that results in any of the following will have any force or effect without the prior written consent of the Secretary:

A.   Any amendment that modifies the term of the Partnership;

B.   Any amendment that activates this requirement that a HUD previous participation certification be obtained from any additional partner;

C.   Any amendment that in any way affects the note, mortgage or security agreement on the Project or the Regulatory Agreement between HUD and the owner of the project (the "Regulatory Agreement");

D.   Any amendment that would authorize any partner other than the General Partner to bind the Partnership for all matters concerning the Project which requires HUD's consent or approval;

E.   A change in the General Partner of the Partnership; or

F.   Any change in the guarantor of any obligation to the Secretary;

G.   No provision required by HUD to be inserted into the Partnership's organizational documents may be amended;

H.   Any party acquiring any of the following positions anew must meet the applicable requirements for HUD provisions participation clearance;

i.    General Partner of the Partnership;
ii.   Any partner with a ten (10%) percent or greater governance interest, and
iii.  Any Partner with twenty-five (25%) percent or greater financial interest.

I.   Voluntarily dissolve or change to another type of entity; and

2.    The Partnership is authorized to execute or assume a note, mortgage and security agreement in order to secure a loan insured by the Secretary and to execute the Regulatory Agreement and other documents required by the Secretary in connection with the HUD-insured loan.

3.    Any incoming Partner must as a condition of receiving an interest in the Partnership agree to be bound by the note, mortgage, security agreement, the Regulatory Agreement and any other documents in connection with the HUD-insured loan to the same extent and on the same terms as the other partners.

4.    Notwithstanding any other provisions of the Certificate of Limited Partnership or the Partnership Agreement, upon any dissolution, no title or right to possession and control of the Project, and no right to collect the rents from the Project shall pass to any person who is not bound by the Regulatory Agreement in a manner satisfactory to the Secretary.

5.     Notwithstanding any other provisions of this Partnership Agreement or the Certificate of Limited Partnership, in the event that any provision of this Partnership Agreement and the Certificate of Limited Partnership conflicts with the terms of the note, mortgage, security agreement or HUD Regulatory Agreement, the provisions of the note, mortgage, security agreement and/or Regulatory Agreement will control.

6.     So long as the Secretary or the Secretary's successors or assigns is the insurer or holder of the note on the Project, the Partnership may not voluntarily be dissolved without the prior written approval of the Secretary.

7.     Anything contained in this Partnership Agreement to the contrary notwithstanding, the provisions contained in this Article XIX shall be deemed to take precedent and have priority over any of the other provisions of this Article XIX conflict with any other provision of the Partnership Agreement, the provisions contained in this Article XIX shall be deemed to apply and take precedent over the other conflicting provision.

IN WITNESS WHEREOF, the parties have affixed their signatures and seals to this Amended and Restated Agreement of Limited Partnership of Pontiac ILF Limited Dividend Housing Association Limited Partnership as of the date first written above.

GENERAL PARTNERS:

WITNESS/ATTEST:

PATHWAY OF PONTIAC, INC., a Michigan corporation

By: _____
    Name: Jerome E Finis
    Title: V P

PV NORTH LLC, a Michigan limited liability company

By: _____
    Name:
    Title:

WITHDRAWING GENERAL PARTNERS

PATHWAY SENIOR LIVING OF MICHIGAN, LLC, a Michigan limited liability company

By: _____
    Name: Jerome E Finis
    Title: authorized agent

PRESBYTERIAN VILLAGE NORTH, a Michigan limited liability company

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have affixed their signatures and seals to this Amended and Restated Agreement of Limited Partnership of Pontiac ILF Limited Dividend Housing Association Limited Partnership as of the date first written above.

GENERAL PARTNERS:

WITNESS/ATTEST:

PATHWAY OF PONTIAC, INC., a Michigan corporation

By: _____
    Name:
    Title:

PV NORTH LLC, a Michigan limited liability company

By: _____
    Name:
    Title:

WITHDRAWING GENERAL PARTNERS

PATHWAY SENIOR LIVING OF MICHIGAN, LLC, a Michigan limited liability company

By: _____
    Name:
    Title:

PRESBYTERIAN VILLAGE NORTH, a Michigan limited liability company

By: _____
    Name:
    Title:

INVESTMENT PARTNERSHIP:

SUNAMERICA HOUSING FUND 1050,
A NEVADA LIMITED PARTNERSHIP

By:   AIG SunAmerica Inc., its general
partner

By: _____
       Michael L. Fowler,
       Vice President

WITHDRAWING LIMITED PARTNER

_____
JEROME E. FINIS

W225990 8

INVESTMENT PARTNERSHIP:

SUNAMERICA HOUSING FUND 1050,
A NEVADA LIMITED PARTNERSHIP

By:   AIG SunAmerica Inc., its general
partner


By: _____
Michael L. Fowler,
Vice President



WITHDRAWING LIMITED PARTNER

_____
JEROME E. FINIS

W225990.8

AS A CONSENTING PARTY WITH RESPECT TO THE PROVISIONS OF SECTIONS 8.17 AND 8.18:

Management Agent:

PRESBYTERIAN VILLAGES OF MICHIGAN

By: _____
    Name: _____
    Title: _____


AS A CONSENTING PARTY WITH RESPECT TO THE PROVISIONS OF ARTICLE VIII AND SECTION 11.01

Developer:

PATHWAY SENIOR LIVING OF MICHIGAN, LLC


By: _____
    Name: _____
    Title: _____

PRESBYTERIAN VILLAGE NORTH

By: _____
    Name _____:
    Title: _____

W225990 8

AS A CONSENTING PARTY WITH RESPECT TO THE PROVISIONS OF SECTIONS 8.17 AND 8.18:

Management Agent:

PRESBYTERIAN VILLAGES OF MICHIGAN

By: _____

     Name: _____

     Title: _____


AS A CONSENTING PARTY WITH RESPECT TO THE PROVISIONS OF ARTICLE VIII AND SECTION 11.01

Developer:

PATHWAY SENIOR LIVING OF MICHIGAN, LLC

By: _____

     Name: _____

     Title: _____

PRESBYTERIAN VILLAGE NORTH


By: _____

     Name _____:

     Title: _____

W225990.8

COUNTY OF _Cook_    )

                     ) : ss

STATE OF _Illinois_  )


Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared _Jerome E. Finis_, in (i) his capacity as _Vice President_ of Pathway of Pontiac, Inc., as General Partner of Pontiac ILF Limited Dividend Housing Association Limited Partnership, [and (ii) as a consenting party with respect to the provisions of Section 8.15 of the foregoing Amended and Restated Agreement of Limited Partnership], and being duly sworn, acknowledged the execution of the foregoing Agreement of Limited Partnership.

Witness my hand and notarial seal this _18th_ day of _Sept_, 2002.

                                    _Rosemarie J. Russo_
                                    Notary Public

My Commission Expires: _9/17_, 2004

> OFFICIAL SEAL
> ROSEMARIE J. RUSSO
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES 9/17/2004

W225990.8

COUNTY OF _Cook_ )

STATE OF _ILLINOIS_ : ss )

    Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared _Jerome E Finis_ , in (i) his capacity as _Authorized Agent_ of Pathway Senior Living of Michigan, LLC, as Withdrawing General Partner of Pontiac ILF Limited Dividend Housing Association Limited Partnership, and (ii) as a consenting party with respect to the provisions of Section 8.17, 8.18 and 11.04 of the foregoing Amended and Restated Agreement of Limited Partnership], and being duly sworn, acknowledged the execution of the foregoing Agreement of Limited Partnership.

    Witness my hand and notarial seal this _18th_ day of _Sept_ , 2002.

                              _Rosemarie J Russo_
                              Notary Public

My Commission Expires: _9/17, 2004_

> OFFICIAL SEAL
> ROSEMARIE J. RUSSO
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES 9/17/2004

W225990.8

COUNTY OF Cook )
                      : ss
STATE OF Illinois )

        Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared Jerome E.Finis in his capacity as WITHDRAWING LIMITED PARTNER of Pontiac ILF Limited Dividend Housing Association Limited Partnership., and being duly sworn, acknowledged the execution of the foregoing Agreement of Limited Partnership.

        Witness my hand and notarial seal this 18th day of Sept , 2002.

                                     _____
                                     Notary Public

My Commission Expires: 9/17/2004

OFFICIAL SEAL
ROSEMARIE J. RUSSO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2004

W225990.8

COUNTY OF _Los Angeles_ )
                     : ss
STATE OF ~~MICHIGAN~~    )
        _California_

      Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared Michael L. Fowler, in his capacity as Vice President of AIG SunAmerica Inc., as general partner of SunAmerica Housing Fund 1050, a Nevada Limited Partnership, as Limited Partner of Pontiac ILF Limited Dividend Housing Association Limited Partnership, and being duly sworn, acknowledged the execution of the foregoing Amended and Restated Agreement of Limited Partnership.

      Witness my hand and notarial seal this _13th_ day of _September_ 2002.

                                 _Sue Anderson Ford_
                                   Notary Public

My Commission Expires: _2/14_, 2003

SUE ANDERSON FORD
Commission # 1210960
Notary Public - California
Los Angeles County
My Comm. Expires Feb 14, 2003

COUNTY OF _Oakland_ )
                   : ss
STATE OF _mi_ )

       Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared _Roger Myers_, in (i) his capacity as _Manager_ of PV North LLC, as General Partner of Pontiac ILF Limited Dividend Housing Association Limited Partnership,, and being duly sworn, acknowledged the execution of the foregoing Agreement of Limited Partnership.

       Witness my hand and notarial seal this _18_ day of _Sept_, 2002.

                               _Karen L Martin_
                               Notary Public

My Commission Expires: _____, 200_

                                    KAREN E. MARTIN
                             NOTARY PUBLIC MACOMB CO., MI
                          MY COMMISSION EXPIRES Aug 13, 2006

COUNTY OF _Oakland_ )
                              : ss
STATE OF _MI_ )

     Before me, the undersigned Notary Public in and fort he aforesaid County and State, personally appeared _Roger Myers_, in (i) his capacity as _Manager_ of Presbyterian Village North LLC, as Withdrawing General Partner of Pontiac ILF Limited Dividend Housing Association Limited Partnership, and (ii) as a consenting party with respect to the provisions of Section 11.04 of the foregoing Amended and Restated Agreement of Limited Partnership, and being duly sworn, acknowledged the execution of the foregoing Agreement of Limited Partnership.

     Witness my hand and notarial seal this _18_ day of _Sept_, 2002.

                             Notary Public

My Commission Expires: _____, 200_

KAREN E. MARTIN
NOTARY PUBLIC MACOMB CO., MI
MY COMMISSION EXPIRES Aug 18, 2006

W225990 8

## EXHIBITS

| | |
|---|---|
| A | Incentive Partnership Management Fee Agreement |
| B | Development Agreement |
| C | Form of Bridge Loan Note |
| D | Description of Property |
| E | Construction Advisory Services Agreement |
| F | General Partner's Disclosure as to Sale and Refinancing Restrictions |
| G | Guaranty Agreement |
| H | Development Budget |
| I | Replacement Reserve Items |
| J | Form of Management Agreement |
| K | Insurance Requirements |
| L | Form of Contractor's Affidavit |
| M | Form of Construction Update |
| N | Cable TV and Telecom Policies |

N162938 2

EXHIBIT "A"

EXHIBIT "A"

Incentive Partnership Management Fee Agreement

INCENTIVE PARTNERSHIP MANAGEMENT FEE AGREEMENT

THIS AGREEMENT entered into as of September 1, 2002, by and between Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership (the "Partnership"), and Pathway Senior Living of Michigan, LLC, ("PSLM"), a Michigan limited liability company as the as a developer of the Apartment Complex.

WHEREAS, Pathway of Pontiac, a Michigan corporation, PV North LLC, a Michigan limited liability company, (collectively, Pathway of Pontiac and PV North LLC to be referred to as the "General Partners") and SunAmerica Housing Fund 1050, A Nevada Limited Partnership ("SHF" or the "Investment Partnership"), as the Limited Partner; have entered into an Amended and Restated Agreement of Limited Partnership in order to continue a limited partnership pursuant to the Michigan Limited Partnership Act (the "Act"), to be known as Pontiac ILF Limited Dividend Housing Association Limited Partnership (the "Partnership"); and

WHEREAS, the Partnership has been formed to develop, acquire, rehabilitate, own, maintain and operate a 150-unit multifamily apartment complex for rental to seniors of low and moderate income, to be known as Presbyterian Village North, and located in Pontiac, Michigan (the "Apartment Complex"); and

WHEREAS, GMAC Commercial Mortgage Corporation (the "Lender") will issue to the Partnership its commitment to provide a HUD insured construction mortgage loan for the Apartment Complex in the anticipated principal amount of $5,300,000 (the "Mortgage Loan"); the initial closing of the Mortgage Loan is anticipated to occur on or about October 15, 2002 (the "Construction Loan Closing"); and

WHEREAS, the Partnership desires that PSLM provides certain management services with respect to the business of the Partnership for the period commencing as of the date hereof and continuing throughout the term of the Partnership.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties agree as follows:

1.  <u>Appointment</u>.  The Partnership hereby appoints PSLM to render certain services with respect to the management and administration of the Partnership during the term of the Partnership as herein contemplated.

2.  <u>Authority</u>.  In conformity with the provisions of the Partnership Agreement, throughout the term of the Partnership, PSLM shall have the authority and the obligation, which authority and obligation may, subject to the provisions of the Partnership Agreement, be exercised by the General Partner to:

(i)     administer, manage and direct the business of the Partnership, and take such further action as it may deem necessary or desirable to further the

interest of the Partnership in accordance with the provisions of the Partnership Agreement;

(ii)     monitor the day-to-day operations of the Apartment Complex and make recommendations with respect thereto;

(iii)     investigate and make recommendations with respect to the selection and conduct of relations with consultants and technical advisors (including, without limitation, accountants and other similar advisors, attorneys, corporate fiduciaries, escrow agents, depositaries, custodians, agents for collection, insurers, insurance agents and banks) and persons acting in any other capacity, in connection with the Partnership;

(iv)     maintain appropriate books and records of the Partnership in accordance with sound federal income tax accounting principles and in conformity with the requirements of the Lender, including information relating to the sale by the General Partner or any Affiliate of goods or services to the Partnership;

(v)     be responsible for the safekeeping and use of all funds and assets of the Partnership, including the maintenance of bank accounts in accordance with Section 13.02 of the Partnership Agreement;

(vi)     prior to October 15 of every year, furnish or cause to be furnished to all Persons who were Partners at any time during the Partnership's fiscal year, preliminary tax information regarding the Partnership and its operations during the current fiscal year;

(vii)     on or before March 15 of every year, furnish or cause to be furnished to all Persons who were Partners at any time during the Partnership's prior fiscal year, all tax information regarding the Partnership and its operation during the prior fiscal year which is reasonably necessary to the Partners for their preparation of their tax returns;

(viii)     provide reports to Partners required pursuant to Section 13.04 of the Partnership Agreement;

(ix)     furnish or cause to be furnished to the Partners copies of any and all financial reports that may be requested by any party(ies) to any of the Project Documents or any governmental agencies having jurisdiction, including copies of any financial statements required by the Lender;

(x)     furnish or cause to be furnished to the Partners and/or any party(ies) to any of the Project Documents all such information as they may reasonably request from time to time with respect to the financial and administrative conditions of the Apartment Complex and the Partnership; and

(xi)     provide office space, support staff and administrative services as required by the Partnership.

3.      <u>Fees</u>.   For services to be performed under this Incentive Partnership Management Fee Agreement, the Partnership shall pay the PSLM, solely from the Net Cash Flow of the Partnership available pursuant to Section 11.01(a) of the Partnership Agreement, an annual Incentive Partnership Management Fee.  Such annual fee shall be in an amount and in the priority set forth in Section 11.01(a) of the Partnership Agreement, commencing after the payment of all preceding items in Section 11.01(a), but in no event greater than 7% of Gross Income per annum.

4.      <u>Withholding of Fee Payments</u>.  In the event that (i) the General Partners or any successor General Partner shall not have substantially complied with any material provisions under this Agreement and the Partnership Agreement, or (ii) the Pathway of Pontiac, Inc. shall have been removed pursuant to Section 8.16 of the Partnership Agreement, then such General Partner shall be in default of this Agreement, and the Partnership shall withhold payment of all or any installment of fees payable to PSLM pursuant to Section 3 of this Agreement and Section 8.13 of the Partnership Agreement.

All amounts so withheld by the Partnership under this Section 4 shall be promptly released to PSLM, only after the General Partners have cured the default justifying the withholding, unless the General Partner shall have been removed pursuant to the Partnership Agreement.

5.      <u>Successors and Assigns; Termination</u>.  This Agreement shall be binding on the parties hereto, their heirs, successors and assigns.  In the event that the Interests of Pathway of Pontiac, Inc., as General Partner, is transferred pursuant to Section 6.01 of the Partnership Agreement, further payment of the Incentive Management Fee from the Partnership to PSLM pursuant to Section 3 above shall be governed by such Section 6.01. The parties hereto may terminate this Agreement upon mutual consent to do so.

6.      <u>Defined Terms</u>.   Capitalized terms used in this Agreement and not specifically defined herein shall have the same meanings assigned to them as in the Partnership Agreement.

7.      <u>Separability of Provisions</u>.   Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

8.      <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

9.      <u>No Continuing Waiver</u>.   The waiver of any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

10.     <u>Applicable Law</u>.   This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan.

IN WITNESS WHEREOF, the parties have caused this Incentive Partnership Management Fee Agreement to be duly executed as of the date as first written above.

PARTNERSHIP:

Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership

By:    PV North, LLC, as managing general partner

By: _____
      Name:
      Title:

By:    Pathway of Pontiac, Inc., general partner

By: _____
      Name:
      Title:

PARTNERSHIP MANAGER:

Pathway Senior Living of Michigan, LLC, a Michigan limited liability company

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the parties have caused this Incentive Partnership Management Fee Agreement to be duly executed as of the date as first written above.

PARTNERSHIP:

Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership

By:     PV North, LLC, as managing general partner

By: _____
    Name:
    Title:

By:   Pathway of Pontiac, Inc., general partner

By: _____
    Name: _____
    Title: _____

PARTNERSHIP MANAGER:

Pathway Senior Living of Michigan, LLC, a Michigan limited liability company

By: _____
    Name: _____
    Title: _____

N162938.2

EXHIBIT "B"

<u>Development Agreement</u>

# DEVELOPMENT AGREEMENT

THIS AGREEMENT is made and entered into as of September 1, 2002, between Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership (the "Partnership"), Presbyterian Village North, a Michigan non-profit corporation ("Presbyterian"), and Pontiac Senior Living of Michigan, LLC, a Michigan limited liability company ("PSLM") (PV North and PSLM to be collectively referred to herein as the "Developer").

WHEREAS, on or about June 30, 2001, PSLM and Presbyterian, as the Initial Limited Partners, executed a Certificate of Limited Partnership (the "Certificate") for the formation of Pontiac ILF Limited Dividend Housing Association Limited Partnership (the "Partnership") pursuant to the terms of the Michigan Revised Uniform Limited Partnership Act (the "Act"), which Certificate was subsequently filed with the Secretary of State of Michigan (the "State") on July 3, 2001; and

WHEREAS, the Initial General Partners and Jerome E. Finis, as the Initial Limited Partner executed an Agreement of Limited Partnership (the "Original Agreement") of the Partnership; and

WHEREAS, the Partnership has been formed to develop, acquire, rehabilitate, own, maintain and operate a 150-unit multifamily apartment complex intended for rental to seniors of low and moderate income, to be known as Presbyterian Village North, and to be located in Pontiac, Michigan (the "Apartment Complex"); and

WHEREAS, as of even date herewith, Pathway of Pontiac, Inc., a Michigan corporation ("Pathway") and PV North, LLC, a Michigan limited liability company, ("PV North") (Pathway and PV North to be collectively referred to herein as the "General Partners") and SunAmerica Affordable Housing Fund 1050, A Nevada limited Partnership (the "Investment Partnership") executed an Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement") to (i) continue the Partnership; (ii) admit the Investment Partnership to the Partnership as Limited Partner; (iii) withdraw the Initial Limited Partner from the Partnership; (iv) admit Pathway and PV North to the Partnership as the General Partners; (v) withdraw the Initial General Partners from the Partnership; (vi) reassign Interests in the Partnership; and (vi) set forth all of the provisions governing the Partnership; and

WHEREAS, the Partnership desires to appoint the Developer to provide certain services for the Partnership with respect to overseeing the development of the Apartment Complex until all development work is completed; and

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.     <u>Appointment</u>.   The Partnership hereby appoints the Developer to render services for the Partnership, and confirms and ratifies the appointment of the Developer with respect to services rendered for the Partnership to date, in supervising and overseeing the development of the Apartment Complex as herein contemplated.

2.     <u>Authority</u>.   In conformity with the provisions of the Partnership Agreement, the Developer shall have, and has had, the authority and the obligation to:

(i)     act on behalf of the Partnership in its relation with any governmental agency or authority and any Construction and/or Mortgage Loan lender with respect to all matters relating to the construction and development of the Apartment Complex, but the Developer shall not take any action and shall not be responsible for obtaining the Mortgage Loan for the Partnership;

(ii)     select the architect ("Architect"), coordinate the preparation of the plans and specifications (the "Plans and Specs") and recommend alternative solutions whenever design details affect construction feasibility or schedules;

(iii)     ensure that the Plans and Specs are in compliance with all applicable codes, laws, ordinances, rules and regulations;

(iv)     negotiate all necessary contracts and subcontracts (other than the Construction Contract) for the construction of the Apartment Complex;

(v)     choose the products and materials necessary to equip the Apartment Complex in a manner which satisfies all requirements of the Mortgage Loan and the Plans and Specs;

(vi)     monitor disbursement and payment of amounts owed Architects and the subcontractors;

(vii)     insure that the Apartment Complex is constructed free and clear of all mechanics' and materialmen's liens;

(viii)     obtain an Architect's certificate that the work on the Apartment Complex is substantially complete, and inspect the Architect's work;

(ix)     secure all building code approvals and obtain certificates of occupancy for all of the Residential Units of the Apartment Complex;

(x)     cause the Apartment Complex to be completed in a prompt and expeditious manner, consistent with good workmanship, and in compliance with the following:

(1)     the Plans and Specs as they may be amended by the agreement of the parties hereto and with the consent of the mortgagee under the Mortgage Loan;

(2)  any and all obligations of the Partnership under the Mortgage Loan;

(3)  any and all zoning regulations, county ordinances, including health, fire and safety regulations, and any other requirements of federal, state and local laws, rules, regulations and ordinances applicable to construction of the Apartment Complex;

(xi)  cause to be performed in a diligent and efficient manner the following:

(1)  rehabilitation of the Apartment Complex pursuant to the Plans and Specs, including any required off-site work; and

(2)  general administration and supervision of rehabilitation of the Apartment Complex, including but not limited to activities of subcontractors and their employees and agents, and others employed as to the Apartment Complex in a manner which complies in all respects with the Mortgage Loan and the Plans and Specs;

(xii)  keep, or cause to be kept, accounts and cost records as to the construction of the Development;

(xiii)  maintain, or cause to be maintained, at its expense, all office and accounting facilities and equipment necessary to adequately perform the foregoing functions;

(xiv)  make available to the Partnership, during normal business hours and upon the Partnership's written request, copies of all material contracts and subcontracts;

(xv)  deliver to the Partnership a dimensioned as-built survey of the real property (locating only buildings) and as-built drawings of the Apartment Complex construction;

(xvi)  provide, and periodically update Apartment Complex construction time schedule which coordinates and integrates Architect's services with construction schedules;

(xvii)  investigate and recommend a schedule for purchase by the Partnership of all materials and equipment requiring long lead time procurement, coordinate the schedule with Architect and expedite and coordinate delivery of such purchases;

(xviii)  prepare pre-qualification criteria for bidders interested in the Apartment Complex, establish bidding schedules and conduct pre-bid conferences to familiarize bidders with the bidding documents and management techniques with any special systems, materials or methods;

(xix)    receive bids, prepare bid analyses and make recommendations to the Partnership for award of contracts or rejection of bids;

(xx)    coordinate the work of Architect to complete the Apartment Complex in accordance with the objectives as to cost, time and quality, and provide sufficient personnel at the Apartment Complex with authority to achieve such objectives;

(xxi)    provide a detailed schedule of realistic activity sequences and durations, allocation of labor and materials and processing of shop drawings and samples;

(xxii)    provide regular monitoring of the schedule as construction progresses, identify potential variances between scheduled and probable completion dates, review the schedule for work not started or incomplete, recommend to the Partnership adjustments in the schedule to meet the probable completion date, provide summary reports of such monitoring, and document all changes in the schedule;

(xxiii)    recommend courses of action to the Partnership when requirements of subcontracts are not being fulfilled;

(xxiv)    revise and refine the approved estimate of construction cost, incorporate changes as they occur, and develop cash flow reports and forecasts as needed;

(xxv)    provide regular monitoring of the approved estimate of construction cost, show actual costs for activities in process and estimates for uncompleted tasks, identify variances between actual and budgeted or estimated costs and advise the Partnership whenever projected costs exceed budgets or estimates;

(xxvi)    develop and implement a system for review and processing of change orders as to construction of the Apartment Complex.

(xxvii)    develop and implement a procedure for the review and processing of applications by subcontractors for progress and final payments;

(xxviii)    in collaboration with Architect, establish and implement procedures for expediting the processing and approval of shop drawings and samples; and

(xxix)    record the progress of the Apartment Complex and submitting written progress reports to the Partnership and Architect, including the percentage of completion and the number and amounts of change orders.

The Developer shall not be responsible for and shall take no actions which pertain to the acquisition of the Land, the admission of the Limited Partners to the Partnership and the obtaining of the Mortgage Loan.

3.    <u>Development Fee</u>.

(a)    For services performed and to be performed under Sections 1 and 2 of this Agreement the Partnership agrees to pay the Developer a Development Fee in the aggregate amount of One Million Dollars ($1,000,000). It is anticipated that payment of the Development Fee will be made from (i) a portion of the Investment Partnership's Capital Contributions to the extent available and (ii) pursuant to payments pursuant to Sections 11.01 and 11.04 of the Partnership Agreement and (iii) to the extent not paid the proceeds described in clauses (i) and (ii) above, then any unpaid Development Fee shall be paid from the proceeds of the General Partner's Special Capital Contribution upon the earlier to occur of ten (10) years after the date of this Agreement or the date on which the General Partner is removed as the General Partner of the Partnership. In the event that on or before the date on which the Investment Partnership makes its Third Additional Capital Contribution, there is a Tax Credit Shortfall and the Investment Partnership's Capital Contribution is reduced and, as a result, the amount of the Development Fee remaining to be paid shall be paid from Net Cash Flow, provided however that the total Development Fee shall not be increased as a result. The unpaid portion of the Development Fee shall bear interest commencing upon the date on which the Investment Partnership makes its First Additional Capital Contribution to the Partnership (the "Effective Date") on the outstanding unpaid balance at the "applicable Federal long-term rate" (as defined in Section 1274(d) of the Code) in effect on the Effective Date, compounded annually. All payments made hereunder shall be applied first to interest due hereunder and then to the outstanding balance of the Development Fee until the Development Fee is paid in full. Any outstanding balance shall be payable upon dissolution of the Partnership. If the Partnership has not dissolved on the date which is ten (10) years after the date of this Agreement, any outstanding balance of the Development Fee, including accrued interest, shall be payable.

(b)    For those services set forth pursuant to clauses (i), (ii), (iii) and (iv) of Section 2 performed on or before December 31, 2002 as set forth in Section 2 hereof, 20% percent of the Development Fee shall be deemed earned as of December 31, 2002.

4.    <u>Acknowledgment</u>. The Developer acknowledges and agrees to the provisions of Sections 8.09(a)(iv), 8.13, 8.15 and 11.01(a)(iv) of the Partnership Agreement and agrees that amounts due under this Agreement may be applied or withheld as set forth therein. In the event that the Developer shall be in default of this Agreement after Notice and a thirty (30) day opportunity to cure such default, the Partnership may terminate this Agreement and withhold any payments due hereunder. The Developer agrees that it shall not perform any of the services described in Section 4.04(b) of the Partnership Agreement.

5.    <u>Assignment of Fees</u>. The Developer shall not assign, pledge or otherwise encumber, for security or otherwise, the Development Fee set forth above to be made by the Partnership, or any portion(s) thereof or any right(s) of the Developer thereto, without the prior Consent of the Investment Partnership.

6.    <u>Construction Warranty</u>.

(a)    Developer hereby warrants to the Partnership and to the Investment Partnership that the materials and equipment furnished in accordance with this Agreement will be of good quality, that the work will be free from defects, and that the work will conform with the requirements of the Plans and Specifications. Work not

conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. If requested by the Investment Partnership or the Lender, Developer shall furnish satisfactory evidence as to the kind and quality of materials and equipment used in the construction of the Apartment Complex.

(b)     If, within one (1) year after Substantial Completion, any of the structural or non-structural work performed to construct the Apartment Complex is found to be materially defective or not in accordance in all material respects with the Plans and Specifications and with all applicable building codes, laws, rules and regulations, Developer shall correct or cause the Contractor to correct such defect(s) promptly after receipt of written notice from the Partnership or the Investment Partnership to do so. With respect to portions of the work first performed after Substantial Completion, such one (1) year period shall be extended by the period of time between the date of Substantial Completion and the actual performance of the work. The obligation under this Section 6 shall survive acceptance of the work performed to construct the Apartment Complex. The Partnership or the Investment Partnership shall give such notice promptly after discovery of the condition. In the event a material defect is discovered more than one (1) year after the date of Substantial Completion, as such period may be extended under this Section, and such defect was known to Developer or an Affiliate of Developer and was not disclosed to the Partnership and the Investment Partnership or was intentionally concealed by Developer or such Affiliate, then Developer shall promptly take such action as may be necessary, at Developer's sole expense, to correct such defective work to the satisfaction of the Investment Partnership. The Partnership or the Investment Partnership, as applicable, shall report to Developer any defective condition discovered more than one (1) year after the date of Substantial Completion, as such period may be extended under this Section.

7.     Successors and Assigns, Termination. This Agreement shall be binding on the parties hereto, their heirs, successors, and assigns. However, this Agreement may not be assigned by any party hereto without the Consent of the Investment Partnership, nor may it be terminated without the Consent of the Investment Partnership; such Consent shall not be unreasonably withheld.

8.     Defined Terms. Capitalized terms used in this Agreement and not specifically defined herein shall have the same meanings assigned to them as in the Partnership Agreement.

9.     Separability of Provisions. Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

10.     Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

11.     No Continuing Waiver. The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

12.    <u>Applicable Law</u>.    This Agreement shall be construed and enforced in accordance with the laws of the Michigan.

IN WITNESS WHEREOF, the parties have caused this Development Agreement to be duly executed as of the date first written above.

Pontiac ILF Limited Dividend Housing Association Limited Partnership

By:    Pathway of Pontiac, a Michigan corporation, a general partner

By:    _____
Name: ~~Yvonne C. Fino~~
Title: VV?

By:    PV North, LLC, a Michigan limited liability company, managing general partner

Pathway Senior Living of Michigan, LLC, a Michigan limited liability company

By:    _____
Name: Yvonne C. Fino
Title: authorized agent

Presbyterian Village North, a Michigan non profit corporation

By:    _____
Name:
Title:

N162938 2

IN WITNESS WHEREOF, the parties have caused this Development Agreement to be duly executed as of the date first written above.

Pontiac ILF Limited Dividend Housing Association Limited Partnership

By:    Pathway of Pontiac, a Michigan corporation, a general partner

By: _____
Name:
Title:

By:    PV North, LLC, a Michigan limited liability company, managing general partner

Pathway Senior Living of Michigan, LLC, a Michigan limited liability company

By: _____
Name:
Title:

Presbyterian Village North, a Michigan non-profit corporation

By: _____
Name:
Title:

N162938 2

IN WITNESS WHEREOF, the parties have caused this Development Agreement to be duly executed as of the date first written above.

**PARTNERSHIP**
Pontiac ILF Limited Dividend Housing Association Limited Partnership

By:     Pathway of Pontiac, a Michigan corporation, a general partner

By: _____
     Name:
     Title:

By:     PV North, LLC, a Michigan limited liability company, managing general partner

By:        Presbyterian Village North, a Michigan non-profit corporation, its sole member

By: _____
     Name:
     Title:

<u>DEVELOPER</u>:
Pathway Senior Living of Michigan, LLC, a Michigan limited liability company

By: _____
     Name:
     Title:

Presbyterian Villages North, a Michigan non-profit corporation

By: _____
     Name:
     Title:

EXHIBIT "C"

Form of Bridge Loan Note

# PROMISSORY NOTE

**$7,789,608**                                                    **September 20, 2002**
**Pontiac, Michigan**

FOR VALUE RECEIVED, **PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP**, a Michigan limited partnership ("Maker"), whose address is c/o Presbyterian Villages North, 25300 West Six  Mile Road, Redford, Michigan 48240, promises to pay to the order of SUNAMERICA HOUSING FUND 1050, a Nevada limited partnership, and its successors and assigns ("Holder"), whose address is c/o AIG SunAmerica Inc. at 1 SunAmerica Center, Century City, Los Angeles, California 90067-6022, or such other address as Holder may from time to time designate, the principal sum of Seven Million Seven Hundred Eighty Nine Thousand Six Hundred Eight Dollars ($7,789,608) Dollars (or such lesser amount as may be advanced to Maker and be outstanding in connection with this Note), together with interest thereon at the interest rates set forth below.

1.      Definitions.  As used herein, the following terms shall have the indicated meanings:

Administrator.  WestLB in its capacity as administrator under the Facility Agreement and its successors and assigns in such capacity.

Advance.  A borrowing evidenced hereby, which shall include any Base Rate Advance and any Eurodollar Advance.

Affected Party.  The Purchasers, WestLB, their participants, their affiliates and their respective successors and assigns.

Business Day.  Any day on which banks are not authorized or required to close in New York City, New York or Los Angeles, California and the Depositary Trust Service of New York is open for business and, if this definition is used in connection with the Eurodollar Rate or other matters concerning the Eurodollar Rate, the term "Business Day" means any such day on which dealings are carried on in the London interbank market and on which banks are open for business in London, England.

Committed Purchasers.   The committed purchasers party to the Facility Agreement and their respective successors and assigns, and the respective successors and assigns of such successors and assigns.

Concentration Account.  The account of the Administrator, as Administrator for the benefit of the Owners under the Facility Agreement, at WestLB, as may from time to time be identified in writing to Maker by Servicer as the "Concentration Account."

Facility Agreement.    An agreement among Servicer, Purchaser, the Committed Purchasers and Administrator, dated as of November 23, 1999, as from time to time amended.

Loan.  The loan or loans evidenced hereby.

Loan Documents.    Collectively, all documents and instruments now or hereafter evidencing, securing or guaranteeing the indebtedness evidenced by this Note, as the same may be amended or replaced from time to time hereafter.

Loan Maturity Date. :  The earliest to occur of (a) the first anniversary of the date of receipt of the final certificate(s) of occupancy (if any) with respect to all improvements comprising the project financed hereby (the Apartment Complex"), (b) any date specified by Servicer to Maker as the Loan Maturity Date as set forth in Maker's partnership agreement, and (c) December 1, 2004.

Maximum Rate.   The maximum non-usurious rate of interest per annum permitted by whichever of applicable United States federal law or Michigan law permits the higher interest rate, including, to the extent permitted by such applicable law, any amendments thereof or any new law thereafter coming into effect to the extent a higher maximum non-usurious rate of interest is permitted thereby.  The Maximum Rate shall be applied by taking into account all amounts characterized by applicable law as interest on the debt evidenced by this Note, so that the aggregate of all interest does not exceed the maximum non-usurious amount permitted by applicable law.

Note.  This Promissory Note.

Purchased Interest.  A one hundred percent (100%) undivided interest in (a) all then outstanding Advances made by the Holder on the date of the purchase of this Note by the Purchasers under the Facility Agreement, (b) all cash collections and other cash proceeds in respect of such Advances, including, without limitation, all cash collections and other cash proceeds representing payments of principal, interest, late fees, prepayment fees in respect of such Advances, and other proceeds of such Advances, (c) all right, title and interest in the Note and the other Loan Documents (exclusive of any obligations to make Advances hereunder) with respect to such Advances, and (d) all of the proceeds of the foregoing.

Purchaser.  Compass US Acquisition, LLC, as purchaser under the Facility Agreement and its successors and assigns thereunder.

Purchasers.  Purchaser and Committed Purchasers.

Reserve Requirement. With respect to an Interest Period for any Eurodollar Advance, the maximum aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency,

supplemental or other marginal reserve requirement) with respect to liabilities or assets consisting of or including Eurocurrency liabilities.

Servicer.  SunAmerica Investments, Inc., a Georgia corporation, and its successors and assigns in such capacity.

WestLB.  Westdeutsche Landesbank Girozentrale, New York Branch.

2.   Interest Rate.  The outstanding principal balance of this Note shall bear interest from time to time at the Alternate Base Rate or, if applicable, at the rate, or combination of rates, chosen by Servicer as set forth below, provided however that during any time after the occurrence and continuation of an Event of Default, at the option of Servicer, the outstanding principal balance hereof shall bear interest at a rate per annum equal to the rate otherwise applicable plus 2% per annum.  In no event shall the rate of interest payable hereunder exceed the Maximum Rate.  In no event shall the rate of interest payable hereunder be less than the highest of the applicable Cost of Funds Rates then in effect under the Facility Agreement.  Any portion of the outstanding principal balance of this Note from time to time constituting a Base Rate Advance shall, during such time, bear interest at the rate per annum equal to the Alternate Base Rate from and including the date of such Advance or the date on which such Advance was converted into or otherwise became a Base Rate Advance to (but not including) the date on which such Base Rate Advance is paid or converted to a Eurodollar Advance.  At the option of Servicer, all or any portion of the principal amount hereof may from time to time bear interest at the Eurodollar Rate for a specified Interest Period.  Any portion of the outstanding principal balance of this Note from time to time constituting a Eurodollar Advance shall bear interest from and including the first day of the Interest Period applicable thereto to, but not including, the last day of such Interest Period at the rate per annum equal to the Eurodollar Rate for such Interest Period.

In its sole discretion, Servicer shall choose the method of calculating interest, the type of Advance (whether a Base Rate Advance or Eurodollar Advance), the date on which interest is payable hereunder, and the length of Interest Periods for Eurodollar Advances.

For purposes hereof, the following terms shall have the following meanings: "Alternate Base Rate" - for any day, a rate of interest per annum equal to the higher of (a) the Corporate Base Rate for such day, and (b) the sum of the Federal Funds Effective Rate for such day plus 1/2% per annum; "Base Rate Advance" - at any time, that portion of the outstanding principal amount of this Note as to which interest is not accruing at the Eurodollar Rate; "Corporate Base Rate" - a rate per annum equal to the corporate base rate of interest announced by WestLB from time to time, changing when and as said corporate base rate changes (the Corporate Base Rate is a reference rate and does not necessarily represent the lowest or best rate of interest actually charged to any customer); "Eurodollar Advance" - at any time, any portion of the outstanding principal amount of this Note which accrues interest at the Eurodollar Rate for a specified Interest Period pursuant to an election made by Servicer on behalf of Maker pursuant to this Section 2 (when used with respect to any Committed Purchaser, "Eurodollar Advance" shall mean such Committed Purchaser's share thereof); "Eurodollar Base Rate" - with respect to a Eurodollar Advance for the relevant Interest Period, (a) the rate at which deposits in U.S. Dollars appear on

Telerate page 3750 as of 11 a.m. (London time) two Business Days prior to the first day of such Interest Period or (b) for any Interest Period for which no such Telerate quote is available, the rate at which deposits in U.S. Dollars are offered by Administrator to first-class banks in the London interbank market at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, in an amount agreed upon by Servicer and the Administrator and having a maturity approximately equal to such Interest Period; "Eurodollar Rate" - with respect to a Eurodollar Advance for the relevant Interest Period, the sum of (a) the quotient of (i) the Eurodollar Base Rate applicable to such Interest Period, divided by (ii) one minus the Reserve Requirement (expressed as a decimal) applicable to such Interest Period, plus (b) 0.50% (the Eurodollar Rate shall be rounded to the next higher multiple of 1/16 of 1% if the rate is not such a multiple); "Federal Funds Effective Rate" - for any day, an interest rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published for such day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations at approximately 12:00 p.m. (New York time) on such day on such transactions received by the Administrator from three Federal funds brokers of recognized standing selected by the Administrator in its sole discretion; "Interest Period" - with respect to a Eurodollar Advance, a period of one, two, three or six months commencing on a Business Day selected by Servicer on behalf of Maker pursuant to this Section 2 (such Interest Period shall end on the day which corresponds numerically to such date one, two, three or six months thereafter as selected by Servicer); provided, however, that if there is no such numerically corresponding day, such Interest Period shall end on the last Business Day of such next, second, third or sixth succeeding month. If an Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next succeeding Business Day; provided, however, that if said next succeeding Business Day falls in a new calendar month, such Interest Period shall end on the immediately preceding Business Day.

3.     Payment. The outstanding principal balance hereof, together with interest and all other amounts payable hereunder, shall be due on the earlier of (a) the date of acceleration of such amount pursuant to Section 11 hereof or (b) the Loan Maturity Date. All amounts due hereunder shall be payable in lawful money of the United States of America.

4.     Payment of Interest. Accrued interest not paid when due shall, to the fullest extent allowed by law, bear interest at the same rate as the principal of this Note.

5.     Interest Payment Dates; Interest Basis. Interest accrued on each Base Rate Advance shall be payable on the last day of each month, commencing with the first such date to occur after the date hereof, on any date on which a Base Rate Advance is prepaid, whether due to acceleration or otherwise, and at maturity. Interest accrued on each Eurodollar Advance shall be payable on the last day of its applicable Interest Period, on any date on which such Eurodollar Advance is prepaid, whether by acceleration or otherwise, and at maturity. Interest accrued on each Eurodollar Advance having an Interest Period longer than three months shall also be payable on the last day of each three-month interval during such Interest Period. Interest shall be calculated for actual days elapsed on the basis of a 360-day year. Interest shall be payable for the day the Loan is made but not for

the day of any payment on the amount paid if payment is received by the Holder prior to noon (New York City time) at the place of payment.  If any payment of principal of or interest on the Loan shall become due on a day which is not a Business Day, such payment shall be due on the next succeeding Business Day.

6.  <u>Method of Payment</u>.  All payments hereunder shall be made, without setoff, deduction or counterclaim, in immediately available funds to the Concentration Account, or to such other account as Servicer may designate in writing to Maker and Administrator, by noon (New York City time) on the date when due.

7.  <u>Voluntary Prepayment; Reborrowings</u>.  This Note may not be voluntarily prepaid except with the consent of Servicer.  Any such prepayment shall be subject to the terms of <u>Section 16</u> hereof.  Except as provided in the preceding two sentences, Maker may prepay this Note at any time without premium or penalty.  Maker shall not be entitled to reborrow any amounts prepaid hereunder except, with the consent of Servicer, as described in Section 15.  Although the face amount of this Note may exceed the initial Advance hereunder, the Holder shall be under no obligation to Maker to make any additional Advances.

8.  <u>Administrative Matters</u>.  Maker hereby authorizes Holder to extend, convert or continue Advances, effect selections of interest options and to transfer funds based on telephonic notices made by any person or persons Holder in good faith believes to be acting on behalf of Servicer.

9.  <u>Increased Costs, Capital Adequacy</u>.

(a)  If, after the date hereof due to either (i) the introduction of or any change in or to the interpretation of any law or regulation by the governmental authority that promulgated or administers compliance with such law or regulation (other than laws or regulations with respect to income taxes or any change by way of imposition or increase of reserve requirements included in the Reserve Requirement) or (ii) the compliance with any guideline or request from any central bank or other governmental authority or similar agency (whether or not having the force of law), any reserve or deposit or similar requirement shall be imposed, modified or deemed applicable or, any basis of taxation shall be changed or any other condition shall be imposed, and there shall be any increase in the cost to any Affected Party (either directly or indirectly) of making, funding, purchasing or maintaining ownership of the Purchased Interest in Eurodollar Advances (or portions thereof) or in the cost to such Affected Party of agreeing to make, fund, purchase or maintain the ownership of the Purchased Interest in Eurodollar Advances (or portions thereof), then Maker shall from time to time, upon demand by the Administrator on behalf of such Affected Party by submission of the certificate described below, pay to the Administrator on behalf of such Affected Party additional amounts sufficient to compensate such Affected Party for such increased cost related to the Purchased Interest in such Eurodollar Advances (except those costs incurred more than 60 days prior to the date of such submission).  A certificate setting forth in reasonable detail the amount of such increased cost submitted to Servicer by the Administrator on behalf of such Affected Party shall be conclusive and binding for all purposes, absent manifest error.

(b)    If any Affected Party determines that compliance with any law or regulation or any guideline or request or any written interpretation from any central bank or other governmental authority or similar agency (whether or not having the force of law) which is introduced, implemented or received by such Affected Party after the date hereof, affects or would affect capital adequacy or the amount of capital required or expected to be maintained by such Affected Party or any corporation controlling such Affected Party and that the amount of such capital is increased by or based upon the Eurodollar Advances or the existence of this Note or any other Loan Document or upon any Affected Party's commitment under the Facility Agreement to make purchase of or otherwise maintain ownership of the Purchased Interest and other commitments of that type, or has or would have the effect of reducing the rate of return on capital, then, upon demand by the Administrator on behalf of such Affected Party by the submission of the certificate described below, the Maker shall pay to the Administrator on behalf of such Affected Party from time to time as specified by the Administrator on behalf of such Affected Party, additional amounts sufficient to compensate such Affected Party or such corporation in the light of such circumstances, to the extent that such Affected Party reasonably determines such increase in capital to be allocable to such Eurodollar Advances or the existence of this Note or any other Loan Document (except for any such increase in capital or reduction in return on capital incurred more than 60 days prior to the date of such submission) and is generally charging similarly situated customers for such amount. A certificate setting forth in reasonable detail the amount of such additional amounts submitted to Servicer by the Administrator on behalf of such Affected Party shall be conclusive and binding for all purposes, absent manifest error.

10.    <u>Taxes</u>.

(a)    All payments made by Maker under this Note shall be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority having taxing authority, excluding net income taxes and franchise taxes (imposed in lieu of income taxes) imposed on any Affected Party, as a result of any present or former connection between the jurisdiction of the government or taxing authority imposing such tax or any political subdivision or taxing authority thereof or therein and such Affected Party (excluding a connection arising solely from such Affected Party having executed, delivered or performed its obligations or received a payment under, or enforced, this Note or any other Loan Document) (all such non-excluded taxes, levies, imposts, duties, charges, fees, deductions and withholdings being hereinafter called "<u>Taxes</u>"). If any Taxes are required to be withheld from any amounts payable to the Holder, (i) the sum payable shall be increased as may be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 10</u>), the relevant Affected Party receives an amount equal to the sum it would have received had no such deductions been made, (ii) Maker shall make such deductions, and (iii) Maker shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    In addition, Maker agrees to pay the Administrator on behalf of Purchasers and Holder any present or future stamp or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made by it

hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Note or the other Loan Documents (hereinafter "Other Taxes").

(c)     Maker will indemnify each Affected Party for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 10) paid by or on behalf of such Affected Party related to this Note and the other Loan Documents and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, except Maker shall have no liability therefor as a result of the gross negligence or willful misconduct of such Affected Party.  The agreements in this subsection shall survive the termination of the Loan Documents and the payment of the Note.

11.     Events of Default.  At the option of Holder (or, in the case of (c) or (d) below, automatically), the payment of all principal, any interest accrued thereon and any other sums then due and payable under the provisions of this Note will be accelerated and such principal, interest and such other sums shall be immediately due and payable without notice or demand upon the earlier to occur of any of the following events (an "Event of Default"):

(a)     the failure of Maker to pay (i) any principal hereunder when due, (ii) any interest hereunder when due which failure shall continue for five or more Business Days, (iii) any other amounts hereunder when due which failure shall continue for fifteen or more Business Days;

(b)     a default under any Loan Document, not cured within any applicable grace period;

(c)     Maker's making an assignment for the benefit of creditors or filing a voluntary petition in bankruptcy or filing any petition or answer seeking for itself any arrangement, composition, adjustment, liquidation, dissolution or similar relief to which it may be entitled, or filing any answer admitting the material allegations of any petition filed against it in any such proceedings, or seeking or consenting to or acquiescing in the appointment of any trustee, receiver, custodian or liquidator of all or a substantial part of its properties or assets; and

(d)     the commencement of a bankruptcy or insolvency proceeding against Maker (unless stayed or dismissed within sixty days).

12.     Waivers.  Maker, for itself and its legal representatives, successors and assigns, expressly waives presentment, protest, demand, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purposes of accelerating the maturity, and diligence in collection.

13.     Fees, Costs and Expenses; Indemnity.  (a)  If Holder or Servicer employs counsel to collect this Note or otherwise to exercise its remedies, including without limitation filing a claim in connection with any bankruptcy or insolvency proceedings, Maker shall pay the reasonable fees, costs and expenses of Holder and Servicer, including without limitation attorneys' fees, whether or not suit is brought.  (b) Maker hereby agrees to indemnify Holder and its successors and assigns, from and against, and to pay and

reimburse Holder and Servicer for, any and all costs, losses, damages, liabilities, claims or expenses (including reasonable counsel fees) whatsoever and of any nature arising out of or resulting from this Note or any Loan Document or in connection herewith.

14.   <u>Limitations on Interest</u>.  This Note is subject to the express condition that at no time shall Maker be obligated or required to pay interest on the principal balance at a rate which could subject Holder to either civil or criminal liability as a result of being in excess of the maximum rate which Maker is permitted by law to contract or agree to pay.  If by the terms of this Note Maker is at any time required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate.

15.   <u>Illegality</u>.  If any Committed Purchaser or Maker maintaining any portion of any outstanding Eurodollar Advances shall determine that it may not lawfully continue to maintain and fund any of its outstanding Eurodollar Advances to maturity and shall so specify in a notice to Servicer, Maker shall, upon request from Servicer, promptly prepay in full the then outstanding principal amount of each such Eurodollar Advance together with accrued interest thereon in conjunction with a Base Rate Advance in a like principal amount from such Committed Purchaser.

16.   <u>Funding Losses</u>.  If for any reason Maker makes any payment of principal with respect to any Advance, or if Maker fails to borrow or prepay any Advance after notice thereof has been given, Maker shall, on request of Servicer, reimburse Purchaser or Committed Purchaser for any resulting loss or expense incurred by it (or by any participant in the related Advance), including (without limitation) any loss incurred in obtaining, liquidating or employing deposits from third parties, <u>provided</u> that such Purchaser or Committed Purchaser shall have delivered to Servicer (with a copy to the Administrator) a certificate setting forth in reasonable detail calculations as to the amount of such loss or expense, which certificate shall be conclusive and binding on Maker in the absence of manifest error.

17.   <u>Role of Holder</u>.  Maker acknowledges and agrees that this Note is made payable to the order of the Holder as a matter of administrative convenience and that this Note evidences a number of discrete loans in the aggregate principal amount set forth in the first paragraph of this Note or such lesser amount as may be advanced to Maker and be outstanding in connection with this Note.

18.   <u>Authority of Servicer</u>.  Maker irrevocably authorizes Servicer from time to time to give and receive notices and directions on behalf of Maker with respect to this Note (including without limitation notices with respect to borrowing, repayment, the selection of Interest Periods, the selection of Eurodollar Advances or Base Rate Advances, and the basis upon which interest shall be calculated), irrevocably and unconditionally agrees to be bound by such notices and directions by Servicer, and agrees that the Administrator, the Purchaser and the Committed Purchaser may rely upon, and shall incur no liability by acting upon, any such notices or directions and Servicer shall incur no liability to Maker in connection therewith.

19.     Notice.  Whenever any party hereto shall desire to, or be required to, give or serve any notice, demand, request or other communication with respect to this Note, each such notice, demand, request or communication shall be in writing and shall be effective only if the same is delivered by personal service (including, without limitation, courier or express service) or mailed certified or registered mail, postage prepaid, return receipt requested, or sent by telegram or facsimile transmission with confirmation of receipt, to the parties at the addresses shown throughout this Note or such other addresses which the parties may provide to one another in accordance herewith.  If notice is sent to Holder or Servicer, a copy of such notice shall also be given to Nixon Peabody LLP, 401 Ninth Street, N.W., Suite 900, Washington, D.C. 20002; Attention: Jeffrey S. Lesk, Esq. or such other person as Holder or Servicer may designate from time to time.  Notices delivered personally will be effective upon delivery to an authorized representative of the party at the designated address; notices sent by mail in accordance with this Section will be effective upon execution by the addressee of the return receipt.  Notices delivered via facsimile will be effective upon confirmation of receipt.

20.     Recourse Obligation.  This Note is specifically a full recourse obligation, and nothing herein contained shall be construed to prevent Holder from proceeding personally against Maker under this Note.  Maker may not transfer its obligations under this Note without the prior written consent of Holder and Servicer.

21.     Subordination.     Holder agrees that payments on this Note shall be subordinate and inferior to all payments with respect to any Construction Loan and/or Mortgage Loan (as such terms are defined in Maker's partnership agreement, operating agreement, or loan and security agreement, as applicable) (other than to Servicer or an affiliate of Servicer) and that Holder shall not seek or accept any payments in violation of any applicable loan documents, and that if Holder receives payments during the pendency of a default, it shall hold such payments in trust for the benefit of the holder of such Construction Loan or Mortgage Loan (other than a Construction Loan or Mortgage Loan to Servicer or an affiliate of Servicer).  Notwithstanding the foregoing, to the extent that any financial institution, insurance company or other similar entity is the insurer or holder of the first mortgage on the Apartment Complex, Holder agrees that the terms of any subordination agreement with such entity are hereby incorporated by reference herein. Notwithstanding the foregoing, nothing herein shall preclude payments to Holder pursuant to the guaranty of the Note given by AIG SunAmerica Inc. or American Group International, Inc. in connection with the Facility Agreement.

22.     Surplus Cash.   If and so long as the Secretary of Housing and Urban Development or his/her successors or assigns, are the insurers or holders of the first mortgage on the Apartment Complex, payments of interest due under this Note shall be payable only from (i) surplus cash of the Apartment Complex, as the term surplus cash is defined in the Regulatory Agreement between the United States Department of Housing and Urban Development and the Maker or (ii) from capital contributions made to the Maker.

23.     Termination.  This Note may not be terminated or amended orally, but only by a termination in writing signed by Holder and Servicer or an amendment in writing signed by Holder, Maker and Servicer.  This Note shall inure to the benefit of Holder, Administrator, Purchasers and their respective successors and assigns.

24.    Business Purpose.    Maker certifies that this loan is obtained, and the proceeds of the Loans will be used by Maker for, its business purposes, and that the proceeds thereof will not be used for personal, family, household or agricultural purposes, and that no part of the proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System). Neither the making of any Loan nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System (relating to margin stock in the case of each such regulation).

25.    Representations and Warranties.    Maker makes the following representations and warranties, which shall be deemed to be continuing representations and warranties in favor of Holder, and covenants and agrees to perform all acts necessary to maintain the truth and correctness, in all material respects, of the following:

(a)    each of this Note and the other Loan Documents has been duly authorized and is in full force and effect, constitutes the legal, valid and binding obligation of Maker, and is enforceable against Maker in accordance with its terms.

(b)    Maker is not a federal, state or local government, any agency or instrumentality thereof, or any political subdivision thereof.

(c)    Maker is not a natural person and is organized in and a resident of the United States.

(d)    Maker is not in default of any obligation to pay principal or interest hereunder, under any Loan Document or in connection with any other promissory note made by Maker or an affiliate thereof and purchased by the Purchasers under the Facility Agreement.

(e)    Maker is not insolvent or involved in any insolvency, bankruptcy or other similar proceeding instituted by or against Maker.

(f)    Maker's Employer Identification Number is 30-0099650 and its principal place of business is c/o The Damone Group, 850 Stephenson Highway, Suite 200, Troy, Michigan 48083, attention: Michael G. Damone.

(g)    Maker agrees that it shall not, without prior written notification to Holder, move or otherwise change its principal place of business.

(h)    Maker agrees that no part of the proceeds of any Advance will be used to "purchase" or "carry" any "margin stock" or to extend credit to others for the purpose of "purchasing" or "carrying" any "margin stock" (as such quoted term is defined or used in Regulation T, U or X of the Board of Governors of the Federal Reserve System). The use of proceeds of any Advance will not violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System dealing with "margin securities" (as defined in such regulation).

26.     CHOICE OF LAW.    THIS NOTE WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.    THE PARTIES FURTHER AGREE THAT IN THE EVENT OF DEFAULT, THIS NOTE MAY BE ENFORCED IN ANY COURT OF COMPETENT JURISDICTION IN THE STATE OF MICHIGAN] AND THEY DO HEREBY SUBMIT TO THE JURISDICTION OF ANY AND ALL SUCH COURTS REGARDLESS OF THEIR RESIDENCE OR WHERE THIS NOTE OR ANY ENDORSEMENT HEREOF MAY BE EXECUTED.

27.     WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND ACKNOWLEDGING THAT THE CONSEQUENCES OF SAID WAIVER ARE FULLY UNDERSTOOD, MAKER HEREBY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY (AND BY ACCEPTANCE HEREOF, THE ADMINISTRATOR AND EACH PURCHASER WAIVES SUCH RIGHT), THE RIGHT TO INTERPOSE ANY DEFENSE BASED UPON ANY STATUTE OF LIMITATIONS, ANY CLAIM OF LACHES AND ANY SETOFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED AGAINST MAKER OR ANY OTHER PERSON LIABLE ON THIS NOTE.  MAKER ACKNOWLEDGES AND AGREES THAT HOLDER SHALL HAVE ALL RIGHTS OF A THIRD PARTY CREDITOR WITH RESPECT TO THIS NOTE, AND MAKER WAIVES AND RELEASES FOR ITSELF ALL CLAIMS TO THE CONTRARY.

SIGNATURE PAGE TO THAT CERTAIN PROMISSORY NOTE GIVEN BY PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP A MICHIGAN LIMITED PARTNERSHIP, TO SUNAMERICA HOUSING FUND 1050, A NEVADA LIMITED PARTNERSHIP

EXECUTED as of the date set forth above.

<u>MAKER</u>:

PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP, a Michigan limited partnership

By:    Pathway of Pontiac, Inc.
       a Michigan corporation,
       a General Partner]

       By: _____
          Name: _____
          Title: _____


By:    PV North LLC, a Michigan limited liability company, a general partner]

       By: _____
          Name:
          Title:

SIGNATURE PAGE TO THAT CERTAIN PROMISSORY
NOTE GIVEN BY PONTIAC ILF LIMITED DIVIDEND
HOUSING ASSOCIATION LIMITED PARTNERSHIP A
MICHIGAN LIMITED PARTNERSHIP, TO SUNAMERICA
HOUSING   FUND   1050,   A   NEVADA   LIMITED
PARTNERSHIP

EXECUTED as of the date set forth above.

MAKER:

PONTIAC ILF LIMITED DIVIDEND HOUSING
ASSOCIATION LIMITED PARTNERSHIP,
a Michigan limited partnership

By:     Pathway of Pontiac, Inc.
        a Michigan corporation,
        a General Partner]

        By:     _____
                Name:
                Title:


By:     PV North LLC, a Michigan limited
        liability company, a general partner]

        By:     _____
                Name:
                Title:

EXHIBIT "D"

Description of Property

## EXHIBIT A

## LEGAL DESCRIPTION OF THE REAL ESTATE

Land in the City of Pontiac, Oakland County, Michigan, described as:

> Unit 3, of PRESBYTERIAN VILLAGE NORTH CONDOMINIUM, a Condominium according to the Master Deed thereof recorded in Liber 26560, page 43, Oakland County Records, and designated as Oakland County Condominium Subdivision Plan No. 1462, and any amendments thereto, together with an undivided interest in the common elements of said condominium as set forth in said Master Deed, and any amendments thereto

Commonly known as 420 S. Opdyke Road, Pontiac, Michigan 48342
Tax Parcel Number:   14-34-201-004 (includes other land)

## EXHIBIT A

## LEGAL DESCRIPTION OF THE REAL ESTATE

Land in the City of Pontiac, Oakland County, Michigan, described as:

A sixty (60.00) foot wide parcel the centerline of which is described as commencing at the Southeast corner of Lot 1 "ASSESSOR'S PLAT NO. 141" (Liber 54a, pages 99 & 99a), City of Pontiac, Oakland County, Michigan; thence North 02 degrees 18 minutes 40 seconds West along the West right-of-way of Opdyke Road as recorded in said plat, 403.74 feet to a point of beginning; thence South 87 degrees 41 minutes 20 seconds West 284.36 feet; thence along a circular curve concave to the South (Central Angle = 22 degrees 00 minutes 00 seconds, Radius = 583.66 feet; Chord Bearing South 76 degrees 41 minutes 20 seconds West 222.74 feet), 224.11 feet to Reference Point "A"; thence South 65 degrees 41 minutes 20 seconds West 150.00 feet; thence along a circular curve concave to the Northwest (Central Angle = 16 degrees 26 minutes 22 seconds, Radius = 1648.92 feet, Chord Bearing South 73 degrees 54 minutes 31 seconds West, 471.49 feet), 473.11 feet to a point of ending.  ALSO beginning at Reference Point "A"; thence North 19 degrees 41 minutes 20 seconds West, 115.00 feet; thence along a circular curve concave to the Southwest (Central Angle = 68 degrees 00 minutes 00 seconds, Radius = 340.00 feet, Chord Bearing North 53 degrees 41 minutes 20 seconds West, 380.25 feet), 403.52 feet to a point of ending.

Commonly known as Kirkman Road and Peterson Road
Tax Parcel Number:   14-34-201-005

EXHIBIT "E"

<u>Construction Advisory Services Agreement</u>

CONSTRUCTION ADVISORY SERVICES AGREEMENT

THIS AGREEMENT is made and entered into as of September 1, 2002, between Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership (the "Partnership"), and SUNAMERICA AFFORDABLE HOUSING PARTNERS, INC. ("SAHP").

WHEREAS, on or about June 30, 2001, Pathway Senior Living of Michigan, LLC, a Michigan limited liability company ("PSLM") and Presbyterian Village North, a Michigan non-profit corporation, ("Presbyterian") (PSLM and Presbyterian to be collectively referred to herein as the "Initial General Partners") executed a Certificate of Limited Partnership (the "Certificate") for the formation of Pontiac ILF Limited Dividend Housing Association Limited Partnership (the "Partnership") pursuant to the terms of the Michigan Revised Uniform Limited Partnership Act (the "Act"), which Certificate was subsequently filed with the Secretary of State of Michigan (the "State") on July 3, 2001; and

WHEREAS, the Initial General Partners, and Jerome E. Finis, as limited partner (the "Initial Limited Partner") executed an Agreement of Limited Partnership (the "Original Agreement") of the Partnership; and

WHEREAS, the Partnership has been formed to develop, acquire, rehabilitate, own, maintain and operate a 150-unit multifamily apartment complex intended for rental to seniors of low and moderate income, to be known as Presbyterian Village North, and to be located in Pontiac, Michigan (the "Apartment Complex"); and

WHEREAS, as of even date herewith, Pathway of Pontiac, Inc., a Michigan corporation ("Pathway") and PV North, LLC, a Michigan limited liability company, ("PV North") (Pathway and PV North to be collectively referred to herein as the "General Partners") and SunAmerica Affordable Housing Fund 1050, A Nevada limited Partnership (the "Investment Partnership") executed an Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement") to (i) continue the Partnership; (ii) admit the Investment Partnership to the Partnership as Limited Partner; (iii) withdraw the Initial Limited Partner from the Partnership; (iv) admit Pathway and PV North to the Partnership as the General Partners; (v) withdraw the Initial General Partners from the Partnership; (vi) reassign Interests in the Partnership; and (vi) set forth all of the provisions governing the Partnership; and

WHEREAS, SAHP has provided and will continue to provide certain services to the Partnership in connection with the Partnership's construction, analysis and planning of the development of the Apartment Complex.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.    Appointment.  The Partnership has appointed SAHP to render services for the Partnership, and confirms and ratifies the appointment of SAHP with respect to

services rendered for the Partnership to date in acquiring and in analyzing and planning the development of the Apartment Complex as herein contemplated.

2.   <u>Authority</u>.  SAHP has provided and will provide the following services to the Partnership:

(i)   identify and analyze the Apartment Complex as an investment for the Partnership;

(ii)   performing feasibility and economic analysis with regard to the construction budget and program;

(iii)   make recommendations to the Partnership regarding the construction and development of the Apartment Complex;

(iv)   assist the Partnership regarding compliance of the construction program as it relates to laws and regulations governing the low-incoming housing tax credit program; and

(v)   review draw requests to the Construction Lender, as set forth in Section 3.

3.   <u>Review of Construction Loan Draw Requests</u>.  Not less than five days prior to the submission of any requests to the Construction Lender for draws under the Construction Loan, the General Partners shall submit the written draw request (together with all supporting documentation required by the Construction Lender) to SAHP or its designee for its review.  SAHP or its designee shall have a period of five (5) business days after receipt of the proposed draw request to approve or disapprove it.  The General Partners shall not submit any draw request to the Construction Lender unless and until SAHP or its designee has approved it in writing, provided that the draw request shall be deemed approved on the sixth day after receipt by SAHP or its designee unless SAHP or its designee has given Notice to the General Partners that it disapproves the draw request as proposed.

4.   <u>Construction Advisory Services Fee</u>.

(a)   For services performed and to be performed under Sections 1, 2 and 3 of this Agreement, the Partnership agrees to pay to SAHP a fee in the amount of One Thousand Dollars ($1,000).

(b)   Payment of such fees in (a) shall be subject to the terms and conditions of the Partnership Agreement, and shall be payable in full upon receipt by the Partnership of the Initial Installment of the Capital Contributions of the Investment Partnership provided for under Section 5.01(c)(i) of the Partnership Agreement.

5.   <u>Successors and Assigns, Termination</u>.  This Agreement shall be binding on the parties hereto, their heirs, successors, and assigns.  However, this Agreement may not be assigned by any party hereto without the Consent of the Investment Partnership and the

General Partners, nor may it be terminated without the Consent of the Investment Partnership and the General Partners; such Consent shall not be unreasonably withheld.

6.      <u>Defined Terms</u>.    Capitalized terms used in this Agreement and not specifically defined herein shall have the same meanings assigned to them as in the Partnership Agreement.

7.      <u>Separability of Provisions</u>.    Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

8.      <u>Counterparts</u>.    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

9.      <u>No Continuing Waiver</u>.    The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

10.      <u>Applicable Law</u>.    This Agreement shall be construed and enforced in accordance with the internal laws of the State of Michigan.

IN WITNESS WHEREOF, the parties have caused this ConstructionAd visory Services Agreement to be duly executed as of the date first written above.

Pontiac ILF Limited Dividend Housing Association Limited Partnership

By:     Pathway of Pontiac,a  Michigan corporation

By:     _____
        Name:
        Title: VP

By:     PV North, LLC, a Michigan limited liability company

By:     _____
        Name:
        Title:

SUNAMERICA AFFORDABLE HOUSING PARTNERS, INC.

By:     _____
        Michael L. Fowler
        President

N162938.2

IN WITNESS WHEREOF, the parties have caused this ConstructionAd visory Services Agreement to be duly executed as of the date first written above.

Pontiac ILF Limited Dividend Housing Association Limited Partnership

By:    Pathway of Pontiac, a Michigan corporation

By:      _____
          Name:
          Title:

By:    PV North, LLC, a Michigan limited liability company

By:      _____
          Name:
          Title:

SUNAMERICA AFFORDABLE HOUSING PARTNERS, INC.

By:      _____
          Michael L. Fowler
          President

IN WITNESS WHEREOF, the parties have caused this ConstructionAd visory Services Agreement to be duly executed as of the date first written above.

Pontiac ILF Limited Dividend Housing Association Limited Partnership

By:    Pathway of Pontiac,a  Michigan corporation

By:    _____
       Name:
       Title:

By:     PV North, LLC, a Michigan limited liability company

By:    _____
       Name:
       Title:

SUNAMERICA AFFORDABLE HOUSING PARTNERS, INC.

By:    _____
       Michael L. Fowler
       President

N162938 2

EXHIBIT "F"

<u>General Partner's Disclosure as to Sale
and Refinancing Restrictions</u>

EXHIBIT "G"

Guaranty Agreement

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty"), made as of September 1, 20002, is by Pathway Senior Living of Michigan, LLC, E. James Keledjian, Michael G. Damone, Jerome E. Finis, Robert H. Helle and Brian J. Cloch. (individually and colelctively referred to herein as the "**Guarantors**") jointly and severally, each of whose address is set forth below, for the benefit of SUNAMERICA HOUSING FUND 1050, A NEVADA LIMITED PARTNERSHIP (the "Investment Partnership"), whose address is c/o AIG SunAmerica Inc., 1 SunAmerica Center, Century City, Los Angeles, California 90067-6022, Attention: Michael L. Fowler.

## W I T N E S S E T H:

WHEREAS, Pathway of Pontiac, Inc. ("Pathway") and PV North, LLC ("PV North") (Pathway and PV North to be collectively referred to herein as the "General Partners"), are the general partners of Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership (the "Partnership"); and

WHEREAS, the Partnership is governed by its Amended and Restated Agreement of Limited Partnership dated as of September 1, 2002, (the "Partnership Agreement"); and

WHEREAS, Presbyterian Village North a Michigan non-profit corporation ("Presbyterian"), and Pontiac Senior Living of Michigan, LLC, a Michigan limited liability company ("PSLM"), (Presbyterian and PLSM collectively referred to herein as the "Developer"), and the Partnership entered into that certain Development Agreement dated as of the date hereof (the "Development Agreement"); and

WHEREAS, the Investment Partnership has been requested to enter into the Partnership Agreement and the Partnership with the General Partner; and

WHEREAS, each Guarantor is an affiliate of Pathway, and believes it shall substantially benefit, directly or indirectly, from the Investment Partnership's entering into the Partnership Agreement and the Partnership with the General Partners; and

WHEREAS, as a condition to entering into the Partnership Agreement and the Partnership, the Investment Partnership has required the Guarantors to jointly and severally guarantee to the Investment Partnership the obligations of the General Partners under the Partnership Agreement, of the Developer under the Development Agreement and certain other items as herein set forth.

NOW, THEREFORE, in order to induce the Investment Partnership to enter into the Partnership Agreement and the Partnership in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby jointly and severally covenants and agrees as follows:

1.      Each Guarantor irrevocably and unconditionally fully guarantees the due, prompt and complete performance of each and every one of the following obligations: (a) the

payment and performance by the General Partner of each and every obligation of the General Partner due under the Partnership Agreement; (b) the payment and performance by the Partnership of each and every obligation of the Partnership under the Bridge Loan Note and the Development Agreement; (c) the payment and performance by the General Partners of each and every obligation of the General Partner under the General Partners Pledge; (d) the payment and performance of each and every obligation of the Developer under the Development Agreement; and (e) the due, prompt and complete payment of all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by the Investment Partnership in collection of the enforcement of this Guaranty against the Guarantors (the obligations described in this Paragraph 1 are hereinafter collectively referred to as the "Indebtedness").

2.     Each Guarantor hereby grants to the Investment Partnership, in the uncontrolled discretion of the Investment Partnership, and without notice to any Guarantor, the power and authority to deal in any lawful manner with the Indebtedness and the other obligations guaranteed hereby, and without limiting the generality of the foregoing, further power and authority, from time to time:

(a)     to renew, compromise, extend, accelerate or otherwise change the time or place of payment of or to otherwise change the terms of the Indebtedness;

(b)     to modify or to waive any of the terms of the Partnership Agreement, the Development Agreement and/or any other obligations guaranteed hereby;

(c)     to take and hold security for the payment of the Indebtedness and/or performance of the other obligations guaranteed hereby and to impair, exhaust, exchange, enforce, waive or release any such security;

(d)     to direct the order or manner of sale of any such security as the Investment Partnership, in its sole discretion, may determine;

(e)     to grant any indulgence, forbearance or waiver with respect to the Indebtedness or any of the other obligations guaranteed hereby;

(f)     to release or waive rights against any one or more Guarantors without releasing or waiving any rights against any other Guarantor; and/or

(g)     to agree to any valuation by the Investment Partnership of any collateral securing payment of any of the Indebtedness in any proceedings under the United States Bankruptcy Code concerning the Investment Partnership or the Guarantors.

The liability of each Guarantor hereunder shall not be affected, impaired or reduced in any way by any action taken by the Investment Partnership under the foregoing provisions or any other provision hereof, or by any delay, failure or refusal of the Investment Partnership to exercise any right or remedy it may have against the General Partner or any other person, firm or corporation, including other guarantors, if any, liable for all or any part of the Indebtedness or any of the other obligations guaranteed hereby.

3.      The Guarantors agree that if any of the Indebtedness is not fully and timely paid or performed according to the tenor thereof, whether by acceleration or otherwise, the Guarantors shall immediately upon receipt of written demand therefor from the Investment Partnership pay all of the Indebtedness hereby guaranteed in like manner as if the Indebtedness constituted the direct and primary obligation of the Guarantors.  The Guarantors shall not have any right of subrogation as a result of any payment hereunder or any other payment made by the Guarantors or a Guarantor on account of the Indebtedness, and each Guarantor hereby waives, releases and relinquishes any claim based on any right of subrogation, any claim for unjust enrichment or any other theory that would entitle a Guarantor to a claim against the General Partners based on any payment made hereunder or otherwise on account of the Indebtedness.

4.      This Guaranty and the obligations of the Guarantors hereunder shall be continuing and irrevocable until the Indebtedness has been satisfied in full. Notwithstanding the foregoing or anything else set forth herein, and in addition thereto, if at any time all or any part of any payment received by the Investment Partnership from a Guarantor under or with respect to this Guaranty is or must be rescinded or returned for any reason whatsoever (including, but not limited to, determination that said payment was a voidable preference or fraudulent transfer under insolvency, bankruptcy or reorganization laws), then Guarantors' obligations hereunder shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence, notwithstanding such previous receipt of payment by the Investment Partnership, and Guarantors' obligations hereunder shall continue to be effective or be reinstated as to such payment, all as though such previous payment to the Investment Partnership had never been made.  The provisions of the foregoing sentence shall survive termination of this Guaranty, and shall remain a valid and binding obligation of each Guarantor until satisfied.

5.      Each Guarantor hereby waives notice of acceptance of this Guaranty by the Investment Partnership and this Guaranty shall immediately be binding upon each Guarantor.  Any Guarantor who executes this Agreement shall be fully bound hereby regardless of whether or not any other Guarantor subsequently executes this Guaranty.

6.      Each Guarantor hereby waives and agrees not to assert or take advantage of:

(a)     any right to require the General Partner to proceed against any other person or to proceed against or exhaust any security held by the General Partner at any time or to pursue any other remedy in the General Partner's power before proceeding against any one or more Guarantors hereunder;

(b)     any right to require the Investment Partnership to proceed against the General Partner or any other person or to proceed against or exhaust any security held by the Investment Partnership at any time or to pursue any other remedy in the power of the Investment Partnership before proceeding against any one or more Guarantors hereunder;

(c)     the defense of the statute of limitations in any action hereunder or in any action for the collection of the Indebtedness or the performance of any other obligations guaranteed hereby;

(d)     any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of the Investment Partnership to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons;

(e)     demand, presentment for payment, notice of non-payment, protest, notice of protest and all other notices of any kind, including, without limitation, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of the Investment Partnership or any endorser or creditor of the Investment Partnership or any Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by the Investment Partnership or in connection with the Indebtedness;

(f)     any defense based upon an election of remedies by the Investment Partnership, the right of Guarantors to proceed against the Investment Partnership for reimbursement, or both, or if contrary to the express agreement of the parties, California law is deemed to apply to this Guaranty, any rights or benefits under Sections 2809, 2810, 2819, 2845, 2846, 2847, 2848, 2849 and 2850 of the California Civil Code or under Section 580a, 580d or 726 of the California Code of Civil Procedure, or under Sections 364 and 1111 of the U.S. Bankruptcy Code as same may be amended or replaced from time to time;

(g)     any election by the Investment Partnership to exercise any right or remedy it may have against the Partnership or any security held by the Investment Partnership, including, without limitation, the right to foreclose upon any such security by judicial or non-judicial sale, without affecting or impairing in any way the liability of Guarantors hereunder, except to the extent the Indebtedness has been paid, and the Guarantors waive any default arising out of the absence, impairment or loss of any right of reimbursement, contribution or subrogation or any other right or remedy of the Guarantors against the Partnership or any such security whether resulting from such election by the Investment Partnership or otherwise.  The Guarantors understand that if all or any part of the liability of the Partnership to the Investment Partnership for the Indebtedness is secured by real property the Guarantors shall be liable for the full amount of their liability hereunder, notwithstanding foreclosure on such real property by trustee sale or any other reason impairing the Guarantors' right to proceed against the Partnership; and

(h)     all duty or obligation on the part of the Investment Partnership to perfect, protect, not impair, retain or enforce any security for the payment of the Indebtedness or performance of any of the other obligations guaranteed hereby.

7.     All existing and future indebtedness of the General Partners to the Guarantors or to any person controlled or owned in whole or in part by any of the Guarantors and, the right of the Guarantors to withdraw or to cause or permit any person controlled or owned in whole or in part by any of the Guarantors to withdraw any capital invested by any Guarantor or such person in the General Partners, is hereby subordinated to the Indebtedness at any time after a default exists under the Indebtedness. Furthermore, without the prior written consent of the Investment Partnership, such subordinated indebtedness shall not be paid and such capital shall not be withdrawn in whole or in part nor shall any Guarantor accept or cause or permit any person controlled or

owned in whole or in part by a Guarantor to accept any payment of or on account of any such subordinated indebtedness or as a withdrawal of capital at any time after a default exists under the Indebtedness. Any payment received by the Guarantors in violation of this Guaranty shall be received by the person to whom paid in trust for the Investment Partnership, and Guarantors shall cause the same to be paid to the Investment Partnership immediately on account of the Indebtedness. No such payment shall reduce or affect in any manner the liability of the Guarantors under this Guaranty.

8.     The amount of each Guarantor's liability and all rights, powers and remedies of the Investment Partnership hereunder shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to the Investment Partnership under the Partnership Agreement, any document or agreement relating in any way to the terms and provisions thereof or otherwise by law. With respect to each Guarantor, this Guaranty is in addition to and exclusive of the guaranty of any other Guarantor executing this Guaranty or any other person or entity which guarantees the Indebtedness and/or the other obligations guaranteed hereby.

9.     The liability of each Guarantor under this Guaranty shall be an absolute, direct, immediate and unconditional guarantee of payment and not of collectability. The obligations of each Guarantor hereunder are independent of the obligations of the General Partners or any other party which may be initially or otherwise responsible for performance or payment of the obligations hereunder guaranteed and each other Guarantor, and, in the event of any default hereunder, a separate action or actions may be brought and prosecuted against any one or more Guarantors, whether or not the General Partners are joined therein or a separate action or actions are brought against the General Partners. The Investment Partnership may maintain successive actions for other defaults. The Investment Partnership' rights hereunder shall not be exhausted by its exercise of any of its rights or remedies or by any such action or by any number of successive actions until and unless the Indebtedness has been paid in full.

10.     The Investment Partnership, in its sole discretion, may at any time enter into agreements with the General Partners or with any other person to amend, modify or change the Partnership Agreement or any document or agreement relating in any way to the terms and provisions thereof, or may at any time waive or release any provision or provisions thereof and, with reference thereto, may make and enter into all such agreements as the Investment Partnership may deem proper or desirable, without any notice or further assent from any Guarantor and without in any manner impairing or affecting this Guaranty or any of the rights of the Investment Partnership or each Guarantor's obligations hereunder.

11.     The Guarantors hereby agree to pay to the Investment Partnership, upon demand, reasonable attorneys' fees and all costs and other expenses which the Investment Partnership expend or incur in collecting or compromising the Indebtedness or in enforcing this Guaranty against each Guarantor whether or not suit is filed, including, without limitation, all costs, attorneys' fees and expenses incurred by the Investment Partnership in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceedings involving a Guarantor which in any way affect the exercise by the Investment Partnership of its rights and remedies hereunder. Any and all such costs, attorneys' fees and expenses not so paid shall bear interest at an annual interest rate equal to the lesser of

(i) 18%, or (ii) the highest rate permitted by applicable law, from the date incurred by the Investment Partnership until paid by the Guarantors.

12.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions nevertheless shall be effective.

13.     No provision of this Guaranty or right of the Investment Partnership hereunder can be waived nor can any Guarantor be released from such Guarantor's obligations hereunder except by a writing duly executed by the Investment Partnership. This Guaranty may not be modified, amended, revised, revoked, terminated, changed or varied in any way whatsoever except by the express terms of a writing duly executed by the Investment Partnership.

14.     When the context and construction so require, all words used in the singular herein shall be deemed to have been used in the plural, and the masculine shall include the feminine and neuter and vice versa.  The word "person" as used herein shall include any individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

15.     If any or all of the Indebtedness is assigned by the Investment Partnership, this Guaranty shall automatically be assigned therewith in whole or in part, as applicable, without the need of any express assignment and when so assigned, each Guarantor shall be bound as set forth herein to the assignee(s) without in any manner affecting such Guarantor's liability hereunder for any part of the Indebtedness retained by such the Investment Partnership.

16.     Each Guarantor is jointly and severally liable with each other Guarantor.

17.     Pathway Senior Living of Michigan, LLC's Employer Identification Number is 38-3572328.

18.     This Guaranty shall inure to the benefit of and bind the heirs, legal representatives, administrators, executors, successors and assigns of the Investment Partnership and Guarantors.

19.     This Guaranty shall be governed by and construed in accordance with the laws of the State of Michigan without regard to principles of conflicts of law, except to the extent that any of such laws may now or hereafter be preempted by Federal law, in which case, such Federal law shall so govern and be controlling.  In any action brought under or arising out of this Guaranty, each Guarantor hereby consents to the jurisdiction of any competent court within the State of Michigan or the State of California and consents to service of process by any means authorized by the laws of such state.  Except as provided in any other written agreement now or at any time hereafter in force between the Investment Partnership and any Guarantor, this Guaranty shall constitute the entire agreement of Guarantors with the Investment Partnership with respect to the subject matter hereof, and no representation, understanding, promise or condition concerning the subject matter hereof shall be binding upon the Investment Partnership or any Guarantor unless expressed herein.

20.     All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be in writing and shall be deemed to have been validly given or served by delivery of same in person to the addressee or by depositing same with Federal Express for next business day delivery or by depositing same in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed as follows:

| Investment Partnership: | SunAmerica Housing Fund 1050, A Nevada Limited Partnership c/o AIG SunAmerica Inc. 1 SunAmerica Center, Century City Los Angeles, California  90067-6022 Attention:  Michael L. Fowler Telephone: (310) 772-6000 |
|---|---|
| Guarantors: | Senior Living of Michigan, LLC c/o The Damone Group 850 Stephenson Highway, Suite 200 Troy, Michigan 48083 Attention: Michael G. Damone Telephone: (248) 583-6020 |
| | E. James Keledjian, c/o PSL Holdings, LLC 701 Lee Street Des Plaines, IL  60016 Telephone: (847) 635-4002 |
| | Michael G. Damone, c/o The Damone Group 850 Stephenson Highway, Suite 200 Troy, Michigan  48083 Telephone: (248) 583-6020 |

Jerome E. Finis
c/o PSL Holdings, LLC
701 Lee Street
Des Plaines, IL  60016
Telephone: (847) 635-4002

Robert H. Helle
c/o PSL Holdings, LLC
701 Lee Street
Des Plaines, IL  60016
Telephone: (847) 635-4002

Brian J. Cloch
c/o PSL Holdings, LLC
701 Lee Street
Des Plaines, IL  60016
Telephone: (847) 635-4002

All notices, demands and requests shall be effective upon such personal delivery or upon being deposited with Federal Express or in the United States mail as required above. However, with respect to notices, demands or requests so deposited with Federal Express or in the United States mail, the time period in which a response to any such notice, demand or request must be given shall commence to run from the next business day following any such deposit with Federal Express or, in the case of a deposit in the United States mail as provided above, the date on the return receipt of the notice, demand or request reflecting the date of delivery or rejection of the same by the addressee thereof.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, demand or request sent.  By giving to the other party hereto at least 30 days' written notice thereof in accordance with the provisions hereof, the parties hereto shall have the right from time to time to change their respective addresses and each shall have the right to specify as its address any other address within the United States of America.

21.    Each Guarantor hereby agrees that this Guaranty, the Indebtedness and all other obligations guaranteed hereby, shall remain in full force and effect at all times hereinafter until paid and/or performed in full notwithstanding any action or undertakings by, or against, the Investment Partnership, any Guarantor, and/or any partner and/or member in the Investment Partnership in any proceeding in the United States Bankruptcy Court, including, without limitation, any proceeding relating to valuation of collateral, election or imposition of secured or unsecured claim status upon claims by the Investment Partnership pursuant to any Chapter of the Bankruptcy Code or the Rules of Bankruptcy Procedure as same may be applicable from time to time.

22.    Any married person who signs this Guaranty hereby agrees that recourse may be had against his or her separate property for all of his or her obligations.

23.    This Guaranty may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, with the same effect as if all

parties hereto had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages. Execution by any Guarantor shall bind such Guarantor regardless of whether any one or more other Guarantors execute this Guaranty.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty"), made as of September 1, 20002, is by Pathway Senior Living of Michigan, LLC, E. James Keledjian, Michael G. Damone, Jerome E. Finis, Robert H. Helle and Brian J. Cloch. (individually and colelctively referred to herein as the "**Guarantors**") jointly and severally, each of whose address is set forth below, for the benefit of SUNAMERICA HOUSING FUND 1050, A NEVADA LIMITED PARTNERSHIP (the "Investment Partnership"), whose address is c/o AIG SunAmerica Inc., 1 SunAmerica Center, Century City, Los Angeles, California 90067-6022, Attention: Michael L. Fowler.

W I T N E S S E T H:

WHEREAS, Pathway of Pontiac. Inc. ("Pathway") and PV North, LLC ("PV North") (Pathway and PV North to be collectively referred to herein as the "GeneralPar tners"), are the general partners of Pontiac ILF Limited Dividend Housing Association Limited Partnership, a Michigan limited partnership (the "Partnership"); and

WHEREAS, the Partnership is governed by its Amended and Restated Agreement of Limited Partnership dated as of September 1, 2002, (the "Partnership Agreement"); and

WHEREAS, Presbyterian Village North a Michigan non-profit corporation ("Presbyterian"), and Pontiac Senior Living of Michigan, LLC, a Michigan limited liability company ("PSLM"), (Presbyterian and PLSM collectively referred to herein as the "Developer"), and the Partnership entered into that certain Development Agreement dated as of the date hereof (the "Development Agreement"); and

WHEREAS, the Investment Partnership has beenr equested to enter into the Partnership Agreement and the Partnership with the General Partner;a nd

WHEREAS, each Guarantor is an affiliate of Pathway, and believes it shall substantially benefit, directly or indirectly, from the Investment Partnership's entering into the Partnership Agreement and the Partnership with the General Partners; and

WHEREAS, as a condition toe ntering into thePar tnership Agreement and the Partnership, the Investment Partnership has required the Guarantors to jointly and severally guarantee to the Investment Partnership the obligations of the General Partners under the Partnership Agreement, of the Developer under the Development Agreement and certain other items as herein set forth.

NOW, THEREFORE, in order to induce the Investment Partnership to enter into the Partnership Agreement and the Partnership in consideration of the premises and for other good and valuablec onsideration, ther eceipt and sufficiency of which are hereby acknowledged. eachG uarantor hereby jointly and severally covenants and agrees as follows:

1. Each Guarantor irrevocably and unconditionally fully guarantees the due, prompt and complete performance of each and every one of the following obligations: (a) the

payment and performanceby  the General Partner of each and every obligation of the General Partner due under the Partnership Agreement; (b) the payment and performance by the Partnership of each and every obligation of the Partnership under the Bridge Loan Note and the Development Agreement; (c) the payment and performance by the General Partners of each and every obligation of the General Partner under the General Partners Pledge; (d) the payment and performance of each and every obligation of the Developer under the Development Agreement; and (e) the due, prompt and complete payment of all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by the Investment Partnership in collection of the enforcement of this Guaranty against the Guarantors (the obligations described in this Paragraph 1 are hereinafter collectively referred to as the "Indebtedness").

2.      Each Guarantor hereby grants to the Investment Partnership, in the uncontrolled discretion of the Investment Partnership, and without notice to any Guarantor, the power and authority to deal in any lawful manner with the Indebtedness and the other obligations guaranteed hereby, and without limiting the generality of the foregoing, further power and authority, from time to time:

(a)      to renew, compromise, extend, accelerate or otherwise change the time or place of payment of or to otherwise change the terms of the Indebtedness;

(b)      to modify or to waive any of the terms of the Partnership Agreement, the Development Agreement and/or any other obligations guaranteed hereby;

(c)      to take and hold security for the payment of the Indebtedness and/or performance of the other obligations guaranteed hereby and to impair, exhaust, exchange, enforce, waive or release any such security;

(d)      to direct the order or manner of sale of any such security as the Investment Partnership, in its sole discretion, may determine;

(e)      to grant any indulgence, forbearance or waiver with respect to the Indebtedness or any of the other obligations guaranteed hereby;

(f)      to release or waive rights against any one or more Guarantors without releasing or waiving any rights against any other Guarantor; and/or

(g)      to agree to any valuation by the Investment Partnership of any collateral securing payment of any of the Indebtedness in any proceedings under the United States Bankruptcy Code concerning the Investment Partnership or the Guarantors.

The liability of each Guarantor hereunder shallno t be affected, impaired or reduced in any way by any action taken by the Investment Partnership under the foregoing provisions or any other provision hereof, or by any delay, failure or refusal of the Investment Partnership to exercise any right or remedy it may have against the General Partner or any other person, firm or corporation, including other guarantors, if any, liable for all or any part of the Indebtedness or any of the other obligations guaranteed hereby.

3.    The Guarantors agree that if any of the Indebtedness is not fully and timely paid or performed according to the tenor thereof, whether by acceleration or otherwise, the Guarantors shall immediately upon receipt of written demand therefor from the Investment Partnership pay all of the Indebtedness hereby guaranteed in like manner as if the Indebtedness constituted the direct and primary obligation of the Guarantors.  The Guarantors shall not have any right of subrogation as a result of any payment hereunder or any other payment made by the Guarantors or a Guarantor on account of the Indebtedness, and each Guarantor hereby waives, releases and relinquishes any claim based on any right of subrogation, any claim for unjust enrichment or any other theory that would entitle a Guarantor to a claim against the GeneralPar tners based on any payment made hereunder or otherwise on account of the Indebtedness.

4.    This Guaranty and the obligations of the Guarantors hereunder shall be continuing and irrevocable until the Indebtedness has been satisfied in full. Notwithstanding the foregoing or anything else set forth herein, and in addition thereto, if at any time all or any part of any payment received by the Investment Partnership from a Guarantor under or with respect to this Guaranty is or must be rescinded or returned for any reason whatsoever (including, but not limited to, determination that said payment was a voidable preference or fraudulent transfer under insolvency, bankruptcy or reorganization laws), then Guarantors' obligations hereunder shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence, notwithstanding such previous receipt of payment by the Investment Partnership, and Guarantors' obligations hereunder shall continue t ob e effective or ber einstated as to such payment, all as though such previous payment to the Investment Partnership had never been made.  The provisions of the foregoing sentence shall sur vive termination of this Guaranty, and shall remain a valid and binding obligation of each Guarantor until satisfied.

5.    Each Guarantor hereby waives notice of acceptance of this Guaranty by the Investment Partnership and this Guaranty shall immediately be binding upon each Guarantor.  Any Guarantor who executes this Agreement shall be fully bound hereby regardless of whether or not any other Guarantor subsequently executes this Guaranty.

6.    Each Guarantor hereby waives and agrees not to assert or take advantage of:

(a)    any right to require the General Partner to proceed against any other person or to proceed against or exhaust any security held by the General Partner at any time or to pursue any other remedy in the General Partner's power before proceeding against any one or more Guarantors hereunder;

(b)    any right to require the Investment Partnership to proceed against the GeneralPa rtner or any other person or to proceed against or exhaust any security held by the Investment Partnership at any time or to pursue any other remedy in the power of the Investment Partnership before proceeding against any one or more Guarantors hereunder;

(c)    the defense of the statute of limitations in any action hereunder or in any action for the collection of the Indebtedness or the performance of any other obligations guaranteed hereby;

(d)     any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of the Investment Partnership to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons;

(e)     demand, presentment for payment, notice of non-payment, protest, notice of protest and all other notices of any kind, including, without limitation, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of the Investment Partnership or any endorser or creditor of the Investment Partnership or any Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by the Investment Partnership or in connection with the Indebtedness;

(f)     any defense based upon an election of remedies by the Investment Partnership, the right of Guarantorsto proceed against the Investment Partnership for reimbursement, or both, or if contrary to the express agreement of the parties, California law is deemed to apply to this Guaranty, any rights or benefits under Sections 2809, 2810, 2819, 2845, 2846, 2847, 2848, 2849 and 2850 of the California Civil Code or under Section 580a, 580d or 726 of the California Code of Civil Procedure, or under Sections 364 and 1111 of the U.S. Bankruptcy Code as same may be amended or replaced from time to time;

(g)     any election by the Investment Partnership to exercise any right or remedy it may have against the Partnership or any security held by the Investment Partnership, including, without limitation, the right to foreclose upon any such security by judicial or non-judicial sale, without affecting or impairing in any way the liability of Guarantors hereunder, except to the extent the Indebtedness has been paid, and the Guarantors waive any default arising out of the absence, impairment or loss of any right of reimbursement, contribution or subrogation or any other right or remedy of the Guarantors against the Partnership or any such security whether resulting from such election by the Investment Partnership or otherwise. The Guarantors understand that if all or any part of the liability of the Partnership to the Investment Partnership for the Indebtedness is secured by real property the Guarantors shall be liable for the full amount of their liability hereunder, notwithstanding foreclosure on such real property by trustee sale or any other reason impairing the Guarantors' right to proceed against the Partnership; and

(h)     all duty or obligation on the part of the Investment Partnership to perfect, protect, not impair, retain or enforce any security for the payment of the Indebtedness or performance of any of the other obligations guaranteed hereby.

7.     All existing and future indebtedness of the General Partners to the Guarantors or to any person controlled or owned in whole or in part by any of the Guarantors and, the right of the Guarantors to withdraw or to cause or permit any person controlled or owned in whole or in part by any of the Guarantors to withdraw any capital invested by any Guarantor or such person in the General Partners, is hereby subordinated to the Indebtedness at any time after a default exists under the Indebtedness. Furthermore, without the prior written consent of the Investment Partnership, such subordinated indebtedness shall not be paid and such capital shall not be withdrawn in whole or in part nor shallan y Guarantor accept or cause or permit any person controlled or

owned in whole or in part b y a Guarantor to accept any payment of or on account of any such subordinated indebtedness or as a withdrawal of capital at any time after a default exists under the Indebtedness. Any payment received by the Guarantors in violation of this Guaranty shall be received by the person to whom paid in trust for the Investment Partnership, and Guarantors shall cause the same to be paid to the Investment Partnership immediately on account of the Indebtedness. No such payment shall reduce or affect in any manner the liability of the Guarantors under this Guaranty.

8.    The amount of each Guarantor's liability and all rights, powers and remedies of the Investment Partnership hereunder shall be cumulative and not alternative and such rights, powers and remedies shallb e in addition to all rights, powers and remedies given to the Investment Partnership under the Partnership Agreement, any document or agreement relating in any way to the terms and provisions thereof or otherwise by law. With respect to each Guarantor, this Guaranty is in addition to and exclusive of the guaranty of any other Guarantor executing this Guaranty or any other person or entity which guarantees the Indebtedness and/or the other obligations guaranteed hereby.

9..   The liability of each Guarantor under thisG uaranty shall be an absolute, direct, immediate and unconditional guarantee of payment and not of collectability. The obligations of each Guarantor hereunder are independent ofthe obligations of the General Partners or any other party which may be initially or otherwise responsible for performance or payment of the obligations hereunder guaranteed and each other Guarantor, and, in the event of any default hereunder, a separate action or actions may be brought and prosecuted against any one or more Guarantors, whether or not theG eneral Partners are joined therein or a separate action or actions are brought against the General Partners. The Investment Partnership may maintain successive actions for other defaults. The Investment Partnership' rights hereunder shall not be exhausted by its exercise of any of its rights or remedies or by any such action or by any number of successive actions until and unless the Indebtedness has been paid in full.

10.   The Investment Partnership, in its sole discretion, may at any time enter into agreements with the General Partners or with any other person to amend, modify or change the Partnership Agreemento r any document or agreement relating in any way to the terms and provisions thereof, or may at any time waive orr elease any provision or provisions thereof and, with reference thereto, may make and enter into all such agreements as the Investment Partnership may deem proper or desirable, without any notice or further assent from any Guarantor and without in any manner impairing or affecting this Guaranty or any of the rights of the Investment Partnership or each Guarantor's obligations hereunder.

11.   The Guarantors hereby agree to pay to the Investment Partnership, upon demand, reasonable attorneys' fees and all costs and other expenses which the Investment Partnership expend or incur in collecting or compromising the Indebtedness or in enforcing this Guaranty against each Guarantor whether or not suit is filed, including, without limitation, all costs, attorneys' fees and expenses incurred by the Investment Partnership in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceedings involving a Guarantor which in any way affect the exercise by the Investment Partnership of its rights and remedies hereunder. Any and all such costs, attorneys' fees and expenses not so paid shall bear interest at an annual interest rate equal to the lesser of

20.    All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be in writing and shall be deemed to have been validly given or served by delivery of same in person to the addressee or by depositing same with Federal Express for next business day delivery or by depositing same in theUn ited States mail, postage prepaid, registered or certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| Investment Partnership: | SunAmerica Housing Fund 1050, A Nevada Limited Partnership c/o AIG SunAmerica Inc. 1 SunAmerica Center, Century City Los Angeles, California  90067-6022 Attention:  Michael L. Fowler Telephone: (310) 772-6000 |
| Guarantors: | Senior Living of Michigan, LLC c/o The Damone Group 850 Stephenson Highway, Suite 200 Troy, Michigan 48083 Attention: Michael G. Damone Telephone: (248) 583-6020 |
| | E. James Keledjian, c/o PSL Holdings, LLC 701 Lee Street Des Plaines, IL  60016 Telephone: (847) 635-4002 |
| | Michael G. Damone, c/o The Damone Group 850 Stephenson Highway, Suite 200 Troy, Michigan  48083 Telephone: (248) 583-6020 |

Jerome E. Finis
c/o PSL Holdings, LLC
701 Lee Street
Des Plaines, IL 60016
Telephone: (847) 635-4002

Robert H. Helle
c/o PSL Holdings, LLC
701 Lee Street
Des Plaines, IL 60016
Telephone: (847) 635-4002

Brian J. Cloch
c/o PSL Holdings, LLC
701 Lee Street
Des Plaines, IL 60016
Telephone: (847) 635-4002

All notices, demands and requests shall be effective upon such personal delivery or upon being deposited with Federal Express or in the United States mail as required above. However, with respect to notices, demands or requests so deposited with Federal Express or in the United States mail, the time period in which a response to any such notice, demand or request must be given shall commence to run from the next business day following any such deposit with Federal Express or, in the case of a deposit in the United States mail as provided above, the date on the return receipt of the notice, demand or request reflecting the date of delivery or rejection of the same by the addressee thereof.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, demand or request sent.  By giving to the other party hereto at least 30 days' written notice thereof in accordance with the provisions hereof, the parties hereto shall have the right from time to time to change their respective addresses and each shall have the right to specify as its address any other address within the United States of America.

21.    Each Guarantor hereby agrees that this Guaranty, the Indebtedness and all other obligations guaranteed hereby, shall remain in full force and effect at all times hereinafter until paid and/or performed in full notwithstanding any action or undertakings by, or against, the Investment Partnership, any Guarantor, and/or any partner and/or member in the Investment Partnership in any proceeding in the United States Bankruptcy Court, including, without limitation, any proceeding relating to valuation of collateral, election or imposition ofse cured or unsecured claim status upon claims by the Investment Partnership pursuant to any Chapter of the Bankruptcy Code or the Rules of Bankruptcy Procedure as same may be applicable from time to time.

22.    Any married person who signs this Guaranty hereby agrees that recourse may be had against his or her separate property for all of his or her obligations.

23.    This Guaranty may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, with the same effect as if all

parties hereto had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages. Execution by any Guarantor shall bind such Guarantor regardless of whether any one or more other Guarantors execute this Guaranty.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned Guarantors have executed this Guaranty Agreement as of the day and year first above written.

**GUARANTORS:**

**Pathway Senior Living of Michigan, LLC**, a Michigan limited liability company

By: _____

Name: _____

Title _Jerome E. Finis_

_____
**E. James Keledjian**

_____
**Michael G. Damone**

_____
**Jerome E. Finis**

_____
**Robert H. Helle**

_____
**Brian J. Cloch**

[

ILL

STATE OF ~~MICHIGAN~~ )

COUNTY OF _Cook_ ) ss.

The foregoing instrument was acknowledged before me this _18th_ day of September, 2002, by Pathway Senior Living of Michigan, LLC.

WITNESS my hand and official seal.

My commission expires: _9/17/04_

_Rosemarof Russo_

Notary Public

```
OFFICIAL SEAL
ROSEMARIE J. RUSSO
NOTARY PUBLIC · STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2004
```

N162938 2

STATE OF ILLINOIS      )
                       ) ss.
COUNTY OF _COOK_       )

The foregoing instrument was acknowledged before me this _18th_ day of September, 2002, by E James Keledjian.

WITNESS my hand and official seal.

My commission expires: _9/17/04_

_Rosemarie J Russo_
Notary Public

OFFICIAL SEAL
ROSEMARIE J. RUSSO
NOTARY PUBLIC · STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2004

N162938.2

STATE OF MICHIGAN    )
                             ) ss.
COUNTY OF _____)

       The foregoing instrument was acknowledged before me this _____ day of September, 2002, by Michael G. Damone.

       WITNESS my hand and official seal.

       My commission expires:

                                     _____
                                     Notary Public

STATE OF ILLINOIS        )
                         ) ss.
COUNTY OF _COOK_         )

The foregoing instrument was acknowledged before me this _18th_ day of September, 2002, by Jerome E. Finis.

WITNESS my hand and official seal.

My commission expires: _9/17/04_

_Rosemarie J. Russo_
Notary Public

OFFICIAL SEAL
ROSEMARIE J. RUSSO
NOTARY PUBLIC · STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2004

N162938 2

STATE OF ILLINOIS      )
                       ) ss.
COUNTY OF _COOK_       )

The foregoing instrument was acknowledged before me this 18th day of September, 2002, by Robert H. Helle.

WITNESS my hand and official seal.

My commission expires: 9/17/04

_Rosemarie J. Russo_
Notary Public

OFFICIAL SEAL
ROSEMARIE J. RUSSO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2004

N162938.2

STATE OF ILLINOIS      )
                       ) ss.
COUNTY OF _Cook_       )

The foregoing instrument was acknowledged before me this _17th_ day of September, 2002, by Brian J. Cloch.

WITNESS my hand and official seal.

My commission expires: _9/17/04_

_Rosemarie J. Russo_
Notary Public

OFFICIAL SEAL
ROSEMARIE J. RUSSO
NOTARY PUBLIC · STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2004

N162938.2

EXHIBIT "H"

Development Budget

EXHIBIT "I"

Replacement Reserve Items

EXHIBIT "I"

REPLACEMENT RESERVE ITEMS

The Reserve for Replacements may be used for the following items with the Consent of the Investment Partnership:

- Major clubhouse renovation and signage upgrades

- Additions of the newest amenity to stay competitive (e.g., the equivalent of fitness centers, business centers, expanded children's facilities)

- Roof replacements

- Painting and siding rehab

- HVAC and appliance replacements

- Wood replacement to dry or wet rot or termites

- Security enhancements as neighborhoods change and properties age (e.g., fencing and controlled access gates or improved exterior lighting)

- The addition of facilities that will improve operations or cut costs such as maintenance garage or trash compactor

- The replacement of carpeting in the apartment units due to normal wear and tear

Opportunities for remarketing of utilities (sub-metering water and sewer and possibly gas and electric)

N162938 2

EXHIBIT "J"

FORM OF MANAGEMENT AGREEMENT

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") is made as of **September 1, 2002** by and between **PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP** a **Michigan** limited partnership ("Owner"), and **PRESBYTERIAN VILLAGES OF MICHIGAN** a Michigan non-profit corporation ("Manager").

WHEREAS, Owner is the owner of a 150-unit multifamily apartment complex intended for rental to persons of low and moderate income, known as Presbyterian Village North, and located in Pontiac, Michigan (the "Apartment Complex");

WHEREAS, Pathway of Pontiac a Michigan corporation and PV North, LLC, a Michigan limited liability company, as the General Partners (hereinafter collectively referred to as the "General Partner") and SunAmerica Housing Fund 1050, A Nevada Limited Partnership (the "Investment Partnership") (the "Limited Partner") are the sole partners of Owner;

WHEREAS, Owner is governed by its Amended and Restated Agreement of Limited Partnership dated as of September 1, 2002 (the "Partnership Agreement");

WHEREAS, Manager is an Affiliate of PV North, LLC, one of the the General Partners;

WHEREAS, Manager is engaged in the business of property management; and

WHEREAS, Owner desires to engage Manager as property manager under the terms set forth in this Agreement.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager mutually agree as follows:

## 1.   DEFINITIONS

a.    "Affiliate" means any person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the General Partner or with another designated Person, as the context may require.

b.    "Agency" means the Michigan State Housing Development Authority ("MSHDA"), in its capacity as the designated agency of the State to allocate Tax Credits, acting through any authorized representative.

c.    "Code"  means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding law.

d.    "Extended Use Agreement" means the extended low-income housing commitment executed or to be executed by the Owner and properly recorded in the

appropriate land records for the jurisdiction in which the Apartment Complex is located, setting forth certain terms and conditions under which the Apartment Complex is to be operated and which meets the requirements of Code Section 42(h)(6)(B).

      e.    "40-60 Set Aside Test" means the Minimum Set-Aside Test whereby at least 40% of the units in the Apartment Complex must be occupied by individuals with incomes of 60% or less of area median income, as adjusted for family size.

      f.    "Gross Operating Revenues" means the actual monthly cash collections from the customary operations of the Apartment Complex consisting of rental, vending machine and laundry room receipts net of any costs or expenses, forfeited or applied deposits, rent claim settlements net of any collection fees, lease termination or modification payments, and other operating receipts, excluding applicable sales tax and refundable deposits); Gross Operating Revenues shall not include any revenues from condemnation or casualty proceeds, any cash advances from Owner, loss of rental insurance; refunds or rebates from suppliers or vendors, revenue from the sale of any personal or real property of Owner, late charges, cleaning fees, pet fees, deposits, or from any source other than the customary operations of the Apartment Complex ("Excluded Revenues").

      g.    "Minimum Set-Aside Test" means the set-aside test selected by the Partnership pursuant to Section 42(g) of the Code with respect to the percentage of units in its Apartment Complex to be occupied by tenants with incomes equal to no more than a certain percentage of area median income.  The Owner has selected the 40-60 Set Aside Test as the Minimum Set Aside Test.

      h.    "Person" means any individual, partnership, corporation, trust, limited liability company or other entity.

      i.    "Project Lenders" shall mean any Person in its capacity as a holder of a loan on the Apartment Complex.

      j.    "Project Loans" shall mean the loans and indebtedness of the Owner to the Project Lenders.

      k.    "Regulatory Agreement" means, to the extent applicable, and collectively, any regulatory agreements and/or any declaration of covenants and restrictions heretofore or hereafter entered into between the Owner and the Project Lender or any applicable government agency setting forth certain terms and conditions under which the Apartment Complex is to be operated.

      l.    "Rent Restriction Test" means the test pursuant to Section 42(g) of the Code whereby the gross rent charged to tenants of the low-income units in the Apartment Complex cannot exceed thirty percent (30%) of the imputed income limitation of the applicable units.

      m.    "Reserve For Replacements" means the cash funded reserve for replacements required by the Project Lenders or the Investment Partnership in connection with the Project Loans, which shall be used exclusively for replacement expenditures (and

- 2 -

not operational expenditures) for the Apartment Complex.  The Reserve Fund for Replacements shall be funded as follows:  (i) from the date of Substantial Completion until the date five (5) years after Substantial Completion, the Reserve for Replacements shall be funded based on $200 per apartment unit per year; (iii) from the date five (5) years from the date of Substantial Completion until the date ten (10) years after the date of Substantial Completion, the Reserve For Replacements shall be funded based on $250 per apartment unit per year; (iv) with respect to each subsequent five (5) year period, the required funding shall be increased by $50 per apartment unit per five year period, provided that the Owner shall increase the minimum funding of the Reserve For Replacements if necessary to ensure that such increase is necessary to comply with sound asset management principles. If the terms of the Mortgage Loan imposes more strict requirements regarding the funding and/or use of Reserve For Replacements, such more strict requirements shall apply.

n.    "Substantial Completion" means the date that the Partnership receives all necessary permanent certificates of occupancy from the applicable governmental jurisdiction(s) or authority(ies) for one hundred percent (100%) of the apartment units in the Apartment Complex; provided, however, that Substantial Completion shall not be deemed to have occurred if on such date any liens or other encumbrances as to title to the Land and the Apartment Complex exist, other than those securing the Project Loans and/or those consented to by the Investment Partnership.

o.    "Tax Credit" means the low-income housing tax credit allowed for low-income housing projects pursuant to Section 42 of the Code.

**2.     APPOINTMENT OF MANAGER.** On and subject to the terms and conditions of this Agreement, Owner hereby retains Manager commencing on September 1, 2002, (the "Commencement Date") to manage and lease the Apartment Complex.

**3.     TERM.** This Agreement shall commence on the Commencement Date and, subject to Section 10, shall expire on the date twelve months from the Commencement Date (the "Original Term").  The term will be automatically renewed at the end of the Original Term or any later Renewal Term (each term after the Original Term being referred to herein as a Renewal Term) for an additional one year, unless terminated in accordance with the provisions of Section 10.  The terms and conditions during any Renewal Term shall be the same as the terms and conditions during the Original Term.

**4.     MANAGEMENT FEES.** In consideration of the performance by Manager of its duties and obligations hereunder, Owner shall pay to Manager a management fee ("Management Fee") equal to 5% of Gross Operating Revenues, which fee is calculated with respect to the preceding calendar month and payable on the tenth of each calendar month. Manager shall submit to Owner an invoice detailing the calculation of the Management Fee each month, no later than the fifth day of the next succeeding month.  If the first or last month of this Agreement is not a complete calendar month, the Management Fee for such month shall be calculated on the basis of Gross Operating Revenues for the entire month, and the amount payable for such month shall then be prorated based on the number of days during such month that this Agreement was in effect. As an Affiliate of Owner, Manager agrees to accrue the Management Fee to the extent necessary at any time to prevent a default under the Project Loans.

5.    **AUTHORITY AND RESPONSIBILITIES OF MANAGER.**

a.    Independent Contractor.  In the performance of its duties hereunder, the Manager shall be and act as an independent contractor, with the sole duty to supervise, manage, operate, control and direct performance of the details of its duties incident to the specified duties and obligations hereunder, subject to the rights of the Owner, as described herein.  Nothing contained in this Agreement shall be deemed or construed to create a partnership, joint venture, employment relationship, or otherwise to create any liability for one party with respect to indebtedness, liabilities or obligations of the other party except as otherwise may be expressly set forth herein.

b.    Standard of Care.  Manager shall perform its duties and obligations in a professional, competent, businesslike and efficient manner as would a first class property manager of apartment projects similar to the Apartment Complex and as of apartment projects generating Tax Credits.

c.    Depository Accounts.  All rents and other revenue from the Apartment Complex shall be deposited by Manager into one or more deposit accounts designated by Owner and shall be insured by the Federal Deposit Insurance Corporation (each a "Depository Account").  The Depository Account shall be the sole and exclusive property of Owner, and Manager shall retain no interest therein.  Manager shall not commingle the Depository Account with any other funds.  Checks may be drawn upon such Depository Account only by persons authorized by Manager in writing to sign checks.  Manager shall not use a "standardized clearing account" for any Depository Account.  The Depository Account shall be established in the name of the Manager to be held in trust for the Owner.

d.    Security Deposits.  Manager shall deposit and maintain all security deposits in a separate account that is interest bearing and distinct from the Depository Account.

e.    Budgets.  Manager shall prepare and present to Owner in a format approved by Owner, prior to the Commencement Date and annually thereafter, by November 15, annual operating budgets for the following calendar year for the Apartment Complex; which once approved by Owner, the Investment Partnership and Manager shall be the budget ("Budget").  Except in cases of emergency, without the written approval of Owner, Manager shall not incur any expenses that are not included within the approved budget for the current year.  Once a Budget is approved by Owner, any variations or changes must be approved by Owner in writing.

f.    Leasing, Collection of Rents, Etc.

(1)    Manager shall use its best efforts consistent with the standard of care set forth herein to lease apartment units, retain residents and maximize Gross Operating Revenues.

(2)    Manager shall sign apartment leases in its capacity as property manager hereunder.  Manager shall only sign leases in the form of lease approved by Owner.  Manager shall not enter into any lease which has a term greater than 12 months.

(3)     Manager shall collect rents, security deposits and other charges payable by tenants in accordance with the tenant leases, and shall collect income due Owner with respect to the Apartment Complex from all other sources, and shall deposit all such income received immediately upon receipt as provided in Section 5(d).

(4)     Manager shall pay all debt service, monthly bills and insurance on the Apartment Complex from the Depository Account as set forth in the Budget.

(5)     Manager shall, at Owner's expense, terminate leases, evict tenants, institute and settle suits for delinquent payments as Manager deems advisable, subject to other provisions of this Agreement.  In connection therewith, Manager may, at Owner's expense from available cash flow, as limited by the provisions of Section 5(m), consult and retain legal counsel.

(6)     Manager shall, on the twenty-fifth (25th) day of each month, pay Owner an amount equal to the sum of (i)  Gross Operating Revenues plus any other funds received by the Manager, including but not limited to Excluded Revenues less amounts paid for all approved operating expenses including without limitation debt service; and (ii)  working reserves including the Reserve For Replacements.

(7)     Manager acknowledges the Owner's objective of obtaining Tax Credits for One Hundred  percent (100%) of units in the Apartment Complex.  Manager represents and warrants that it is familiar with Section 42 of the Code and the requirements thereto including without limitation (i) the Minimum Set-Aside Test, (ii) the Rent Restriction Test, (iii) the Extended Use Agreement, (iv) the Regulatory Agreement, if any, (v) the requirements in Section 42(g)(2)(D) that the next available unit must be rented to a low-income tenant if income rises above 140 percent of income limit; (vi) rules and regulations regarding qualification for Tax Credits where units are vacant; and (vii) rules and regulations by the Agency (collectively referred to herein as the "Regulatory Requirements").  Manager agrees to operate the Apartment Complex in a manner which meets the Regulatory Requirements, including but not limited to the following:

(a)     To cause the apartment units in the Apartment Complex to be leased to suitable tenants who comply with all regulations regarding eligibility of the Apartment Complex for the Credit;

(b)     To obtain from all tenants in the Apartment Complex the right to receive annual reports from such tenants concerning their incomes and family sizes and any other information needed to verify eligibility;

(c)     To execute a lease for any rental unit in respect of which Tax Credits have been allocated to the Owner only upon first obtaining certification from the tenant, and such other information as may be necessary for the Manager to determine income criteria for low-income housing, that he or she satisfies the income criteria for low-income housing;

(d)     To prepare for Owner's signature, and then to file in a proper manner, the annual certifications required by the provisions of law referred to in Code Section 42(l)(2); and

(e)     To cause the Apartment Complex to be operated in a manner that complies with all other statutes, regulations and agreements which must be complied with in order for Owner to obtain the Tax Credits with respect to at least One Hundred percent (100%) of units in the Apartment Complex.

(8)     Manager acknowledges receipt of the Tax Credit Compliance Manual ("Manual") and shall comply with the terms and conditions set forth in the Manual.

(9)     The responsibilities and services included in this Section 5 as part of Manager's duties shall not entitle Manager to any additional compensation over and above the Management Fee.  Manager shall not be entitled to any compensation based upon any Apartment Complex financing or sale of the Apartment Complex, unless Manager is engaged pursuant to a separate agreement approved in writing by the Investment Partnership of Owner to provide brokerage services in connection therewith, in which case Manager's right to compensation for Apartment Complex financing or sale shall be based upon such separate agreement.

g.     Repair, Maintenance and Service.

(1)     Manager shall maintain the Apartment Complex in good repair and condition, consistent with the standard of care set forth herein.

(2)     Subject to the other terms and conditions of this Agreement, Manager in its capacity hereunder shall execute contracts for water, electricity, gas, telephone, television, vermin or pest extermination and any other services which are necessary to properly maintain the Apartment Complex.  Manager shall, in Owner's name and at Owner's expense, out of available cash flow, hire and discharge independent contractors for the repair and maintenance of the Apartment Complex.  Other than tenant leases, which Manager is authorized to execute hereunder, Manager shall not, without the prior written consent of the Owner, enter into any contract in name of Owner which may not be terminated with thirty (30) days notice.  Manager shall act at arms length with all contractors and shall employ no Affiliates of Manager or the General Partner without Owner's and the Investment Partnership's prior written consent.

h.     Manager's Employees.  Manager shall have in its employ at all times a sufficient number of employees to enable it to professionally manage the Apartment Complex in accordance with the terms of this Agreement.  Manager shall prepare, execute and file all forms, reports and returns required by applicable laws.  All payroll costs for on-site employees shall be at Owner's expense from available cash flow.  However, Owner shall not pay or reimburse Manager for all or any part of Manager's general, administrative and overhead expenses, including salaries and payroll expenses of personnel of Manager not working full time on-site.  All matters pertaining to the employment and supervision of such employees shall be the sole responsibility of the Manager, which in all respects shall be the employer of such employees, and Owner shall have no liability with respect to such matters.

i.     Manager's Insurance.  With respect to its operations of the Apartment Complex, Manager shall carry, (i)  worker's compensation insurance for compensation to

any person engaged in the performance of any work undertaken under this Agreement, including employer's liability coverage with limits of not less than $1,000,000 each employee and each disease; such policy must be in compliance with the statutory requirements of the state in which the Apartment Complex is located, (ii) commercial general liability insurance and excess/umbrella liability insurance policies with combined limits of not less than $5,000,000 per occurrence and in the aggregate; such policies shall be written on an occurrence basis, and include contractual liability and other provisions as Owner shall reasonably require, (iii) a crime insurance policy including insuring agreement for employee dishonesty, forgery and alteration, theft, disappearance & destruction, and robbery and safe burglary. Limits of liability for each insuring agreement shall not be less than $100,000, with a maximum deductible of $1,000 per claim, (iv) if the Manager provides services similar to those set forth in this Agreement to third-party clients with which the Manager has no other affiliation, a professional liability insurance policy covering all the activities of Manager; such policy shall be written on a "claims made" basis, with limits of at least $1,000,000 in the aggregate and with a maximum deductible of $10,000, and (v) such other insurance as a first class property manager of apartment projects similar to the Apartment Complex would carry, or as reasonably required by Owner. Any loss within the deductibles shall be borne by Manager. All policies of insurance shall be maintained in during the period of the Agreement. Each policy shall be from an insurance company rated "A" or higher by the A.M. Best Insurance Guide, with a financial size category rating of 12 or higher. Each policy shall be endorsed to include the provision giving the Owner at least thirty (30) days prior written notice of cancellation, non-renewal or material change of the policy. The Commercial General Liability insurance policy shall be endorsed to include as additional insured the Owner, SunAmerica Housing Fund 1050, AIG SunAmerica Inc. and SunAmerica Affordable Housing Partners, Inc. Manager shall furnish Owner with copies of all such endorsements, and with Certificates of Insurance evidencing such policies and the renewals thereof. Owner shall further have the right to receive full copies of the insurance policies for its review. Other than the cost for worker's compensation insurance, the Manager shall pay without any right of reimbursement all costs of maintaining the insurance required under this section.

        j.    <u>Owner's Insurance</u>. Owner shall carry, at its expense, such insurance as it deems appropriate. Manager shall be named as an additional insured.

        k.    <u>Waiver of Subrogation</u>. Manager hereby waives any and all rights of recovery against Owner, its officers, agents, partners in and employees occurring out of the ownership, management and operation of the Apartment Complex for loss or damage as a result of any casualty covered and to the extent covered by its insurance policies. The Manager shall upon obtaining the policies of insurance required by this Section, notify the insurance carrier that the foregoing waiver is contained in this Agreement and shall require such carrier to include an appropriate waiver of subrogation provision in the insurance policies.

        l.    <u>Maintenance of Records.</u> Manager agrees to keep and maintain at all times all necessary books and records relating to the leasing, management and operation of the Apartment Complex, including all books and records relating to the reporting requirements under Code Section 42, and to prepare and render to Owner monthly itemized accounts of receipts and disbursements incurred in connection with its leasing operation and management by the twentieth (20th) day of the following month. Unless Owner, in

writing, expressly directs, Manager shall not be required to file any reports other than such monthly statements. An annual audit report shall be prepared at Owner's expense, out of available cash flow, showing a balance sheet and an income and expense statement, all in reasonable detail and certified by an independent Certified Public Accountant. All books, correspondence and data pertaining to the leasing, management and operation of the Apartment Complex shall, at all times, be safely preserved. Such books, correspondence and data shall be available to Owner at all reasonable times, and shall, upon the termination of this Agreement be delivered to Owner in their entirety and upon request of Owner be delivered to Owner within thirty (30) days of such request. Manager shall maintain files of all original documents relating to reporting requirements under Code Section 42, leases, vendors and all other business of the Apartment Complex in an orderly fashion at the Apartment Complex, which files shall be the property of Owner and shall at all times be open to Owner's inspection.

m. <u>Operating Expenses</u>. Manager shall use reasonable efforts to minimize operating expenses by obtaining competitive pricing on all services and obtaining at least three bids on expenditures exceeding $10,000 (a "<u>major expenditure</u>"). Manager shall use reasonable efforts to comply with the limitations on expenditures set forth in the Budget. Manager shall obtain Owner's prior written consent before incurring on behalf of Owner any single expenditure in excess of five thousand dollars ($5,000) excluding utility bills and other normal and recurring expenses included in the Budget, except in an emergency in which case Manager may incur such expenses as are to protect life and property. Manager shall notify Owner of any such emergency expenses as soon as practicable after they are incurred but in no event later than three (3) days thereafter. Manager shall not request payment of any invoices, whether to itself or a third party, marked-up above cost, nor shall Manager request payment of any compliance fees, marketing fees, mark-up on employees' salary or travel or fees for personnel off-site.

n. <u>Legal Proceedings and Compliance with Applicable Laws</u>.

(1) Manager shall promptly notify Owner in writing of the receipt or service of any demand, notice or legal process upon Manager (although Manager is not authorized to accept service of process on behalf of the Owner), or the occurrence of any casualty loss, injury or damage on or about the Apartment Complex;

(2) Manager shall fully comply and cause its employees to fully comply, with all applicable laws in connection with this Agreement and the performance of its obligations hereunder, including all federal, state and local laws, ordinances and regulations relative to the leasing, use, operation, repair and maintenance of the Apartment Complex and the operations of Manager, including without limitation, laws prohibiting discrimination in housing, employment laws (including those related to unfair labor practices), laws regarding tenant security deposits and laws regarding the storage, release and disposal of hazardous materials, and toxic substances, including without limitation, asbestos, petroleum and petroleum products.

(3) Manager agrees that it shall use its best efforts not to, and shall use its best efforts to cause its employees not to cause any hazardous materials or toxic substances, to be stored, released or disposed of on or in the Apartment Complex except as may be incidental to the operation of any apartment project (e.g., cleaning

supplies, fertilizers, paint, pool supplies and chemicals) and then only in complete compliance with all applicable laws and regulations and in conformity with good property management.  If (i) there is a violation of applicable laws regarding the storage, release and disposal of such hazardous materials, or toxic substances, or (ii)  Manager reasonably believes that the storage, release or disposal of any hazardous material, petroleum product, or toxic substances, could cause liability to the Owner, including any releases caused by Tenants, third parties or employees, on the Apartment Complex, Manager shall notify Owner immediately.

          (4)    Subject to the requirements under Code Section 42, the Manager agrees that the Apartment Complex shall be offered to all prospective tenants on a nondiscriminatory basis without regard to race, color, religion, sex, family status, handicap or national origin in accordance with applicable law.

          o.    <u>Computers</u>.  All computers, hardware, software, computer upgrades and maintenance in connection therewith shall be at Owner's expense.

**6.**    **REPRESENTATIONS OF MANAGER.**  The Manager represents, warrants, covenants and agrees that:

          a.    it has the authority to enter into and to perform this Agreement, to execute and deliver all documents relating to this Agreement, and to incur the obligations provided for in this Agreement;

          b.    when executed, this Agreement, together with all documents executed pursuant hereto, shall constitute the valid and legally binding obligations of the Manager in accordance with its terms;

          c.    the Manager has all necessary licenses, consents and permissions to enter into this Agreement, manage the Apartment Complex, and otherwise comply with and perform Manager's obligations and duties hereunder.  Manager shall comply with any conditions or requirements set out in any such licenses, consents and permissions, and shall at all times operate and manage the Apartment Complex in accordance with such conditions and requirements;

          d.    during the term of this Agreement, the Manager will be a valid non-profit corporation, duly organized under the laws of the State, and shall have full power and authority to manage the Apartment Complex, and otherwise comply with and perform Manager's obligations and duties under this Agreement;

          e.    the Apartment Complex shall be managed in a manner to satisfy all restrictions, including tenant income and rent restrictions, applicable to projects generating Tax Credits;

          f.    the Manager shall comply with any requirements under applicable environmental laws, regulations and orders which affect the Apartment Complex;

          g.    the Manager shall cause the Apartment Complex to be operated in a manner so that all requirements shall be met which are necessary to obtain or achieve (i)

compliance with the Minimum Set-Aside Test, the Rent Restriction Test, and any other requirements necessary for the Apartment Complex to initially qualify, and to continue to qualify, for Tax Credits, including all applicable requirements set forth in the Regulatory Agreement and the Extended Use Agreement, (ii)  issuance of IRS Forms 8609, and (iii) issuance of all necessary permanent unconditional certificates of occupancy, including all governmental approvals required to permit occupancy of all of the apartment units in the Apartment Complex;

       h.     the Manager shall manage the Apartment Complex upon Substantial Completion so that (i) no less than eighty percent (80%) of the gross income from the Apartment Complex in every year is rental income from or with respect to dwelling units in the Apartment Complex used to provide living accommodations not on a transient basis and (ii)  the rental of all units in the Apartment Complex comply with the tenant income limitations and other restrictions under the Rent Restriction Test and as set forth in the Regulatory Agreement and the Project Loan documents; and

       i.     the Manager shall familiarize itself with the partnership and loan documents for the Reserve For Replacements and comply with the requirements of the Reserve For Replacements.  In connection therewith, the Manager shall utilize the Reserve Fund for Replacements only after the satisfaction in full of the obligation of Owner's general partner (or managing member or similar entity, as applicable) to make operating deficit loans to the Owner pursuant to the terms of the Partnership Agreement. Withdrawals from the Reserve For Replacements shall be subject to the approval of the Owner and the Investment Partnership, in their sole discretion.

    **7.**    **REPRESENTATIONS OF OWNER.** The Owner represents and warrants, that:

       a.     the Owner has the authority to enter into and to perform this Agreement, to execute and deliver all documents relating to this Agreement, and to incur the obligations provided for in this Agreement; and

       b.     when executed, this Agreement, together with all documents executed pursuant hereto, shall constitute the valid and legally binding obligations of the Owner in accordance with its terms.

## 8.   INDEMNIFICATION.

a.   <u>Indemnification of Owner</u>.  The Manager shall indemnify, protect, defend (with legal counsel approved by Owner) and hold harmless Owner and Owner's partners, together with their respective officers, directors, agents, employees and affiliates (collectively "<u>Indemnitees</u>") from and against any and all claims, demands, actions, liabilities, losses, costs, expenses, damages, penalties, interest, fines, injuries and obligations, including reasonable attorneys' fees, court costs and litigation expenses ("<u>Claims</u>") incurred by any Indemnitee as a result of (a) any act by Manager (or any officer, agent, employee or contractor of Manager) outside the scope of Manager's authority hereunder, (b) any act or failure to act by Manager (or any officer, agent, employee or contractor of Manager) constituting negligence, misconduct, fraud or breach of this Agreement, other than as covered by Owner's insurance (for negligence or misconduct only) and to the extent Owner's insurance is available, (c) Claims made by current or former employees or applicants for employment arising from hiring, supervising or firing same, or (d) any act or omission by Manager, its employees, officers, agents or contractors in violation of any applicable law.

b.   <u>Indemnification of Manager by Owner</u>.  Owner shall indemnify, protect, defend and hold harmless Manager from and against any and all Claims incurred by Manager resulting from performance of its obligations under this Agreement, except that this indemnification shall not apply with respect to any Claims (a) resulting from any act by Manager outside the scope of Manager's authority hereunder, (b) resulting from any act or failure to act constituting negligence, misconduct, fraud or breach of this Agreement, (c) resulting from Claims made by current, former employees or applicants for employment arising from hiring, supervising or firing same, or (d) any act by Manager, its employees, agents or contractors in violation of any applicable law.  Owner shall control, without recourse, all aspects of Manager's defense against any Claims in matters in which Manager is entitled to indemnification under this Paragraph 8(b).  If at any time during the course of such defense Owner determines, in its reasonable judgment, that such Claim results from an event, action or nonaction for which Manager is not entitled to indemnification hereunder, Owner shall automatically be entitled to immediate reimbursement for all losses, costs and expenses incurred on behalf of itself and of Manager incurred to the date of such determination.

c.   <u>Survival</u>.   The provisions of this Paragraph 8 shall survive the termination of this Agreement.

## 9.   DEFAULTS.

a.   <u>Manager's Event of Default</u>.  Manager shall be deemed to be in default hereunder upon the happening of any of the following ("<u>Manager's Event of Default</u>"):

(1)   The failure by Manager to keep, observe or perform any covenant, agreement, term or provision of this Agreement and the continuation of such failure, in full or in part, for a period of ten (10) days after written notice thereof by Owner to Manager, including without limitation, the following:

(a)   failure to make any payment or perform any financial

obligation required hereby;

(b)  failure to collect Gross Operating Revenues, Excluded Revenues and such other funds that should be collected by the Manager for the operation of the Apartment Complex as required hereby;

(c)  failure to deposit Gross Operating Revenues, Excluded Revenues and such other funds from the Apartment Complex as required hereby;

(d)  failure to maintain the Apartment Complex as required hereby;

(e)  failure of the Apartment Complex to comply with the requirements of Code Section 42;

(f)  failure to meet the standard of care as set forth in Section 5(b) hereof;

(g)  failure to maintain Reserve for Replacements in accordance with the terms hereof;

(h)  failure to meet the Regulatory Requirements;

(i)  failure to deliver financial reports, tax credit reports, legal notices and other reports or notices when and as required by this Agreement; or

(j)  an act or omission of Manager, its officers, agents, employees or contractors, in violation of any applicable law.

(2)  Notwithstanding paragraph (1), the occurrence of any of the following shall be a Manager's Event of Default and Manager shall not have the right to cure such default:

(a)  The request by Manager of payment of any invoice, whether to itself or a third party, marked-up above cost as prohibited herein;

(b)  The making of a general assignment by Manager for benefit of its creditors, the filing by Manager with any bankruptcy court of competent jurisdiction of a voluntary petition under Title 11 of U.S. Code, as amended from time to time, the filing by Manager of any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, Manager being the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended from time to time, or the dissolution or liquidation of Manager; or

(c)  The misapplication, misappropriation or commingling of funds held by Manager for the benefit of Owner, including the payment of fees to Affiliates of the Manager or the loaning of funds to Affiliates.

b.      Remedies of Owner.  Upon a Manager's Event of Default, Owner shall be entitled (i) to terminate in writing this Agreement effective as of the date designated by Owner (which may be the date upon which notice is given), and/or (ii) to pursue any remedy at law or in equity, including without limitation, specific performance.  All of Owner's rights and remedies shall be cumulative.

c.      Owner's Event of Default.  Owner shall be deemed to be in default hereunder (an "Owner's Event of Default") if Owner shall fail to keep, observe or perform any covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Owner, and such default shall continue for a period of thirty (30) days after written notice thereof by Manager to Owner, or if such default cannot be cured within such thirty (30) day period, then such additional period as shall be reasonable, provided Owner commences to cure such default within such thirty (30) day period and proceeds diligently to prosecute such cure to completion.

d.      Remedies of Manager.  Upon an Owner's Event of Default, Manager shall be entitled (i) to terminate in writing this Agreement effective as of the date designated by Owner which is at least 10 days after receipt of such notice of termination by Owner provided the Event of Default has not then been cured or such cure commenced, and/or (ii) to pursue an action for the actual compensatory damages incurred by Manager.  Manager expressly agrees that termination and compensatory monetary damages are its sole rights and remedies with respect to an Owner's Event of Default and Manager expressly waives and releases the right to seek equitable relief, including specific performance or injunctive relief, and to sue for any consequential or punitive damages.

**10.    TERMINATION RIGHTS.**

a.      Expiration of Term.  If not sooner terminated, this Agreement shall terminate on the expiration of its term set forth in Section 3 hereof.

b.      Termination By Owner Upon Manager's Event of Default.  Upon a Manager's Event of Default, Owner may terminate this Agreement as specified in Section 9(b) hereof.

c.      Termination By Manager Upon Owner's Event of Default.  Upon an Owner's Event of Default, Manager may terminate this Agreement as specified in Section 9(d) hereof.

d.      Termination By Owner Without Cause.  Even in the absence of any other express right to terminate this Agreement, Owner may terminate this Agreement upon written notice at any time upon thirty (30) days' prior notice from the Owner.

e.      Termination Upon Sale of the Apartment Complex.  If the Apartment Complex is sold, conveyed or transferred during the term hereof, this Agreement shall terminate.

f.      Effect of Termination Upon Payment of Fees.  Upon the termination of this Agreement for any reason, Manager shall be entitled to its earned, but unpaid fees, for

the period prior to the termination.  Manager shall not be entitled to any fees relating to the period after the date of termination of this Agreement; provided that in the case of termination by Owner pursuant to Section 9(d), Manager shall be entitled to actual, compensatory damages as specified in Section 9(d).

g.    <u>Delivery of Apartment Complex Upon Termination</u>.   Immediately after termination of this Agreement for any reason, Manager shall deliver to or as directed by Owner all funds, checks, keys, lease files, books and records and other Confidential Information (as defined below) to Owner. Immediately after termination, Manager shall leave the Apartment Complex and cause its employees to leave the Apartment Complex without causing any damage thereto.  Under no circumstances shall any default by Owner give rise to any lien on the Apartment Complex or give rise to a right of Manager to stay on the Apartment Complex after the date of termination.  Termination of this Agreement under any of the provisions of this Agreement shall not release either party as against the other from liability for failure to perform any of its duties or obligations as expressed herein and required to be performed prior to such termination. Manager agrees to cooperate with Owner in the obligations set forth in this Section 10(g).

## 11.    CONFIDENTIALITY.

a.    <u>Preservation of Confidentiality</u>. In connection with the performance of obligations hereunder, Manager acknowledges that it will have access to "<u>Confidential Information</u>" (as defined below).  Manager shall treat such Confidential Information as proprietary to Owner and private, and shall preserve the confidentiality thereof and not disclose, or cause or permit its employees, agents or contractors to disclose, such Confidential Information.  Notwithstanding the foregoing, Manager shall have the right to disclose Confidential Information if and only to the extent it is required by court order to disclose any Confidential Information.  "<u>Confidential Information</u>" shall mean the books, records, business practices, methods of operations, computer software, financial models, financial information, policies and procedures, and all other information relating to Owner and the Apartment Complex (including any such information relating to the Apartment Complex generated by the Manager), which is not available to the public.  If Manager or anyone to whom Manager transmits Confidential Information pursuant to this Agreement becomes legally compelled to disclose any of the Confidential Information, Manager shall provide Owner with prompt notice thereof so that Owner may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Agreement.  In the event that such protective order or other remedy is not obtained by Owner or Owner waives compliance with the provisions of this Agreement, Manager shall furnish or cause to be furnished only that portion of the Confidential Information which Manager is required by contract to furnish, and will exercise commercially reasonable efforts to obtain reliable assurances that confidential treatment is accorded the Confidential Information so furnished.

b.    <u>Property Right in Confidential Information</u>.    All Confidential Information shall remain the property of Owner and Manager shall have no ownership interest therein.

## 12.    SURVIVAL OF AGREEMENT. All indemnity obligations set forth herein, all obligations to pay earned and accrued fees and expenses, all confidentiality obligations,

and all obligations to perform and duties accrued prior to the date of termination shall survive the termination of this Agreement.

**13.    ENFORCEMENT OF AGREEMENT.** This Agreement, its interpretation, performance and enforcement, and the rights and remedies of the parties hereto, shall be governed and construed by and in accordance with the law of the State in which the Apartment Complex is located.   In any dispute pertaining to, or litigation or arbitration arising from to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover its attorneys fees and costs, including those incurred in connection with all appellate levels, bankruptcy, mediation or otherwise to maintain such action, from the losing party.

**14.    ASSIGNMENT.** Manager shall not directly or indirectly (except with the consent of Owner and the Investment Partnership, and of any lender of governmental entity, if required) sell, assign or otherwise transfer by operation of law or otherwise all or any part of the legal or beneficial interests in the Manager or all or any part of its rights or obligations under this Agreement.  Owner may assign this Agreement to a successor owner of the Apartment Complex.   A change in the constituent partners of the Investment Partnership shall not constitute an assignment.  Manager agrees to the assignment of this Agreement to the Investment Partnership if the Investment Partnership or its assignee shall become a general partner of Owner.  If Owner assigns this agreement to a successor owner of the Apartment Complex, the Agreement shall constitute a novation, releasing Owner of all rights and obligations hereunder.  Owner's general partner (or managing member or similar entity, as applicable) shall not directly or indirectly (except with the consent of the Investment Partnership, and of any lender or governmental entity if so required) sell, transfer or assign any legal or beneficial interests in such entity.

**15.    NOTICES.**  All notices, demands, requests or other communications ("Notices") to be sent by one party to the other hereunder or required by law shall be in writing and shall be deemed to have been validly given or served by delivery of same in person to the addressee or by depositing same with Federal Express or Airborne for next business day delivery or by depositing same in the United States mail, postage prepaid, registered or certified mail, return receipt requested, or by sending by facsimile transmission, addressed as follows:

|  |  |
|---|---|
| If to Owner: | Pontiac ILF Limited Dividend Housing Association Limited Partnership |
|  | 850 Stephenson Highway, Suite 200 |
|  | Troy, Michigan 48083 |
|  | Attention: Michael G. Damone |
|  | Fax No.@248) 583-6165 |

With a copy to:     SunAmerica Housing Fund 1050,
A Nevada Limited Partnership
c/o AIG SunAmerica Inc.
1 SunAmerica Center, Century City
Los Angeles, California  90067-6022
Attention:  Donald J. Whinfrey, Vice President
Fax No.:  (310) 772-6179

If to Manager:     Presbyterian Villages of Michigan
c/o Roger Myers
25300 West Six Mile Road
Redford, MI  48240
Fax No.:  (313) 533-6616

All Notices shall be effective upon such personal delivery, upon being deposited with Federal Express or Airborne, in the United States mail or upon facsimile transmission as required above.  However, with respect to Notices so deposited with Federal Express or Airborne or the United States mail, the time period in which a response to any such notice, demand or request must be given shall commence to run from the next business day following any such deposit with Federal Express or Airborne, in the case of a deposit in the United States mail as provided above, the date on the return receipt of the Notice reflecting the date of delivery or rejection of the same by the addressee thereof.  By giving to the other parties hereto at least 15 days' written notice in accordance with the provisions hereof, a party may change its address for notice purposes.

## 16.    MISCELLANEOUS.

a.    <u>Subordination</u>.  All claims of Manager, General Partner and the Affiliates of the General Partner or any guarantor of the General Partner of the obligations under this Agreement, shall be inferior and subordinate to the claims of Investment Partnership against Owner under or in connection with the Partnership Agreement.

b.    <u>Third Party Beneficiary</u>.  The Investment Partnership is a  third party beneficiary of the terms of this Agreement.

c.    <u>Limitation on Limited Partners' Liability</u>.  The Manager agrees that the Limited Partners shall not have any liability for the obligations of the Owner to Manager under or in connection with this Agreement or otherwise.

d.    <u>Captions</u>.  The captions of this Agreement are inserted only for the purpose of convenient reference and do not define, limit or prescribe the scope or intent of this Agreement or any part hereof.

e.    <u>Modifications and Changes</u>.  This Agreement cannot be changed or modified except by another agreement in writing, signed by the parties sought to be charged therewith. In addition, pursuant to the terms of the Partnership Agreement, this Agreement may not be further amended without the further written consent of the Investment Partnership.

f.      Entire Agreement.      This Agreement embodies the entire understanding of the parties, and there are no further agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof.

g.      Time is of Essence.  Time is the essence hereof.

h.      Construction of Document.  This Agreement has been negotiated at arms' length and has been reviewed by counsel for the parties.  No provision of this Agreement shall be construed against any party based upon the identity of the drafter.

i.      Severability.  If any provision of this Agreement or the application thereof, is held to be invalid or unenforceable, such defect shall not affect other provisions or applications of this Agreement that can be given effect without the invalid or unenforceable provisions or applications, and to this end, the provisions and applications of this Agreement shall be severable.

j.      Waiver of Jury Trial.  To the fullest extent permitted by law, each party to this agreement severally, knowingly, irrevocably and unconditionally waives any and all rights to trial by jury in any action, suit or counterclaim brought by any party to this Agreement arising in connection with, out of or otherwise relating to this Agreement.

k.      No Continuing Waiver.  The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXECUTED as of the date set forth above.

OWNER:

**PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP**,
a Michigan limited partnership

By: Pathway of Pontiac,
a Michigan corporation,
general partner

By: _____
Name: _____
Title: ᴠᴘ

By: PV North, LLC, a Michigan limited liability
company, Managing general partner

By: _____
Name:
Title:

MANAGER:

**PRESBYTERIAN VILLAGES OF MICHIGAN,** a Michigan non-profit corporation,

By: _____
Name: _____
Title: _____

N1o2938 2

EXECUTED as of the date set forth above.

OWNER:

PONTIAC ILF LIMITED DIVIDEND
HOUSING ASSOCIATION LIMITED
PARTNERSHIP,
a Michigan limited partnership

By:   Pathway of Pontiac,
a Michigan corporation,
general partner

By:   _____
Name:
Title:

By:  PV North, LLC, a Michigan limited liability
company, Managing general partner

By:  _____
Name:
Title:

MANAGER:

PRESBYTERIAN VILLAGES OF
MICHIGAN, a Michigan non-profit corporation,

By:  _____
Name:
Title:

N162938 2

EXHIBIT "K"

INSURANCE REQUIREMENTS

**SunAmerica Affordable Housing Partners, Inc.**

**Partnership Agreement Insurance Requirements**

Immediately upon purchase of the Land, and throughout the term of this Agreement, the General Partner shall obtain, and maintain in full force and effect, the following policies of insurance:

- Commercial General Liability Insurance, insuring for legal liability of the Partnership, and caused by bodily injury, property damage, personal injury or advertising injury, arising out of the ownership or management of the Land and including the costs to defend such actions brought against the Partnership.  The policy shall include endorsements adding the Limited Partner, AIG SunAmerica, Inc. and SunAmerica Affordable Housing Partners, Inc. as additional insureds, and shall be primary coverage for the additional insureds, without contribution from other valid insurance policies which may be carried directly by the additional insureds.  Limits of the policy shall be at least $1 million per occurrence and $2 million in the aggregate.

- Automobile Liability insurance, insuring for legal liability of the Partnership, and caused by bodily injury, property damage, or personal injury arising out of the ownership or use of motor vehicles, including vehicles not owned by the Partnership, and including the costs to defend such actions brought against the Partnership.  The policy shall include endorsements adding AIG SunAmerica, Inc. and SunAmerica Affordable Housing Partners, Inc. as additional insureds, and shall be primary coverage for the additional insureds, without contribution from other valid insurance policies which may be carried directly by the additional insureds.  Limits of the policy shall be at least $1 million combined single limits per accident.

- Worker's Compensation insurance, insuring for occupational disease or injury and employer's liability, and covering the Partnership's full liability for statutory compensation to any person or persons who perform work for the Partnership or perform duties on the site of the Apartment Complex, and liability to the dependents of such persons.  The policy will be in a form which complies with the worker's compensation acts and safety laws of the state in which the Apartment Complex is located.  Worker's Compensation limits shall be statutory; Employer's Liability limits shall be at least $1 million per occurrence.

- Umbrella/Excess Liability insurance, with the Commercial General Liability, Automobile Liability and Employers Liability policies scheduled as underlying policies.  Limits of the policy shall be at least $4 million per occurrence and in the annual aggregate.

- Other forms or types of insurance which the Limited Partner may now or hereafter require.

N162938 2

Prior to the commencement of any construction of the Apartment Complex, General partner shall obtain (or cause to be obtained by the Contractor) and keep in force until the Final Closing:

- Builder's Risk insurance, insuring for all risks of physical loss of or damage (excluding the perils of earthquake and flood, unless specifically required by the Limited Partner) to the real property comprising or intended to comprise the Apartment Complex construction, and personal property of the Partnership used to maintain or service the Apartment Complex construction, whether located at the site or elsewhere, including while in-transit. Coverage and limits shall be extended to include the loss of anticipated rents sustained due to an insured loss, for a period of at least twelve months from the date of such loss. Policy shall provide for claims to be paid based upon replacement cost of the lost or damaged property without deduction for depreciation, and for any additional architectural or engineering fees incurred as a result of an insured loss, loss payment shall be to the Partnership. Limits of policy will be at least the estimated replacement value of the completed Apartment Complex. The policy shall have a deductible of no greater than $10,000 per occurrence. The policy shall carry no coinsurance provisions. The policy shall include an endorsement naming the limited Partner as Loss Payee, as its interests may appear, and as an additional insured, and shall allow the Limited Partner to be associated in the adjustment of any claim.

- Evidence from the Contractor of Worker's Compensation insurance, insuring for occupational disease or injury and employer liability, and covering the Contractor's full liability for statutory compensation to any person or persons who perform work in, on, or about the Apartment Complex construction, including the employees of sub-contractors of any tier, and liability to the dependents of such persons. The policy will be in a form which complies with the worker's compensation acts and safety laws of the state in which the Apartment Complex is located. Worker's Compensation limits shall be statutory, Employer's Liability limits shall be at least $1 million per occurrence.

**Prior to any occupancy of the Apartment Complex, General Partner shall obtain, and shall maintain in full force and effect throughout the term of this Agreement, the following policies of insurance:**

- Property Damage insurance, insuring for all risks of physical loss or damage (excluding the perils of earthquake and flood, unless specifically required by the Limited Partner) to the real property comprising the Apartment Complex, personal property of the Partnership used to maintain or serve the Apartment Complex, and new construction, additions, alterations and repairs to structures. Policy shall provide for claims to be paid based upon replacement cost of the lost or damaged property without deduction for depreciation; loss payment shall be to the Partnership. Limits of policy will be at least he replacement value of the Apartment Complex (excluding the value of the Land, site utilities, foundations and architectural and engineering expenses). The policy shall have a deductible of no greater than $10,000 per occurrence. The policy shall carry no coinsurance provisions. Coverage and limits shall be extended to include the actual loss of rents sustained due to an insured loss, for a period of at least twelve months from the date of such loss. Coverage shall be further extended to include debris removal, outdoor trees, shrubs, plants and lawns and Ordinance or Law coverage for the increased costs

of construction caused by the enforcement of building, zoning or land use law. The policy shall include an endorsement naming the Limited Partner as Loss Payee, as its interest may appear, and as an additional insured, and shall allow the Limited Partner to be associated in the adjustment of any claim.

- Evidence of Worker's Compensation insurance from any contractor performing work for the Partnership, insuring for occupational disease or injury and employer's liability, and covering the Contractor's full liability for statutory compensation to any person or persons who perform work in, on, or about the Apartment Complex, including the employees of sub-contractors of any tier, and liability to the dependents of such persons. The policy will be in a form which complies with the worker's compensation acts and safety laws of the state in which the Apartment Complex is located. Worker's Compensation limits shall be statutory; Employer' Liability limits shall be at least $1 million per occurrence.

All such policies shall be underwritten by companies licensed to write such insurance in the state in which the Apartment Complex is located, and shall be rated in the latest A.M. Best's Insurance Rating Guide with a rating of at least A-, and be in a financial category of at least X. The General Partner shall furnish to the Limited Partner a complete copy of each such policy of insurance. If the policy is not available prior to the Final Closing, then certificates of insurance detailing the policy terms and conditions as noted above shall be provided, but the policies must then be provided within sixty days. All such policies shall include endorsements requiring at least 30 days prior written notice to the Limited Partner of any cancellation, termination or reduction of coverage therein. Notice of the renewal of any policy shall be made at least 10 days prior to the scheduled date of such renewal, and shall be in the form of endorsement to the policy. Notice to the Limited Partner of any replacement of any policy shall be made at least 10 days prior to such replacement, and shall be in the form of a copy of the replacement policy, or by certificate, as noted above.

The General Partner hereby releases and relieves the Limited Partner, AIG SunAmerica Inc. and SunAmerica Affordable Housing Partners, Inc. for any and all liability, and waives its entire right of recovery against them, with respect to any loss or damage of property or for property damage, bodily injury or personal injury to third-parties arising out of or incident to any loss or peril insured against under any of the foregoing policies and any other perils for which the General Partner has arranged insurance.

EXHIBIT "L"

Owner's and Contractor' Affidavit

# EXHIBIT "L"

## OWNER'S AND CONTRACTOR'S AFFIDAVIT
(construction in progress)

This Owner's and Contractor's Affidavit is made this ___ day of _____, _____, by _____ Limited Partnership (Owner), and _____ (General Contractor), who, being duly sworn on their oaths, did say the following:

     1.     That they are, respectively, the Owner (or an authorized representative thereof) of the property hereafter described and the General Contractor in connection with the construction or repair of the improvements located on said property as their names are indicated above (if the word ALONE appears in the above space preceding ·General Contractor, the Owner stated that construction or repair was made under his own supervision, and no general contractor having been employed); and

     2.     General Contractor has been paid for services, labor, or materials or supplies furnished with respect to the property (AGC Claims) up to the date of _____, and has executed a Waiver of Liens whereby he waives and releases his right to file a mechanics' or materialman's lien against said property, with respect to said paid GC Claims.    Upon the General Contractor's receipt of payment of $_____ for GC Claims for which payment is requested as of the date of this Affidavit, General Contractor agrees to execute a Waiver of Liens for GC Claims arising from and after the date of the last payment for GC Claims received by the General Contractor through _____.

     3.     The General Contractor states and affirms that, except as noted on the attachment hereto (if any), all of the persons, firms and corporations, including those whose names, if any, appear on the Waivers of Lien (attached hereto, if any), including the General Contractor and all subcontractors, who have furnished services, labor, or materials, according to plans, specifications, or extra items, used in the construction or repair of such improvements, at the direction of the General Contractor, have been paid for all labor or services performed and/or for all materials or supplies furnished (A Sub Claims) up to the date of _____, that there are no mechanic's or materialmen's liens against said property and no claims outstanding which would entitle the holder thereof to claim a lien against the property for said paid Sub Claims.  Upon the General Contractor's payment of a subcontractor's Sub Claim for which payment is requested as of the date of this Affidavit, General Contractor agrees to obtain an executed Waiver of Liens from that subcontractor, whereby such subcontractor shall waive and release his right to file a mechanics' or materialman's lien against the property for said paid SubClaims.

4.      That there are no financing statements, chattel mortgages, conditional bills of sale or retention of title agreements (other than in favor of the Owner's construction loan lender) affecting any fixtures or any cabinets, mantles, awnings, doors or windows or screens therefor or any plumbing, lighting, heating, cooking, refrigerating, ventilating or air condition equipment or apparatus used separately or in combination as packaged units or installations in connection with the improvements on the property.

5.      That this affidavit is made for the purpose of inducing SunAmerica Housing Fund 1050, A Nevada Limited partnership ("SHF") to fund a draw request for construction on said property and the Owner does hereby agree to indemnify and hold SHF harmless of and from any and all loss, cost, damage and expense of every kind, including attorneys' fees, which SHF shall or may suffer or incur or become liable for under the Amended and Restated Agreement of Limited Partnership between SHF and the Owner directly or indirectly, out of such improvements, repairs or other construction on the property hereafter described or on account of any such mechanics' or materialmen's lien or liens or claim or claims, or in connection with its enforcement of its rights under this agreement. The General Contractor hereby agrees to indemnify and hold SHF 1050 harmless of and from any and all loss, cost, damages or expenses arising out of claims made by subcontractors and suppliers or others entitled to a mechanics' or materialmen's claim claiming under or through the General Contractor, either by payment of funds or contracting of work or materials provided.

The real estate and improvements referred to herein are situated in the City _____, _____ County, State of _____, and are briefly described as:

commonly known as _____ Apartments.

**Owner**

_____ Limited Partnership

By: _____, its
        General Partner

By: _____
        Name:
        Title:

**General Contractor**

_____

By: _____
        Name:
        Title:

(Notary Acknowledgments Follow)

STATE OF _____)
                       ) :SS
COUNTY OF _____)

On this \_\_\_ day of _____, \_\_\_\_\_, before me, the undersigned, a Notary Public in and for the jurisdiction aforesaid, personally appeared _____, personally well known (or satisfactorily proven) to me to be the person whose name is subscribed to the foregoing and annexed Instrument who, being by me first duly sworn, did depose and state that he/she executed the annexed Instrument in his/her capacity as _____ of _____, a corporation which is a general partner of _____ Limited Partnership, which entity is a party to the foregoing and annexed Instrument, on behalf of said entity as its free act and deed for the uses and purposes therein contained.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public
My commission expires: _____

State of _____)
                 ) :ss
County of _____)

On this \_\_\_ day of _____, 20\_\_, before me, the undersigned, a Notary Public in and for the jurisdiction aforesaid, personally appeared _____, personally well known (or satisfactorily proven) to me to be the person whose name is subscribed to the foregoing and annexed Instrument who, being by me first duly sworn, did depose and state that he/she executed the annexed Instrument in his/her capacity as _____ of _____, which entity is a party to the foregoing and annexed Instrument, on behalf of said entity as its free act and deed for the uses and purposes therein contained.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public
My commission expires: _____

EXHIBIT "M"

Construction Update

EXHIBIT "N"

Cable TV and Telecom Policies