**Exhibit A**



**NIXON PEABODY LLP**
**ATTORNEYS AT LAW**

NIXONPEABODY.COM
@NIXONPEABODYLLP

Louis E. Dolan, Jr.
*Partner*
T 202-585-8818
ldolan@nixonpeabody.com

799 9th Street NW
Suite 500
Washington, DC 20001-4501
202-585-8000

February 28, 2019

<u>*VIA E-MAIL & FIRST CLASS MAIL*</u>

Mike Stefanko, Esq.
Loomis, Ewert, Parsley, Davis & Gotting, P.C.
124 W. Allegan St., Suite 700
Lansing, MI 48933

RE: **Pontiac ILF Limited Dividend Housing Association Limited Partnership**

Dear Mike:

    I write on behalf of SunAmerica Housing Fund 1050, A Nevada Limited Partnership, the Investment Partnership in the above-referenced Limited Partnership and in response to your request for additional information and authorities in connection with our discussions about the right of first refusal contained in the Partnership Agreement. Specifically, you indicated that you do not believe there is a requirement that the Partnership be a willing seller in order to trigger the right of first refusal and that the Section 42(i)(7)(A) right of first refusal is effectively an option exercisable at the discretion of the General Partner. We disagree.

    As an initial matter, Michigan law has long distinguished between rights of first refusal and option agreements. Rights of first refusal are narrowly construed pre-emptive rights that require a willing seller. *See, e.g., Randolph v. Reisig*, 727 N.W. 2nd 388, 391 (Mich. App. 2007) ("A right of first refusal, or preemptive right, is a conditional option to purchase dependent on the landowner's desire to sell."); *Walnut Brook Dev. Co. v. Defloria* (Mich. App. 2014) ("A right of first refusal is a contractual option to purchase property if the owner decides to sell to a different buyer.") Options, on the other hand, are not so-conditioned, and may be exercised in accordance with their terms to force the owner to sell, even against its wishes. *Czapp v. Cox*, 445 N.W. d2 218 (Mich. App. 1989).

    Further, we note that Section 42(i)(7)(A) of the Internal Revenue Code authorized the grant of a "right of 1st refusal", and not an option. While Congress easily could have used express language to include an option in 42(i)(7)(A), it did not do so and the plain language it elected to use must be given its ordinarily understood meaning. Indeed, the legislative history at the time

4843-6734-8617.1

Mike Stefanko, Esq.
February 28, 2019
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

42(i)(7)(A) was enacted reflects Congressional intent that the owner had to be willing to sell for the right of first refusal granted under 42(i)(7)(A) to be operative. *See, e.g.,* 136 Cong. Rec. 30528 (October 18, 1990) (referencing requirement under right of first refusal "should the owner decide to sell").

Moreover, the current version of the Cantwell-Hatch bill before Congress (S.548 – 115th Congress (2017-2018)), if enacted, would change the "right of 1st refusal" language in Section 42(i)(7)(A) to an "option" – demonstrating the clear Congressional understanding of the distinction between the two instruments and the Congressional decision to use the former instead of the latter when it enacted Section 42(i)(7)(A). As you know, the distinction between the two is reflected in the Partnership Agreement, which grants both a right of first refusal and an option. Adopting your client's reading of the right of first refusal would render the option meaningless.

Finally, it is worth noting that exercising the right of first refusal over the objection of the Investment Partnership as you indicated your client intends to do would violate the economic substance doctrine and jeopardizes the economic structure and tax benefits of the Partnership resulting in tax credit recapture. It would allow the Internal Revenue Service to deem the right of first refusal holder to be an option holder, with no Section 42(i)(7)(A) safe harbor, and thus deem it, not the Partnership, to be the owner of the Property and economic benefits (such as tax credits) for tax purposes. Plainly, such a result would have extremely adverse consequences for the Partnership, its partners, and guarantors.

We hope these materials and thoughts are helpful to you in determining your client's course of action. We continue to be open to trying to resolve this matter and considering any offers or suggestions your client may have. As your client has been advised, we will oppose any unilateral attempt to solicit offers and trigger the ROFR under these circumstances.

Thank you for your attention to these matters. All rights reserved.

Sincerely,

Louis E. Dolan, Jr.

Enc.

4843-6734-8617.1

**727 N.W.2d 388**
**272 Mich. App. 331**
E. Richard RANDOLPH and Betty J. Randolph, Plaintiffs-Appellants,
v.
Clarence E. REISIG, Monica Reisig, William Hinkley, and Debra Hinkley, Defendants-Appellees.
Docket No. 259943.
Court of Appeals of Michigan.
Submitted September 6, 2006, at Grand Rapids.
Decided October 3, 2006, at 9:00 a.m.
Released for Publication January 5, 2007.

[727 N.W.2d 389]

Warner Norcross & Judd L.L.P. (by John G. Cameron, Jr.; John J. Bursch and Daniel P. Lennington), Grand Rapids, for E. Richard and Betty J. Randolph.

Timmis & Inman P.L.L.C. (by Joseph M. Xuereb), Detroit, for Clarence E. and Monica Reisig.

Before: SAWYER, P.J., and FITZGERALD and O'CONNELL, JJ.

PER CURIAM.

Plaintiffs appeal as right the order granting defendants' motion for summary disposition pursuant to MCR 2.116(C)(10) in this dispute arising out of the interpretation of covenants contained in a property owners' association agreement. We reverse and remand.

We review de novo a trial court's decision on a motion for summary disposition. A motion for summary disposition under MCR 2.116(C)(10) tests the factual support of a claim. *Rice v. Auto Club Ins. Ass'n*, 252 Mich.App. 25, 30, 651 N.W.2d 188 (2002). In reviewing a motion for summary disposition under MCR 2.116(C)(10), the deciding court considers all the evidence, affidavits, pleadings, admissions, and other information available in the record in the light most favorable to the nonmoving party. *Id.* at 30-31, 651 N.W.2d 188. The nonmoving party must present more than mere allegations in order to demonstrate a genuine issue of material fact for resolution at trial. Summary disposition is properly granted if no factual dispute exists, thereby entitling the moving party to judgment as a matter of law. *Id.* at 31, 651 N.W.2d 188.

Additionally, we review de novo the proper interpretation of a contract. *Grand Trunk W. R., Inc. v. Auto Warehousing Co.*, 262 Mich.App. 345, 350, 686 N.W.2d 756 (2004). In interpreting a contract, our obligation is to determine the intent of the parties. *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251 (2003). We examine the language in the contract and give the words their plain and ordinary meaning. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47, 664 N.W.2d 776 (2003). "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law," and "[i]f the language of the contract is unambiguous, we construe and enforce the contract as written." *Quality Products, supra* at 375, 666 N.W.2d 251.

In 1948, property owners on Houseman Lake created a property owners' association charged with maintaining the value and resources of property surrounding the lake. On October 15, 1949, these property owners entered into an agreement providing, in part:

Whereas the above described parties [11 individuals] are the owners of all the land surrounding Houseman Lake which

[727 N.W.2d 390]

is located in Lilley Township, Newaygo County, Michigan, and are desirous of placing certain restrictions, conditions, covenants, limitations, reservations and easements on



Case 2:19-cv-11783-AJT-MKM ECF No. 7-2, PageID.299 Filed 09/20/19 Page 5 of 9

Randolph v. Reisig, 727 N.W.2d 388, 272 Mich. App. 331

the above described land for the protection of the above described owners and any and all future purchasers of land in said area:

Now, therefore, it is hereby mutually agreed by and between and among the above named parties that the following restrictions, conditions, covenants, limitations, reservations, and easements shall be binding upon the above described owners of the land in the above described area, their heirs, successors, representatives and assigns, and said restrictions, conditions, covenants, limitations, reservations and easements shall run with the land, as follows:

* * *

D. That any party or parties owning any land covered by this agreement and who desire to sell their property and to discontinue their summer residence on such property, before entering into any binding agreement to sell any of said property to any person or persons not an owner of and summer resident on land covered by this agreement, will notify in writing all the then owners of the land covered by this agreement and directly bordering upon the parcel of land which it is thus desired to sell, of their intention to sell such property and shall give the parties so notified, or any of them, the first option to buy the said property for a period of fifteen (15) days from the date of mailing such notification. In the event a price and terms of sale have been offered for such property by any person or persons not an owner of and summer resident on land covered by this agreement, such notification shall contain the price and terms of sale offered by the proposed purchaser and such notification shall constitute an option to those notified, or any of them, to purchase the said land for the same price and on the same terms.

E. The parties hereto individually bind themselves to sell or lease their respective properties to members of the Caucasian race only.

F. These covenants shall run with the land and shall be binding upon all parties hereto and all persons claiming under them until January 1, 1960, at which time such covenants shall be automatically extended for successive periods of ten (10) years unless by a vote of the majority of the then owners of sites in said area it is agreed to change the said covenants in whole or in part.

* * *

H. Invalidation of any one or more of these covenants by judgment or decree of any court shall in no wise effect [sic] any of the other provisions which shall remain in full force and effect.

Plaintiffs own real property located on Houseman Lake. Defendants Clarence and Monica Reisig owned real property adjacent to plaintiffs' property. On April 15, 2001, the Reisigs executed a contract for the sale of their property to defendants William and Debra Hinkley. The Hinkleys were not landowners on Houseman Lake. On May 1, 2001, the Reisigs notified the Houseman Lake property owners of their land contract sale to the Hinkleys. On June 7, 2001, plaintiffs attempted to exercise their right of first refusal, tendering $500 and offering to purchase the property under the same terms as those provided in the Hinkleys' land contract. On June 26, 2001, the Reisigs returned plaintiffs' money and refused to sell them the property.

[727 N.W.2d 391]

Plaintiffs instituted this litigation in August 2001. The circuit court initially granted the Reisigs' motion for summary disposition, concluding that the racially restrictive provision of the property owners' agreement rendered the right of first refusal unenforceable. This Court affirmed the circuit



-2-

erred by concluding that the renewal provision in the agreement transformed the agreement into an agreement of indefinite duration.

Plaintiffs also argue that the trial court erred by determining that the right of first refusal in the agreement is a property right subject to the rule against perpetuities.[2] The Michigan statutory rule against perpetuities that governs interests created between September 23, 1949, and December 27, 1988, provides as follows:

The common law rule known as the rule against perpetuities now in force in this state as to personal property shall hereafter be applicable to real property and estates and other interests therein, whether freehold or non-freehold, legal or equitable, by way of trust or otherwise, thereby making uniform the rule as to perpetuities applicable to real and personal property. [MCL 554.51.]

In *Hubscher & Son, Inc. v. Storey*, 228 Mich.App. 478, 482-483, 578 N.W.2d 701 (1998), this Court explained:

The rule against perpetuities . . . [codified at MCL 554.51] is violated if, at the time the instrument creating a future estate comes into operation, it is not certain that the estate will either vest or fail to vest within twenty-one years of the death of a person named in the instrument. The rule applies only to nonvested property interests. [Citation omitted.]

An option contract does not create an interest in land. A right of first refusal gives the promisee fewer rights than an option contract. The promisee in an option contract holds the power to purchase the property at will for the specified price during the specified period. But the option contract does not create an interest in land. *Marina Bay Condominiums, Inc. v. Schlegel*, 167 Mich.App. 602, 607, 423 N.W.2d 284 (1988). Conversely, the promisee in a right of first refusal agreement cannot exercise any right to purchase property unless the seller decides to sell to a different buyer. Because the right of first refusal gives the holder fewer rights than an option, we conclude that if the latter does not create an interest in land, neither does the former. Indeed, Michigan courts have generally treated similar agreements containing first refusal rights as contracts, not property interests, and have relied on the contractual nature of the first refusal agreement in determining that it is not limited by the common-law rule against perpetuities. See *Windiate v. Leland*, 246 Mich. 659, 664-665, 225 N.W. 620 (1929) (the rule against perpetuities concerns rights in property only and does not affect the making of contracts that do not create rights in property).[3]

[727 N.W.2d 393]

The trial court erred by determining that the rule against perpetuities applied to the right of first refusal in the property owners' agreement.

Reversed and remanded. Jurisdiction is not retained.

DAVID H. SAWYER, E. THOMAS FITZGERALD and PETER D. O'CONNELL, JJ., concur.

---------------

Notes:

1. *Randolph v. Reisig*, unpublished opinion per curiam of the Court of Appeals, issued September 2, 2003, 2003 WL 22049115 (Docket No. 239666), slip op. at 2-3.

2. Neither party disputes the characterization of the covenant as a right of first refusal.

3. Even assuming that the right of first refusal is a property right subject to the rule against perpetuities, the right of first refusal under consideration is within neither the purpose of



-4-

nor the reason for the rule. This is not an exclusive option to buy at a fixed price that may be exercised at some remote time beyond the limit of the rule against perpetuities, meanwhile forestalling alienation. The right of first refusal simply gives an adjoining landowner the right to take the seller's interest at the same price the seller could secure from another purchaser whenever the seller desires to sell. It amounts to no more than a continuing and preferred right to buy at the market price whenever the seller desires to sell. This does not restrain free alienation by the seller. He or she may sell at any time, but must afford adjoining landowners a prior right to buy. An adjoining landowner cannot prevent a sale. His or her sole right is to accept or reject as a preferred purchaser when the seller is ready to sell. The right of first refusal is therefore not objectionable as a perpetuity. See, e.g., *Weber v. Texas Co.*, 83 F.2d 807 (C.A.5, 1936).

----------------

exclusion with respect to graduate level courses is repealed.

### Effective Date

Effective for taxable years beginning after September 30, 1990.

4. Exclusion for Employer-Provided Group Legal Services; Tax Exemption for Qualified Group Legal Services Organizations (sec. 7104 of the bill and sec. 120 of the Code).

### Present Law

Under present law, amounts contributed by an employer to a qualified group legal services plan for an employee (or the employee's spouse or dependents) are excluded from the employee's gross income for income and employment tax purposes (sec. 120). The exclusion also applies to any services received by an employee (or the employee's spouse or dependents) or any amounts paid to an employee under such a plan as reimbursement for the cost of legal services for the employee (or the employee's spouse or dependents). The exclusion is limited to an annual premium value of $70. In order to be a plan under which employees are entitled to tax-free benefits, a group legal services plan is required to fulfill certain requirements. One such requirement is that group legal services benefits may not discriminate in favor of highly compensated employees in certain respects.

The exclusion for group legal services benefits expired for taxable years beginning after September 30, 1990. Only amounts paid before October 1, 1990, in taxable years beginning in 1990 for coverage before October 1, 1990, are taken into account in determining the amount of the exclusion for the year.

In addition, present law provides tax-exempt status for an organization the exclusive function of which is to provide legal services or indemnification against the cost of legal services as part of a qualified group legal services plan (sec. 501(c)(20)). The tax exemption for such an organization expired for taxable years beginning after September 30, 1990.

### Reasons for Change

The committee believes it is appropriate to extend, on a temporary basis, the exclusion for employer-provided group legal services and the tax exemption for group legal services organizations.

### Explanation of Provision

The bill extends the exclusion for employer-provided group legal services and the tax exemption for qualified group legal services organizations through taxable years beginning before January 1, 1992. The special rule limiting the exclusion in the case of taxable years beginning in 1990 is repealed.

### Effective Date

The provision is effective for taxable years beginning after September 30, 1990.

5. Targeted Jobs Tax Credit (sec. 7105 of the bill and sec. 51 of the Code).

### Present Law

A tax credit is available on elective basis to employers of individuals described in at least one of nine targeted groups. The nine groups consist of individuals who are either recipients of payments under means-tested transfer programs, economically disadvantaged (as measured by family income), or disabled. The credit generally is equal to 40 percent of the first $6,000 of qualified first year wages. A credit equal to 40 percent of up to $3,000 of wages to qualified summer youth employees is also allowed. The employer's deduction for wages must be reduced by the amount of the credit. The credit expired on September 30, 1990.

Present law also authorizes appropriations for administrative and publicity expenses relating to the credit through September 30, 1990. These monies are to be used by the Internal Revenue Service (IRS) and Department of Labor to inform employers of the credit program.

### Reasons for Change

The committee believes that the targeted jobs tax credit provides a useful incentive for hiring disadvantaged individuals. It further believes that a further extension will provide an opportunity for further assessment of the program by the Congress and the Treasury Department.

### Explanation of Provision

The bill extends the targeted jobs tax credit through December 31, 1991. Generally, the authorization for appropriations also is extended.

### Effective Date

The provision is effective for amounts paid or incurred with respect to an individual who begins work for an employer after September 30, 1990.

6. Business Energy Tax Credits (sec. 7106 of the bill and sec. 46(b) of the Code).

### Present Law

Three nonrefundable business energy tax credits have been allowed for certain types of energy property since 1978 and 1980. These tax credits were extended in the Omnibus Budget Reconciliation Act of 1989 for a 9-month period, and consequently, they expired after September 30, 1990. The credits, i.e., the rates and property to which they pertain, are:

(1) Solar—10% credit;
(2) Geothermal—10% credit; and
(3) Ocean thermal—15% credit.

Under section 38, these (and other) tax credits may not exceed the excess (if any) of the taxpayer's net income tax over the greater of (a) the taxpayer's tentative minimum tax for the taxable year, or (b) 25 percent of so much of the taxpayer's net regular tax liability for the taxable year that exceeds $25,000.

### Reasons for Change

The committee believes that the business energy credits for solar energy, geothermal, and ocean thermal properties serve a valuable function in encouraging the development of renewable fuel sources and should be continued.

### Explanation of Provision

The business energy tax credits for solar, geothermal, and ocean thermal energy property are extended beyond the present September 30, 1990, expiration date through December 31, 1991.

### Effective Date

The provision is effective for qualified investments placed in service after September 30, 1990, and before January 1, 1992.

7. Low-Income Rental Housing Tax Credit (sec. 7107 of the bill and sec. 42 of the Code).

### Present Law

#### Overview of the credit

A tax credit is allowed in annual installments over 10 years for qualifying low-income rental housing, which may be newly constructed or substantially rehabilitated residential rental property. For most newly constructed and substantially rehabilitated housing placed in service after 1987, the credit percentages are adjusted monthly to maintain a present value of the credit stream of 70 percent of the total qualified expenditures. In the case of housing receiving other Federal subsidies (including the use of the proceeds of tax-exempt bonds) and the acquisition of an existing building which is substantially rehabilitated, monthly adjustments are made to maintain a present value of the credit stream of 30 percent of the total qualified expenditures. Generally, that part of the building for which the credit is claimed must be rented to qualified low-income tenants at restricted rents for 15 years after the building is placed in service. In addition, a subsequent additional 15-year period of low-income use is generally also required.

In order for a credit to be claimed with respect to a building, the building owner generally must receive a credit allocation from the appropriate credit authority. An exception is provided for property which is substantially financed with the proceeds of tax-exempt bonds subject to the State's private-activity bond volume limitation. The low-income housing credit is allocated by State or local government authorities subject to an annual limitation for each State. The annual State credit limitation was $1.25 per resident for years before 1990 and is $0.9375 per resident for 1990.

#### Rights of first refusal

Under present law, any determination as to whether Federal income tax benefits are allowable to a taxpayer with respect to a qualified low-income building is made without regard to whether the tenants are given the right of first refusal to purchase the building, for a minimum purchase price, should the owner decide to sell to them (at the end of the compliance period). The minimum purchase price to be paid by the tenants is the sum of: (1) the principal amount of all indebtedness secured by the building, with the exception of indebtedness incurred within the five years immediately prior to sale, and (2) all Federal, State, and local income taxes attributable to such sale. In determining the Federal income (but not other) taxes attributable to the sale, the tax liability resulting from the agreement to pay taxes attributable to the sale are taken into account.

#### 10-year rule

Generally, properties placed in service within the last 10 years are ineligible for the credit. An exception is provided for certain transfers including transfers in which the new owner retains the basis of the previous owner. In addition, when the transferor is a qualified tax-exempt organization or a governmental entity, the 10-year rule is applied by looking to the placed-in-service date of the most recent taxable owner. There are also circumstances in which the 10-year rule may be waived, including transfers of: (1) certain Federally assisted properties, a default on which would result in a Federal Government budget outlay, (2) low-income buildings the mortgages on which are subject to prepayment if the waiver is necessary to avert conversion of the properties to market rate use; and (3) certain buildings acquired from failed financial institutions.

#### Compliance

Under present law each State must develop a plan for allocation of the credit among projects. A qualified State allocation plan must provide a procedure for the agency to notify the Internal Revenue Service of noncompliance with the credit rules. There is no affirmative requirement that qualified

## SEC. 205. TENANT VOUCHER PAYMENTS TAKEN INTO ACCOUNT AS RENT FOR CERTAIN PURPOSES.

(a) IN GENERAL.—Subparagraph (B) of section 42(g)(2) of the Internal Revenue Code of 1986 is amended by adding at the end the following new sentence: "In the case of a project with respect to which the taxpayer elects the requirements of subparagraph (C) of paragraph (1), or the portion of a project to which subsection (d)(5)(C) applies, clause (i) shall not apply with respect to any tenant-based assistance (as defined in section 8(f)(7) of the United States Housing Act of 1937 (42 U.S.C. 1437f(f)(7))).".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to rent paid in taxable years beginning after December 31, 2017.

# TITLE III—CREDIT RATE AND OTHER RULES RELATING TO CREDIT ELIGIBILITY AND DETERMINATION

## SEC. 301. MINIMUM CREDIT RATE.

(a) IN GENERAL.—Subsection (b) of section 42 of the Internal Revenue Code of 1986 is amended—

(1) by redesignating paragraph (3) as paragraph (4), and

(2) by inserting after paragraph (2) the following new paragraph:

"(3) MINIMUM CREDIT RATE.—In the case of any new or existing building to which paragraph (2) does not apply and which is placed in service by the taxpayer after December 31, 2016, the applicable percentage shall not be less than 4 percent.".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to buildings placed in service after December 31, 2016.

## SEC. 302. RECONSTRUCTION OR REPLACEMENT PERIOD AFTER CASUALTY LOSS.

(a) IN GENERAL.—Subparagraph (E) of section 42(j)(4) of the Internal Revenue Code of 1986 is amended by striking "a reasonable period established by the Secretary" and inserting "a reasonable period established by the applicable housing credit agency (not to exceed 25 months from the date on which the casualty loss arises). The determination under paragraph (1) shall not be made with respect to a property the basis of which is affected by a casualty loss until the period described in the preceding sentence with respect to such property has expired.".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to casualty losses arising after the date of the enactment of this Act.

## SEC. 303. MODIFICATION OF RIGHTS RELATING TO BUILDING PURCHASE.

(a) IN GENERAL.—Subparagraph (A) of section 42(i)(7) of the Internal Revenue Code of 1986 is amended—

(1) by striking "a right of 1st refusal" and inserting "an option", and

(2) by striking "the property" and inserting "the property or a partnership interest relating to the property".