UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SUNAMERICA HOUSING FUND 1050, A NEVADA LIMITED PARTNERSHIP, a Nevada limited partnership, <br><br>                           Plaintiff, <br><br> v. <br><br> PATHWAY OF PONTIAC, INC. et al., <br><br>                           Defendants. | Case No. 2:19-cv-11783-AJT-MKM |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF SUNAMERICA HOUSING FUND 1050, A NEVADA LIMITED PARTNERSHIP**

**NIXON PEABODY LLP**
Keith E. Edeus, Jr.
Nixon Peabody, LLP
70 W. Madison, Suite 3500
Chicago, Illinois 60602

Louis E. Dolan, Jr.
Nixon Peabody, LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327

*Attorneys for Plaintiff SunAmerica
Housing Fund 1050, A Nevada Limited
Partnership*

## Table of Contents

**Page**

ISSUES PRESENTED ............................................................................................. 1

LOCAL RULE 7(1)(d) STATEMENT ................................................................... 2

INTRODUCTION ................................................................................................. 2

FACTUAL BACKGROUND ................................................................................ 4

    A.    The Parties. ................................................................................... 4

    B.    The Low Income Housing Tax Credit Program. ........................... 5

    C.    Relevant Terms of the Partnership Agreement. ............................ 7

        1.    The General Partners are Obligated to Protect the Limited Partner's Interests ................................................. 7

        2.    Presbyterian's ROFR and Option Rights ............................ 8

        3.    Limited Partner Consent Required Before Any Sale of the Property ......... 9

    D.    Presbyterian's Purported Exercise of the ROFR ....................... 10

    E.    The Present Lawsuit. ................................................................... 12

LEGAL STANDARD .......................................................................................... 13

ARGUMENT ....................................................................................................... 14

    A.    Presbyterian Did Not Validly Exercise Its Right of First Refusal Because It Failed To Satisfy Conditions Precedent. ........................................... 15

        1.    The Partnership Did Not Form an Intent To Sell To Lockwood or any Third Party. .............................. 15

        2.    The Lockwood Offer Is Not *Bona Fide*. ......................... 19

        3.    Giving Effect to Presbyterian's Exercise of The ROFR Would Render the Option Superfluous. ......................... 20

        4.    Giving Effect To Presbyterian's Attempted Exercise of the ROFR Is Inconsistent with the Partnership Agreement and Section 42(i)(7). ................................................. 21

    B.    The General Partners Have Breached the Contract and Their Fiduciary Duties to SHF 1050. .............................................. 22

    C.    Defendants Have Failed To Adduce Evidence Of A Breach By SHF 1050. ........ 23

i

Table of Contents (continued)

Page

CONCLUSION..................................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Douglas v. Cty. of Jackson*,
    804 F. Supp. 944 (E.D. Mich. 1992) ..................................................................13

*Frank Lyon Co. v. United States*,
    435 U.S. 561 (1978) ............................................................................................6(fn3)

*Gross v. FBL Financing Services, Inc.*,
    557 U.S. 167 (2009) ..................................................................................................6

*Lucas v. Leaseway Multi Transp. Serv., Inc.*,
    738 F. Supp. 214 (E.D. Mich. 1990), *aff'd* 929 F.2d 801 (6th Cir. 1991) ..............13

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ................................................................................................21

*Miller v. LeSea Broadcasting, Inc.*,
    87 F.3d 439 (C.A. 7, 1996) ................................................................................16(fn11)

*Senior Hous. Assistance Grp. v. AMTAX Holdings 260, LLC*,
    No. C17-1115RSM, 2019 WL 687837, at *1 (W.D. Wash. Feb. 19, 2019) .............. 5, 6, 17-18

**State Cases**

*Brauer v. Hobbs*,
    391 N.W.2d 482 (Mich. Ct. App. 1986) .............................................................15

*Chapman v. Mut. Life Ins. Co. of New York*,
    800 P.2d 1147, 1150 (Wyo., 1990) ...................................................................16(fn11)

*Czapp v. Cox*,
    445 N.W.2d 218 (Mich. Ct. App. 1989) .............................................................21

*LaRose Mkt., Inc. v. Sylvan Ctr., Inc.*,
    530 N.W.2d 505 (Mich Ct. App. 1995) .............................................................19

*LIN Broad. Corp. v. Metromedia, Inc.*,
    139 A.D.2d 124, *aff'd* 74 N.Y.2d 54, 542 N.E.2d 629 (1989) .......................16(fn11)

*Randolph v. Reisig*,
    727 N.W.2d 388 (Mich Ct. App. 2007) .............................................................15

*Riley v. Campeau Homes (Texas), Inc.*,
    808 S.W.2d 184 (Tex. App., 1991) ...................................................................16(fn11)

Table of Authorities (continued)

*Univ. of Michigan Bd. of Regents v. Dep't of Treasury*,
  553 N.W.2d 349 (Mich. Ct. App. 1996) ...............................................................19

**Federal Statutes**

26 U.S.C. 42(i)(7) ................................................................................... *passim*

MCL 449.1403(b) .......................................................................................22

MCL 449.21(a) ...........................................................................................22

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................13

**Regulations**

26 C.F.R. § 1.42–4 ..................................................................................6(fn3)

**Other Authorities**

Affordable Housing Credit Improvement Act of 2017 (S. 540) .............................7(fn4)

Affordable Housing Credit Improvement Act of 2019 (S. 1703) ...........................7(fn4)

H.R. Rep. No. 101-247, 101st Cong., 1st Sess. (1989).........................................7

Pub. L. No. 101-239, Title VII, Subtitle A, § 7108(q), 103 Stat. 2321 (1989)............6

S. 980, 101st Cong., 2d Sess., § 2(y) (1989)..................................................7(fn4)

Tracy A. Kaye, <u>Sheltering Social Policy in the Tax Code: The Low–Income
  Housing Credit</u>, 38 Vill. L. Rev. 871, 875 (1993) ...........................................7(fn4)

17 C.J.S. Contracts § 24.............................................................................16

## ISSUES PRESENTED

1. The holder of a conditional right of first refusal to purchase real property, as permitted under the Internal Revenue Code Section 42(i)(7), may not exercise that conditional right:

    a. Where the owner of the property has not formed an intent to sell the property;

    b. On the basis of a sham third party offer that was not made in good faith, but solely for the purpose of attempting to trigger the right of first refusal holder's purchase rights; and

    c. Without satisfying all required conditions precedent.

2. Where a partnership agreement expressly requires the limited partner's consent before selling the partnership's real property, the partnership cannot be said to have formed an "intent to sell," for purposes of a right of first refusal, unless the limited partner actually consents to sell the property.

3. The general partners of a limited partnership breached their fiduciary duties to the limited partner, and breached the partnership agreement, by attempting to compel the partnership to sell substantially all of the partnership's assets to an entity affiliated with the general partners for less than fair market value on the basis of a right of first refusal, where the general partners had actual knowledge that the conditions precedent to such right were not satisfied.

## LOCAL RULE 7.1(d) STATEMENT REGARDING
## KEY CONTROLLING AUTHORITIES

26 U.S.C. § 42(i)(7)

## INTRODUCTION

This case involves a dispute among partners (and a related entity) in the Pontiac ILF Limited Dividend Housing Association Limited Partnership (the "Partnership"). Plaintiff SunAmerica Housing Fund 1050, A Nevada Limited Partnership ("SHF 1050") is the sole limited partner and 99.99% owner of the interests in the Partnership. Defendants Pathway of Pontiac, Inc. ("Pathway") and PV North LLC ("PV North" and, together with Pathway, the "General Partners") are the sole general partners in the Partnership owning 0.01% of the Partnership interests, and in that capacity owe fiduciary and contractual duties to SHF 1050 and to the Partnership. Defendant Presbyterian Village North ("Presbyterian") is not a partner, but is affiliated with one of the General Partners, PV North. The Partnership provides affordable housing to the elderly pursuant to the Low Income Housing Tax Credit program (26 U.S.C. § 42, "LIHTC") and, for that purpose, owns a 150-unit multi-family apartment complex located in Pontiac, Michigan (the "Property").

More specifically, this case arises out of the efforts of the General Partners' affiliate, Presbyterian, working in concert with the General Partners to the detriment of the limited partner, to exercise a right of first refusal ("ROFR") to acquire the Property at a price substantially below fair market value. However, Presbyterian is not entitled to exercise the ROFR because fundamental conditions precedent to exercising that right have not been satisfied. Instead, Defendants engaged in a deceptive, concerted scheme and exercise intended to create the *appearance* that conditions precedent had been met, all for the purpose of benefitting themselves to the detriment of the Partnership and its sole limited partner, SHF 1050.

There are two critical criteria for triggering and exercising the ROFR both under the Partnership Agreement and under Michigan law: (i) formation on the part of the owner (here, the Partnership) of an intent to sell the Property and (ii) receipt of a *bona fide* third party offer to acquire the Property.   These are the *sine qua non* for any attempt to trigger and exercise the ROFR under the Partnership Agreement and Michigan law. Neither of those conditions exists here.

Contrary to Defendants' representations both before and during this lawsuit, the "offer" relied upon by Presbyterian demonstrably is not *bona fide*—and Defendants were well aware of that fact at all material times. Unbeknownst to SHF 1050, Defendants solicited an "offer" that they intended to be a sham: they informed their targeted third party offeror that its offer would be used in connection with exercising Presbyterian's ROFR and it would not be treated as real. Defendants even coached the third party with advice from their legal counsel that a binding, *bona fide*, offer was needed to trigger the ROFR—but then failed to meet their own acknowledged requirements. Thus, Defendants actively participated in a scheme to contrive a sham offer to deprive Plaintiff of the value in its partnership interests. The lack of a *bona fide* offer alone is sufficient reason to grant summary judgment in favor of Plaintiff herein.

However, even if the offer in this case was not a sham, and actually was *bona fide*, under established law that would be insufficient to trigger the right of first refusal unless the Partnership possessed the *actual intent to sell its property*. Here, the Defendants failed to adduce any evidence manifesting that the Partnership actually had any intent to sell the Property at all, let alone to the purported third party offeror. To the contrary, the documents produced by Defendants in discovery prove the exact opposite: neither the Partnership nor the Defendants ever intended to sell the Property; the Defendants solely sought to elicit an "offer" to be used by Presbyterian as pretext to exercise the ROFR. Further, the governing partnership agreement expressly required SHF 1050's

consent before the Property could be sold to a third party. SHF 1050 has never consented or agreed to sell the Property to anyone. Consequently, in two key manifestations, the Partnership did not form an intent to sell to the third party offeror, meaning that Presbyterian's ROFR did not ripen.

Notwithstanding the foregoing, the General Partners, in breach of their contractual and fiduciary duties, and with full knowledge that the third party "offer" was a sham that they elicited and contrived to harm their limited partner, assert that their affiliate's purported exercise of the ROFR is effective and have attempted to conclude a sale of the Partnership's property to Presbyterian. Given the absence of a true *bona fide* offer coupled with the lack of Partnership intent to sell the Property, Defendants essentially argue that the ROFR should be treated as a unilateral option. That position is inconsistent with the partnership agreement, Michigan's long-standing common law on rights of first refusal, and the plain language of Section 42(i)(7) of the Internal Revenue Code, which authorizes a right of first refusal—but not an automatic option—to a qualified non-profit entity without adverse tax consequences. Defendants' arguments are wholly without merit and should be rejected summarily.

## FACTUAL BACKGROUND

### A.   The Parties.

SHF 1050, PV North, and Pathway are partners in the Partnership, which is a Michigan limited partnership formed pursuant to the Michigan Revised Uniform Limited Partnership Act. (Answer,[1] ¶ 1). The Partnership and the relationship between the parties is governed by that certain Amended and Restated Agreement of Limited Partnership dated September 1, 2002, as amended (Ex. 1, the "Partnership Agreement"). (Answer, ¶¶ 1, 24). The Partnership Agreement is expressly governed by Michigan law. Ex. 1, § 16.02 and p. 13. The Partnership was formed for the purpose

---

[1] The "Answer" shall refer to ECF No. 14, "Defendants' First Amended Answer, Affirmative Defenses and Counterclaim."

of acquiring, rehabilitating and operating the Property in order to provide low income housing to qualified individuals pursuant to the LIHTC program. (Answer, ¶ 3).

Plaintiff SHF 1050 is a Nevada limited partnership, and is the only limited partner in the Partnership. It owns 99.99 percent (99.99%) of the interests in the Partnership. (Answer, ¶ 20). Pathway and PV North are the sole General Partners of the Partnership and they collectively own .01 percent (0.01%) of the interests in the Partnership. (Answer, ¶ 21). Presbyterian is a Michigan non-profit corporation that is affiliated with PV North, one of the General Partners. (Answer, ¶ 22). Presbyterian is not a partner in the Partnership.

**B.      The Low Income Housing Tax Credit Program.**

The LIHTC Program is a federal program under the Internal Revenue Code that is designed to promote the development of, and to encourage investment in, affordable rental housing for low-income and other qualified households. 26 U.S.C. § 42; Senior Hous. Assistance Grp. v. AMTAX Holdings 260, LLC, No. C17-1115RSM, 2019 WL 687837, at *1 (W.D. Wash. Feb. 19, 2019) (citations omitted). Under the program, Owners of qualifying LIHTC projects receive tax credits over a period of years. Id.

Section 42 of the Code contains a "Safe Harbor" provision that allows (but does not require) the project owner to grant a "right of 1st refusal" to a qualifying nonprofit organization, a tenant association or a governmental agency, permitting it to purchase the project at the end of a fifteen-year "Compliance Period"[2] for a statutorily described "minimum purchase price." 26 U.S.C. § 42(i)(7)(A), (B). The "minimum purchase price," which essentially is the sum of any remaining debt plus taxes attributable to the sale, can be below fair market value in areas where

---

[2] Generally, LIHTC properties must be maintained as affordable housing for an initial 15-year "Compliance Period" followed by a 15-year extended use period. 26 U.S.C. § 42(h)(6)(D).

underlying real estate values have appreciated. <u>AMTAX Holdings 260</u>, at *1. The Safe Harbor operates to ensure that that the owner's entitlement to tax credits and other losses will not be defeated under the "economic substance" doctrine, or similar tax principles, merely because the owner granted a potentially below-market right of first refusal to a qualifying non-profit organization.[3]

Congress chose to enact the Safe Harbor only for a right of first refusal. There is no safe harbor for unilateral, below-market price *options*. Rights of first refusal and options are, of course, legally distinct concepts. As more fully discussed below, a right of first refusal may only be exercised if the owner receives a *bona fide* offer to buy and forms an actual intent to sell; in contrast, an option allows the holder to force a sale of the property—regardless of the owner's desire to sell or receipt of any offer to purchase. The Court must presume that Congress understood this distinction when it elected to use the words "Right of 1st Refusal" in the Safe Harbor. <u>See</u> <u>Gross v. FBL Financial Services, Inc.</u>, 557 U.S. 167, 175 (2009) ("[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.")

Legislative history supports the conclusion that the choice of the United States Congress to limit the Safe Harbor's application to rights of first refusal, as opposed to options, was intentional. <u>See</u> <u>Pub. L. No. 101-239</u>, Title VII, Subtitle A, § 7108(q), 103 Stat. 2321 (1989). In

---

[3] Pursuant to the "economic substance" doctrine and long-standing tax principles, tax benefits attributable to property ownership, including tax credits, are limited to the true owner of the property. <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 572, 98 S. Ct. 1291, 1298, 55 L. Ed. 2d 550 (1978). The holder of a below-market right to acquire property generally is treated as the property owner for tax purposes. <u>See, e.g.,</u> 26 C.F.R. § 1.42–4. Application of these principles in the LIHTC context would defeat the central purpose of the program, because tax credits would be allocated to the non-profit holder of the right of first refusal (which usually cannot use the tax credits because it pays little or no taxes), rather than the partnership and investors who invested significant sums in reliance on the promise of tax credits. The Safe Harbor makes it clear that the owner may provide a right of first refusal—not a unilateral option—to a qualifying nonprofit, without risk that is tax credits will be put in jeopardy.

the accompanying United States House of Representatives Committee Report, the right of first refusal in § 42(i)(7) was described as a right to "purchase the building, for a minimum purchase price, *should the owner decide to sell* (at the end of the compliance period)." H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1195 (1989) (emphasis added).[4]

## C.    Relevant Terms of the Partnership Agreement.

### 1.    The General Partners are Obligated to Protect the Limited Partner's Interests

Section 8.01(a) of the Partnership Agreement entrusts the management and operation of the Partnership to the General Partners, PV North and Pathway, subject to several important limitations. First, in managing and operating the Partnership, the General Partners are required to "take all actions necessary or appropriate to *protect the interests of the Limited Partners* [i.e., SHF 1050] and of the Partnership." Ex. 1, § 8.01(a) (emphasis added). In other words, the General Partners are *required* to put the interest of SHF 1050 before their own self-interest (and the interests of their affiliate), which the General Partners ultimately failed to do.

Likewise, the General Partners are required to "make all decisions affecting the business of the Partnership and … manage and control the affairs of the Partnership [using] best efforts to *carry out the purpose of the Partnership*." Section 8.01(a) (emphasis added). The express purpose of the partnership is to "acquire, finance, rehabilitate, own, maintain, operate and sell or otherwise

---

[4] An earlier draft version of § 42(i)(7) would have allowed an *option* (i.e. an automatic right) to purchase the property at a below-market price, but that version was rejected due to concerns that a below-market purchase option would render the nonprofit organization the owner of the property for tax purposes because it was not conditioned on the owner's desire to sell. See, S. 980, 101st Cong., 2d Sess., § 2(y) (1989) (proposed bill); Tracy A. Kaye, Sheltering Social Policy in the Tax Code: The Low–Income Housing Credit, 38 Vill. L. Rev. 871, 875 (1993). Thereafter, Congress twice considered, but rejected, bills that would have expanded the Safe Harbor to include options. Affordable Housing Credit Improvement Act of 2017, S. 548, and Affordable Housing Credit Improvement Act of 2019, S.1703. These bills would have changed the existing language in Section 42(i)(7) by deleting the words "Right of 1st Refusal" and replacing those words with "option"—demonstrating that Congress clearly intended only to allow a right of first refusal when it passed the 1989 amendments to the 1986 Tax Reform Act (which created the LIHTC program) and that it understood then, as it does now, the difference between rights of first refusal and options.  Congress did not authorize a below market option. This legislative history clearly evidences Congressional determination to limit the Safe Harbor to rights of first refusal as opposed to options.

dispose of the [Property], in order **to obtain long-term appreciation, cash income**, Tax Credits [under the LIHTC program] and tax losses." Section 3.01 (emphasis added). In other words, the General Partners explicitly agreed not only to put Plaintiff's interests first (before their own interests and those of their affiliate), but specifically agreed to take all actions necessary to protect Plaintiff's interest in the long-term appreciation of the Property as well as ongoing, considerable cash-flow distributions from the Property.

Notwithstanding these obligations, the General Partners have engaged in a scheme to deprive Plaintiff of its interest in the Partnership, long-term appreciation, and income, by compelling a below-market sale to their affiliate, all on grounds of a bogus third-party offer manufactured by the Defendants themselves.

## 2.     Presbyterian's ROFR and Option Rights

Article 17 of the Partnership Agreement grants Presbyterian, under separate terms, both a ROFR and an option. The ROFR provisions are consistent with the requirements of Section 42(i)(7). For example, the purchase price under the ROFR is equal to the statutory "minimum purchase price" under the Code. Ex. 1, § 17.04(a). Section 17.03 of the Partnership Agreement expressly conditions Presbyterian's ROFR on receipt of a _bona fide_ offer to purchase the Property:

> Manner of Exercising Right of First Refusal. **Upon receipt of a bona fide offer**, Partnership shall notify Presbyterian in writing of the offer, and Presbyterian shall thereupon exercise its right of first refusal within thirty (30) days, or Partnership may sell the [Property] on the terms as it may determine.

Ex. 1, § 17.03 (emphasis added).

Presbyterian also was given an option under Article 17 of the Partnership Agreement (the "Option"), which Presbyterian could unilaterally exercise without the Partnership's determination

to sell the property and without the need for a *bona fide* offer.[5] The Option and the ROFR were concurrently available for a term of one year following the end of the Compliance Period, but there is an important distinction: In contrast to the ROFR provisions, the purchase price under Presbyterian's Option is "the ***greater*** of the fair market value (as continued low-income housing)" or the price defined for the ROFR. Ex. 1, § 17.09(a) (emphasis added). In other words, the Option, unlike the ROFR, sets a "floor" for the purchase price equal to the fair market value of the Property.[6]

### 3. Limited Partner Consent Required Before Any Sale of the Property

Section 8.02 expressly states that the General Partners, "shall not, without the Consent of [the Limited Partner] which Consent may be withheld in its sole and absolute discretion, have any authority to … except as provided in Article 17 hereof, sell or otherwise dispose of, at any time, all or any material portion of the assets of the Partnership… ." Ex. 1, § 8.02(b)(i). "Consent" is defined as "prior written consent or approval of [SHF 1050] to do the act or thing for which the consent is solicited." Ex. 1, Art. 2. In other words, even if the Partnership received a *bona fide* third party offer to purchase the Property, the General Partners lacked the power to agree to sell to the offeror without SHF 1050's express written Consent.

Under Michigan law, Presbyterian cannot exercise the ROFR unless and until the Partnership *agrees to sell* the property to a third party. Pursuant to Section 8.02, the Partnership cannot agree to sell to a third party without SHF 1050's Consent. Thus, SHF 1050 must be willing or agree to sell to *someone* before Presbyterian can exercise the ROFR. That did not happen here—SHF 1050 never consented to *any* sale. Consequently, Presbyterian's ROFR did not ripen.

---

[5] Presbyterian was entitled to unilaterally exercise this Option by "written notice of the exercise" during the one-year period commencing after the end of the Compliance Period. Ex. 1, §§ 17.06-17.08.

[6] This avoids the adverse tax consequences that would otherwise arise under the economic substance doctrine in the event of its exercise.

D.      **Presbyterian's Purported Exercise of the ROFR**

        As early as 2017, Presbyterian advised the Partnership that it desired to acquire the Property

at the conclusion of the Compliance Period. (Answer, ¶ 39). Presbyterian reiterated this desire in

early 2019, after the Compliance Period ended. Id. In response, on February 28, 2019, SHF 1050

sent a letter through its counsel advising Defendants that SHF 1050 objected to any unilateral

exercise of the ROFR or sale of the Property. Ex. 2. SHF 1050 objected on grounds that, *inter alia*,

Michigan law required that the Partnership be a "willing seller" with respect to a third party offer

as a precondition to a valid exercise of the ROFR, and that a unilateral below-market option would

run afoul of the Safe Harbor. Id. The Defendants responded through counsel on March 6, 2019,

simply stating that they disagreed with SHF 1050's position and that "the General Partners intend

to proceed in accordance with Article 17 of the … Partnership Agreement." Ex. 3.

        On May 2, 2019—in complete disregard of SHF 1050's instructions—Brian Carnaghi of

PV North sent an email to a third party, Lockwood Development Company ("Lockwood"),

soliciting an offer to purchase the Property. Ex. 4. In the email, Mr. Carnaghi admitted that

Defendants sought to use such offer not as a basis to sell the Property to Lockwood, but instead as

part of an attempt to trigger Presbyterian's ROFR rights. Id. Mr. Carnaghi attached a copy of a

previous letter of intent from another prospective "purchaser" and wrote:

> By way of this e-mail, I am asking Kevin [Roragen, Defendants' counsel] to copy
> all on his recent communications comments/suggestions on ways to strengthen the
> offer . . . While Lockwood is formulating this, I believe we will move forward with
> sending [the Limited Partner] the initial LOI, and let them know another offer might
> be forthcoming. Then we will next put the ROFR to the L[imited] P[artner].

Ex. 4. Then, on May 7, 2019, Mr. Carnaghi forwarded to Lockwood an email from Defendants'

counsel, Kevin Roragen, wherein Mr. Roragen stated his concern that the previous LOI "does not

meet the standard of a 'bona fide offer' to purchase the project." Ex. 5. Attorney Roragen wrote:

- 10 -

> The LOI states that it is non-binding and does not create an enforceable contract. It also states that the parties anticipate executing a further PSA. The Michigan case law on "bona fide offers" in the context of rights of first refusal defines an "offer" as something that manifests a clear intent to enter into a bargain, and which would justify the other party in believing that if they accept, then a legally binding agreement is formed. … As such, my concern is that it would be vulnerable to attack as not being a "bona fide offer" which triggers the ROFR. In order to clearly constitute a "bona fide offer" I think the purchaser has to submit something which states that the acceptance by the Partnership will result in a binding agreement between the parties. That would then trigger the ROFR, which could be exercised, and then the "offer" could be rejected, due to the exercise of the ROFR.

Ex. 5.[7] Mr. Carnaghi directed Lockwood to "consider [Roragen's advice] as you draft your LOI or whatever you would call your offer. We really appreciate the effort." Id. In short, Defendants told Lockwood that while it sought an "offer," Presbyterian intended to use this as a basis to exercise its ROFR, after which the "offer" would be rejected.  It was all a ruse designed to circumvent the Plaintiff's rights under the Partnership Agreement and under the law.

On May 31, 2019, the General Partners sent letters to SHF 1050 and to Presbyterian simply stating that an offer to purchase the Property had been received from Lockwood dated May 21, 2019. Exs. 6 and 7. That purported offer, dated May 21, 2019, which was attached to the letters, is annexed hereto as Exhibit 8 (the "Lockwood Proposal"). ECF No. 14-3. The General Partners knew full well that the Lockwood Proposal was never intended to be a legitimate offer and that the Partnership never intended to accept it. Despite this, they put the proposal forward to SHF 1050 without disclosing the foregoing details about how the Lockwood Proposal was obtained, all in furtherance of their scheme to compel a below-market sale to their affiliate.

Notwithstanding Attorney Roragen's advice, the Lockwood Proposal by its express terms is *non-binding* because Lockwood retained the right to terminate "for any reason or no reason …

---

[7] Mr. Roragen's emails were voluntarily sent by his client to a third party, thus waiving any attorney client privilege protections that may have previously attached.

by written notice to Seller…" for sixty days following acceptance. Ex. 7, § 5(a). The Partnership

Agreement required Presbyterian to exercise the ROFR within 30 days after notice of a *bona fide*

offer. Ex. 1, § 17.03. Thus, if Presbyterian failed to exercise the ROFR as promised within that 30

days, Lockwood still had ample time to simply terminate the proposal.

Thereafter, on June 3, 2019, Presbyterian sent written notice to the Partnership stating that,

as a consequence of its receipt of the Offer on May 31, it intended to exercise the ROFR, and

further intended to proceed with a transaction to purchase the Property. (Ex. 9; See Answer, ¶ 48

and ECF No. 14-4). Again, neither the General Partners nor Presbyterian disclosed to SHF 1050

the circumstances under which the Lockwood Proposal had been obtained. Of note, the Partnership

never accepted the Lockwood Proposal.

### E.    The Present Lawsuit.

SHF 1050 filed its four-count complaint herein to enjoin the Defendants from proceeding

with the threatened sale of the Property to Presbyterian, and to obtain other relief.[8] In response,

Defendants filed three "affirmative defenses," none of which has merit. Defendants also filed a

Counterclaim alleging that the Lockwood Proposal triggered Presbyterian's ROFR, likewise

without merit. (Counterclaim, ¶¶ 21-23). Defendants allege that Presbyterian validly exercised the

ROFR by providing written notice of its intent to exercise the ROFR within 30 days of the Offer

and that SHF 1050 breached the Partnership Agreement by refusing to consent. (Id., ¶¶ 24-25 and

---

[8] Count I seeks a declaratory judgment that Presbyterian may not unilaterally exercise the ROFR unless and until all conditions necessary for the exercise of that right have been satisfied. Count II alleges that the General Partners have breached the Partnership Agreement, and seeks damages and an order precluding any transfer or sale of the Property to Presbyterian pursuant to the ROFR. Count III alleges that the Defendants have breached the covenant of good faith and fair dealing and also seeks damages and an order enjoining Defendants from further breaches of their covenant. Finally, Count IV of the Complaint alleges that the General Partners have breached their fiduciary duties by attempting, in contravention of the Partnership Agreement, to dispose of substantially all of the assets of the Partnership to a related entity for less than fair value. Plaintiff seeks to recover its damages and to enjoin the General Partner's conduct.

Ex. C). Defendants seek unspecified damages and to compel SHF 1050 to cooperate with a below-market sale of the Property to Presbyterian.[9]

## LEGAL STANDARD

Summary judgment should be granted where, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is 'material' and precludes summary judgment, "if proof of that fact would have the effect of establishing or refuting one of the essential elements of the cause of action or defense … and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Douglas v. Cty. of Jackson, 804 F. Supp. 944, 947 (E.D. Mich. 1992) (citations omitted). The movant's burden of demonstrating the absence of a disputed material fact, "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case [after which] the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue." Id.

To create a genuine issue of material fact, the non-movant must do more than present some evidence on a disputed issue. Lucas v. Leaseway Multi Transp. Serv., Inc., 738 F. Supp. 214, 217 (E.D. Mich. 1990), aff'd 929 F.2d 701 (6th Cir. 1991) (citations omitted). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for the factfinder to return a verdict for that party, and if the non-movant's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. Thus, "a nonmovant must do more than raise

---

[9] In Count I, Defendants allege that SHF 1050's filing of this lawsuit and its refusal to consent to Presbyterian's exercise of the ROFR constitute breaches of the Partnership Agreement. Defendants seek damages for purported economic harm or, alternatively, an order compelling SHF 1050 to "comply with its duties under Article 17 of the Purchase Agreement." Count II of the Counterclaim, alleging that SHF 1050 breached fiduciary duties to the General Partners, has been dismissed by the Court. Count III of the Counterclaim repeats the allegations of breach of contract set forth in Count I, but on behalf of Presbyterian as a third party beneficiary. None of these claims has merit.

some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact." Id.

## ARGUMENT

After the Compliance Period, Presbyterian held an Option to purchase the Property at full fair market value and a ROFR to acquire it at the statutory "minimum purchase price," which was below fair market value. Not surprisingly, Defendants preferred the below market price. However, the ROFR was not available to them because conditions precedent had not been satisfied. Thus, Defendants conjured a sham third-party offer as a pretense to trigger Presbyterian's exercise of the ROFR for the much lower, statutory minimum purchase price.[10] These efforts failed. The two key conditions precedent to exercise of the ROFR—the Partnership's willingness to sell the Property and receipt of a *bona fide* offer—remain unsatisfied. As such, Presbyterian's purported exercise of the ROFR was ineffective.

The General Partners acted with full knowledge of the sham nature of the Lockwood Proposal, which they failed to disclose to SHF 1050, that the Partnership never formed an intent to sell, and that SHF 1050 had expressly instructed them that it did not wish to sell the Property. Moreover, the General Partners were aware of their express contractual duties to protect SHF 1050's interests, including its interest in the long-term appreciation of, and continued cash-flow distributions from, the Property. As such, the General Partners breached the Partnership Agreement as well as their fiduciary duties to SHF 1050, through their complicity with Presbyterian's scheme, and by their efforts to compel a sale of substantially all of the Partnership's assets to an affiliated entity for less than fair market value.

---

[10] Defendants' efforts amount to an attempt to meld their favorite features of both the ROFR and Option into one agreement: the below-market price under the ROFR and the automatic, at will, feature of their Option. That is impermissible.

For these reasons, SHF 1050 is entitled to summary judgment as to each count of its Complaint, as to all counts of Defendants' Counterclaims, and as to all affirmative defenses asserted by Defendants.

**A.      Presbyterian Did Not Validly Exercise Its Right of First Refusal Because It Failed To Satisfy Conditions Precedent.**

Presbyterian's purported exercise of the ROFR fails for a number of reasons: (1) the Partnership did not form an intent to sell the Property, a precondition to exercise of a right of first refusal under Michigan law; (2) the Lockwood Proposal is not a *bona fide* offer within the meaning of the ROFR because it did not constitute a sincere, good faith and binding offer to purchase the Property, and therefore could not have triggered the ROFR; and (3) permitting Presbyterian to unilaterally exercise the ROFR on the basis of a sham "offer" would be inconsistent with, and defeat, the purposes of the Partnership Agreement and the requirements of the Internal Revenue Code Section 42(i)(7) for which SHF 1050 bargained and made substantial investments.

**1.      The Partnership Did Not Form an Intent To Sell To Lockwood or any Third Party.**

Under Michigan law, "[a] right of first refusal, or preemptive right, is a conditional option to purchase dependent on the landowner's desire to sell." Randolph v. Reisig, 727 N.W.2d 388, 391 (Mich. Ct. App. 2007). This requirement constitutes a fundamental, time-tested distinction between rights of first refusal and option agreements. The holder of an option contract can effectively force a sale of the property for the specified price during the specified period, whereas the holder of a right of first refusal cannot exercise that right to purchase property unless and until the seller decides to sell. Id. Thus, the holder of a right of first refusal is not entitled to enforce that right if the owner does not intend to sell to anyone. See Brauer v. Hobbs, 151 Mich. App. 769, 776, 391 N.W.2d 482, 485 (Mich. Ct. App. 1986) (holder not entitled to specific performance of a right of first refusal where owner did not intend to sell property).

The principle that a right of first refusal cannot be exercised unless the property owner possesses an <u>actual intent to sell</u> is well accepted:

> A right of first refusal is a conditional option which is dependent upon the decision to sell the property by its owner… . Technically the right of first refusal is not an option at all, because it does not require the grantor to offer the property subject to it for sale, ever. It creates a right of preemption, and the right to receive an offer before others do. The only offer involved is one to be made in the future, if and when the property owner reaches an agreement with a third-party purchaser. ***The key to activation of a holder's right of first refusal is mutual willingness to enter into a sale at a specific price satisfactory to both the third party and the seller***.

17 C.J.S. Contracts § 24 (emphasis added).[11]

> *(i)     Defendants Failed to Adduce Evidence of Partnership Intent to Sell*

Here, there is no evidence that the Partnership itself intended to sell the Property to anyone, let alone a specified third party purchaser. The Defendants cannot point to any evidence that they discussed the sale of the Property with the majority owner of the Partnership, SHF 1050, sought a valuation of the Property, obtained an appraisal in order to determine the Property's value, interviewed or listed the Property with any brokers, prepared marketing materials, or otherwise engaged in any other acts that would be natural indicia of a property owner's desire or intent to sell a property.  The only evidence here is to the contrary:  SHF 1050 expressly stated it did not wish to sell.

While the General Partners did solicit the Lockwood Proposal, they simultaneously communicated to Lockwood that they intended to use that proposal as a stalking horse only—as a

---

[11] <u>See also</u>, <u>Miller v. LeSea Broadcasting, Inc.</u>, 87 F.3d 224, 226 (C.A.7, 1996) ("All [a right of first refusal] entitles the holder to do is to match an offer from a third party should the grantor of the option be minded to accept that offer."); <u>Chapman v. Mut. Life Ins. Co. of New York</u>, 800 P.2d 1147, 1150 (Wyo., 1990) ("[W]hen the condition precedent of the owner's intention to sell is met the right of first refusal 'ripens' into an option...."); <u>Riley v. Campeau Homes (Texas), Inc.</u>, 808 S.W.2d 184, 187 (Tex. App., 1991) ("[A] right of first refusal does not give the lessee the power to compel an unwilling owner to sell."); <u>Lin Broad. Corp. v. Metromedia, Inc.</u>, 139 A.D.2d 124, 135, 531 N.Y.S.2d 514, 520 (1988), <u>aff'd</u>, 74 N.Y.2d 54, 542 N.E.2d 629 (1989) ("The right of first refusal, however, is contingent upon the existence of a valid, outstanding contract to a third-party. If there is no such contract, then there is nothing to accept or refuse.").

basis for putting the ROFR before SHF 1050, after which they would terminate the proposal. They even provided Lockwood with advice from their counsel on ways to ensure that the proposal would satisfy legal requirements for exercising the ROFR. Despite this, the Lockwood Proposal failed to satisfy those requirements—it plainly states that Lockwood could terminate for sixty days after acceptance for any reason or no reason. It is difficult to imagine a clearer example of parties expressing an intent *not* to sell.

The notion that Presbyterian can exercise the ROFR without the Partnership's actual intent to sell was soundly rejected by the District Court for the Western District of Washington in <u>Amtax Holdings</u>, a case that, like the case before this Court, involved a partnership formed in connection with the LIHTC Program. There, a general partner sought to exercise its right of first refusal to acquire the partnership's property at the minimum purchase price under Section 42(i)(7) on the basis of a third party letter of intent. The limited partners argued that the letter of intent was not a *bona fide* offer, but was obtained solely for the benefit of the general partner's scheme to exercise its right of first refusal. Unlike the Partnership Agreement in this case, the partnership agreement in <u>Amtax Holdings</u> did not expressly require limited partner consent to market or sell the project to a third party. Nevertheless, the court held that the holder was not entitled to exercise its right of first refusal because it failed to demonstrate that the partnership, as a whole, *formed the requisite intent to sell the property*.

The court in <u>Amtax Holdings</u>, interpreting Washington law on rights of first refusal, which is similar to Michigan law, held that rights of first refusal could only be exercised if the partnership had a "sincere and genuine interest" in selling the property "to a third party." The fact that the general partner did not obtain independent appraisals of the property and never evaluated whether a sale of the properties was in the partnership's best interest was deemed to be evidence of the lack

of sincere intent to sell the properties to a third party. Id., Conclusions of Fact, ¶¶35, 55, 67, 79, 85, Conclusions of Law ¶¶ 8, 14, 20.  Even though the limited partners had "contracted away their consent rights" (unlike in the Partnership Agreement here), the court held that third-party offers must be genuinely "acceptable" to the whole of the partnership to be deemed *bona fide*. Id., Conclusions of Law ¶¶20-21.

Amtax Holdings makes clear that a right of first refusal is not something that the holder can unilaterally exercise for its own benefit whenever it chooses. It may only be exercised where the property owner—the partnership—receives a bona fide third party offer, and where the partnership, including its limited partner, *sincerely and genuinely decides to sell the property*. Those propositions are consistent with the law governing rights of refusal generally, and specifically under Michigan law. But the case also makes clear that the right of first refusal must be viewed in the context of the rights and obligations of all the partners and the partnership as a whole.

### (ii)     SHF 1050's Consent was Required for any Sale

Unlike the agreement in Amtax Holdings, the Partnership Agreement here expressly requires the Limited Partner's written consent before any sale. Ex. 1, § 8.02(b)(i). There is no evidence that SHF 1050—the vast majority owner of the Partnership—ever contemplated, much less agreed in writing, to the sale of the Property. Thus, even if the General Partners could somehow demonstrate that *they* formed a genuine intent to sell the Property, it would be insufficient to satisfy the requirement that the property owner—i.e., the *Partnership*—formed the

- 18 -

requisite intent. In short, the General Partners lacked the power unilaterally to form an *intent* to sell on behalf of the Partnership.[12]

      **2.**      **The Lockwood Offer Is Not *Bona Fide*.**

Defendants' failure to establish the existence of a *bona fide* offer to purchase the Property constitutes an independent basis to grant summary judgment for Plaintiff. Rights of first refusal are to be interpreted narrowly. LaRose Mkt., Inc. v. Sylvan Ctr., Inc., 209 Mich. App. 201, 205, 530 N.W.2d 505, 507 (Mich. Ct. App. 1995). Here, the Partnership Agreement expressly conditions Presbyterian's ROFR on receipt of a *bona fide* offer to purchase the Property. Ex. 1, § 17.03. "*Bona fide* offer" is not a defined term in the agreement. Michigan courts have construed the term "*bona fide*" by reference to its dictionary definition: "Black's Law Dictionary (6th ed. 1990) defines 'bona fide' as '[i]n or with good faith; honestly, openly, and sincerely; without deceit or fraud ... [t]ruly; actually; without simulation and pretense.'" Univ. of Michigan Bd. of Regents v. Dep't of Treasury, 217 Mich. App. 665, 671, 553 N.W.2d 349, 352 (Mich. Ct. App. 1996).

The Lockwood Proposal clearly fails that standard. The uncontroverted evidence establishes that it was always, and only, intended to serve as a pretense for Presbyterian's exercise of the ROFR. When they solicited the proposal, Defendants advised Lockwood that they intended to use it as a basis to put the ROFR before the limited partner (SHF 1050). They provided advice from their legal counsel explaining that the offer needed to be binding in order to satisfy the requirements for exercising the ROFR, and further explaining that once the ROFR was exercised, the offer would be terminated. The Lockwood Proposal ultimately failed to meet those criteria, as

---

[12] To be clear, *none of the partners formed an intent to sell to Lockwood or to any other third party*. The General Partners sought to create the mere *appearance* of an intent to sell as part of a scheme to benefit their affiliate. As noted above, there is no evidence that the General Partners themselves ever intended to conclude any sale to Lockwood— the evidence is to the contrary.

it gave Lockwood a sixty-day, unilateral right to terminate.  Again, it is hard to imagine a clearer case of an offer being insincere, and made with pretense.

### 3.  Giving Effect to Presbyterian's Exercise of The ROFR Would Render the Option Superfluous.

The Partnership Agreement granted Presbyterian both a ROFR and a unilateral Option, both with identical one-year terms beginning at the expiration of the Compliance Period. Ex. 1, Art. 17. The ROFR permitted Presbyterian to purchase at the minimum purchase price, provided that all conditions were satisfied. The Option, on the other hand, permitted Presbyterian an unfettered right to acquire the Property at the ***greater*** of minimum purchase price or the fair market value price of the Property.

Reading these provisions together, if the Partnership decided to sell at the end of the Compliance Period, received a *bona fide* offer, and SHF 1050 consented to the sale to a third party, Presbyterian could exercise the ROFR and purchase for the minimum purchase price, likely below the market price. If the Partnership did not want to sell, Presbyterian could unilaterally force it to do so by exercising its Option, albeit at the fair market price.[13] This balance protects the investments of the partners while increasing the likelihood that the Property will continue to be owned either by the Partnership, or if not, owned by the General Partner and its non-profit affiliate and in either event, will continue as affordable housing after the Compliance Period.

Presbyterian elected not to exercise its Option. Instead, Presbyterian is trying to force the Partnership to sell without having to pay the fair market value price—i.e. combining the automatic nature of the Option with the lower price point of the ROFR. This is impermissible and renders the Option meaningless. If Presbyterian can simply foist a sham offer on the Partnership and then

---

[13] In this manner, Presbyterian was protected in its ability to control the disposition of the Project–either through the ROFR or the Option.  Presbyterian did not attempt to exercise its Option.

compel a sale to Presbyterian at the below-market price over the objections of the 99.99% owner

of the Partnership, then the Option is superfluous. Presbyterian would never willingly pay "the

greater" of the fair market price or the minimum purchase price if it could trigger the ROFR by

simply cajoling someone to make an offer with assurances that it would not actually be accepted.

It is a cardinal principle of contract construction that a document should be read to give

effect to all its provisions and to render them consistent with each other. Mastrobuono v. Shearson

Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S. Ct. 1212, 1219, 131 L. Ed. 2d 76 (1995); Czapp v.

Cox, 179 Mich. App. 216, 220, 445 N.W.2d 218, 220 (1989) ("Every word in the agreement must

be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the

court can discover any reasonable purpose thereof which can be gathered from the whole

instrument."). The Defendants' construction of the Partnership Agreement violates this principle,

and must be rejected.

### 4.   Giving Effect To Presbyterian's Attempted Exercise of the ROFR Is Inconsistent with the Partnership Agreement and Section 42(i)(7).

It is undisputed that the Partnership was formed for the purpose of owning and operating

the Property pursuant to the LIHTC program. The Partnership Agreement reflects a clear intention

to operate the Property pursuant to the LIHTC program, and to enjoy associated tax credits. Despite

this, the Defendants are attempting to enforce what is, in substance, the exercise of a non-existent

below market *option*. While the Safe Harbor allows a LIHTC partnership to grant a right of first

refusal at the minimum purchase price to a qualified non-profit, there is no statutory authorization

to grant Presbyterian a below fair market value option; it is not authorized by the Internal Revenue

Code. To conflate rights of first refusal with options as the Defendants seek to do here is

inconsistent with the Partnership Agreement, violates the Safe Harbor and, if successful, would

cast into doubt all of the tax benefits that SHF 1050 took over time–an outcome that would utterly

frustrate the intentions of the parties when they entered into the Partnership Agreement.[14]

**B.**     **The General Partners Have Breached the Contract and Their Fiduciary Duties to**
         **SHF 1050.**

Pursuant to the Michigan Uniform Limited Partnership Act, a general partner of a limited

partnership "has the liabilities of a partner in a partnership without limited partners to the

partnership and to the other partners." MCL 449.1403(b). Under the Michigan Uniform

Partnership Act, which governs general (not limited) partnerships, partners are accountable to each

other as fiduciaries for each other's interests. MCL 449.21(a). Thus, the General Partners owe

fiduciary duties to SHF 1050, the sole limited partner.

Moreover, pursuant to Section 8.01(a) of the Partnership Agreement, the General Partners

agreed to "take all actions necessary or appropriate to protect the interests of the Limited Partners

[i.e., SHF 1050] and of the Partnership," and to comply with the laws, including the Internal

Revenue Code. Ex. 1, §§ 8.01(a), 8.02(i). The General Partners further agreed to "make all

decisions affecting the business of the Partnership and … manage and control the affairs of the

Partnership [using] best efforts to ***carry out the purpose of the Partnership***." Section 8.01(a)

(emphasis added). The purpose of the partnership is to "acquire, finance, rehabilitate, own,

maintain, operate and sell or otherwise dispose of the [Property], in order to obtain ***long-term***

***appreciation, cash income, Tax Credits*** [under the LIHTC program] ***and tax losses***." Section 3.01

(emphasis added). SHF 1050, as the owner of a 99.99% interest in the Partnership, has a clear and

---

[14] The end of the Compliance Period does not excuse LIHTC partnerships from continuing compliance with the requirements of the "economic substance doctrine," since the tax credits received by the Partnership remain subject to recapture by the Internal Revenue Service for a period thereafter and other tax benefits continue to flow to the Partnership and SHF 1050 after the Compliance Period. The Defendants have taken a position that, if given effect, would mean that Presbyterian should be deemed to have been the owner for tax purposes all along: a position that would negate the tax benefits of the entire transaction the parties have lived with for more than 15 years – in order to better their own position now.  This is flatly contradictory to the express purposes of Partnership set forth in the Partnership Agreement and the Internal Revenue Code.

significant interest in long-term appreciation of the Property, and in continued cash-flow distributions.

Notwithstanding their express obligations, the General Partners have actively aided Presbyterian—an affiliated entity—in its scheme to acquire substantially all of the Partnership's assets for less than fair market value on the basis of a sham offer. Worse still, the General Partners failed to disclose the nefarious manner in which they solicited the Lockwood Proposal to SHF 1050—their partner. If successful, this scheme would reduce the purchase price paid to the Partnership, deprive the limited partner of long-term appreciation, and end cash-flow distributions to the limited partner. In short, the General Partners knowingly engaged in misconduct directly contradictory to the interests of both the Partnership and the limited partner. Consequently, the General Partners have breached the Partnership Agreement, and have breached their fiduciary duties and covenant of good faith and fair dealing.

**C.      Defendants Have Failed To Adduce Evidence Of A Breach By SHF 1050.**

Finally, the Defendants have failed to adduce any evidence tending to establish that SHF 1050 breached the Partnership Agreement. The only breaches alleged by Defendants are that SHF 1050 "withheld consent to" Presbyterian's invalid exercise of the ROFR and filed this lawsuit and a related *lis pendens*. The argument regarding consent is not even internally consistent; Defendants position is that they do not need SHF 1050's consent to conclude the ROFR transaction. More importantly, SHF 1050 was perfectly entitled lawfully to pursue its rights under the Partnership Agreement for all the reasons stated herein.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court grant summary judgment against Defendants as to all counts of Plaintiff's Complaint, all affirmative defenses asserted by Defendants, and Counts I and III of Defendants' Counterclaim, that it grant

such other relief as Plaintiff seeks in its Motion for Summary Judgment, and that the Court grant

such other and further relief as it deems just.

Dated:  July 29, 2020                    Respectfully submitted,

                                         **NIXON PEABODY LLP**

                                         /s/ Keith E. Edeus, Jr.
                                         Keith E. Edeus, Jr.
                                         Nixon Peabody, LLP
                                         70 W. Madison, Suite 3500
                                         Chicago, Illinois 60602

                                         *OF COUNSEL*
                                         Louis E. Dolan, Jr.
                                         Nixon Peabody, LLP
                                         799 9th Street NW, Suite 500
                                         Washington, DC 20001-5327

                                         *Attorneys for Plaintiff SunAmerica*
                                         *Housing Fund 1050, A Nevada Limited*
                                         *Partnership*