UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SUNAMERICA HOUSING FUND 1050, A NEVADA LIMITED PARTNERSHIP, a Nevada limited partnership,<br><br>                                Plaintiff,<br><br>v.<br><br>PATHWAY OF PONTIAC, INC. et al.,<br><br>                                Defendants. | Case No. 2:19-cv-11783-AJT-MKM |

**EXHIBIT 8**

**LOCKWOOD PROPOSAL**

<u>OFFER TO PURCHASE REAL ESTATE</u>

THIS OFFER TO PURCHASE REAL ESTATE is made this 21st day of May, 2019 by LOCKWOOD DEVELOPMENT COMPANY, LLC whose address is 27777 Franklin Road, Suite 1410, Southfield, MI 48034 (the "Purchaser") and is made to PONTIAC ILF LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP whose address is 420 South Opdyke Road, Pontiac, Michigan 48341 (the "Seller").

1. <u>OFFER</u>. Purchaser hereby offers and agrees to purchase from Seller, upon the terms and conditions set forth herein, the apartment complex situated in the City of Pontiac, County of Oakland, State of Michigan, described in the legal description attached hereto as Exhibit "A", commonly known as The Village of Oakland Woods, together with any improvements thereon and appurtenances thereto (the "Property")**.**

2. <u>PURCHASE PRICE; METHOD OF PAYMENT</u>. The purchase price ("Purchase Price") shall be the sum of **FIVE MILLION TWO-HUNDRED FIFTY THOUSAND DOLLARS ($5,250,000.00)**, which shall be paid in the following manner:

(a) Within three (3) business days of the Acceptance Date, Purchaser shall deposit the sum of fifty Thousand Dollars ($50,000.00) (the "Deposit") with First American Title Insurance Company, Bloomfield Hills, MI (the "Title Company"). The Deposit shall become a credit in favor of Purchaser toward payment of the Purchase Price, or it shall otherwise be disbursed to the Purchaser or Seller in accordance with the provisions of this Agreement. Notwithstanding any provisions of this Agreement other than Paragraphs 11 and 12, if this Agreement is not terminated by Purchaser prior to the expiration of the Investigation Period pursuant to the terms of this Agreement, then the Deposit shall become non-refundable to Purchaser.

(b) At the Closing, Purchaser shall pay to Seller the Purchase Price, less the amount of the Deposit and subject to the adjustments and prorations provided for in this Agreement. Payment shall be made as provided herein.

3. <u>TITLE AND SURVEY</u>. Purchaser shall have thirty (30) days from the date that Seller has accepted Purchaser's offer hereunder ("Acceptance") to obtain a commitment for an ALTA owner's title insurance policy, without standard exceptions, dated after the date of Acceptance, in the amount of the Purchase Price, at Seller's expense. Purchaser shall have forty-five (45) days from the date of Acceptance to obtain a survey of the Property (the "Survey"), dated after the Acceptance, showing the locations of all improvements on the Property and any encroachments from or onto adjoining properties, building lines, easements, driveways, roads or highways. The Survey shall be certified to Purchaser, Purchaser's lender (if any) and their respective assigns. The legal description as shown on such survey shall match the legal description used in the Title Commitment and the policy of title insurance issued pursuant thereto, and in the warranty deed and all documents of conveyance to be delivered to Purchaser by Seller under this Agreement.

4. <u>TITLE AND SURVEY OBJECTIONS</u>. Purchaser shall have twenty (20) days from receipt of the later of (i) the Title Commitment, (ii) legible copies of all underlying title documents, and (iii) the Survey (as defined below) to notify Seller of any objections to matters disclosed in the Commitment and Survey (collectively, the "Title Objections"), and if the Seller is unable to cure the

Title Objections within twenty (20) days after receipt of Purchaser's notice of Title Objections after using its best efforts and all due diligence, this offer shall be null and void, the Deposit shall be promptly refunded to Purchaser and upon such refund the parties shall be relieved of any further obligations or liabilities under this Agreement. If the Seller fails to have the Title Objections deleted from the Commitment or discharged within twenty (20) days after receipt of notice thereof from Purchaser, the Purchaser may (a) terminate this Agreement by delivery of written notice to the Seller, whereupon the Deposit shall be returned immediately to the Purchaser, and neither Seller nor Purchaser shall have any further duties or obligations under this Agreement, (b) elect to take title as it then is, subject to the right to deduct from the Purchase Price the funds necessary to satisfy outstanding monetary liens and any special assessments or deferred or delinquent real estate taxes, or (c) extend for up to twenty (20) days the period for Seller to cure such Title Defects, and if such Title Defects are not deleted or discharged during the extended period, Purchaser may then exercise their rights under subparagraphs (a) or (b) above.

     5.    INVESTIGATION PERIOD.

     (a)    The investigation period ("Investigation Period") shall commence on the date of Acceptance and shall end sixty (60) days thereafter. During the Investigation Period Purchaser may make such investigations as Purchaser considers appropriate, in its sole discretion, in order to determine whether the Property is suitable for its purposes. If Purchaser determines for any reason or no reason that it does not wish to acquire the Property, Purchaser may terminate this Agreement by written notice to Seller on or before the expiration of the Investigation Period, whereupon the Deposit shall be returned immediately to the Purchaser, and the parties shall be relieved of any further obligations or liabilities under this Agreement. Purchaser's right of termination under this Paragraph 5 may be exercised for any reason notwithstanding Purchaser's failure to exercise any other right of termination provided for in this Agreement.

     (b)    Seller hereby grants to Purchaser and to Purchaser's agents, consultants and contractors, the right to enter upon the Property at any time to perform such acts, tests and studies as Purchaser considers necessary, including, without limitation, the right to perform feasibility studies, soil tests, borings, engineering studies, environmental studies, surveys, site plan reviews and any other test or study.

     6.    INTENTIONALLY OMMITED

     7.    INTENTIONALLY OMMITED

     8.    REPRESENTATIONS AND WARRANTIES. With the understanding that each of the following representations and warranties are material and have been relied on by Purchaser in connection with this Agreement, the Seller represents and warrants to the Purchaser as of the date hereof and the Closing Date as follows.

     (a)    Seller has the full power and authority to enter into and undertake and perform its obligations under this Agreement, and has taken all necessary corporate, partnership or other action to authorize the same. This Agreement, and the documents to be executed and delivered by Seller in connection with the consummation of this Agreement, are and will be valid and binding in accordance with their respective terms and conditions.

(b) The execution, delivery and performance by Seller of this Agreement is not precluded by, and will not violate, any provisions of any existing law, statute, rule or regulation of the State of Michigan, or any judgment, order, decree, writ or injunction of any court, governmental department, commission, board, bureau, agency or instrumentality, and will not result in a breach of, or default under, any agreement, mortgage, contract, undertaking or other instrument or document to which Seller is a party or by which Seller is bound or to which Seller or any portion of the Property is subject.

(c) To Seller' knowledge, there are no actions, suits or proceedings pending or threatened against or by or the Seller or any other person in any court or before any government agency which relate to or affect the Property or Seller' ability to convey the Property.

(d) To the best of Seller's knowledge and information, there has not been, and prior to the Closing Date will not be discharged, released, generated, treated, stored, disposed of or deposited in, on or under the Property, and to the best of the Seller's knowledge, the Property is free of and does not contain, any "toxic or hazardous substance", PCB's, radioactive materials, flammable explosives or any other hazardous or contaminated substance prohibited, limited or regulated under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") or under any other applicable federal, state or local statutes, regulations and ordinances (collectively the "Environmental Laws"), and there are no substances or conditions in, on or under the Property which may support a claim or cause of action under any of the Environmental Laws. The Property is free and clear of fill materials of any kind and nature and has not been used as a landfill or for similar purposes.

(e) As of the Acceptance Date of this Agreement, there are not now, nor on the Closing Date will there be, nor does the Seller have any reason to believe that there will in the future be, any assessments, charges, paybacks or obligations requiring payment of any nature or description against any portion of the Property which remain unpaid.

(f) No broker is entitled to payment of any commissions or fees, and in the event a claim of payment is made by any broker, such payment, if deemed owed, shall be the obligation of the Seller.

(g) The Seller has not received any notice of, nor is it aware of, any pending action to take all or any portion of the Property, nor has the Seller agreed or committed to dedicate any part of the Property.

(h) The Seller has not received any notice of, nor is it aware of, any litigation or administrative proceeding pending or threatened (including the expiration of any appeal period with respect thereto) relating to the Property or to its use which may adversely affect the validity of any license, permit or other governmental determination or authorization necessary to develop the Proposed Project.

(i) From the Effective Date and through and including the Closing Date or the earlier termination of this Agreement, the Seller agrees to operate the Property consistent with the Seller's operation of the Property prior to the Effective Date, and during such period the Seller agrees to: (i) refrain from transferring any portion of the Property or granting, or permitting the creation of, any easements, liens, claims, charges, mortgages, pledges, security interests, restrictions, or encumbrances upon the Property; (ii) refrain from entering into any contracts or other commitments

burdening the Property without the prior written consent of the Purchaser, which consent may be withheld by the Purchaser in its sole and absolute discretion; (iii) refrain from entering into any lease of the Property without the prior written consent of the Purchaser, which consent may be withheld in the Purchaser's sole and absolute discretion; (iv) keep in effect public liability and hazardous and extended coverage insurance for the Property, which insurance may be in the form of a blanket policy or policies; (v) refrain from constructing any Improvements on, above or below the surface of the Property without the prior written consent of the Purchaser, which consent may be withheld by the Purchaser in its sole and absolute discretion; (vi) refrain from doing, or permitting to be done, any act or deed which would in any manner impair or diminish the value of the Property or the Seller's right or ability to convey the Property to the Purchaser pursuant to this Agreement and (vii) use reasonable efforts to deliver to the Purchaser, promptly after receipt thereof, copies of all notices of violations of any laws, ordinances, regulations, orders, codes or requirements of any governmental authority having jurisdiction over the Property or the use or operation thereof.

(j) The Seller is not a "foreign person" as contemplated by Section 1445 of the Internal Revenue Code. Neither the Seller nor any of its affiliates is a person or entity with whom U.S. persons or entities are restricted or prohibited from doing business under any laws, orders, statutes, regulations or other governmental action relating to terrorism or money laundering (including Executive Order No. 13224 effective September 24, 2001, and regulations of the Office of Foreign Asset Control of the Department of the Treasury) ("Blocked Persons"), and, to the best of the Seller's knowledge, neither the Seller nor any of its affiliates engages in any dealings or transactions with any Blocked Person or is otherwise associated with a Blocked Person.

(k) The Seller has not received notice of and has no knowledge of any existing, pending or threatened building or development moratoria with respect to or affecting the Property or any other adverse information or any fact which would materially adversely affect the Property or the contemplated development or use thereof.

Each of the foregoing representations and warranties will be true and correct as of the date of Closing and shall survive Closing for a period of two (2) years.

9. CLOSING.

(a) Subject to the provisions of this Agreement, the closing of the purchase and sale of the Property (the "Closing") shall take place at a time and place designated by Purchaser which is not more than One-Hundred Twenty (120) days after the Acceptance Date. Purchaser shall give Seller at least fourteen (14) days notice of the time and place of Closing. Purchaser shall have two (2) options to extend the Closing Date by thirty (30) days, per extension, upon notice to Seller with payment to Seller of an extension fee of $25,000 (each, an "Extension Fee") upon exercise of each such option. The Extension Fee shall be non-refundable to Purchaser, except as otherwise expressly provided herein, but applicable to the Purchase Price at Closing. At the Closing:

(i) Purchaser shall pay to Seller the Purchase Price, less the Deposit and any Extension Fees, and plus or minus the net of those adjustments, prorations and credits provided in this Agreement, by certified or cashier's check or federal wire transfer of immediately available funds to Seller's designated financial institution.

        (ii)    Seller shall execute, acknowledge and deliver to Purchaser a Warranty Deed with a Real Estate Transfer Tax Valuation Affidavit attached thereto, conveying marketable title to the Property, free and clear of all liens and encumbrances other than those acceptable to Purchaser.

        (iii)    Seller shall deliver to Purchaser a Bill of Sale transferring to the Purchaser all of the Seller's right, title and interest in any personal property.

        (iv)    An owner's affidavit in the form acceptable by the Title Company to cause the deletion of the standard exceptions.

        (v)    Seller shall cause the Title Commitment to be updated and re-certified as of the Closing Date and shall cause a policy of title insurance, without standard exceptions, to be issued to Purchaser pursuant to such updated Title Commitment, at Seller' expense.

        (vi)    Seller shall deliver to Purchaser an affidavit stating that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445(f)(3).

        (vii)    Seller sand Purchaser shall deliver a closing statement.

        (viii)    Seller and Purchaser shall deliver to the other such other documents or instruments as shall reasonably be required by either party's counsel and/or the Title Company to consummate the transaction contemplated herein and/or to issue the policy of title insurance which, in the opinion of counsel for the party from whom delivery is requested, does not increase such party's liability or decrease such party's rights.

        (ix)    Seller shall deliver to Purchaser immediate possession of the Property, free from the claims of tenants or parties in possession.

    (b)    <u>Closing Costs, Prorations and Adjustments</u>.

        (i)    Seller shall pay or be charged with the following costs and expenses in connection with this transaction:

            (1)    the cost of the title examination, the Commitment, and the premium for the owner's title policy, and the cost of any title endorsement approved Purchaser as a cure for any of Purchaser's Title Objections;

            (2)    state and county transfer taxes and conveyance fees on the sale and transfer of the Property; and

            (3)    the fees and expenses of Seller's attorney(s) and other advisor(s).

        (ii)    Purchaser shall pay the following costs and expenses in connection with this transaction:

            (1)    the recording costs of the Warranty Deed;

            (2)    the costs of the Survey, if obtained;

            (3)    all costs incurred by Purchaser in connection with its due

diligence; and

      (4)    the fees and expenses of Purchaser's attorney(s).

    (iii)    All real estate taxes and assessments which are a lien upon the Property on or prior to the Closing Date (except current taxes which are not yet due and payable) shall be paid by Seller. All current real estate taxes levied against the Property shall be prorated and adjusted between the parties in accordance with the due date method, and shall be paid by Seller or Purchaser as the case may be.

    (iv)    The final readings and final billings for utilities will be made, if possible, as of the Closing Date, in which case the Seller shall pay all such bills as of the Closing Date and no proration shall be made at the Closing with respect to utility bills. Otherwise, a proration shall be made based upon the parties' reasonable good faith estimate and a readjustment made within 30 days after the Closing, if necessary. The Seller shall be entitled to the return of any deposit(s) posted by it with any utility company, and the Seller shall notify each utility company serving the Property to terminate the Seller's account, effective as of the Closing Date.

10.    <u>INDEMNIFICATION</u>. Purchaser shall not be liable or responsible for Pre-Closing Property Claims, and Seller shall indemnify, hold harmless, warrant and defend Purchaser against and from all Pre-Closing Property Claims. Seller shall not be liable or responsible for Post-Closing Property Claims, and Purchaser shall indemnify, hold harmless, warrant and defend Seller against and from all Post-Closing Property Claims. "Pre-Closing Property Claims" are all claims, liabilities, damages and expenses (including reasonable attorney fees) attributable to any occurrence on or relating to the Property or the use, possession, operation or maintenance thereof, prior to the Closing Date and the delivery of possession of the Property to Purchaser, except for matters against which Purchaser has expressly agreed to indemnify Seller in this Agreement. "Post-Closing Property Claims" are all claims, liabilities, damages and expenses (including reasonable attorney fees) attributable to any occurrence on or relating to the Property or the use, possession, operation or maintenance thereof, on or after the Closing Date and the delivery of possession of the Property to Purchaser, unless attributable to Seller' own acts or omissions.

11.    <u>CONDEMNATION OR EMINENT DOMAIN</u>. If any condemnation or eminent domain proceedings for any public or quasi-public purposes, which could result in a taking of any part or all of the Property, are instituted or threatened at any time prior to Closing, Purchaser shall have the option (i) to terminate this Agreement, in which event the Deposit and any Extension Fee(s) paid shall be promptly refunded to Purchaser, and upon such refund, the parties shall be released of all further liability under this Agreement; or (ii) to close the transaction contemplated by this Agreement, in which event the Purchase Price shall not be adjusted and Seller shall assign any condemnation or eminent domain award to Purchaser. Purchaser shall notify Seller of its election of (i) or (ii) above within thirty (30) days of Purchaser's receipt of notice from Seller of any such condemnation or eminent domain proceedings.

12.    <u>DEFAULT.</u> In the event of a default by the Seller hereunder, Purchaser may pursue any remedy available to it at law or in equity (including, but not limited to, specific performance of this Agreement or monetary damages), or Purchaser may, at its option, terminate this Agreement and receive a refund of the Deposit and any Extension Fee(s). In the event of a default by the Purchaser

hereunder, Seller' sole remedy shall be the right to terminate this Agreement and to receive and retain the Deposit and any Extension Fee(s) as liquidated and agreed upon damages, for Purchaser's breach hereof, and Purchaser shall have no further or other liability hereunder. In no event shall Purchaser have any personal liability under this Agreement.

13. NOTICES. All notices from Seller to Purchaser or from Purchaser to Seller shall be deemed duly served (i) when personally served, (ii) three (3) days after deposited in the U.S. certified mail, return receipt requested, or (iii) one (1) day after sent via "overnight" courier service, addressed to such party as follows:

> If to the Seller:  Brian Carnaghi
> Presbyterian Villages of Michigan
> 26200 Lahser Road, Suite 300
> Southfield, MI 48033

> If to the Purchaser:  Mark Lockwood
> Lockwood Development, LLC
> 27777 Franklin Road, Suite 1410
> Southfield, MI 48034

Any designated recipient may change its address by like notice given to the other party.

14. Tax Deferred Exchange (§1031). Seller shall cooperate with Purchaser to the extent that this transaction is part of a tax deferred exchange pursuant to §1031 of the Internal Revenue Code for Purchaser, provided, however that Seller shall not incur any cost, expense, risk or potential liability whatsoever on account thereof. Purchaser shall cooperate with Seller to the extent that this transaction is part of a tax deferred exchange pursuant to §1031 of the Internal Revenue Code for Seller; provided, however, that Purchaser shall not incur any additional cost, expense, risk or potential liability whatsoever on account thereof.

15. MISCELLANEOUS.

(a) Acceptance. This offer is valid for a period of fourteen (14) days from the date first set forth above. This offer shall expire without further action on the part of Purchaser if not accepted by the Seller within such time, whereupon the Deposit shall be immediately refunded to Purchaser by Seller. Seller may accept Purchaser's offer only by signing a counterpart of this Agreement where indicated below and delivering the signed counterpart to Purchaser. If Purchaser's offer is accepted before it expires, this Agreement shall become a binding agreement between Purchaser and Seller. If Purchaser's offer is not accepted before it is terminated or expires, this Agreement shall become void and of no effect, and the parties shall have no obligations to each other than the obligation of Seller to refund the Deposit to Purchaser.

(b) Assignment. Purchaser reserves the right to assign all of its right, title and interest in and to this Agreement or to transfer its interest in the Property to any entity affiliated with Purchaser, and upon notice of such assignment to Seller, all terms and conditions hereof shall apply equally to such assignee as if the assignee was the original party hereto.

(c) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

(d) <u>Successors and Assigns</u>. This Agreement and the provisions hereof shall inure to the benefit of, and be binding upon, the heirs, executors, administrators, personal representatives, successors and permitted assigns of the parties hereto.

(e) <u>Entire Agreement</u>. This Agreement and the Exhibits attached hereto, and all other documents and instruments delivered contemporaneous herewith (all of which are incorporated herein and made a part hereof) constitute the full and entire understanding and agreement among the parties with respect to the transactions herein contemplated and shall supersede all prior understandings, agreements, summaries of terms or letters of intent relating thereto, all of which are hereby declared to be null and void and of no further force and effect. Any modification or amendment to this Agreement shall be effective only if in writing and executed by both Seller and Purchaser.

(f) <u>Headings</u>. The headings of the Sections and paragraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(g) <u>Construction</u>. This Agreement shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared by counsel for one of the parties, it being recognized that both Purchaser and Seller have contributed substantially and materially to the preparation of this Agreement.

(h) <u>Time is of the Essence</u>. All dates and times in this Agreement are of the essence.

(i) <u>Counterparts; Fax</u>. This Agreement may be executed in two or more counterpart copies, each of which shall be deemed an original, and all of which together shall be deemed one in the same instrument. This Agreement may be executed in telecopy (faxed) copies and electronic (PDF) copies and facsimile and electronic (PDF) signatures shall be binding upon the parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have set their hands on the day and year first above written.

**SELLER:**

_____

Dated: _____, 2019

**PURCHASER:**
**Lockwood Development, LLC**

_/s/ Mark A. Lockwood_____
Mark A. Lockwood, Its Manager

Dated: May 21, 2019

9

**EXHIBIT "A"**

**Legal Description**