# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 |  |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: May 10, 2022

Mr. David A. Davenport
Mr. Alexander M. Hagstrom
BC Davenport
105 Fifth Avenue, S.
Suite 375
Minneapolis, MN 55401

Mr. Louis E. Dolan Jr.
Nixon Peabody
799 Ninth Street, N.W.
Suite 500
Washington, DC 20001-4501

Mr. Keith E. Edeus Jr.
Mr. Seth Horvath
Nixon Peabody
70 W. Madison Street
Suite 3500
Chicago, IL 60602

Mr. Larry James Obhof Jr.
Shumaker, Loop & Kendrick
41 S. High Street
Suite 2400
Columbus, OH 43215

Mr. Kevin J. Roragen
Clark Hill
212 E. Cesar E. Chavez Avenue
Lansing, MI 48906

Mr. Mark Duane Wagoner Jr.
Shumaker, Loop & Kendrick
1000 Jackson Street
Toledo, OH 43604-5573

Re: Case No. 21-1243, *SunAmerica Housing Fund 1050 v. Pathway of Pontiac, Inc., et al*
Originating Case No. : 2:19-cv-11783

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

            Yours very truly,

            Deborah S. Hunt, Clerk


            Cathryn Lovely
            Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0100p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

SUNAMERICA HOUSING FUND 1050,
    *Plaintiff-Appellee*,

*v.*

PATHWAY OF PONTIAC, INC.; PV NORTH LLC; PRESBYTERIAN VILLAGE NORTH,
    *Defendants-Appellants*.

No. 21-1243

---

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-11783—Arthur J. Tarnow, District Judge.

Argued: January 28, 2022

Decided and Filed: May 10, 2022

Before: CLAY, GRIFFIN, and STRANCH, Circuit Judges.

---

#### COUNSEL

**ARGUED:** David A. Davenport, BC DAVENPORT, LLC, Minneapolis, Minnesota, for Appellants. Louis E. Dolan, Jr., NIXON PEABODY LLP, Washington, D.C., for Appellee. **ON BRIEF:** David A. Davenport, Alexander M. Hagstrom, BC DAVENPORT, LLC, Minneapolis, Minnesota, Kevin J. Roragen, LOOMIS EWERT PARSLEY DAVIS & GOTTING, P.C., Lansing, Michigan, for Appellants. Louis E. Dolan, Jr., NIXON PEABODY LLP, Washington, D.C., Seth A. Horvath, Keith E. Edeus, Jr., NIXON PEABODY LLP, Chicago, Illinois, Larry J. Obhof, Jr., Mark D. Wagoner, Jr., SHUMAKER, LOOP & KENDRICK LLP, Toledo, Ohio, for Appellee.

No. 21-1243            *SunAmerica Housing Fund 1050 v.*            Page 2
                   *Pathway of Pontiac, Inc., et al.*

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. This case arises from a contractual dispute among partners of a limited partnership formed to operate a low-income housing complex pursuant to the Low-Income Housing Tax Credit (LIHTC) program, 26 U.S.C. § 42. The dispute centers around the "right of first refusal" (ROFR) provision of the Partnership Agreement, which, pursuant to § 42(i)(7) of LIHTC, granted a nonprofit organization the ROFR to purchase the property at a below-market rate following the conclusion of the LIHTC program's compliance period. At issue is whether the conditions precedent to trigger the ROFR have been met. The district court concluded that they were not and granted summary judgment in favor of SunAmerica Housing Fund 1050 (SunAmerica). For the reasons that follow, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. The Low-Income Housing Tax Credit Program

Because the parties' claims are intertwined with LIHTC—a highly complex, unique federal program—some background into the mechanics of LIHTC is needed. The LIHTC program was created as part of the Tax Reform Act of 1986. Pub. L. No. 99-514, § 252, 100 Stat. 2085, 2189–208 (codified as amended at 26 U.S.C. § 42). The program is premised on a model of leveraging private-sector equity to facilitate cash flow into the development and rehabilitation of low-income housing. *See* H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1188 (1989) (giving "tax incentives to private investors . . . is the most appropriate way to achieve th[e] aim" of increasing affordable housing). Through the program, the Internal Revenue Service (IRS) allocates federal tax credits to state housing credit agencies, which then distribute the credits to eligible low-income housing developers.

A typical arrangement under LIHTC proceeds as follows. *See generally* Off. of the Comptroller of the Currency, *Low-Income Housing Tax Credits: Affordable Housing Investment*

No. 21-1243            *SunAmerica Housing Fund 1050 v.*            Page 3
*Pathway of Pontiac, Inc., et al.*

*Opportunities for Banks* 6–9 (Mar. 2014), https://www.occ.gov/publications-and-resources/publications/community-affairs/community-developments-insights/pub-insights-mar-2014.pdf (providing general overview of the mechanics of LIHTC). A low-income housing developer first applies to a state housing credit agency for an award of federal tax credits. If the state agency grants the application, the developer then enters into a limited partnership as a general partner with a private investor as a limited partner. Often, the investor is a bank or another financial entity that has ample annual tax liability of its own that makes acquiring the nonrefundable tax credits a worthwhile investment. The limited partner investor then provides the capital needed to build and develop the low-income housing development. In return, the partnership allocates the vast majority (usually 99.99%) of tax credits and other tax benefits to the investor. These benefits alone provide the investor with a significant return on investment that makes the arrangement attractive and worthwhile to the investor. *See, e.g.,* Ernst & Young, Low-Income Housing Tax Credit Assessment Survey 6 (2009), https://www.nahma.org/wp-content/uploads/files/member/Tax%20Credit/Legislative%20Study_FINAL%20092509.pdf (finding average annual post-tax rate of return on investment to be approximately 10%).

LIHTC allows investors to claim the tax credits through the arrangement annually over a ten-year period. 26 U.S.C. § 42(b)(1)(B). Housing developments that receive LIHTC tax credits must comply with income-eligibility requirements and rent limits for an initial 15-year compliance period, and, for projects that began in 1990 or later, an additional 15-year extended use period. *See id.* § 42(h)(6)(D), (i)(1). During the initial 15-year compliance period, the tax credits can be recaptured by the IRS if the developer violates the LIHTC requirements for the housing developments, such as certain rent or income restrictions, or if the development faces serious physical damage or financial problems. *See id.* § 42(j). Beyond this initial period, however, the IRS cannot recapture any tax credit and the program is then enforced primarily by the state housing agencies. *See id.*

When Congress enacted LIHTC, it was especially concerned about the long-term preservation of the low-income housing developments. Recognizing that nonprofits are generally more likely than for-profit developers to maintain rents at below-market levels beyond the initial compliance period, LIHTC requires that state agencies administering the program

award at least 10% of their tax credits to projects that involve nonprofit developers. *See id.* § 42(h)(5).

In addition, Congress included a carve-out provision to facilitate the continued participation of nonprofit developers by authorizing them to negotiate provisions in the partnership agreements to "buy out" the limited partner investor after the initial 15-year compliance period through a ROFR. *See id.* § 42(i)(7). Section 42(i)(7) is structured as a safe harbor ensuring that none of the tax credits allocated to the investor will be disallowed by the IRS (and thus subject to recapture) because a qualified, tax-exempt nonprofit holds a below-market ROFR to purchase the property. *See id.* By crafting the safe harbor clause in this manner, Congress was careful to distinguish the ROFR from an option that would allow a nonprofit to unilaterally purchase the property for a below-market value. Indeed, if Congress created a below-market option, the IRS could deem the nonprofit entity the "true owner" of the property under the so-called "economic substance doctrine." *See Frank Lyon Co. v. United States*, 435 U.S. 561, 571–73 (1978). Thus, the safe harbor provision operates to protect the incentives of for-profit entities to initially invest in affordable housing projects, while creating a means for nonprofits to regain ownership and continue the mission of affordable housing once those incentives expire.

Facilitation of the investor exit after the expiration of the fifteen-year compliance period is, therefore, crucial to the efficacy of the LIHTC program. The mechanism creates an incentive, as discussed, for nonprofits to participate in the program; nonprofits will be less likely to enter a partnership that includes an investor, if doing so entails a serious risk of an ownership battle after the fifteenth year. Unsurprisingly, industry participants in LIHTC programs have long acted in accordance with that understanding. For example, a study commissioned by the United States Department of Housing and Urban Development found that the vast majority of LIHTC properties remain affordable at the end of the tax credit period, noting that "[b]y far the most common pattern of ownership around Year 15 is for the investor partners to sell their interests in the property to the general partner" or the affiliated nonprofit. Office of Pol'y Dev. & Research, U.S. Dep't of Hous. & Urban Dev., *What Happens to Low Income Housing Tax Credit*

No. 21-1243  *SunAmerica Housing Fund 1050 v.*  Page 5
*Pathway of Pontiac, Inc., et al.*

*Properties at Year 15 and Beyond?* (Aug. 2012), at 15, available at https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf.

### B. Factual Background

In 2001, Presbyterian Village North (Presbyterian), a nonprofit provider of subsidized housing, organized a partnership under the Michigan Revised Uniform Limited Partnership Act (the Partnership) to rehabilitate and operate an affordable housing community, consisting of 150-unit apartments, for the elderly (the Property).

The Partnership followed the same general structure discussed earlier. It originally consisted of Presbyterian and Pathway Senior Living of Michigan (PSL) as General Partners that managed the Property. They applied to the Michigan State Housing Development Authority for housing credits under LIHTC. On June 1, 2002, the Housing Authority granted housing credits to the Partnership. At that point, SunAmerica, a large institutional investor, joined the Partnership as a Limited Partner, owning 99.99% of the Partnership. To facilitate SunAmerica's receipt of its expected tax-related benefits, Presbyterian and PSL withdrew from the Partnership, and Pathway of Pontiac, Inc., and PV North—an affiliate of Presbyterian—entered as General Partners, collectively owning 0.01% of the Partnership.

The General Partners were responsible for managing and overseeing the Property. Consistent with the Limited Partnership Agreement (LPA), SunAmerica made $8,747,378 in capital contributions in exchange for 99.99% of the $11,606,890 in housing credit that had been secured as part of the LIHTC program. The LPA provided that the General Partners "shall make all decisions affecting the business of the partnership." Concerning potential sales of the Property, the LPA stated that:

> The General Partner shall not, without the Consent of [SunAmerica] which Consent may be withheld in its sole and absolute discretion, have any authority to[,] except as provided in Article 17 hereof, sell or otherwise dispose of, at any time, all or any material portion of the assets of the Partnership.

(LPA, R. 1-1, § 8.02(b)(i), PageID 74). The LPA is to be read according to Michigan law.

Case 2:19-cv-11783-TGB-MKM ECF No. 54, PageID.1050 Filed 05/10/22 Page 8 of 20 (8 of 20)
Case: 21-1243     Document: 52     Filed: 05/10/2022     Page: 6

No. 21-1243     *SunAmerica Housing Fund 1050 v.*     Page 6
*Pathway of Pontiac, Inc., et al.*

Under the exception provided in Article 17, Presbyterian retained a ROFR to purchase the Property for an amount less than the fair market value and a unilateral option to purchase the Property for the fair market value (the Option). The ROFR provisions in the LPA are, in relevant parts, as follows:

> 17.01. Grant of Right of First Refusal. Partnership hereby grants to Presbyterian a right of first refusal to purchase the [Property] on the terms and conditions set forth in Sections 17.02, 17.03, 17.04 and 17.05 hereof. Presbyterian's right to exercise the right of first refusal is subject to Presbyterian providing the Partnership with an opinion of counsel reasonably acceptable to [the General Partners] and [SunAmerica] that the exercise of the right of first refusal will not cause any recapture of tax credits to any Partner of Partnership allowable under [LIHTC], that there is no existing Event of Default of General Partner under this Agreement, and that Presbyterian is a qualified nonprofit organization or government agency as required by Section 42(i)(7)(A) of [LIHTC].
>
> 17.02. Term. The term of this right of first refusal shall commence one day after the Compliance Period and shall terminate one year thereafter.
>
> 17.03. Manner of Exercising Right of First Refusal. **Upon receipt of a bona fide offer**, Partnership shall notify Presbyterian in writing of the offer, and Presbyterian shall thereupon exercise its right of first refusal within thirty (30) days, or Partnership may sell the [Property] on the terms as it may determine.
>
> 17.04. Purchase Price.
>
> (a) The purchase price shall be the sum of (i) the principal amount of outstanding indebtedness secured by the [Property] (other than indebtedness incurred within the five-year period ending on the date of the sale), (ii) the IP Loan, the unpaid amount of any Tax Credit Shortfall, and all federal, state, and local taxes projected to be attributable to the sale and the receipt of the above amounts by the Limited Partner, and (iii) all GP Loans, Operating Deficit Loans, and Excess Development Cost payments made by Pathway or Pathway Senior Living of Michigan, LLC or their Affiliates. Notwithstanding any other provision of this Agreement, the proceeds from the purchase described hereunder, shall be distributed to Pathway with respect to proceeds received under clause (iii) hereunder, and to the Investment Partnership with respect to proceeds received under clause (ii) hereunder.

(LPA, R. 1-1, PageID 114) (emphasis added). Both the ROFR and the Option are available for one year following the end of the Compliance period.

In late 2017—about a year before the end of the LIHTC Compliance period—Presbyterian expressed its desire to acquire the Property. SunAmerica responded that it would

prefer to hold off discussions concerning the sale of the Property until the Compliance period lapsed. By early 2019, the General Partners and SunAmerica had discussed the conditions necessary to trigger the ROFR. The Partners disagreed on the proper interpretation of the conditions, and the General Partners expressed their intent to proceed "in accordance with Article 17."

On March 27, 2019, a third-party entity called The Michaels Organization sent the General Partners a letter of intent (LOI), indicating its desire to purchase the Property and stating the terms of its intended offer. On May 2, PV North reached out to another third-party entity called Lockwood Development Company LLC (Lockwood). PV North sent an email to Lockwood indicating that The Michaels Organization had offered to buy the Property. The e-mail stated, among other things, that PV North intended to submit The Michaels Organization's offer to SunAmerica, let them know that another offer was forthcoming (presumably from Lockwood), and that after presenting the offers to SunAmerica, the General Partners intended to "put the ROFR to" SunAmerica.

A few days later, PV North reached out to Lockwood again. This time, PV North's counsel expressed concerns regarding whether the LOI from The Michaels Organization satisfied the ROFR conditions. Specifically, there was concern that the LOI was not sufficiently binding and would not trigger the ROFR. PV North then instructed Lockwood to "consider" this advice when drafting its own LOI.

On May 21, Lockwood submitted its offer to purchase the Property. Among other things, the Proposal contained a clause providing for a 60-day "Investigation Period," during which Lockwood could terminate the agreement "for any reason or no reason." Ten days later, the General Partners told SunAmerica that they had received a bona fide offer, and thus Presbyterian could exercise its rights under the ROFR pursuant to Article 17.

On June 3, Presbyterian wrote to the General Partners, indicating that it was planned to exercise its ROFR. In response, SunAmerica filed this lawsuit against the General Partners and Presbyterian.

## C. Procedural History

On June 14, SunAmerica filed its complaint, seeking declaratory relief as to its rights under 26 U.S.C. § 42, and bringing claims for breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty against the General Partners and Presbyterian. The General Partners filed their answer and asserted counterclaims for breach of fiduciary duty and breach of the partnership agreement. Presbyterian filed a counterclaim for breach of the Partnership agreement as a third-party beneficiary. The district court later dismissed the General Partners' counterclaim for breach of fiduciary duty. SunAmerica timely moved for summary judgment, and the General Partners and Presbyterian responded and filed a cross-motion for summary judgment.[1]

The district court granted summary judgment to SunAmerica on February 4, 2021, reasoning that to exercise the ROFR, two conditions had to be met: (1) the Partnership needed to receive a bona fide offer, and (2) the General Partners needed to manifest a true intention to sell. Based on the record before it, the district court held that the Lockwood offer did not constitute a bona fide offer because it was undisputed that the offer was solicited for the purpose of triggering the ROFR, and because the offer was not legally enforceable. It found that the General Partners lacked any intention to sell the property and merely wanted Presbyterian to be able to exercise the ROFR. It held that neither condition was met, the General Partners breached the contract by exercising the ROFR, and, as a result, the General Partners also breached their fiduciary duties to SunAmerica. The General Partners and Presbyterian timely appealed.

---

[1]In their briefing, the General Partners assert that neither party had the opportunity to fully conduct discovery and that they "intended to take several depositions, including to establish the original meaning and intent of the LPA." They suggest that, as a result, the district court prematurely decided the motion for summary judgment. We disagree. SunAmerica filed its motion for summary judgment one day before the deadline for discovery, and the district court did not issue its order and judgment until well after the deadline for dispositive motions. The General Partners provide no explanation, moreover, as to why they failed to conduct the necessary discovery, request extension of the discovery deadlines, or file a Rule 56(d) affidavit or motion to conduct additional discovery in response to SunAmerica's motion for summary judgment.

## II. ANALYSIS

The main issues on appeal are whether the district court correctly granted summary judgment to SunAmerica when it concluded that: (1) the Lockwood proposal did not constitute a bona fide offer; and (2) the General Partners did not manifest an intent to sell the Property. The parties do not dispute the existence of these two conditions—they disagree over how the conditions should be interpreted under the provisions of the LPA and thus whether they triggered the ROFR.

### A. Standard of Review

We review de novo the court's grant of summary judgment. *Wilson v. Gregory*, 3 F.4th 844, 855 (6th Cir. 2021). In reviewing the district court's grant of summary judgment, we draw reasonable inferences in favor of the nonmoving party. *See id.* The moving party is entitled to summary judgment if it "show[s] the absence of a genuine dispute of material fact as to at least one essential element" of each claim for which it seeks judgment, *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020) (quoting *Romans v. Mich. Dep't of Hum. Servs*, 668 F.3d 826, 835 (6th Cir. 2012)), with a "genuine dispute" existing when the nonmoving party presents "sufficient evidence from which a jury can reasonably find" in its favor, *id.* (quoting *Romans*, 668 F.3d at 835). In our review, we are careful not "to weigh the evidence and determine the truth of the matter," but only "determine whether there is a genuine issue for trial." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1978)). Review of summary judgment is, therefore, "limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue." *Tygrett v. Washington*, 543 F.2d 840, 844 n.17 (D.C. Cir. 1974) (quoting *Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440, 442 (1972)). As a result, any findings of fact in relation to a motion for summary judgment "are not truly findings of fact," *id.*, and "are entitled to no deference." *Garter-Bare Co. v. Munsingwear, Inc.*, 650 F.2d 975, 983 (9th Cir. 1980) (Wallace, J., concurring).

### B. Bona Fide Offer

The LPA explicitly states that the ROFR is triggered upon receipt of a "bona fide offer," but, as the district court correctly noted, the LPA does not define the term. The district court did not clearly state whether it found the term "bona fide offer" to be unambiguous in the context of the LPA. The court, nonetheless, attempted to craft its own interpretation of the plain and ordinary meaning of the terms by determining how Michigan state courts would define "bona fide" and "offer," and employing that interpretation to decide the meaning of the contractual language. The General Partners and Presbyterian contend that the district court erred in interpreting the term "bona fide offer" in the LPA and in the context of LIHTC.

To begin, the term "bona fide offer" has a very specific meaning in the typical ROFR context—i.e., the general "common law" interpretation. In *Imperial Refineries Corp. v. Morrissey*, 119 N.W.2d 872, 874 (Iowa 1963), for example, a lessee was granted a right of first refusal to purchase "at the same price and terms as any bona fide offer for [the] property." At some point, the defendant sought to sell the property, and she initially received a bona fide offer of $45,000 from a third-party. *Id.* at 874, 877. Once the plaintiff indicated that he would exercise his ROFR and match the offer, the defendant received an offer to buy the property from her son for $60,000. *Id.* The Iowa Supreme Court concluded that the son's offer to buy the property was not bona fide because the evidence showed that the son could not meet the onerous payments, and because an "impartial and unbiased purchaser would be unlikely to increase the highest bid by $15,000 or 1/3rd of the amount bid." *Id.* at 878. The court concluded that "[h]olding this to be a bona fide offer would provide a device by which an optioner could render ineffective any first refusal option that he might wish to escape." *Id.* Accordingly:

> For an offer to be considered a bona fide offer, it must be shown with reasonable certainty that [the] offeror possessed the financial ability to comply with the terms of the contract. Proof which indicates that the offeror is operating on a shoestring speculation or attractive probabilities falls short of reasonable certainty.

*Id.* Other courts have assessed whether an offer constituted a bona fide offer to trigger a ROFR on similar grounds. *See Brownies Creek Collieries, Inc. v. Asher Coal Min. Co.*, 417 S.W.2d 249, 252 (Ky. 1967); *David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 146–49 (Md. 2007).

The "bona fide offer" requirement in the ROFR context, thus, operates to protect the holder from being forced to match an outlandish offer, effectively forfeiting the ability to exercise the contractual ROFR. Serious offerors—those willing to put forth an honest offer that the ROFR-holder cannot match—however, can acquire the property despite the rights of the ROFR holder. Under this general "common law" definition of ROFR, the focus of the analysis is on the offeror, and whether its intentions and capabilities establish a serious intention to make an offer to purchase the property.

This understanding of the ROFR varies materially from the one employed by the district court. Both the district court and the "common law" definitions require that a third-party put forth an enforceable offer. The district court, however, focused mainly on whether the offer was solicited (assuming that such action automatically defeated the bona fide element), whereas under the "common law" definition, courts focus on whether the offeror actually intended to comply and was, in fact, capable of following through with a purchase.

In any case, neither definition controls the meaning of the language of the LPA provision at issue here. For that, we must begin with the language of the LPA. The LPA, and specifically its provisions regarding the ROFR, is replete with references to the LIHTC program, 26 U.S.C. § 42. SunAmerica concedes that § 42(i)(7) is "expressly" incorporated into the ROFR provision of the LPA. The LPA and its relevant provisions, therefore, must be understood in the context of the LIHTC program. *See Shay v. Aldrich*, 790 N.W.2d 629, 639 (Mich. 2010) (reading the contract in light of the statute on which it relied to discern the meaning of the language).

As discussed earlier, Congress enacted § 42(i)(7) to create a mechanism through which properties could be transferred to nonprofit organizations to ensure that the housing remains affordable over the long term. It chose to do so by allowing nonprofits to retain a ROFR at a below-market price. *See* 26 U.S.C. § 42(i)(7). During Congress's early discussions of LIHTC, the initial thought was to grant nonprofit organizations an option to purchase the property at a below-market price. S. 980, 101st Cong., § 2(y) (1989) (proposed bill). Lawmakers raised concerns, however, that nonprofit organizations would then be deemed the true owners of the property and the IRS could reclaim the tax credits that were needed to attract private investor

No. 21-1243    *SunAmerica Housing Fund 1050 v.*    Page 12
               *Pathway of Pontiac, Inc., et al.*

limited partners. *See Frank Lyon Co.*, 435 U.S. at 571–73. Congress chose to avoid that problem by enacting a safe harbor for the ROFR, recognizing that a nonprofit could not unilaterally exercise the ROFR in the same way that an option could be exercised.

> As the Massachusetts Supreme Court explained,
>
> Section 42(i)(7) therefore represents a compromise, facilitating the inexpensive transfer of property to nonprofit organizations, but in a way that does the least violence to the traditional rules of tax law. The right of first refusal described in § 42(i)(7) is not a typical right of first refusal, for the obvious reason that it favors the nonprofit organization with a statutorily prescribed, often below-market price. At common law, a right of first refusal allows the holder to purchase the property only by matching the price offered by a third party. In contrast, a right of first refusal under § 42(i)(7) allows the holder to purchase the property at the § 42 price, even if it is far below the third-party offer. Yet, a right of first refusal under § 42(i)(7) is not completely unanchored from its common-law meaning. In enacting § 42(i)(7), Congress relied on the common-law distinction between an option to purchase, which can be unilaterally exercised, and a right of first refusal, which cannot. Congress specifically chose to allow one but not the other, recognizing that a right of first refusal—which cannot be exercised until the owner decides to sell—is for that very reason a less serious curtailment on ownership rights.

*Homeowner's Rehab, Inc. v. Related Corporate V SLP, LP*, 99 N.E.3d 744, 757–58 (Mass. 2018) (internal citations omitted).

The ROFR contemplated by § 42 varies markedly from a ROFR in a "typical" real estate transaction, where the holder of the ROFR can purchase the property if he or she is willing to match the price of a third-party offer. In that context, as explained earlier, the bona fide offer requirement functions to allow the third-party bidder to prevail by offering a high price that cannot be matched, if that offer is, in fact, genuine and made in good faith. The "bona fide" offer requirement, therefore, operates to protect the ROFR holder from an unreasonable offer it cannot beat that would preclude it from exercising its contractual right of first refusal. By contrast, the ROFR in the LPA and under § 42(i)(7) eliminates that possibility because the holder need not match the price. The § 42-established ROFR defines *ex ante* the price at which the nonprofit will purchase the project: the outstanding debt on the property plus any "exit taxes" that result from the sale (sometimes referred to as "debt plus taxes"). *See* 26 U.S.C.

No. 21-1243 *SunAmerica Housing Fund 1050 v.* Page 13
*Pathway of Pontiac, Inc., et al.*

§ 42(i)(7)(B); *AMTAC Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 557 (1st Cir. 2021). In this respect, § 42(i)(7) clearly deviates from the general "common law" definition of ROFRs. To implement the LIHTC, Congress therefore chose to employ a statutorily-specified ROFR that differs from that contemplated under general common law. *See Homeowner's Rehab, Inc.*, 99 N.E.3d at 757–58 (holding that importing common law bona fide offer requirements into a § 42(i)(7) ROFR would "contravene the purpose of § 42(i)(7)"); *Opa-Locka Cmty. Dev. Corp. v. HK Aswan, LLC*, No. 2019-16912-CA-01, 2020 WL 4381624, at *9 (Fla. Cir. Ct. July 7, 2020) (declining to read a bona fide offer requirement into § 42(i)(7) because doing so was not consistent with § 42).

We cannot impress the general common law meaning of bona fide offer on the term as it is used in the LPA that was created to accord with the LIHTC program. To do so would, in essence, contravene the purpose of § 42(i)(7). A practical example reveals why: based on the common law, no reasonable buyer, much less a serious buyer, would offer to buy a property knowing full well that a third-party (here, Presbyterian) would win the deal no matter how good the offer was. In these circumstances, soliciting an offer from a serious buyer that knew the ROFR-holder would exercise its right, as the General Partners did, may well be the *only* way to trigger the ROFR. Wholesale importation of the common law understanding of bona fide offer into the plain language of the LPA, therefore, would make the ROFR provision, as specified in the LIHTC, meaningless. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 468 (Mich. 2003) (declining to construe provision of contract in a way that would render the provision meaningless).

Not only would it contravene Congress's intentions, but it also would contravene the Partners' bargained-for exchange under the LIHTC arrangement. The purpose of the Partnership arrangement was for SunAmerica to reap the benefits from the housing tax credits, not from the Property's long-term appreciation gains. *See, e.g.*, LPA §§ 4.02(a)–(c), (j), 8.02(a) (requiring "best efforts" to produce for SunAmerica's benefit "maximum allowable" Housing Credits). That purpose is further evinced by the fact that SunAmerica's role in the Partnership was meant to be entirely passive. *Id.* at § 10.01 (stating that "No Limited Partner shall take part in the

management or control of the business of the Partnership nor transact any business in the name of the Partnership."). By gaining the tax credit, SunAmerica received its benefit of the bargain.

SunAmerica argues that because the LIHTC program does not mandate that the Property be conveyed to a nonprofit or even require that a ROFR be granted in LIHTC transactions, Congress had no intention to "transfer" the property back to a nonprofit. In addition, SunAmerica contends that the General Partners and Presbyterian's understanding treats the ROFR as a transfer provision, which would also render the Option provision meaningless. Thus, they argue, the common law understanding is appropriate here. But the fact that Congress did not *require* the LIHTC program to transfer the property makes no difference here because § 42(i)(7) specified a certain ROFR—one that allows the parties to negotiate a below-market price for the property— and the parties agreed to incorporate that statutory provision into the LPA. When interpreting such an ROFR provision, we must account for Congress's goals expressed in LIHTC, including its intention to make it easier for nonprofits to regain ownership of the property and continue the availability of low-income housing. Thus, those Congressional intentions confirm that the general common law understanding of bona fide offer cannot be substituted for the ROFR mechanism created by Congress in LIHTC.

To SunAmerica's second point, the bona fide offer requirement operates as a condition precedent that works to distinguish it from the Option in the LPA. The Option could become relevant if *none* of the General Partners, manifested an intent to sell the Property and if they never received a bona fide offer to satisfy that condition precedent. In that circumstance, Presbyterian could still acquire the property via the Option mechanism in the LPA. Recognizing the nature of the statutory ROFR does not transform the ROFR provision into an Option; unlike the Option, the ROFR has additional condition precedents, including the "bona fide offer" requirement.

In light of the foregoing, this court cannot impress the general common law meaning of "bona fide offer" on an ROFR and LPA that expressly incorporated the LIHTC program and thus was created to accord with the LIHTC program. Nevertheless, the undisputed facts in the record do not clearly resolve the meaning of the term—"bona fide offer"—as it is to be construed under

Case 2:19-cv-11783-TGB-MKM ECF No. 54-2, PageID.1059 Filed 05/10/22 Page 17 of 20
Case 1:17-83-TGB-MKM Document 52 Page 10591 Filed 05/20/22 Page 17 of 20 (17 of 20)

No. 21-1243   *SunAmerica Housing Fund 1050 v.*   Page 15
              *Pathway of Pontiac, Inc., et al.*

the LIHTC. We, therefore, find that the term as it is used in the LPA is ambiguous. Accordingly, there are disputed issues of material fact concerning the meaning of the term in the LPA—specifically, how the term "bona fide offer" in the LPA is to be formulated to accord with the Congressional expressions of intent in the LIHTC-promulgated ROFR—and whether that condition has been satisfied. These are matters that are better developed at trial and decided by a jury. *See Klapp*, 663 N.W.2d at 454–55 ("[T]he meaning of an ambiguous contract is a question of fact that must be decided by the jury.").

### C. Intent to Sell

To trigger the ROFR, the General Partners must manifest an intent to sell the property, in addition to the existence of a bona fide offer. The parties do not challenge the district court's conclusion that only the General Partners, and not SunAmerica, needed to manifest such intent. They contest whether that intent to sell must be directed toward a third-party offer.

The General Partners and Presbyterian contend that the district court erred in requiring that the intent to sell be directed at a "third party." Pointing to the legislative history of § 42, they argue that Congress intended the General Partner to manifest only a general "willingness to sell" for the ROFR to be triggered. Further, requiring intent to sell to a third-party offering a fair market value, they contend, would make little sense because the Partnership knows that a bona fide offer would trigger the ROFR—and so, "the § 42 ROFR would paradoxically never be triggered." SunAmerica argues that "a right of first refusal cannot be exercised unless the property owner possesses an *actual genuine intent to sell to a third party*." It relies on a distinction between an "option" and a true ROFR—the latter of which requires a third-party offer.

The arguments of both parties are correct, in some respects. Based on Congress's intent for the LIHTC program, § 42(i)(7) only requires an intent to sell generally and does not, in and of itself, require the existence of a bona fide offer. *See Homeowner's Rehab, Inc.*, 99 N.E.3d at 757–58 (rejecting the argument that Congress intended to import a bona fide offer requirement into a § 42(i)(7) ROFR); H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1195 (1989) (describing § 42(i)(7) as a right to "purchase the building, for a minimum price, should the owner

decide to sell (at the end of the compliance period).").  But here the language of the LPA implementing the LIHTC program explicitly requires that a bona fide offer be on the table to trigger the ROFR.  Under any definition of bona fide offer, the offer must come from a third party, and it therefore follows that SunAmerica's argument is correct in some sense:  there must be an intent to sell to a third party.

But the General Partners and Presbyterian are also correct.  It cannot be the case that knowledge of the ROFR holder's intention to exercise that right if a third party makes an offer would defeat the willingness to sell.  That conclusion would render the ROFR provision meaningless because the General Partners' knowledge that the ROFR holder wants to exercise the provision would mean that the General Partners could never manifest a true intention of selling to a third party.

Based on the record and the plain language of the provision, then, the General Partners must have a general intent to sell the property; indeed, they need an offer on the table from a third-party.  But the intent to sell to the nonprofit if the ROFR procedure is invoked—the willingness to comply with the ROFR provision—does not defeat the LPA-required intent to sell the property.

Applying that definition here, the district court erred in concluding that the evidence "overwhelming[ly]" showed that the General Partners did not intend to sell.  The district court relied on e-mails indicating the General Partners "intend[ed] to proceed in accordance with Article 17," but pointed to no evidence showing that the General Partners *never* had an intent to sell or entertain third-party offers.  In some sense, the two offers that they did receive—and the fact that they solicited at least one of those—would seem to suggest the opposite:  they did intend to sell or entertain third-party offers.  In any case, summary judgment is generally not appropriate when resolving a dispositive issue requires a determination of intent or state of mind.  *See Mahcronic v. Walker*, 800 F.2d 613, 617 (6th Cir. 1986).  The record contains a genuine dispute of material fact—whether the General Partners had the requisite intent to trigger the ROFR.  Accordingly, we reverse the district court's grant of summary judgment on the issue and remand for resolution of this factual issue at trial.

No. 21-1243	*SunAmerica Housing Fund 1050 v.*	Page 17
*Pathway of Pontiac, Inc., et al.*

**D. Breach of Fiduciary Duty**

The district court also concluded that because the General Partner Defendants breached the LPA, they also breached their fiduciary duty to SunAmerica. Because this claim is intertwined with the breach of contract claim—as to which we reverse the district court—we also reverse and remand the breach of fiduciary duty claim.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment to SunAmerica and **REMAND** the case to the district court for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-1243

SUNAMERICA HOUSING FUND 1050,

    Plaintiff - Appellee,

v.

PATHWAY OF PONTIAC, INC.; PV NORTH LLC; PRESBYTERIAN VILLAGE NORTH,

    Defendants - Appellants.

**FILED**
May 10, 2022
DEBORAH S. HUNT, Clerk

Before: CLAY, GRIFFIN, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

                            **ENTERED BY ORDER OF THE COURT**

                            Deborah S. Hunt, Clerk